**OUTTEN & GOLDEN LLP**
Ossai Miazad
Christopher McNerney
Elizabeth V. Stork
685 Third Avenue, 25th Floor
New York, New York 10017

## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NEW YORK

| | |
|---|---|
| GEORGE MANDALA and CHARLES BARNETT, individually and on behalf of all others similarly situated, | Case No. _18-cv-6591_ |
| Plaintiffs, | CLASS ACTION COMPLAINT |
| v. | Jury Trial Demanded |
| NTT DATA, INC., | |
| Defendant. | |

Plaintiffs George Mandala ("Mandala") and Charles Barnett ("Barnett") (together, "Plaintiffs"), individually and on behalf of all others similarly situated, allege, upon personal knowledge as to themselves and upon information and belief as to other matters, as follows:

## SUMMARY OF THE CLAIMS

1.      NTT Data, Inc. ("Defendant" or "NTT"), one of the largest information technology ("IT") services providers in the world, rejects job applicants with criminal records, even where the criminal history has no bearing on the applicant's ability to perform the job. Because this practice perpetuates gross racial disparities in the criminal justice system, it is unlawful under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq* ("Title VII").

2.      Plaintiffs allege that Defendant has in the past and continues to utilize a job applicant screening process that systematically eliminates qualified African American applicants based on their race, color or national origin in violation of Title VII.   Plaintiffs further allege that NTT violated their rights and the rights of those similarly situated under the New York Human Rights Law, N.Y. Exec. Law § 290 *et seq.* ("NYHRL"), Article 23-A of the New York State Correction Law, N.Y. Corr. Law § 750 *et seq.* ("Correction Law"), and the New York State Fair Credit Reporting Act ("NY FCRA"), N.Y. Gen. Bus. Law § 380 *et seq*.

3.      Plaintiffs sought employment at NTT, were qualified for the jobs for which they applied, and received offers of employment from NTT.  NTT withdrew each of Plaintiffs' job offers, however, due to their past criminal history.

4.      Plaintiffs were denied job opportunities based on NTT's policy and practice of denying job opportunities to individuals with certain criminal convictions including felonies (or similar criminal classifications).

5.      In addition, NTT's denial of employment to job applicants based on criminal history, without first evaluating the factors laid out in the Correction Law, is a violation of the NYHRL.

6.      Because African Americans interact with the criminal justice system at much higher rates than Whites, NTT's policy and practice of denying individuals with convictions job opportunities creates a disparate impact on African Americans in violation of Title VII.

7.      NTT's policy and practice of denying individuals with criminal convictions job opportunities is not "job related . . . and consistent with business necessity," 42 U.S.C. § 2000e-2(k)(1)(A)(i), because it does not have a "demonstrable relationship to successful performance of

the jobs for which [the policy] used," *Griggs v. Dukes Power, Co.*, 401 U.S. 424, 431(1971), and is otherwise an invalid screening device rendering it improper under Title VII and the NYHRL.

8.     Through this lawsuit, Plaintiffs will show that the conduct outlined in their Complaint constitutes unlawful discrimination and clearly violates the stated public policy of New York and the Unites States to remove barriers to employment for thousands of persons who have paid the penalties for any crimes they may have committed.

## JURISDICTION AND VENUE

9.     This Court has jurisdiction over Plaintiffs' Title VII claims pursuant to 28 U.S.C. § 1331.  This Court also has jurisdiction over Plaintiffs' NYHRL and NY FCRA claims pursuant to 28 U.S.C. § 1367 (supplemental jurisdiction).

10.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events and omissions giving rise to the claims alleged herein occurred in this District.

11.     This Court is empowered to issue a declaratory judgment pursuant to 28 U.S.C. §§ 2201 and 2202.

12.     Plaintiffs have exhausted their administrative remedies and complied with all statutory prerequisites to their Title VII claims.  Plaintiff Mandala filed a charge of discrimination, individually and on behalf of individuals similarly situated with the Equal Employment Opportunity Commission ("EEOC") on June 2, 2017.  By notice dated May 17, 2018, the EEOC issued a Notice of Right to Sue.  This Complaint is filed within ninety days of the Notice of Right to Sue.  Under the Second Circuit's application of the single-filing rule, Mr. Barnett may "piggy-back" on Mr. Mandala's previous filing, because Mr. Mandala's EEOC charge relates to the same claims that Mr. Barnett asserts.

## PARTIES

**Plaintiffs**

13.     Plaintiffs and the proposed Class Members they seek to represent are each "persons," "individuals," "consumers," and "applicants for employment" within the meaning of the NYHRL, the NY FCRA and Title VII.

14.     Plaintiffs have criminal convictions.

15.     Plaintiff Mandala is a resident of Rochester, New York.

16.     Plaintiff Mandala is African American.

17.     Plaintiff Barnett is a resident of Frankfort, Kentucky.

18.     Plaintiff Barnett is African American.

**Defendant**

19.     NTT is a global IT services company that employs over 110,000 people worldwide, including approximately 18,000 employees in North America.

20.     At all relevant times, NTT has been an employer as defined by Title VII and the NYHRL, and a private employer as defined by the Correction Law.

21.     At all relevant times, NTT has been aware of the requirements of the NY FCRA, and yet has disregarded those requirements.

22.     At all relevant times, NTT has been a "person, firm, corporation or other entity" requesting "consumer reports" of Plaintiffs and proposed Class Members for "employment purposes" and have taken "adverse action" against Plaintiffs and similarly situated applicants, as defined by the NY FCRA, for example by preventing them from explaining or challenging their rejections of employment.  These adverse actions have been based wholly or in part on those consumer reports.

4

## STATEMENT OF FACTS

**George Mandala**

23.     In or around January or February of 2017, Mr. Mandala applied for a job as a Salesforce Developer with NTT.

24.     Mr. Mandala had two telephone interviews with NTT employees, during which the NTT employees asked him technical questions related to the position and he answered competently, based on his years of applicable work experience.

25.     Mr. Mandala successfully completed his two telephone interviews and supplied NTT with professional references.

26.     NTT subsequently told Mr. Mandala that he would be working at a company based in Wellesley, Massachusetts, though he would be working remotely based out of his home in Rochester, New York.

27.     NTT sent Mr. Mandala a formal offer letter on March 22, 2017, signed by Patricia Price, a Senior Recruiter with NTT, offering Mr. Mandala a job as an Application Software Development Senior Principal Consultant.

28.     The offer letter stated that NTT's "management team was impressed with [Mr. Mandala's] credentials and experience," and that Mr. Mandala would "work out of NTT DATA's remote home office to begin on April 3, 2017."

29.     Mr. Mandala accepted NTT's offer of employment via correspondence dated March 23, 2017.

30.     Mr. Mandala authorized a background check pursuant to NTT's policy, and NTT obtained a criminal background check on Mr. Mandala from a consumer reporting agency.

31.     On March 30, 2017, Mr. Mandala attended a pre-orientation telephone call with

other new employees.

32.     On the same day, Mr. Mandala received an e-mail from Patricia Price, asking "Could you give me a call to discuss your background check?"

33.     Mr. Mandala called Ms. Price and Ms. Price informed Mr. Mandala that NTT had a policy not to hire persons with felonies on their records.

34.     Mr. Mandala then received a letter from NTT, signed by Ms. Price, dated April 6, 2017, which stated that NTT was withdrawing Mr. Mandala's job offer, and that "[t]his action was influenced by information contained in a consumer report, made at [NTT's] request and provided by . . . ASURINT[.]"

35.     During the interview process, and afterwards, NTT never sought or considered information from Mr. Mandala which would enable it to fully evaluate the factors laid out in Section 753 of the Correction Law.  For example, after reviewing Mr. Mandala's background check, NTT never asked Mr. Mandala for information regarding the circumstances of his convictions or evidence of Mr. Mandala's rehabilitation or good conduct.  Furthermore, NTT's action was indicative of a policy and practice of denying job opportunities to individuals with criminal convictions, which does not permit NTT to fully evaluate the factors laid out in Section 753 of the Correction Law.

36.     NTT never provided Mr. Mandala with a copy of Article 23-A of the Correction Law as required by N.Y. Gen. Bus. Law § 380-g(d).

37.     On June 2, 2017, Mr. Mandala filed a Charge of Discrimination with the EEOC based on NTT's denial of employment.  Ms. Mandala's Charge was filed with the EEOC's Buffalo, New York office.  On May 17, 2018, the EEOC issued Mr. Mandala a Notice of Right to Sue.

**Charles Barnett**

38.     In or around July 2017, NTT contacted Mr. Barnett regarding an opportunity to work on a contract with the Commonwealth of Kentucky as a web developer.  Mr. Barnett said that he would be interested in the position and signed a "Right to Represent" form agreeing that NTT could present him to the Commonwealth of Kentucky for the position.

39.     Mr. Barnett understood that the job to which he applied would involve designing websites for the Kentucky Department of Education, though he would be an employee of NTT.

40.     After several phone calls with Katie Sargent, an NTT recruiter who collected Mr. Barnett's application information, Mr. Barnett had a phone interview with Mark McChesney, the NTT project director, and another NTT employee, Fonyam Atanga.

41.     The interview was successful and Mr. Barnett advanced to the next round.

42.     Mr. Barnett had an in-person interview with NTT employee Mr. Atanga, and this interview was also successful.

43.     After Mr. Barnett's in-person interview, Ms. Sargent told Mr. Barnett he had received an offer of employment, and she sent Mr. Barnett an offer of employment via email, which Mr. Barnett accepted.

44.     Mr. Barnett authorized a background check pursuant to NTT's policy.

45.     NTT obtained a criminal background check on Mr. Barnett from a consumer reporting agency.

46.     After the background check was completed, Ms. Sargent informed Mr. Barnett via phone that NTT was withdrawing its offer of employment to Mr. Barnett as a result of Mr. Barnett's convictions.

47.     NTT provided Mr. Barnett with a "Right-To-Represent" contracts for other open

positions, which he signed.

48.     Mr. Barnett subsequently sought to apply for other positions with NTT, but several weeks after he sought to apply for these positions, Ms. Sargent informed Mr. Barnett that NTT would not submit Mr. Barnett's profile for other positions because of his felony convictions.

49.     Notably, after the convictions at issue but prior to applying to NTT, Mr. Barnett was an employee of the Commonwealth of Kentucky for approximately four years, performing IT work and project coordination as an Administrative Specialist.

50.     Also after the convictions at issue and prior to applying to NTT, Mr. Barnett achieved a Masters of Science in Computer Science Technology and an Associate degree in Applied Science/Computer Programming.  Previously, Mr. Barnett had also obtained a Bachelor of Science degree in Agricultural Economics.

51.     During the interview process, and afterwards, NTT never sought or considered information from Mr. Barnett regarding the circumstances of his convictions or evidence of Mr. Barnett's rehabilitation or good conduct.  Furthermore, NTT's action was indicative of a policy and practice of denying job opportunities to individuals with criminal convictions, a policy and practice that does not permit NTT to consider the factors outlined by the 2012 EEOC Enforcement Guidance on the Consideration of Arrest and Conviction Records in Employment Decisions under Title VII of the Civil Rights Act of 1964.

**Factual Allegations Common to All Class Members**

*Title VII Claim*

52.     NTT's policy and practice of denying job opportunities to individuals with non-job related convictions had and continues to have a significant and detrimental impact on African

Americans, based on their race, color and/or national origin, as compared to White applicants. African Americans are arrested and incarcerated for crimes at higher rates than Whites, relative to their share of the national population.[1]

53.     As of 2010, 40% of U.S. prisoners were African American, although African Americans represented only 13% of the overall U.S. population.[2]  Projections based on recent trends in incarceration estimate that one out of every three African American males born today will go to prison, compared to just one out of every seventeen White males.[3]

54.     Compounding the racial disparities in criminal arrests and convictions is proven employer bias against people with criminal records.  For example, audit studies conducted by researchers at Harvard and Princeton Universities found that African Americans with criminal records were particularly disadvantaged in the job market when compared to Whites with criminal records.[4]

---

[1]     *See* U.S. Department of Justice, Federal Bureau of Investigation, *Crime in the United States 2016*, Table 21A (Arrests by Race and Ethnicity), *available at* https://ucr.fbi.gov/crime-in-the-u.s/2016/crime-in-the-u.s.-2016/topic-pages/tables/table-21 (showing 26.9% of arrests are of Black or African American individuals, while 69.6% of arrests are of White individuals); U.S. Census Bureau, *Quick Facts, United States* (2017), *available at* https://www.census.gov/quickfacts/fact/table/US/PST045217 (showing Black or African American individuals make up approximately 13.4% and Whites make up 76.6% of the United States population).  *See also EEOC Enforcement Guidance on the Consideration of Arrest and Conviction Records in Employment Decisions Under Title VII of the Civil Rights Act of 1964*, at 9-10 (April 25, 2012) (national data showing Blacks arrested and convicted at higher rates than Whites "supports a finding that criminal record exclusions have a disparate impact based on race and national origin").

[2]     Leah Sakala, *Breaking Down Mass Incarceration in the 2010 Census: State-by-State Incarceration Rates by Race/Ethnicity*, Prison Pol'y Initiative (May 28, 2014), http://www.prisonpolicy.org/reports/rates.html.

[3]     Marc Mauer, *Addressing Racial Disparities in Incarceration*, 91 Prison J. 87S, 88S (2011), *available at* https://www.sentencingproject.org/wp-content/uploads/2016/01/Addressing-Racial-Disparities-in-Incarceration.pdf.

[4]     Devah Pager et al., *Discrimination in a Low-Wage Labor Market: A Field Experiment*, 74 Am. Soc. Rev. 777, 785-86 (2009); Devah Pager et al., *Sequencing Disadvantage: Barriers to Employment Facing Young Black and White Men with Criminal Records*, 623 Annals Am. Acad.

55.     Any selection device that has a disparate impact must have a "manifest relationship to the employment in question." *Griggs v. Duke Power Co.*, 401 U.S. 424, 433 (1971).  It must "be shown to be necessary to safe and efficient job performance to survive a Title VII challenge." *Dothard v. Rawlinson*, 433 U.S. 321, 331 n.14 (1977).  A criminal record exclusion is valid only when it "operates to effectively link specific criminal conduct, and its dangers, with the risks inherent in the duties of a particular position." *EEOC Enforcement Guidance on the Consideration of Arrest and Conviction Records in Employment Decisions Under Title VII of the Civil Rights Act of 1964*, at 14 (April 25, 2012).

56.     NTT cannot show business necessity with respect to its policies and practices as to screening applicants with criminal histories, including any blanket exclusions of individuals with felony convictions.

57.     NTT cannot show that its applicant screening policies and practices bear a relationship to the employment in question.

58.     For example, having a felony conviction is not an accurate proxy for determining whether an applicant would be able to perform the duties of the job.  Upon information and belief, there are no reliable studies or empirical data to suggest that applicants with criminal records are more likely to engage in terminable offenses.[5]

59.     NTT's policy and practice of denying employment to individuals with criminal histories, including felony convictions, is far too over-inclusive to meet the standards of job-relatedness and consistency with business necessity.

---

Pol. & Soc. Sci. 195, 199 (2009); Devah Pager, *The Mark of a Criminal Record*, 108 AM. J. SOC. 937, 955-61 (2003).

[5]     *See, e.g.,* Ian B. Petersen, *Toward True Fair-Chance Hiring: Balancing Stakeholder Interests and Reality in Regulating Criminal Background Checks*, 94 Tex. L. Rev. 175, 187-88 (2015).

60.     Upon information and belief, NTT does not have a process or policy to determine whether individuals convicted of crimes have made positive changes in their lives such that they no longer pose a risk to others.  NTT's policy and practice of banning individuals with certain convictions from employment has effectively foreclosed applicants' abilities to provide proof of rehabilitation, such as documentation of successful participation in drug treatment programs, educational achievements or relevant employment, or to submit certificates of relief from disabilities, which in many states create a presumption of rehabilitation.

61.     Upon information and belief, the policy and practice of rejecting individuals with certain convictions has created significant barriers to employment that excluded many properly qualified persons, including disproportionate numbers of African American applicants.  There are less discriminatory alternatives that would have better achieved any legitimate business purpose.

62.     Less discriminatory alternatives include, but are not limited to: (1) considering all applicants with a record of conviction for a crime that by its nature does not pose a legitimate threat to the public safety or risk of workplace misconduct; and (2) giving each individual with a conviction a meaningful opportunity to demonstrate that he or she does not present a current threat, including providing evidence of rehabilitation, an explanation of events leading to the conviction, or information regarding other mitigating factors.

### The NYHRL Article 23-A Claim

63.     The NYHRL states "[i]t shall be an unlawful discriminatory practice" to "deny . . . employment to any individual" based on a criminal conviction "when such denial is in violation of the provisions of article twenty-three-A of the correction law."  N.Y. Exec. Law § 296(15).

64.     Article 23-A of the Correction Law prohibits an employer from denying

employment to any person by virtue of their criminal record unless the employer can meet its

burden of demonstrating one of two exceptions:

(1) there is a direct relationship between one or more of the previous criminal offenses and the specific license or employment sought or held by the individual; or

(2) the issuance or continuation of the license or the granting or continuation of the employment would involve an unreasonable risk to property or to the safety or welfare of specific individuals or the general public.

N.Y. Correct. Law § 752.

65.     Article 23-A of the Correction Law further requires that before taking any adverse

action on the basis of a criminal record, the employer must consider all the following factors:

(a) The public policy of this state, as expressed in this act, to encourage the licensure and employment of persons previously convicted of one or more criminal offenses.

(b) The specific duties and responsibilities necessarily related to the license or employment sought or held by the person.

(c) The bearing, if any, the criminal offense or offenses for which the person was previously convicted will have on his fitness or ability to perform one or more such duties or responsibilities.

(d) The time which has elapsed since the occurrence of the criminal offense or offenses.

(e) The age of the person at the time of occurrence of the criminal offense or offenses.

(f) The seriousness of the offense or offenses.

(g) Any information produced by the person, or produced on his behalf, in regard to his rehabilitation and good conduct.

(h) The legitimate interest of the public agency or private employer in protecting property, and the safety and welfare of specific individuals or the general public.

N.Y. Correct. Law § 753.

66.     It is impossible for an employer to conduct the legally required evaluation of all

Article 23-A factors without first engaging in a conversation with the prospective candidate

before making an employment determination.  *See* N.Y. Correct. Law § 753.

67.     It is impossible for an employer to conduct the legally required evaluation of all

Article 23-A factors if the employer operates with a policy or practice of denying employment to

all individuals with criminal records, or with specific types of criminal convictions.  *See* N.Y.

Correct. Law § 753.

68.     For this reason, among others, the NYHRL forbids companies from denying

employment simply because a job applicant has a criminal record.  Instead, companies must

engage in an evaluation of the factors outlined in the Correction Law before making an

employment determination.

69.     Despite knowing of its obligations under the NYHRL, NTT has denied, and

continues to deny, employment to job applicants with certain convictions, without undertaking

the inquiry required by New York Law.

70.     For example, although not a subject to this suit, the New York City Commission

on Human Rights' guidance about the recently enacted Fair Chance Act is helpful in illuminating

the Article 23-A analysis.  *See* https://www1.nyc.gov/site/cchr/law/fair-chance-act.page.  That

guidance explains that "[e]mployers must carefully conduct the Article 23-A analysis."  *Id.*  This

means that "[o]nce an employer extends a conditional offer and learns of an applicant's criminal

record, it must solicit the information necessary to properly consider each Article 23-A factor,

including the applicant's evidence of rehabilitation."  *Id.*  By denying employment to job

applicants before soliciting such information, NTT violated Article 23-A and therefore violated

the NYHRL.

71.     NTT has acted consciously in breaching its known duties and depriving Plaintiff

Mandala and other job applicants of their rights under the NYHRL and the Correction Law.

72.     At a minimum, NTT's conduct has been reckless in failing to make an appropriate inquiry to ascertain its obligations under the NYHRL and the Correction Law.

73.     The ability to find employment is an essential aspect of reentering society for people with criminal histories.  Recidivism declines when those individuals have viable employment prospects and other stabilizing resources in their communities.  NTT's policy of discriminating against individuals with criminal records frustrates such public policy objectives.

***The NY FCRA Claim***

74. The NY FCRA requires that:

> When a consumer reporting agency provides a consumer report that contains criminal conviction information, permitted by paragraph one of subdivision (a) of section three hundred eighty-j of this article, to a user, the person, firm, corporation or other entity requesting such report shall provide the subject of such report a printed or electronic copy of article twenty-three-A of the correction law governing the licensure and employment of persons previously convicted of one or more criminal offenses.

N.Y. Gen. Bus. Law § 380-g(d).

75.     "The public policy of [New York] state, as expressed in [its Correction Law], [is] to encourage the licensure and employment of persons previously convicted of one or more criminal offenses."  N.Y. Correct. Law § 753(1)(a).

76.     Consistent with the public policy of New York, in 2008 the New York Legislature added Section 380-g.

77.     The purpose of this requirement is to inform individuals with criminal records of their rights and remedies under the law and for employers to be informed of their obligations under the law in order to avoid illegal discrimination.

78.     For example, the New York State Assembly's Memorandum in Support of the Legislation stated, in part: "Once [criminal history information] is obtained, employers have

repeatedly dismissed qualified applicants and terminated employees based solely on their criminal histories, even if there is no direct relationship between the criminal offense(s) and the job and no unreasonable risk to the safety to the public or property, the criteria upon which an employer can deny a job to an applicant or terminate an existing employee.  The enactment of this bill will help ensure that employers and prospective employees are informed about the mandates of Article 23-A of the correction law. This will help to avoid illegal discrimination against persons with a criminal conviction."  N.Y.S. Assembly's Memorandum in Support of the Legislation, Bill No. 10288A, 2007-2008 Term (emphasis added).

79.     Upon information and belief, NTT has routinely and systematically failed to provide Plaintiff Mandala and other job applicants with a copy of Article 23-A of the Correction Law, as required under the law.

80.     This has caused Plaintiff Mandala and other job applicants concrete harm because it has denied them an opportunity to learn of their rights under Article 23-A of the Correction Law and created the risk of future harm.

81.     For example, as discussed above, under the Correction Law, NTT cannot deny employment to an individual "when such finding is based upon the fact that the individual has previously been convicted of one or more criminal offenses, unless" NTT shows "a direct relationship" between the conviction(s) and the job or "an unreasonable risk to property or to the safety or welfare of specific individuals or the general public."  N.Y. Correct. Law § 752.

82.     Instead, NTT must consider all eight factors laid out in Section 753 of the Correction Law and whether the individual has a certificate of relief from disabilities or a certificate of good conduct.  N.Y. Correct. Law § 753.

83.     In turn, Section 754 of the Correction law allows an individual "previously

convicted of one or more criminal offenses" to request a written explanation for the employer's denial of employment, which the employer is required to provide within 30 days of the request— providing applicants with crucial information as to the basis for the job denial.  N.Y. Correct. Law § 754.

84.     NTT's failure to provide Plaintiff Mandala and other job applicants with a copy of Article 23-A of the Correction law denied them information about their legal right to be free from discrimination and remedies for that discrimination once it had occurred.

85.     NTT's failure to provide this information also created the risk that Plaintiff Mandala and other job applicants would fail to seek to vindicate their right to be free from discrimination—either from NTT's denial of employment or the denial of employment by another employer.

86.     NTT's violation of the NY FCRA frustrates New York's public policy to increase the employment of persons with criminal convictions.  *See* N.Y. Correct. Law § 753(1)(a).

87.     NTT has acted willfully in violating the requirements of the NY FCRA.  NTT knew or should have known about its obligations under the NY FCRA.  These obligations are well-established by the longstanding and plain language of the NY FCRA.

88.     Despite NTT's awareness of its legal obligations, it has acted recklessly and willfully in breaching its known duties and depriving Plaintiff Mandala and other job applicants of their rights under the NY FCRA.

## CLASS ACTION ALLEGATIONS

89.     Plaintiffs bring this case as a proposed Class action pursuant to Fed. R. Civ. P. 23 on behalf of themselves and three classes of persons (collectively, the "Classes").

90.     Plaintiffs bring this class action pursuant to Federal Rules of Civil Procedure 23(a), (b)(2), and/or (c)(4) seeking liability-phase injunctive and declaratory relief.

91.     Plaintiffs also bring this class action pursuant to Federal Rules of Civil Procedure 23(a), (b)(3) and/or (c)(4) seeking backpay, monetary damages, and other make-whole relief.

92.     Plaintiffs reserve the right to amend the definition of the Classes based on discovery or legal developments.

93.     Plaintiffs assert the First Cause of Action against NTT on behalf of the "Title VII Disparate Impact Class," defined as follows:

> **Title VII Disparate Impact Class:** All African American individuals who, from August 6, 2016, through the resolution of this action, were denied employment based in whole or in part because of NTT's policy and practice of denying employment to individuals with criminal convictions.

94.     Plaintiff Mandala asserts the Second Cause of Action against NTT on behalf of the "NY Criminal History Discrimination Class" defined as follows:

> **NY Criminal History Discrimination Class**:  All individuals who, from June 2, 2014, through the resolution of this action, were denied employment based in whole or in part on their criminal record without NTT having performed a complete New York Correction Law Article 23-A analysis, as required by N.Y. Exec Law § 296(15).

95.     Plaintiff Mandala asserts the Third Cause of Action against NTT on behalf of the "NY FCRA Class" defined as follows:

> **NY FCRA Class**:   All individuals who, from August 15, 2016, through the resolution of this action, had consumer reports requested about them by NTT and were not provided with a copy of Article 23-A of the Correction Law.

96.     The members of the Title VII Disparate Impact Class, the NY Criminal History Discrimination Class and the NY FCRA Class are collectively referred to as "Class Members."

97.     Plaintiffs reserve the right to amend the definition of above-defined classes based on discovery or legal developments.

98.     The Class Members identified herein are so numerous that joinder of all members is impracticable.  NTT is a large employer both in the United States and in New York, with

18,000 employees in North America, and with over twenty offices in the United States including

four offices in New York State.  The number of job applicants harmed by NTT's violations of

the law is far greater than feasibly could be addressed through joinder.  The precise number is

uniquely within Defendants' possession, and Class Members may be notified of the pendency of

this action by published, mailed and/or e-mailed notice.

99.     There are questions of law and fact common to Class Members, and these

questions predominate over any questions affecting only individual members.  Common legal

and factual questions include, among others:

(a)     Whether it was Defendant's policy and practice to exclude job applicants
        with certain convictions who should have been eligible for employment
        based on valid factors assessing legitimate threat to public safety or risk of
        workplace misconduct;

(b)     Whether Defendant's policy and practice to exclude job applicants based
        on certain convictions had a discriminatory disparate impact on African
        Americans;

(c)     Whether Defendant's policy and practice to exclude job applicants based
        on their criminal history is job-related and consistent with business
        necessity;

(d)     Whether there was a less discriminatory policy and practice that would
        have met Defendant's legitimate needs;

(e)     Whether Defendants violated the NYHRL and the Correction Law when
        denying employment to Plaintiffs and the NY Criminal History
        Discrimination Class;

(f)     Whether Defendants violated the NY FCRA by failing to provide
        Plaintiffs and the NY FCRA Class with a copy of Article 23-A of the
        Correction Law, in violation of N.Y. Gen. Bus. Law § 380-g(d);

(g)     Whether Defendants were willful in their noncompliance with the
        requirements of the NY FCRA;

(h)     Whether compensatory damages and punitive damages for Class Members
        are warranted; and

(i)     Whether a declaratory judgement and/or injunctive relief is warranted regarding Defendants' policies and practices.

100.    Plaintiffs are members of the classes they seek to represent.  NTT took discriminatory adverse action against Plaintiffs based on their criminal histories.

101.    Plaintiffs' claims are typical of the claims of the classes they seek to represent: (1) Each Plaintiff applied for a job with NTT within the relevant time period; (2) Each was subjected to the same hiring process screening applicants for criminal histories; and (3) Each was denied the position because of their criminal histories.  All of these claims are shared by each and every Class Member.  Upon information and belief, it is NTT's standard practice to take adverse actions against applicants based on criminal convictions in a manner that is discriminatory and inconsistent with business necessity and without properly considering the factors laid out in the Correction Law for New York Class Members.

102.    Plaintiffs will fairly and adequately represent and protect the interests of Class Members because their interests coincide with, and are not antagonistic to, the interests of the Class Members they seek to represent.  Plaintiffs have retained counsel who are competent and experienced in complex class actions, including litigation pertaining to criminal background checks, the Correction Law, NY FCRA, disparate impact litigation, other employment litigation, and the intersection thereof.  There is no conflict between Plaintiffs and the Class Members.

103.    Class certification is appropriate pursuant to Federal Rule of Civil Procedure 23(b)(2) because NTT has acted and/or refused to act on grounds generally applicable to the Class Members, making declaratory and injunctive relief appropriate with respect to Plaintiffs and the Class Members as a whole.  The Class Members are entitled to injunctive relief to end Defendant's common, uniform, unfair discriminatory – and illegal – policies and practices.

104.     Class certification is appropriate pursuant to Federal Rule of Civil Procedure 23(b)(3) because common questions of fact and law predominate over any questions affecting only individual Class Members.  For example, NTT has maintained a common policy of denying employment to individuals with certain criminal convictions, which Plaintiffs contend is discriminatory and unlawful.  A class action is superior to other available methods for the fair and efficient adjudication of this litigation.  Class Members have been damaged and are entitled to recovery as a result of Defendant's uniform policies and practices.  Because NTT has maintained a common policy of denying employment to individuals with certain criminal convictions but may not have explained that policy to all Class Members, many Class Members may be unaware that their rights have been violated.

## CAUSES OF ACTION

### FIRST CLAIM FOR RELIEF
**Disparate Impact Discrimination**
**Title VII of the Civil Rights Act of 1964, 42 U.S.C §§ 2000e *et seq*.**
**(On Behalf of Plaintiffs and the Title VII Disparate Impact Class)**

105.     Plaintiffs incorporate by reference the allegations in all preceding paragraphs.

106.     Named Plaintiffs bring this claim on their own behalf and on behalf of the Title VII Disparate Impact Class.

107.     Plaintiff Mandala timely filed a charge with the EEOC, with class-wide allegations, and has thus exhausted the administrative remedies.

108.     Plaintiff Barnett may "piggy-back" off the previous filing of Mr. Mandala, because Mr. Mandala's EEOC charge relates to the same claims that Mr. Barnett asserts.

109.     Defendant's policy and practice of denying employment opportunities to individuals with criminal convictions has harmed, and continues to harm, Plaintiffs, and

constitutes unlawful discrimination on the basis of race, color, and/or national origin in violation of 42 U.S.C. §§ 2000e *et seq.*

110.     Defendant's policy and practice of denying employment opportunities to individuals with criminal convictions had a disparate impact on African Americans and is neither job related nor consistent with business necessity.  Even if Defendant's policy and practice of denying employment opportunities to individuals with criminal convictions could be justified by business necessity, a less discriminatory alternative exists that would have equally served any legitimate purpose.

111.     Defendant's conduct has caused, and continues to cause, Plaintiffs and the members of the Title VII Disparate Impact Class losses in earnings and other employment benefits.

112.     Plaintiffs and the Title VII Disparate Impact Class also seek injunctive and declaratory relief to correct Defendant's discriminatory policies and practices.

## SECOND CLAIM FOR RELIEF
### Discriminatory Denial of Employment
### New York Human Rights Law and Article 23-A of the Correction Law
### (On Behalf of Plaintiff Mandala and the NY Criminal History Discrimination Class)

113.     Plaintiff Mandala, on behalf of himself and the NY Criminal History Discrimination Class, incorporate the preceding paragraphs as alleged above.

114.     Defendant denied employment to Plaintiff Mandala and the NY Criminal History Discrimination Class based in whole or in part on their criminal history.

115.     Before denying employment to Plaintiff Mandala and the NY Criminal History Discrimination Class, Defendant failed to conduct a proper inquiry into the factors outlined in Article 23-A of the Correction Law, in violation of N.Y. Exec. Law § 296(15).

116.    As a result of Defendant's actions, Plaintiff Mandala and the NY Criminal

History Discrimination Class have been deprived of their rights and have lost employment

opportunities, earnings and other employment benefits.

117.    Plaintiff Mandala and the NY Criminal History Discrimination Class also seek

injunctive and declaratory relief to correct Defendant's discriminatory policies and practices.

### THIRD CLAIM FOR RELIEF
**NTT's Failure to Provide a Copy of Article 23-A**
**N.Y. Gen. Bus. Law § 380-g(d)**
**(On Behalf of Plaintiff Mandala and the NY FCRA Class)**

118.    Plaintiff Mandala, on behalf of himself and the NY FCRA Class, incorporates the

preceding paragraphs as alleged above.

119.    NTT violated the NY FCRA by procuring consumer reports from Plaintiff

Mandala and Class Members without providing them with a copy of Article 23-A of the

Correction Law.

120.    NTT caused concrete injury (including the risk of harm) to Plaintiff Mandala and

the NY FCRA Class Members, including because they could not learn of their rights and

opportunities under the NY FCRA.

121.    NTT acted willfully and in knowing or reckless disregard of its obligations and

the rights of Plaintiff Mandala and the NY FCRA Class.

122.    NTT's willful conduct is reflected by, among other things, the fact that it violated

a clear statutory mandate set forth in N.Y. Gen. Bus. Law § 380-g(d).

123.    As a result of NTT's actions, Plaintiff Mandala and the NY FCRA Class have

been deprived of their consumer rights, and prevented from timely and effectively contesting the

adverse action.

124.     NTT's willful and/or negligent conduct makes it liable for actual damages,

punitive damages, and attorneys' fees and costs, in an amount to be determined by the Court

pursuant to N.Y. Gen. Bus. Law § 380-l and N.Y. Gen. Bus. Law § 380-m.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs and Class Members pray for relief as follows:

(a)     Certification of the case as a class action on behalf of the proposed classes;

(b)     Designation of Plaintiffs Mandala and Barnett as representatives of Class Members;

(c)     Designation of Plaintiffs' counsel of record as Class Counsel;

(d)     Restoring of Plaintiffs Mandala and Barnett and Class Members to their rightful positions at NTT;

(e)     An award of compensatory and/or punitive damages for violations of Title VII;

(f)     An award of compensatory and/or punitive damages for violations of the NYHRL;

(g)     An award of all actual damages awardable for violations of the NY FCRA and all punitive damages for each violation found to be willful;

(h)     An award of costs incurred herein, including reasonable attorneys' fees to the extent allowable by law;

(i)     Injunctive and/or declaratory relief to correct Defendants' discriminatory policies and practices;

(j)     Pre-judgment and post-judgment interest, as provided by law;

(k)     Payment of a reasonable service award to Plaintiffs, in recognition of the services they have rendered and will continue to render to Class Members, and the risks they have taken and will take; and

(l)     Such other and further legal and equitable relief as this Court deems necessary, just and proper.

## **JURY DEMAND**

Plaintiffs demand a trial by jury in this action.

Dated: New York, New York
       August 15, 2018

Respectfully submitted,

By:   _/s/ Ossai Miazad_

**OUTTEN & GOLDEN LLP**
Ossai Miazad
Christopher M. McNerney
Elizabeth V. Stork
685 Third Avenue, 25th Floor
New York, New York 10017
Telephone:  (212) 245-1000
Facsimile:  (646) 509-2060
E-mail: om@outtengolden.com
E-mail: cmcnerney@outtengolden.com
E-mail: estork@outtengolden.com

*Attorneys for Plaintiffs and the Putative Classes*