# Exhibit A

Case 6:18-cv-06591-MAV-CDW Document 112 Filed 02/05/18 Page 2 of 25
Case 4:15-cv-00038-JAW Document 112 Filed 02/05/18 Page 25 of 31
E-FILED 2018 JAN 22 2:05 PM POLK - CLERK OF DISTRICT COURT

IN THE DISTRICT COURT OF IOWA FOR POLK COUNTY

| | |
|---|---|
| CARA WILLIAMS, JOHNITA SLAUGHTER, MANDRE MILLER, JAMES COLLIER, TERESA JONES, CHANCE KENYON, & ANTHONY WILLIAMS, individually and on behalf of a putative class of similarly situated individuals, | CL No: LACL131387 |
| Plaintiffs, | |
| vs. | |
| WELLS FARGO BANK, N.A. | **AMENDED PETITION AND JURY DEMAND** |
| Defendant. | |

COMES NOW the Plaintiffs, by and through their attorneys, Newkirk Zwagerman Law Firm, and for their causes of action hereby state the following:

## INTRODUCTION

1. An employer's policy or practice of using applicants' or employees' criminal histories to make personnel decisions violates the prohibition against employment discrimination under Title VII of the Civil Rights Act of 1964 (Title VII) if the policy or practice has a disproportionate effect against minorities and is not job-related and consistent with business necessity.

2. Employers also violate Title VII if they treat criminal history information differently for different applicants or employees based on their protected status.

3. This action challenges Wells Fargo's violations of Title VII stemming from its use of a criminal background check policy.

4. This action also challenges Wells Fargo's violations of Title VII due to its

Case 6:18-cv-06591-MAT-MWP Document 11-2 Filed 12/05/18 Page 3 of 25
Case 4:15-cv-00038-RP-CFB Document 112 Filed 06/15/18 Page 28 of 81
E-FILED 2016 APR 05 3:54 PM POLK - CLERK OF DISTRICT COURT

practice of treating criminal history information differently for different applicants based on their protected status.

5.    Wells Fargo's use of its background check policy was not restricted to Iowa – Wells Fargo implemented this policy at its locations throughout the United States.

6.    Plaintiff Cara Williams is a resident and citizen of Polk County, Iowa.

7.    Plaintiff Johnita Slaughter is a resident and citizen of Polk County, Iowa.

8.    Plaintiff Mandre Miller is a resident and citizen of Polk County, Iowa.

9.    Plaintiff James Collier is a resident and citizen of Polk County, Iowa.

10.    Plaintiff Teresa Jones is a resident and citizen of Polk County, Iowa.

11.    Plaintiff Chance Kenyon is a resident and citizen of Polk County, Iowa.

12.    Plaintiff Anthony Williams is a resident and citizen of Polk County, Iowa.

13.    These Plaintiffs seek to represent a putative class of minority employees and applicants who were negatively affected by Wells Fargo's use of non-job-related criminal history screenings.

14.    Wells Fargo is a federally chartered national banking organization that is organized and exists under the National Banking Act, doing business in Des Moines, Polk County, Iowa, with its home office located in South Dakota.

15.    The acts of which Plaintiffs complain occurred at Wells Fargo locations throughout the United States.

16.    This putative class action is an action for declaratory and injunctive relief, monetary and compensatory damages, and other relief.

## PROCEDURAL REQUIREMENTS

Case 6:18-cv-06591-MAV-CDH   Document 11-2   Filed 12/05/25   Page 4 of 25
Case 4:15-cv-00038-CEW-RSW   Document 11-2   Filed 02/06/15   Page 23 of 81
RE-FILED 22:04 IN RE 05-0554 AM IN COURT CLERK OF U.S. ERK OF U.S. CO-COUNTY

17. Prior to filing this action, the named plaintiffs filed charges of employment discrimination on the basis of race with the Equal Employment Opportunity Commission.

18. The named plaintiffs obtained right to sue letter from the EEOC within 90 days of the filing of this pleading.

## FACTS

Cara Williams

19. Cara Williams is an African American female.

20. In 1991, Ms. Williams was convicted of two misdemeanor theft convictions.

21. Years passed by, and Ms. Williams was never convicted of any other crimes of dishonesty.

22. In 2008, Ms. Williams began working for Wells Fargo.

23. Prior to her employment, Ms. Williams successfully completed a criminal background check that Wells Fargo asked her to conduct.

24. On January 6, 2012, Ms. Williams received a notification from Wells Fargo informing her that her team needed to participate in another criminal background check in order to continue their employment with Wells Fargo.

25. Wells Fargo's notification led Ms. Williams and some of her other team members to believe that they would be completing background checks similar to the background checks that they passed before they first started working for Wells Fargo.

26. Wells Fargo, however, was implementing a new criminal background check policy; a policy where the bank intended to fire any employee who was ever convicted of a crime of dishonesty – no matter how long ago a conviction took place.

27. Wells Fargo never notified its minority employees or applicants of this policy.

3

28.     Wells Fargo never notified its applicants that the bank had the authority to obtain permission to waive its criminal background check policy by obtaining permission from the FDIC.

29.     Wells Fargo never notified its employees prior to the implementation of its new criminal background check policy that they had the opportunity to obtain permission from the FDIC to work for Wells Fargo regardless of their criminal convictions from the distant past.

30.     Wells Fargo knew or should have known that its background check policy would have a disproportionate and adverse impact on its minority employees and applicants.

31.     On January 20, 2012, Wells Fargo completed Ms. Williams' criminal background check.

32.     On January 25, 2012, Wells Fargo fired Ms. Williams pursuant to the company's criminal background check policy.

33.     During Ms. Williams' termination meeting, Wells Fargo told her that she could never work for Wells Fargo again.

34.     During her termination meeting, Wells Fargo never told Ms. Williams that the bank could sponsor a waiver to obtain the FDIC's permission to continue her employment.

35.     During her termination meeting, Wells Fargo never informed Ms. Williams that she had an opportunity to pursue a waiver that would have exempted her from Wells Fargo's criminal background screening policy.

36.     Wells Fargo treated Ms. Williams less favorably than employees who happened to be white who were subjected to Wells Fargo's criminal background screening policy.

37.     Some employees who happened to be white were told how to obtain waivers from the FDIC prior to their terminations.  Ms. Williams, however, was treated differently.

4

38.     Some employees who happened to be white were not told during their termination meetings that they could never work for Wells Fargo again.  Ms. Williams, however, was treated differently.

39.     Some employees who happened to be white were terminated months after the completion of their criminal background check.  Ms. Williams, however, was treated differently.

40.     Some employees who happened to be white received instructions on how to obtain an exemption from the FDIC that would make them eligible for reemployment during their termination meetings.  Ms. Williams, however, was treated differently.

41.     Some employees who happened to be white were promised that they could retain their seniority if they received an exemption to Wells Fargo's background check policy from the FDIC.  Ms. Williams, however, was treated differently.

42.     Prior to Ms. Williams' termination, Wells Fargo knew that its criminal background check policy was not a necessity because all of its employees had the opportunity to obtain waivers.

43.     Prior to Ms. Williams' termination, Wells Fargo knew that its employees' criminal convictions that occurred in the distant past were not indicative of whether those employees could perform their jobs without committing banking-related crimes.

44.     Electing to pursue waivers on behalf of employees like Ms. Williams and electing to tell employees like Ms. Williams about how they could pursue waivers prior to their termination are alternative practices that would have had less of an adverse impact on protected classes of employees.

45.     Social science supports the fact that minorities are disproportionately affected by background screening policies that have no temporal limitation.

Case 6:18-cv-06589-MAV-CDH   Document 112   Filed 02/05/25   Page 7 of 25
Case 4:15-cv-00384-CKJ   Document 112   Filed 06/16/18   Page 20 of 81
REDACTED AND REVISED AS PER AMENDED ORDER - CLERK OF U.S. DISTRICT COURT

46.     Wells Fargo's practice of forcing employees like Ms. Williams to complete criminal background checks with no temporal limitations has a disparate impact on minorities.

Johnita Slaughter

47.     Johnita Slaughter is an African American female.

48.     In 1995, Ms. Slaughter received deferred judgment for second degree fraudulent practice related to her receipt of welfare benefits while she was working a part-time job.

49.     Years passed by, and Ms. Slaughter was never convicted of any other crimes of dishonesty.

50.     In 2007, Ms. Slaughter began working for Wells Fargo.

51.     Prior to her employment, Ms. Slaughter successfully completed a criminal background check that Wells Fargo asked her to conduct.

52.     In approximately late 2011, Ms. Slaughter received a notification from Wells Fargo informing her that her team needed to participate in another criminal background check in order to continue their employment with Wells Fargo.

53.     Wells Fargo's notification led Ms. Slaughter and some of her other team members to believe that they would be completing background checks similar to the background checks that they passed before they first started working for Wells Fargo.

54.     Wells Fargo, however, was implementing a new criminal background check policy; a policy where the bank intended to fire any employee who was ever convicted of a crime of dishonesty – no matter how long ago a conviction took place.

55.     Wells Fargo never notified its minority employees or applicants of this policy.

56.     Wells Fargo never notified its applicants that the bank had the authority to obtain permission to waive its criminal background check policy by obtaining permission from the

Case 6:18-cv-06591-MAV-CDH   Document 112   Filed 04/25/25   Page 8 of 25
Case 4:15-cv-00038-CDH-CW   Document 112   Filed 05/25/18   Page 21 of 91
RE-FILED 1:21-CV-08675   05:35547 AM/FOLDER   CLERK OF US DISTRICT COURT

FDIC.

57.     Wells Fargo never notified its employees prior to the implementation of its new
criminal background check policy that they had the opportunity to obtain permission from the
FDIC to work for Wells Fargo regardless of their criminal convictions from the distant past.

58.     Wells Fargo knew or should have known that its background check policy would
have a disproportionate and adverse impact on its minority employees and applicants.

59.     On January 26, 2012, Wells Fargo completed Ms. Slaughter's criminal
background check.

60.     On February 1, 2012, Wells Fargo fired Ms. Slaughter pursuant to the company's
criminal background check policy.

61.     During Ms. Slaughter's termination meeting, Wells Fargo told her that she could
never work for Wells Fargo again.

62.     During her termination meeting, Wells Fargo never told Ms. Slaughter that the
bank could sponsor a waiver to obtain the FDIC's permission to continue her employment.

63.     During her termination meeting, Wells Fargo never informed Ms. Slaughter that
she had an opportunity to pursue a waiver that would have exempted her from Wells Fargo's
criminal background screening policy.

64.     Wells Fargo treated Ms. Slaughter less favorably than employees who happened
to be white who were subjected to Wells Fargo's criminal background screening policy.

65.     Some employees who happened to be white were told how to obtain waivers from
the FDIC prior to their terminations.  Ms. Slaughter, however, was treated differently.

66.     Some employees who happened to be white were not told that they could never
work for Wells Fargo again during their termination meetings.  Ms. Slaughter, however, was

treated differently.

67.     Some employees who happened to be white were terminated months after the completion of their criminal background check.  Ms. Slaughter, however, was treated differently.

68.     Some employees who happened to be white received instructions on how to obtain an exemption from the FDIC that would make them eligible for reemployment during their termination meetings.  Ms. Slaughter, however, was treated differently.

69.     Some employees who happened to be white were promised that they could retain their seniority if they received an exemption to Wells Fargo's background check policy from the FDIC.  Ms. Slaughter, however, was treated differently.

70.     Prior to Ms. Slaughter's termination, Wells Fargo knew that its criminal background check policy was not a necessity because all of its employees had the opportunity to obtain waivers.

71.     Prior to Ms. Slaughter's termination, Wells Fargo knew that its employees' criminal convictions that occurred in the distant past were not indicative of whether those employees could perform their jobs without committing banking-related crimes.

72.     Electing to pursue waivers on behalf of employees like Ms. Slaughter and electing to tell employees like Ms. Slaughter about how they could pursue waivers prior to their termination are alternative practices that would have had less of an adverse impact on protected classes of employees.

73.     Social science supports the fact that minorities are disproportionately affected by background screening policies that have no temporal limitation.

74.     Wells Fargo's practice of forcing employees like Ms. Slaughter to complete criminal background checks with no temporal limitations has a disparate impact on minorities.

<u>Mandre Miller</u>

75.    Mandre Miller is an African American female.

76.    In 1990, Ms. Miller plead guilty to a felony charge of forgery.

77.    Years passed by, and Ms. Miller was never convicted of any other crimes of dishonesty.

78.    In 2004, Ms. Miller began working for Wells Fargo.

79.    Prior to her employment, Ms. Miller successfully completed a criminal background check that Wells Fargo asked her to conduct.

80.    In approximately late 2011, Ms. Miller received a notification from Wells Fargo informing her that her team needed to participate in another criminal background check in order to continue their employment with Wells Fargo.

81.    Wells Fargo's notification led Ms. Miller and some of her other team members to believe that they would be completing background checks similar to the background checks that they passed before they first started working for Wells Fargo.

82.    Wells Fargo, however, was implementing a new criminal background check policy; a policy where the bank intended to fire any employee who was ever convicted of a crime of dishonesty – no matter how long ago a conviction took place.

83.    Wells Fargo never notified its minority employees or applicants of this policy.

84.    Wells Fargo never notified its applicants that the bank had the authority to obtain permission to waive its criminal background check policy by obtaining permission from the FDIC.

85.    Wells Fargo never notified its employees prior to the implementation of its new criminal background check policy that they had the opportunity to obtain permission from the

Case 6:18-cv-06500-MAT-JWF Document 1-2 Filed 12/12/18 Page 11 of 25
Case 4:15-cv-00038-AWA-RJK Document 1-1 Filed 06/02/18 Page 30 of 91
RE-FILED 2:18-MN-22 05 85554-AWA-RJK - CLERK US DIST RCT COURT

FDIC to work for Wells Fargo regardless of their criminal convictions from the distant past.

86.     Wells Fargo knew or should have known that its background check policy would have a disproportionate and adverse impact on its minority employees and applicants.

87.     On February 6, 2012, Wells Fargo fired Ms. Miller pursuant to the company's criminal background check policy.

88.     During Ms. Miller's termination meeting, Wells Fargo told her that she was ineligible for rehire.

89.     During her termination meeting, Wells Fargo never told Ms. Miller that the bank could sponsor a waiver to obtain the FDIC's permission to continue her employment.

90.     During her termination meeting, Wells Fargo never informed Ms. Miller that she had an opportunity to pursue a waiver that would have exempted her from Wells Fargo's criminal background screening policy.

91.     Wells Fargo treated Ms. Miller less favorably than employees who happened to be white who were subjected to Wells Fargo's criminal background screening policy.

92.     Some employees who happened to be white were told how to obtain waivers from the FDIC prior to their terminations.  Ms. Miller, however, was treated differently.

93.     Some employees who happened to be white were not told that they were ineligible for rehire during their termination meetings.  Ms. Miller, however, was treated differently.

94.     Some employees who happened to be white were terminated months after the completion of their criminal background check.  Ms. Miller, however, was treated differently.

95.     Some employees who happened to be white received instructions on how to obtain an exemption from the FDIC that would make them eligible for reemployment during

their termination meetings.  Ms. Miller, however, was treated differently.

96.    Some employees who happened to be white were promised that they could retain their seniority if they received an exemption to Wells Fargo's background check policy from the FDIC.  Ms. Miller, however, was treated differently.

97.    Prior to Ms. Miller's termination, Wells Fargo knew that its criminal background check policy was not a necessity because all of its employees had the opportunity to obtain waivers.

98.    Prior to Ms. Miller's termination, Wells Fargo knew that its employees' criminal convictions that occurred in the distant past were not indicative of whether those employees could perform their jobs without committing banking-related crimes.

99.    Electing to pursue waivers on behalf of employees like Ms. Miller and electing to tell employees like Ms. Miller about how they could pursue waivers prior to their termination are alternative practices that would have had less of an adverse impact on protected classes of employees.

100.    Social science supports the fact that minorities are disproportionately affected by background screening policies that have no temporal limitation.

101.    Wells Fargo's practice of forcing employees like Ms. Miller to complete criminal background checks with no temporal limitations has a disparate impact on minorities.

James Collier

102.    James Collier is an African American male.

103.    In April of 2000, Mr. Collier was found guilty of crimes related to his possession of marijuana.

104.    Years passed by, and Mr. Collier was never convicted of any other crimes.

Case 6:18-cv-06059-AJCGKS Document 1-2 Filed 02/06/18 Page 13 of 25
Case 4:15-cv-00034-ARW-PSW Document 1-1 Filed 02/06/18 Page 32 of 81
E-FILED 2018 NOV 05 10:57 AM POLK - CLERK OF DISTRICT COURT

105.    In 2004, Mr. Collier began working for Wells Fargo as a Loan Specialist.

106.    Prior to his employment with Wells Fargo in 2004, Mr. Collier successfully completed the company's criminal background check.

107.    In approximately January of 2012, Mr. Collier received a notification from Wells Fargo informing him that he needed to participate in another criminal background check.

108.    Wells Fargo's criminal background check policy resulted in the termination of any employee who was ever convicted of a crime of dishonesty – no matter how long ago the convictions took place.

109.    Wells Fargo never notified its minority employees or applicants of this policy.

110.    Wells Fargo knew or should have known that its background check policy would have a disproportionate and adverse impact on its minority employees and applicants.

111.    Mr. Collier submitted his fingerprints to Wells Fargo's background check screening agency, First Advantage, on May 4, 2012.

112.    On May 11, 2012, Wells Fargo and/or First Advantage sent Mr. Collier a document titled "Pre-Adverse Action Notification" that stated that a decision was currently pending concerning his continued employment with Wells Fargo.

113.    On May 15, 2012, Wells Fargo fired James Collier as a result of the company's criminal background check policy.

114.    Wells Fargo never informed Mr. Collier of his right to pursue a waiver that would have exempted him from Wells Fargo's criminal background screening policy.

115.    Wells Fargo treated Mr. Collier less favorably than employees who happened to be white who were subjected to Wells Fargo's criminal background screening policy.

116.    Wells Fargo notified some employees who happened to be white that they could

obtain waivers and return to work for the company without losing their seniority.

117.    Wells Fargo notified some employees who happened to be white of their ability to
obtain waivers prior to their terminations.

118.    Prior to Mr. Collier's termination, Wells Fargo knew that its criminal background
check policy was not a necessity because all of its employees had the opportunity to obtain
waivers.

119.    Prior to Mr. Collier's termination, Wells Fargo knew that its employees' criminal
convictions that occurred in the distant past were not indicative of whether those employees
could perform their jobs without committing banking-related crimes.

120.    Electing to pursue waivers on behalf of employees like Mr. Collier and electing to
tell employees like Mr. Collier about how they could pursue waivers prior to their termination
are alternative practices that would have had less of an adverse impact on protected classes of
employees.

121.    Social science supports the fact that minorities are disproportionately affected by
background screening policies that have no temporal limitation.

122.    Wells Fargo's practice of forcing employees like Mr. Collier to complete criminal
background checks with no temporal limitations has a disparate impact on minorities.

Teresa Jones

123.    Teresa Jones is an African American female.

124.    In 1990, Ms. Jones was found guilty of illegally receiving welfare benefits.

125.    Years passed by, and Ms. Jones was never convicted of any other crimes.

126.    In 2001, Ms. Jones began working for Wells Fargo.

127.    Prior to Ms. Jones' employment in 2001, Ms. Jones successfully completed Wells

Fargo's background screening process.

128.     In approximately January of 2012, Ms. Jones received a notification from Wells Fargo informing her that she needed to participate in another criminal background check.

129.     Wells Fargo's criminal background check policy resulted in the termination of any employee who was ever convicted of a crime of dishonesty – no matter how long ago the convictions took place.

130.     Wells Fargo never notified its minority employees or applicants of this new policy.

131.     Wells Fargo knew or should have known that its background check policy would have a disproportionate and adverse impact on its minority employees and applicants.

132.     On February 2, 2012, Wells Fargo completed Ms. Jones' criminal background check.

133.     On February 7, 2012, Wells Fargo and/or First Advantage sent Ms. Jones a document titled "Pre-Adverse Action Notification" that stated that a decision was currently pending concerning her continued employment with Wells Fargo.

134.     On February 17, 2012, Wells Fargo fired Ms. Jones as a result of the company's criminal background check policy.

135.     Wells Fargo never informed Ms. Jones of her right to pursue a waiver that would have exempted her from Wells Fargo's criminal background screening policy.

136.     Wells Fargo treated Ms. Jones less favorably than employees who happened to be white who were subjected to Wells Fargo's criminal background screening policy.

137.     Wells Fargo notified some employees who happened to be white that they could obtain waivers and return to work for the company without losing their seniority.

138.     Wells Fargo notified some employees who happened to be white of their ability to obtain waivers prior to their terminations.

139.     Prior to Ms. Jones' termination, Wells Fargo knew that its criminal background check policy was not a necessity because all of its employees had the opportunity to obtain waivers.

140.     Prior to Ms. Jones' termination, Wells Fargo knew that its employees' criminal convictions that occurred in the distant past were not indicative of whether those employees could perform their jobs without committing banking-related crimes.

141.     Electing to pursue waivers on behalf of employees like Ms. Jones and electing to tell employees like Ms. Jones about how they could pursue waivers prior to their termination are alternative practices that would have had less of an adverse impact on protected classes of employees.

142.     Social science supports the fact that minorities are disproportionately affected by background screening policies that have no temporal limitation.

143.     Wells Fargo's practice of forcing employees like Ms. Jones to complete criminal background checks with no temporal limitations has a disparate impact on minorities.

Chance Kenyon

144.     Chance Kenyon is an African American female.

145.     In 1987 and 1990, Ms. Kenyon was found guilty of misdemeanor thefts.

146.     Years passed by, and Ms. Kenyon was never convicted of any other crimes of dishonesty.

147.     In 2006, Ms. Kenyon began working for Wells Fargo.

148.     Prior to her employment in 2006, Ms. Kenyon successfully completed Wells

15

Fargo's criminal background screening practices.

149.    In early 2012, Ms. Kenyon received a notification from Wells Fargo informing her that she needed to participate in another criminal background check.

150.    Wells Fargo's criminal background check policy resulted in the termination of any employee who was ever convicted of a crime of dishonesty – no matter how long ago the convictions took place.

151.    Wells Fargo never notified its minority employees or applicants of this new policy.

152.    Wells Fargo knew or should have known that its background check policy would have a disproportionate and adverse impact on its minority employees and applicants.

153.    On May 7, 2012, Wells Fargo completed Ms. Kenyon's criminal background check.

154.    On May 11, 2012, Wells Fargo and/or First Advantage sent Ms. Kenyon a document titled "Pre-Adverse Action Notification" that stated that a decision was currently pending concerning her continued employment with Wells Fargo.

155.    On May 15, 2012, Wells Fargo fired Ms. Kenyon as a result of the company's criminal background check policy.

156.    Wells Fargo never informed Ms. Kenyon of her right to pursue a waiver that would have exempted her from Wells Fargo's criminal background screening policy.

157.    Wells Fargo treated Ms. Kenyon less favorably than employees who happened to be white who were subjected to Wells Fargo's criminal background screening policy.

158.    Wells Fargo notified some employees who happened to be white that they could obtain waivers and return to work for the company without losing their seniority.

159.     Wells Fargo notified some employees who happened to be white of their ability to obtain waivers prior to their terminations.

160.     Prior to Ms. Kenyon's termination, Wells Fargo knew that its criminal background check policy was not a necessity because all of its employees had the opportunity to obtain waivers.

161.     Prior to Ms. Kenyon's termination, Wells Fargo knew that its employees' criminal convictions that occurred in the distant past were not indicative of whether those employees could perform their jobs without committing banking-related crimes.

162.     Electing to pursue waivers on behalf of employees like Ms. Kenyon and electing to tell employees like Ms. Kenyon about how they could pursue waivers prior to their termination are alternative practices that would have had less of an adverse impact on protected classes of employees.

163.     Social science supports the fact that minorities are disproportionately affected by background screening policies that have no temporal limitation.

164.     Wells Fargo's practice of forcing employees like Ms. Kenyon to complete criminal background checks with no temporal limitations has an adverse impact on minorities.

Anthony Williams

165.     Anthony Williams is an African American male.

166.     In 1999, Mr. Williams plead guilty to attempted second degree burglary and received deferred judgment.

167.     Years passed by, and Mr. Williams was never convicted of any other crimes.

168.     In 2006, Mr. Williams began working for Wells Fargo.

169.     Prior to his employment in 2006, Mr. Williams successfully completed Wells

Case 6:18-cv-06500-MAT-CSRew Document 1-2 Filed 12/12/18 Page 19 of 25
Case 4:19-cv-00034-MW-CAS Document 1-2 Filed 02/06/18 Page 32 of 81
RE-FILED 2018 MAR 05 05:54 AM FL CLERK OF CLASS ACTION

Fargo's criminal background check screening.

170. In early 2012, Mr. Williams received a notification from Wells Fargo informing him that he needed to participate in another criminal background check.

171. Wells Fargo's criminal background check policy resulted in the termination of any employee who was ever convicted of a crime of dishonesty – no matter how long ago the convictions took place.

172. Wells Fargo never notified its minority employees or applicants of this new policy.

173. Wells Fargo knew or should have known that its background check policy would have a disproportionate and adverse impact on its minority employees and applicants.

174. On May 1, 2012, Wells Fargo completed Mr. Williams' criminal background check.

175. On May 8, 2012, Wells Fargo and/or First Advantage sent Mr. Williams a document titled "Pre-Adverse Action Notification" that stated that a decision was currently pending concerning his continued employment with Wells Fargo.

176. On that very same day, Wells Fargo fired Mr. Williams as a result of the company's criminal background check policy.

177. Wells Fargo never informed Mr. Williams of his right to pursue a waiver that would have exempted him from Wells Fargo's criminal background screening policy.

178. Wells Fargo treated Mr. Williams less favorably than employees who happened to be white who were subjected to Wells Fargo's criminal background screening policy.

179. Wells Fargo notified some employees who happened to be white that they could obtain waivers and return to work for the company without losing their seniority.

18

Case 6:18-cv-06500-AA-CPW Document 1-2 Filed 12/12/18 Page 20 of 25
Case 4:19-cv-00038-HFS-KSW Document 1-1 Filed 02/06/19 Page 39 of 91
REFILED 22-MAR-2018 05:55:54 AM FRANK - CLERK OF LASS FRICH COUNTY

180.    Wells Fargo notified some employees who happened to be white of their ability to obtain waivers prior to their terminations.

181.    Prior to Mr. Williams' termination, Wells Fargo knew that its criminal background check policy was not a necessity because all of its employees had the opportunity to obtain waivers.

182.    Prior to Mr. Williams' termination, Wells Fargo knew that its employees' criminal convictions that occurred in the distant past were not indicative of whether those employees could perform their jobs without committing banking-related crimes.

183.    Electing to pursue waivers on behalf of employees like Mr. Williams and electing to tell employees like Mr. Williams about how they could pursue waivers prior to their termination are alternative practices that would have had less of an adverse impact on protected classes of employees.

184.    Social science supports the fact that minorities are disproportionately affected by background screening policies that have no temporal limitation.

185.    Wells Fargo's practice of forcing employees like Mr. Williams to complete criminal background checks with no temporal limitations has an adverse impact on minorities.

## COUNT I
## VIOLATION OF THE TITLE VII
## ADVERSE IMPACT DISCRIMINATION

186.    Plaintiffs replead all other paragraphs provided in this Petition and incorporate the same by reference as if fully set forth herein.

187.    Wells Fargo's background check policy has the effect of disproportionately screening out minority applicants and employees.

188.    Statistical analysis derived from an examination of Wells Fargo's applicant data,

workforce data, and third party criminal background screening data will show that minorities like the named plaintiffs were disproportionately affected by Wells Fargo's use of criminal history screenings.

189. Wells Fargo's criminal background check policy is not job-related to many positions held by the bank's employees.

190. No substantive link exists between the plaintiff's past crimes and the risks inherent in the job duties held by Wells Fargo employees.

191. Wells Fargo failed to implement any targeted screenings of criminal convictions that considered the nature of the crimes, the time elapsed, and the nature of jobs applied for.

192. Wells Fargo failed to provide excluded applicants and employees with an opportunity for an individualized assessment to determine whether their criminal histories were job related.

193. Wells Fargo's background check policy was not a business necessity because Wells Fargo had the option of obtaining waivers for its applicants and employees.

194. Wells Fargo could have implemented less discriminatory alternative employment practices that served its legitimate goals as effectively as its criminal history screenings, but Wells Fargo refused to adopt those practices.

195. The named plaintiffs seek to represent a putative class of minority applicants who were affected by Wells Fargo's use of criminal background screenings.

196. Wells Fargo used its criminal background screenings at its facilities located throughout the United States.

197. As a proximate result of Defendants' acts and omissions, the named plaintiffs and the putative class they seek to represent have in the past and will in the future suffer damages

Case 6:18-cv-06500-MAT-JWF Document 1-2 Filed 12/12/18 Page 22 of 25
Case 4:18-cv-00038-CVE-JFJ Document 1-2 Filed 02/06/18 Page 45 of 91
E-FILED 2018 NOV 05 8:54 AM POLK - CLERK OF DISTRICT COURT

including, but not limited to, mental and emotional distress, fear, anguish, humiliation, intimidation, insecurity, embarrassment, lost enjoyment of life, lost wages, benefits, future earnings, punitive damage, and other emoluments of employment.

198.    In addition, the named plaintiffs and the putative class they seeks to represent are entitled to equitable relief including but not limited to:  1) benefits not measured as compensatory damages, including relief to offset any damage to their reputations, 2) injunctive relief prohibiting Defendant Wells Fargo from subjecting future applicants to discriminatory criminal history screenings, 3) injunctive relief requiring Wells Fargo to hire applicants and former employees who were screened out of the company's hiring process due to criminal background screenings, and 4) other forms of equitable relief available under Title VII.

## COUNT II
## VIOLATION OF TITLE VII
## DISPARATE TREATMENT DISCRIMINATION

199.    Plaintiffs replead all other paragraphs provided in this Petition and incorporate the same by reference as if fully set forth herein.

200.    Prior to its implementation, Wells Fargo knew that its background check policy would result in the termination of a disproportionate number of protected-class individuals, including minority employees.

201.    An audit of Wells Fargo's past practices regarding its use of criminal background checks will reveal inconsistencies showing that Wells Fargo was more likely to give white applicants and employees an avenue to circumvent Wells Fargo's background check policies than minority applicants and employees.

202.    Wells Fargo's usual, rather than unusual, practice (its standard operating procedure) was to give decision-makers discretion in regards to whether they could waive or delay their background screening policy for certain employees and applicants.

203.    Wells Fargo's use of that discretion disproportionately affected minority applicants and employees.

204.    Wells Fargo's use of that discretion resulted in employees who happened to be white being treated more favorably than employees who happened to be minorities.

205.    Statistical analysis derived from an examination of Wells Fargo's applicant data, workforce data, and third party criminal background history data will show that Wells Fargo's use of discretion in the criminal background screening process weighed more heavily against minority workers.

206.    In addition to individual treatment claims, the named plaintiffs seek to represent a putative class of minorities affected by Wells Fargo's pattern-or-practice of allowing hiring supervisors to exercise discretion in their use of criminal background screenings in the hiring process.

207.    While the exact number of putative class members is unknown because such information is in the exclusive control Wells Fargo, upon information and belief there are hundreds, if not thousands, of applicants and former employees who have been the victim of an adverse employment decision taken by Wells Fargo in violation of Title VII because of their criminal backgrounds.

208.    The claims alleged on behalf of the named plaintiffs raise questions of law and fact common to the putative class.

Case 6:18-cv-06500-MAT-JWF Document 1-2 Filed 12/12/18 Page 24 of 25
Case 4:15-cv-00038-WTM-GRS Document 1-1 Filed 02/06/15 Page 33 of 91
RE-FILED 22514 NR225 05 8554AM INFOCLERK-CLERK OF PLDGS RTCT CODUNTY

209.    Chief among these questions is whether Wells Fargo had a policy and practice of unlawfully refusing to employ the named plaintiffs and the putative class members in violation of Title VII because they have been convicted of a crime where there is no direct relationship between the crime and employment.

210.    As a proximate result of Defendants' acts and omissions, the named plaintiffs and the putative class they seek to represent have in the past and will in the future suffer damages including, but not limited to, mental and emotional distress, fear, anguish, humiliation, intimidation, insecurity, embarrassment, lost enjoyment of life, lost wages, benefits, future earnings, and other emoluments of employment.

211.    In addition, the named plaintiffs and the putative class they seek to represent are entitled to equitable relief including but not limited to:  1) benefits not measured as compensatory damages, including relief to offset any damage to their reputations, 2) injunctive relief prohibiting Wells from subjecting future applicants and employees to discriminatory criminal history screenings, 3) injunctive relief requiring Wells Fargo to hire applicants and employees who were adversely affected by Wells Fargo's criminal background screenings, and 4) other forms of equitable relief available under Title VII.

WHEREFORE, Plaintiff and the putative class he seeks to represent demand judgment against Wells Fargo in an amount which will fully and fairly compensate them for their injuries and damages, for punitive damages in an amount sufficient to punish Wells Fargo and deter others, for interest as allowed by law, for attorneys' fees, for the costs of this action, for appropriate equitable and injunctive relief, and for such other relief as may be just in the circumstances and consistent with the purpose of Title VII.

Case 6:18-cv-06500-JAA-SPW Document 1-2 Filed 12/12/18 Page 25 of 25
Case 4:18-cv-00038-JAA-SPW Document 1-1 Filed 02/06/18 Page 38 of 91
E-FILED 2018 JAN 23 8:54 AM POLK - CLERK OF DISTRICT COURT

## JURY DEMAND

COMES NOW the Plaintiff, on behalf of himself and others similarly situated, and

hereby requests a trial by jury in the above-captioned matter on all issues of fact and

compensatory damages.

NEWKIRK ZWAGERMAN, P.L.C.

_____*/s/ Leonard E. Bates*_____
Thomas A. Newkirk   AT0005791
tnewkirk@newkirklaw.com
Leonard E. Bates   AT0010869
lbates@newkirklaw.com
515 E. Locust Street, Suite 300
Des Moines, IA  50309
Telephone:  515-883-2000
Fax:  515-883-2004

ATTORNEYS FOR PLAINTIFF

Original filed.