**MANDATE**

**UNITED STATES COURT OF APPEALS**
**FOR THE**
**SECOND CIRCUIT**

At a Stated Term of the United States Court of Appeals for the Second Circuit, held at the Thurgood Marshall United States Courthouse, 40 Foley Square, in the City of New York, on the 21st day of September, two thousand twenty.

Before:     Denny Chin,
            Richard J. Sullivan,
            William J. Nardini,
                *Circuit Judges.*
_____

George Mandala, Charles Barnett individually and on behalf of all others similarly situated,

       Plaintiffs - Appellants,

v.

NTT Data, Inc.,

       Defendant - Appellee.
_____

**JUDGMENT**

Docket No. 19-2308

The appeal in the above captioned case from a judgment of the United States District Court for the Western District of New York was argued on the district court's record and the parties' briefs.  Upon consideration thereof,

IT IS HEREBY ORDERED, ADJUDGED and DECREED that the district court's judgment is AFFIRMED.

For the Court:

Catherine O'Hagan Wolfe,
Clerk of Court

A True Copy
Catherine O'Hagan Wolfe, Clerk
United States Court of Appeals, Second Circuit

**MANDATE ISSUED ON 03/02/2021**

# United States Court of Appeals
# For the Second Circuit

August Term 2019

Argued: March 9, 2020
Decided: September 21, 2020

No. 19-2308

GEORGE MANDALA, CHARLES BARNETT
INDIVIDUALLY AND ON BEHALF OF ALL
OTHERS SIMILARLY SITUATED,

*Plaintiffs-Appellants*,

*v.*

NTT DATA, INC.,

*Defendant-Appellee.*

Appeal from the United States District Court
for the Western District of New York
No. 18-cv-6591, Charles J. Siragusa, *Judge.*

Before:     CHIN, SULLIVAN, AND NARDINI, *Circuit Judges.*

Plaintiffs are African-American men who were hired at a technology services provider before their offers of employment were revoked because of past criminal convictions. Citing national statistics showing that African Americans are arrested and incarcerated at higher rates than whites relative to their share of the national population, Plaintiffs brought a Title VII disparate impact class action

against their would-be employer.  The district court (Siragusa, *J.*) dismissed the complaint for failure to state a claim.  We agree with that decision.  While national statistics may be used to advance a disparate impact claim if there is reason to believe that the general population is representative of the qualified applicant pool subject to the challenged policy, Plaintiffs' complaint suggests that the jobs they applied for required substantial educational and technical credentials, and Plaintiffs have provided no basis on which to presume that their proffered statistics are representative of the applicant pool in question.  Since Plaintiffs have provided no other allegations to demonstrate that the challenged hiring policy has a disparate impact on African Americans, we AFFIRM the district court's judgment.

      AFFIRMED.

      Judge Chin dissents in a separate opinion.

> RACHEL BIEN, Outten & Golden LLP, Los Angeles, CA; Ossai Miazad, Lewis M. Steel, Christopher M. McNerney, Elizabeth V. Stork, *on the brief*, Outten & Golden LLP, New York, NY; RACHEL M. KLEINMAN (Sherrilyn A. Ifill, Janai S. Nelson, Samuel Spital, *on the brief*), NAACP Legal Defense & Education Fund, Inc., New York, NY; Catherine Meza, *on the brief*, NAACP Legal Defense & Education Fund, Inc., Washington, DC, *for Plaintiffs-Appellants*.
>
> JESSICA F. PIZZUTELLI (Jacqueline Phipps Polito, *on the brief*), Littler Mendelson P.C., New York, NY, *for Defendant-Appellee*.

RICHARD J. SULLIVAN, *Circuit Judge*:

Facts are stubborn things, but statistics are pliable. As Mark Twain's saying suggests, though statistics are often a helpful tool, they must be consulted cautiously. This lawsuit provides a case study as to why that is.

Plaintiffs George Mandala and Charles Barnett have brought a Title VII disparate impact class action against Defendant NTT Data, Inc., arguing that the company's alleged policy not to hire persons with certain criminal convictions has a disproportionately large effect on African-American applicants. To support that assertion, Plaintiffs rely on national statistics showing that, on average, African Americans are more likely to be arrested and incarcerated than whites. But the fact that such a disparity exists among the general population does not automatically mean that it exists among the pool of applicants qualified for the jobs in question – what is true of the whole is not necessarily true of its parts. In fact, because the complaint indicates that the positions that Plaintiffs applied for require certain educational and technical credentials, there is good reason to think that these national statistics are *not* representative of the qualified applicant pool.

Consequently, Plaintiffs have set forth no allegations plausibly suggesting that the company's hiring policy has a disparate impact on African Americans

within the relevant hiring pool.  We therefore AFFIRM the judgment of the district court (Siragusa, *J.*) dismissing the complaint.

## I.    Background

In early 2017, George Mandala applied for a position as a Salesforce Developer at NTT Data, Inc., a global information technology services provider.[1] Impressed by his work experience and his answers to various "technical questions" during the interview process, Compl. ¶ 24, NTT offered Mandala a job as an "Application Software Development Senior Principal Consultant," *id.* ¶ 27. But upon conducting a routine background check, the company discovered that Mandala had been convicted of a felony and quickly withdrew its offer of employment.  When a member of NTT's recruitment team broke the news to Mandala, she indicated that "NTT had a policy not to hire persons with felonies on their records."  *Id.* ¶ 33.

Charles Barnett had a similar experience.  NTT reached out to him in July 2017 about a "web developer" position on a project for the Kentucky Department of Education.  *Id.* ¶ 38.  On paper, Barnett appeared to be a strong

---

[1] Because this appeal involves review at the motion to dismiss stage, we draw these facts from the allegations in the Plaintiffs' complaint, J. App'x at 7–30 ("Compl."), which we accept as true, and the documents incorporated by reference therein.  *See Littlejohn v. City of New York*, 795 F.3d 297, 303 n.1 (2d Cir. 2015).

4

candidate:  he had relevant work experience, a "Masters of Science in Computer Science Technology[,] and an Associate degree in Applied Science/Computer Programming."  *Id.* ¶ 50.  And after a few rounds of interviews, NTT offered him the job.  But the company pulled that offer once it learned that Barnett had been convicted of several felonies.  Though Barnett asked NTT to consider hiring him for other positions, he was informed that he was ineligible "because of his felony convictions."  *Id.* ¶ 48.

So, in August 2018, Mandala and Barnett filed a putative class action complaint against NTT, alleging that the company's hiring practices violate Title VII of the Civil Rights Act of 1964, as well as several New York State anti-discrimination laws.  Specifically, they assert that NTT has a policy not to hire "individuals with certain criminal convictions including felonies (or similar criminal classifications),"  *id.* ¶ 4, which Plaintiffs say is unlawful because it invariably disqualifies a disproportionate number of African-American applicants.

To support this assertion, Plaintiffs point to numerous studies showing that "African Americans are arrested and incarcerated for crimes at higher rates than [w]hites, relative to their share of the national population."  *Id.* ¶ 52.  This disparity

is compounded, they say, by evidence suggesting that employers place additional weight on criminal history when an applicant is African American as opposed to white.  Notably, however, the complaint contains no allegations about racial disparities in NTT's existing workforce or the demographics of qualified applicants that NTT has rejected as a result of its hiring policy.  It also fails to identify the precise contours of the policy itself – Plaintiffs equivocate as to whether the policy covers any prior criminal conviction or only felony convictions.

A little less than a year after it was filed, the district court dismissed the complaint for failure to state a claim.  *See Mandala v. NTT Data, Inc.*, No. 18-cv-6591 (CJS), 2019 WL 3237361 (W.D.N.Y. July 18, 2019).  The court concluded that the national statistics on which Plaintiffs rely are "inadequate to show a relationship between the pool of [NTT] applicants who are Caucasian versus African Americans and their respective rates of felony convictions." *Id.* at *4.  And without any remaining federal claims, the district court refused to exercise supplemental jurisdiction over Plaintiffs' state law claims and dismissed their complaint in its entirety. *Id.*

6

Plaintiffs now appeal that decision, arguing that the district court imposed
an improperly high pleading standard, and that national arrest and conviction
statistics are more than sufficient to state a plausible claim for relief under Title VII.

## II.    Standard of Review

We review *de novo* a district court's decision to dismiss a complaint under
Federal Rule of Civil Procedure 12(b)(6).  *Littlejohn*, 795 F.3d at 306.  A complaint
will survive a motion to dismiss so long as it "contain[s] sufficient factual matter
. . . to state a claim to relief that is plausible on its face."  *Ashcroft v. Iqbal*, 556 U.S.
662, 678 (2009) (internal quotation marks omitted).  In making that assessment, we
accept the plaintiff's factual allegations as true and draw all reasonable inferences
in her favor.  *Menaker v. Hofstra Univ.*, 935 F.3d 20, 30 (2d Cir. 2019).

But while this plausibility pleading standard is forgiving, it is not toothless.
It does not require us to credit "legal conclusion[s] couched as . . . factual
allegation[s]" or "naked assertions devoid of further factual enhancement."  *Iqbal*,
556 U.S. at 678 (internal quotation marks and brackets omitted).  Nor are
allegations that are "merely consistent with" liability enough to defeat a motion to
dismiss.  *Id.* (internal quotation marks omitted).  Lastly, it bears mentioning that
"we are free to affirm a decision [dismissing a complaint] on any grounds

supported in the record, even if it is not one on which the trial court relied." *Thyroff v. Nationwide Mut. Ins. Co.*, 460 F.3d 400, 405 (2d Cir. 2006).

## III.    Discussion

### A.    The Elements of a Title VII Disparate Impact Claim

Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, as amended, prevents employers from discriminating against employees or job applicants based on race, color, religion, sex, or national origin.  As originally enacted, "Title VII's principal nondiscrimination provision held employers liable only for" intentional discrimination (known as "disparate treatment").  *Ricci v. DeStefano*, 557 U.S. 557, 577 (2009).  But in *Griggs v. Duke Power Co.*, the Supreme Court construed the statute to prohibit "not only overt discrimination but also practices that are fair in form, but discriminatory in operation" – that is, practices that have a "disparate impact."  401 U.S. 424, 431 (1971).  *Griggs* thus read Title VII to focus on "the consequences of employment practices, not simply the motivation" behind them.[2]  *Id.* at 432; s*ee also M.O.C.H.A. Soc'y, Inc. v. City of Buffalo*, 689 F.3d 263, 273 (2d Cir. 2012); *Gulino v. N.Y. State Educ. Dep't*, 460 F.3d 361, 382 (2d Cir. 2006).

---

[2] This interpretation was later codified in the Civil Rights Act of 1991, which includes a provision expressly prohibiting disparate impact discrimination.  *See Ricci*, 557 U.S. at 578 (citing 42 U.S.C. § 2000e–2(k)(1)(A)(i)).

Pursuing a disparate impact claim is often a complicated endeavor. Such claims "follow a three-part analysis involving shifting evidentiary burdens." *Gulino*, 460 F.3d at 382 (citing 42 U.S.C. § 2000e–2(k)(1)). The plaintiff "bears the initial burden of [making] a prima facie showing of disparate impact." *Id.* This requires the plaintiff to "(1) identify a specific employment practice or policy; (2) demonstrate that a disparity exists; and (3) establish a causal relationship between the two." *Chin v. Port Auth. of N.Y. & N.J.*, 685 F.3d 135, 151 (2d Cir. 2012) (internal quotation marks and citations omitted). Unlike a disparate treatment claim, however, a disparate impact claim does not require the plaintiff to show that the defendant *intended* to discriminate against a particular group. *See Ricci*, 557 U.S. at 577–78; *M.O.C.H.A.*, 689 F.3d at 273; *see also Chaidez v. Ford Motor Co.*, 937 F.3d 998, 1006–07 (7th Cir. 2019).

Once that *prima facie* showing is made, "the defendant has two avenues of rebuttal." *Gulino*, 460 F.3d at 382. One approach is to undermine the plaintiff's disparate impact or causal analysis. *Id.*; *see also Watson v. Fort Worth Bank & Tr.*, 487 U.S. 977, 996 (1988). If the defendant is successful in doing so, that ends the matter. Alternatively, the defendant can concede that the identified policy has a disparate impact, but nevertheless defend it as "job related for the position in

9

question and consistent with business necessity." *Ricci*, 557 U.S. at 578 (quoting

42 U.S.C. § 2000e–2(k)(1)(A)(i)); *see also Gulino*, 460 F.3d at 382.

Should the defendant succeed in demonstrating the business necessity of

the challenged policy, the burden then shifts back to the plaintiff, who has one last

chance to prove her case.  Namely, she must show that other methods exist to

further the defendant's legitimate business interest "without a similarly

undesirable racial effect."  *M.O.C.H.A.*, 689 F.3d at 274 (quoting *Watson*, 487 U.S.

at 998); *see Gulino*, 460 F.3d at 382.

## B.      The Applicable Pleading Standard

Over the years, this three-step analysis has caused confusion about the

pleading standard applicable to disparate impact claims.  Are plaintiffs required

to plead a *prima facie* case, or is the standard something lower?  And if something

lower, what is that lower threshold?

The Supreme Court appeared to put this issue to rest in *Swierkiewicz v.*

*Sorema N.A.*, when it clarified that *prima facie* sufficiency is "an evidentiary

standard, not a pleading requirement."  534 U.S. 506, 510 (2002).  The Court went

on to explain that to survive a motion to dismiss, a Title VII complaint must

contain only enough facts to give the defendant fair notice of the claim and the

grounds upon which that claim rests.  *Id.* at 512–14.  And while *Swierkiewicz*

10

employed the *McDonnell Douglas* burden shifting framework developed for disparate treatment claims, *id.* at 510 (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)), its analysis nonetheless helped inform disparate impact cases. After all, both types of discrimination claims use multi-part analyses that require the plaintiff to put forward a *prima facie* case of discrimination.

But only seven years later, the Supreme Court cast doubt on *Swierkiewicz*'s vitality. In *Ashcroft v. Iqbal*, it held that mere notice pleading – the pleading standard underlying *Swierkiewicz*'s analysis – was inadequate, and that "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." 556 U.S. at 678 (internal quotation marks omitted). Unsurprisingly, litigants were anxious to know what *Iqbal* meant for Title VII cases.

Over a series of opinions, we clarified that *Iqbal* does not require a plaintiff to plead a *prima facie* case. Instead, it simply requires a plaintiff to "assert [enough] nonconclusory factual matter . . . to nudge [her] claim[] across the line from conceivable to plausible to proceed." *See EEOC v. Port Auth. of N.Y. & N.J.*, 768 F.3d 247, 254 (2d Cir. 2014) (internal quotation marks and alterations omitted); *see also Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 84 (2d Cir. 2015); *Littlejohn,*

795 F.3d at 311; *cf. NAACP v. Merrill*, 939 F.3d 470, 477 (2d Cir. 2019) (recognizing that *prima facie* "is an evidentiary standard, not a pleading requirement" (internal quotation marks omitted)).   And while many of those cases were again decided against the backdrop of the *McDonnell Douglas* framework, their reasoning is not limited to that context.  *Compare Vega*, 801 F.3d at 84 ("[I]f *Swierkiewicz* survives for Equal Pay Act cases it surely survives for Title VII cases."), *with Littlejohn*, 795 F.3d at 309 n.7 (acknowledging that "the Equal Pay Act does not fall under the burden-shifting framework of *McDonnell Douglas*").  In simple terms, then, this means that although a plaintiff need not plead a *prima facie* case, she must at least set forth enough factual allegations to plausibly support each of the three basic elements of a disparate impact claim. *See Adams v. City of Indianapolis*, 742 F.3d 720, 728, 733 (7th Cir. 2014).[3]

---

[3] The standard for pleading a disparate treatment claim is slightly different – all that a plaintiff need set forth to plausibly plead that her employer intended to discriminate against her (one of the basic elements of such a claim) are enough facts to "provide at least minimal support for the proposition that the employer was motivated by discriminatory intent." *Vega*, 801 F.3d at 86–87 (internal quotation marks omitted); *see also Menaker*, 935 F.3d at 30–31 (acknowledging that "minimal support for an inference of discriminatory intent" falls below the typical threshold required to satisfy the *Iqbal*-pleading standard).  The dissent appears to argue that we should import this "minimal support" standard into the disparate impact context.  Dissent at 6 ("While *Vega* and *Littlejohn* were disparate treatment cases, their reasoning applies here:  Mandala and Barnett had the 'minimal burden' of alleging facts 'suggesting' an 'inference' of a disparate impact based on race . . . .").  We disagree.  The purpose behind requiring only minimal support for an inference of discrimination at the pleading stage in a disparate treatment case is that the plaintiff must plausibly allege *intentional* discrimination, which "implicate[s] an employer's usually

## C.     The Role of Statistics in Pleading a Disparate Impact Claim

To nudge a disparate impact claim across the line from conceivable to plausible – and, indeed, to ultimately prove such a claim – plaintiffs typically rely on statistical evidence to show a disparity in outcome between groups.  *See Watson*, 487 U.S. at 987; *M.O.C.H.A.*, 689 F.3d at 273; *Malave v. Potter*, 320 F.3d 321, 325 (2d Cir. 2003).  But not just any statistical assessment will do.

At the *prima facie* stage, a plaintiff's statistical analysis "must [demonstrate] that the disparity is substantial or significant, and must be of a kind and degree sufficient to reveal a causal relationship between the challenged practice and the disparity."   *Chin*, 685 F.3d at 151 (internal quotation marks omitted); *see also Malave*, 320 F.3d at 325–26; *Brown v. Coach Stores, Inc.*, 163 F.3d 706, 712–13 (2d Cir. 1998).  Naturally, that standard is relaxed at the pleading stage.  For one thing,

---

unstated intent and state of mind." *Vega*, 801 F.3d at 86; *id.* (acknowledging that "rarely is there 'direct, smoking gun, evidence of [intentional] discrimination'" (internal citation omitted)). Because of the "elusive" nature of such unspoken motivations, it is perhaps understandable why minimal support can nonetheless render a plaintiff's allegations plausible.  *Id.* (internal quotation marks omitted).  But disparate impact claims are different.  There is no need for a plaintiff to demonstrate motive or intent.  *See M.O.C.H.A.*, 689 F.3d at 273.  And as a result, there is no reason to hold that minimal support is all that it takes to render such a claim plausible.  Rather, like any other claim, a disparate impact claim must be supported by allegations that "allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged" – allegations "that are merely consistent with a defendant's liability" won't do.  *Iqbal*, 556 U.S. at 678 (internal quotation marks omitted).  This is all somewhat academic, however, because even if we agreed with the dissent that a disparate impact claim is rendered plausible by mere "minimal support," we do not believe that Plaintiffs' complaint satisfies even that standard.

13

we do not require a plaintiff to prove in detail the methodological soundness of her statistical assessment to survive a motion to dismiss. *See John v. Whole Foods Mkt. Gr., Inc.*, 858 F.3d 732, 737 (2d Cir. 2017). For another, we do not expect a complaint to supplement its statistical analysis with corroborating evidence. *Cf. Littlejohn*, 795 F.3d at 311; *Malave*, 320 F.3d at 326. But even at this early juncture, the statistics must plausibly suggest that the challenged practice *actually* has a disparate impact. *See Adams*, 742 F.3d at 733 (noting that while "basic" "statistical methods and comparisons" can be enough for a Title VII complaint to survive a motion to dismiss, those statistics must still "move the disparate-impact claims over the plausibility threshold").

This means that the statistical analysis must, at the very least, focus on the disparity between appropriate comparator groups. *See Wards Cove Packing Co. v. Atonio*, 490 U.S. 642, 651 (1989) ("Measuring alleged discrimination in the selection of accountants, managers, boat captains, electricians, doctors, and engineers . . . by comparing the number of nonwhites occupying these [skilled] jobs to the number of nonwhites filling [unskilled] cannery worker positions is nonsensical."), *superseded by statute on other grounds*, 42 U.S.C. § 2000e–2(k), *as recognized in Tex. Dep't of Hous. & Cmty. Affs. v. Inclusive Cmtys. Project, Inc.*, 576 U.S. 519 (2015). In

14

other words, the statistical analysis must reveal disparities between populations that are relevant to the claim the plaintiff seeks to prove.  *See Smith v. Xerox Corp.*, 196 F.3d 358, 368 (2d Cir. 1999), *overruled on other grounds by Meacham v. Knolls Atomic Power Lab.*, 461 F.3d 134 (2d Cir. 2006).  For instance, it would make little sense to judge a hospital's physician-hiring policies by looking at the effect those policies have on a population of high school graduates; most members of that group will be ineligible for the job, irrespective of the challenged policy, because they lack a medical degree.

In a typical case concerning racially discriminatory hiring policies, the relevant comparison is between "the racial composition of the at-issue jobs and the racial composition of the qualified population in the relevant labor market."[4] *Wards Cove Packing*, 490 U.S. at 650 (internal alterations and quotation marks omitted); *see also Smith*, 196 F.3d at 368.  Unfortunately, such figures are not always available, particularly before discovery.  So we often allow plaintiffs to rely on other statistics that do not "conform to the *preferred* methodology" so long as they

---

[4] "[A] statistical showing of disparate impact need not, and in [certain] instances . . . should not, be premised on an analysis of the characteristics of *actual* applicants" because would-be applicants might refrain from applying for a position because of a "self-recognized inability . . . to meet the very standards challenged as being discriminatory."  *EEOC v. Joint Apprenticeship Comm. of Joint Indus. Bd. Elec. of Indus.*, 186 F.3d 110, 119–20 (2d Cir. 1999) (emphasis added).

are probative of whether the challenged policy has a disparate impact on the qualified labor pool in question. *Malave*, 320 F.3d at 326; *see also Wards Cove Packing*, 490 U.S. at 651 (holding that "in cases where [the precise] labor market statistics [are] difficult if not impossible to ascertain, . . . [plaintiffs may rely on] certain other statistics . . . [so long as they] are equally probative").

One possible substitute is "figures for the general population." *Wards Cove Packing*, 490 U.S. at 651 n.6 (internal quotation marks omitted); *see also Joint Apprenticeship Comm.*, 186 F.3d at 119. But such national figures will not always be a viable alternative. General population statistics are a reliable surrogate only when there is reason to think that they "accurately reflect the pool of qualified job applicants" for the position in question. *Malave*, 320 F.3d at 326 (internal quotation marks omitted); *see also Dothard v. Rawlinson*, 433 U.S. 321, 330 (1977); *EEOC v. Freeman*, 961 F. Supp. 2d 783, 798 (D. Md. 2013) ("To use general population statistics to create an inference of disparate impact, the general populace must be representative of the relevant applicant pool."), *aff'd*, 778 F.3d 463 (4th Cir. 2015). Otherwise, relying on them to show a disparate impact is a bit like relying on apples to study oranges.

16

### D.     Plaintiffs Have Failed to State a Claim

Plaintiffs allege that NTT has a "policy and practice of denying job opportunities to individuals with certain criminal convictions including felonies (or similar criminal classifications)."[5]  Compl. ¶ 4.  This policy has a disparate impact on qualified African-American applicants, Plaintiffs say, because "African Americans are arrested and incarcerated for crimes at higher rates than [w]hites, relative to their share of the national population."  *Id*. ¶ 52.  But while this reasoning is facially appealing, it ultimately succumbs to a fatal flaw.

Plaintiffs provide no allegations to demonstrate that national arrest or incarceration statistics are in any way representative of the pool of potential applicants qualified for a position at NTT.  All Plaintiffs offer is the conclusory and unsupported assertion that these figures are so stark that they must hold true for this (or any) segment of the population.  But that is not a plausible – or, for that matter, logical – inference.

---

[5] There is some dispute as to the nature of the hiring policy that Plaintiffs challenge.  According to NTT, Plaintiffs have pleaded facts showing only that the company does not hire convicted felons.  Plaintiffs disagree, arguing that they have set forth allegations demonstrating that NTT's policy covers convictions beyond just felonies.  We need not resolve this dispute because the precise contours of the alleged policy do not affect our analysis.

Plaintiffs' analysis fails to distinguish between group averages and total averages. To put it more plainly, it is error for Plaintiffs to simply presume that population-level statistics will accurately describe subgroups of that population. *See Jones v. City of Lubbock*, 730 F.2d 233, 235–36 (5th Cir. 1984) (Higginbotham, *J.*, concurring) (criticizing the assumption that a subgroup is necessarily a "microcosm" of the broader population); *Daye v. Cmty. Fin. Serv. Ctrs., LLC*, 233 F. Supp. 3d 946, 1017 (D.N.M. 2017) (warning that the assumption "that what is true for the whole is true for a subset of the whole . . . can be dramatically wrong").

The danger behind this presumption becomes even more pronounced when there is reason to think that some characteristic unique to the subgroup is related to the statistic in question – in other words, when a confounding variable exists. A simple example of this pitfall would be to apply national height averages to certain subgroups of the population, say NBA players or horse-racing jockeys.

Here, Plaintiffs have offered no allegations to suggest that the general population statistics on which they rely "might accurately reflect [NTT's] pool of qualified job applicants." *Malave*, 320 F.3d at 326 (internal quotation marks and alterations omitted). And while that alone is fatal to their claim, the trouble does not end there.

18

Plaintiffs' claim concerns hiring policies governing what Plaintiffs allege to be skilled positions. Indeed, the positions' titles alone – Salesforce Developer and web developer – reflect that they require at least some educational or technical experience that is not shared by the general population, and the complaint takes great pains to highlight Plaintiffs' qualifications, plainly indicating that those qualifications are relevant to the jobs at the heart of this dispute. And it is beyond cavil that "[w]hen special qualifications are required to fill particular jobs, comparisons to the general population (rather than to the smaller group of individuals who possess the necessary qualifications) may have little probative value." *Hazelwood Sch. Dist. v. United States*, 433 U.S. 299, 308 n.13 (1977); *see also City of Richmond v. J.A. Croson Co.*, 488 U.S. 469, 501–02 (1989) (same); *Burgis v. N.Y.C. Dep't of Sanitations*, 798 F.3d 63, 70 n.7 (2d Cir. 2015) (same).

We therefore see no basis for using national statistics as a proxy for the qualified applicant pools for the developer positions at issue here. After all, it is not much of a stretch to imagine that arrest and conviction rates are negatively correlated with education (at least to some degree). So while Plaintiffs' statistics show that African Americans are on average more likely to have been convicted of a crime than whites, that does not, without more, make it plausible that an

19

African-American web developer with the educational and technical qualifications to work at NTT is more likely to have been convicted of a crime than his Caucasian counterpart.[6]

What, then, are Plaintiffs to do at the pleading stage before they have access to more granular data? For one, they could provide additional allegations to explain why their chosen national statistics are in fact likely to be representative of NTT's qualified applicant pool. *Cf. Dothard*, 433 U.S. at 330. And if they are unable to do so, they could attempt to identify other publicly available information that could plausibly support a Title VII claim here.

Of course, we are sensitive to the fact that Plaintiffs are undoubtedly working from an informational disadvantage at this early point in the proceedings. But that does not mean that they are free to rely on conclusory statistical inferences to force their way into discovery.

---

[6] While Plaintiffs note that they "seek to represent a nationwide class of NTT applicants, covering a broad range of positions," not just Salesforce Developer and web developer applicants, Pls.' Br. at 27, that does not solve Plaintiffs' problem. Setting aside the fact that no class has yet been certified, the complaint's allegations are limited to Salesforce Developer and web developer positions. So we have no idea what other positions NTT offers, what the qualifications for those positions might be, or even whether NTT applies the same alleged hiring policy to them. All we are told is that NTT allegedly does not hire Salesforce Developers or web developers who have been convicted of certain crimes.

In short, if a Title VII plaintiff intends to rely on national statistics to plead a disparate impact claim, she must explain why those statistics can plausibly be expected to hold true for the qualified applicant pool in question. And while we cannot provide a bright line rule for how to make such a showing, the statistics must at least be able to support the plaintiff's claim without resorting to a statistical fallacy.[7]

## IV.    Conclusion

For the reasons set forth above, we **AFFIRM** the district court's judgment.

---

[7] As the district court properly dismissed the sole federal claim, and because neither judicial economy nor principles of fairness would be advanced by keeping this case before the district court, we see no error with the district court's decision to decline supplemental jurisdiction over Plaintiffs' remaining state law claims. *See Delaney v. Bank of Am. Corp.*, 766 F.3d 163, 170 (2d Cir. 2014); *Valencia ex rel. Franco v. Lee*, 316 F.3d 299, 306 (2d Cir. 2003).

CHIN, *Circuit Judge*, dissenting:

As alleged in their complaint, plaintiffs-appellants George Mandala and Charles Barnett were offered jobs by defendant-appellee NTT Data, Inc. ("NTT") -- Mandala a position as a software development consultant in New York and Massachusetts, and Barnett a position as a website designer in Kentucky.  NTT withdrew the offers, however, after learning that Mandala and Barnett had previously been convicted of crimes.  NTT did so pursuant to its blanket policy of denying employment to job applicants based solely on the fact of a prior conviction, without considering individual circumstances such as the nature and circumstances of the offense, its age, whether the crime had any bearing on the applicant's ability to perform the job sought, or evidence of rehabilitation and post-conviction good conduct.

Mandala and Barnett, who are African American, brought this action below, alleging, *inter alia*, that NTT's policy of rejecting applicants for employment because of prior convictions without individualized consideration has a disparate impact on African Americans, in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq*. ("Title VII").  On a disparate impact claim, a plaintiff need not prove intent to discriminate; he is

required only to prove that "a facially neutral employment policy or practice has

a significant disparate impact" on members of a protected group.  *Brown v. Coach

Stores, Inc.*, 163 F.3d 706, 712 (2d Cir. 1998); *see Ricci v. DeStefano*, 557 U.S. 557,

577-78 (2009); *Griggs v. Duke Power Co.*, 401 U.S. 424, 431 (1971) (Title VII

prohibits "not only overt discrimination but also practices that are fair in form,

but discriminatory in operation"); 42 U.S.C. § 2000e-2(k)(1)(A)(i)).[1]  Plaintiffs

supported the allegations in their class action complaint with statistics showing

that, on a national basis, "African Americans are arrested and incarcerated for

crimes at higher rates than Whites, relative to their share of the national

population."  Joint App'x at 15.  The complaint cites statistics from the Federal

Bureau of Investigation (the "FBI"), the U.S. Department of Justice, the U.S.

Census Bureau, and the U.S. Equal Employment Opportunity Commission (the

"EEOC"), as well as audit studies and other scholarly works.

            The district court granted NTT's motion to dismiss the complaint

pursuant to Federal Rule of Civil Procedure 12(b)(6).  The district court rejected

---

[1]      Where a plaintiff shows that a facially neutral employment policy has a disparate impact, the employer may defend by demonstrating that the policy is job related and consistent with business necessity.  *See Ricci*, 557 U.S. at 578.  If the employer does so, the plaintiff can still prevail by showing that the employer's legitimate interests can be served by an alternative that has less of a disparate impact.  *See id.*

plaintiffs' reliance on national statistics, holding that the statistics "do not indicate whether the individuals in the general population cited shared qualifications that would make them viable candidates for either of the positions offered to Plaintiffs."  Joint App'x at 70.  The majority affirms, largely adopting that reasoning, holding that plaintiffs "provide no allegations to demonstrate that national arrest or incarceration statistics are in any way representative of the pool of potential applicants qualified for a position at NTT."  Maj. Op. at 17.

       I would vacate the dismissal of the complaint and remand for further proceedings.  First, in my view, the district court did not properly apply the standards governing Rule 12(b)(6) motions to dismiss, and instead held plaintiffs to a higher standard.  Second, I do not believe plaintiffs' reliance on national statistics was improper, particularly at the pleadings stage and in light of the other detailed facts alleged.  Third, based on the national statistics and other facts alleged in the complaint, I conclude that plaintiffs plausibly alleged that NTT's policy had a disparate impact on African American job applicants in violation of Title VII.  Accordingly, I dissent.

# I.

In my view, the district court did not properly apply the standards

applicable to Rule 12(b)(6) motions to dismiss.  Although it acknowledged the

"plausibility standard" in discussing the "general legal principles," Joint App'x at

67-68, in determining whether the complaint stated a plausible claim, the district

court relied on a decision setting forth the standards for *proving* -- not *pleading* --

a disparate impact case, Joint App'x at 69 (citing *Robinson v. Metro-North

Commuter R.R.*, 267 F.3d 147 (2d Cir. 2001)).  Indeed, the district court wrote as

follows:

> To plead a plausible claim of disparate impact, a plaintiff must
> allege 'that a facially neutral employment policy or practice has a
> significant disparate impact.'  *Brown v. Coach Stores*, 163 F.3d 706, 712
> (2d Cir. 1998).  'To make this showing, a plaintiff must (1) identify a
> policy or practice, (2) demonstrate that a disparity exists, and (3)
> establish a causal relationship between the two.'  *Robinson v. Metro-
> North Commuter R.R.*, 267 F.3d 147, 160 (2d Cir. 2001).

Joint App'x at 69.  The "showing" referred to in the language from *Robinson*,

however, is "the prima facie showing of disparate impact" that a plaintiff must

make as the first of three steps to *prove* a disparate impact claim.  *Robinson*, 267

F.3d at 160.  To *plead* a disparate impact claim, however, a plaintiff is not

required to show, demonstrate, or identify anything -- he need only allege a

plausible claim.  As we have held, for plaintiffs to "'nudge[] their claims across the line from conceivable to plausible,' they must 'raise a reasonable expectation that discovery will reveal evidence' of the wrongdoing alleged, 'even if it strikes a savvy judge that actual proof of those facts is improbable.'"  *Citizens United v. Schneiderman*, 882 F.3d 374, 380 (2d Cir. 2018) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570, 556(2007); *accord Arista Records, LLC v. Doe 3*, 604 F.3d 110, 120 (2d Cir. 2010) (plausibility "simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of illegal[ity]") (quoting *Twombly*, 550 U.S. at 556).

By concluding that plaintiffs were required to make the "showing" discussed in *Robinson* -- "the prima facie showing of disparate impact" required to prove discrimination or survive a summary judgment motion -- the district court erred, for in employment discrimination cases it is now settled that at the pleadings stage a plaintiff is not required to plead (much less "show" or "prove") a prima facie case.  *Robinson*, 267 F.3d at 160.  Rather, as we have held, "a plaintiff has a 'minimal burden' of alleging facts 'suggesting an inference of discriminatory motivation.'"  *Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 85 (2d Cir. 2015) (quoting *Littlejohn v. City of N.Y.*, 795 F.3d 297, 310 (2d Cir.

2015)).  While *Vega* and *Littlejohn* were disparate treatment cases, their reasoning

applies here: Mandala and Barnett had the "minimal burden" of alleging facts

"suggesting" an "inference" of a disparate impact based on race -- facts that

plausibly give rise to an inference that an employment practice "has the effect of

denying members of a protected class equal access to employment

opportunities."  *M.O.C.H.A. Soc'y, Inc. v. City of Buffalo*, 680 F.3d 263, 273 (2d Cir.

2012); *see also Vega*, 801 F.3d at 87 ("On a motion to dismiss, the question is not

whether a plaintiff is *likely* to prevail, but whether the well-pleaded factual

allegations *plausibly* give rise to an inference of unlawful

discrimination, *i.e.,* whether plaintiffs allege enough to 'nudge[ ] their claims

across the line from conceivable to plausible.'") (citations omitted); *see also*

*Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 511-12 (2002) ("under a notice pleading

system, it is not appropriate to require a plaintiff to plead facts establishing a

prima facie case").[2]

---

[2]     The majority fairly notes that there is a difference between disparate treatment
and disparate impact claims in that the former requires intentional discrimination while
the latter does not.  Maj. Op. at n.3.  I do not believe, however, in light of the cases
discussed above, that this difference means that "minimal support" is sufficient to
render a disparate treatment claim plausible while something more is needed for a
disparate impact claim.  In my view, the plausibility standard does not shift depending
on the type of claim.  In any event, I agree with the majority that the issue is "somewhat

As discussed further below, the national statistics and other facts alleged by plaintiffs were sufficient, in my view, to meet this minimal burden, as the statistics and other factual assertions suggest an inference of a disparate impact.  Instead of measuring plaintiffs' allegations by this "minimal" standard, the district court engaged in the kind of analysis appropriate only at trial: weighing and rejecting the evidence and finding that the national statistics were "inadequate to show a relationship between the pool of applicants who are Caucasian versus African Americans and their respective rates of felony convictions."  Joint App'x at 70-71.  Instead of drawing the reasonable inferences in favor of plaintiffs, the district court rejected the national statistics, requiring plaintiffs to present more: the precise statistical evidence they would use to *prove* their claim.  This was error.  As the Seventh Circuit has observed, "'[d]isparate impact plaintiffs are permitted to rely on a variety of statistical methods and comparisons to support their claims,'" and "'[a]t the pleading stage, some basic allegations of this sort will suffice.'"  *Chaidez v. Ford Motor Co.*, 937 F.3d 998, 1007 (7th Cir. 2019) (citation omitted); *see also, e.g., John v. Whole Foods Mkt. Group, Inc.*, 858 F.3d 732, 737 (2d Cir. 2017) ("At the pleading stage, [plaintiff] need not prove

---

academic" in this case, *id.*, as the district court required plaintiffs to go well beyond plausibility.

the accuracy of [a statistical study's] findings or the rigor of its methodology; he

need only generally allege facts that, accepted as true, make his alleged injury

plausible."); *Brown v. City of N.Y.*, No. 16 Civ. 1106, 2017 WL 1102677, at *6

(E.D.N.Y. Mar. 23, 2017) ("[S]tatistics that may ultimately prove insufficient can

nevertheless support a plausible inference of disparate impact on a motion to

dismiss.").

## II.

Next, plaintiffs' reliance on national statistics was appropriate, and

surely so at the pleadings stage of the litigation.

As the majority acknowledges, in some circumstances national

statistics *can* be probative of whether a challenged policy has a disparate impact.

The cases have so held.  In *Dothard v. Rawlinson*, for example, the Supreme Court

observed that "[t]here is no requirement . . . that a statistical showing of

disproportionate impact must always be based on analysis of the characteristics

of actual applicants."  433 U.S. 321, 330 (1977).  There, the plaintiffs were

permitted to rely on national height and weight data for men and women, even

though the defendant argued that the only relevant data was that of the

applicant pool for corrections officer positions in Alabama.  *Id*. at 329-30.

8

Likewise, in *Malave v. Potter*, this Court rejected the district court's holding, on a summary judgment motion, that plaintiffs were required to provide statistical information as to "the applicant pool or the eligible labor pool." 320 F.3d 321, 325-26 (2d Cir. 2003). We rejected the district court's "adoption of a rule that the lack of statistical information as to an applicant pool always renders it impossible to establish a prima facie disparate impact case." *Id*. at 327. We remanded for the district court to determine, *inter alia*, "the most appropriate labor pool," and reminded the district court of "the Supreme Court's teaching that 'statistics come in infinite variety and . . . their usefulness depends on all of the facts and surrounding circumstances.'" *Id*. (quoting *Watson v. Fort Worth Bank & Trust*, 487 U.S. 977, 994 (1988)); *see also EEOC v. Joint Apprenticeship Comm. of Joint Indus. Bd. of Elec. Indus.*, 164 F.3d 89, 97 (2d Cir. 1998) (at summary judgment, plaintiff's prima facie case can include "studies based on general population data"). And in *Wards Cove Packing Co. v. Atonio*, the Supreme Court recognized that "where 'figures for the general population might . . . accurately reflect the pool of qualified candidates,' . . . we have even permitted plaintiffs to rest their prima facie cases on such statistics as well." 490 U.S. 642, 651 n.6 (1989) (citation omitted). The Court noted that "where such labor market statistics [of

the racial composition of qualified persons in the labor market and the persons

holding at-issue jobs] will be difficult if not impossible to ascertain, . . . certain

other statistics -- such as measures indicating the racial composition of

'otherwise-qualified applicants' for at-issue jobs -- are equally probative for this

purpose." *Id*. at 651.

       Hence, general population statistics may be relevant in a disparate

impact case, depending on the facts and surrounding circumstances.  It was

premature for the district court to conclude, on a motion to dismiss for failure to

state a claim, that the national statistics were not relevant.  The complaint alleges

that NTT is a "global" information technology services company with some

18,000 employees in North America and over twenty offices in the United States,

and it contends that NTT's policy has a national disparate impact.  The specific

allegations support the assertion of a national impact:  Mandala applied for a

Salesforce Developer position while residing in Rochester, New York, and he

was offered a position as an Application Software Development Senior Principal

Consultant in Wellesley, Massachusetts (to work remotely).  Barnett applied for a

web developer position while residing in Frankfort, Kentucky, and was offered

employment designing websites for the Kentucky Department of Education.

Both were impacted by NTT's policy even though they lived in different parts of the country and applied for different types of work. After Barnett's offer was withdrawn, he "sought to apply for other positions with NTT," but NTT would not consider him for any position because of its policy. Joint App'x at 14. And, the complaint alleges, NTT's policy "systematically eliminates qualified African American applicants based on their race, color or national origin," Joint App'x at 8, throughout the United States.

In light of these allegations, it was surely premature for the district court to conclude that national statistics had no probative value. Given the alleged impact of the policy in such distant areas as Rochester, New York, Wellesley, Massachusetts, and Frankfort, Kentucky, the alleged impact of the policy on different jobs (salesforce developer, software development consultant, software developer, and "other positions with NTT," Joint App'x at 14), and the alleged impact of the policy nationally, the national statistics were relevant and should not have been rejected by the district court at the pleadings stage.

In rejecting the national statistics, the district court faulted plaintiffs for not "alleg[ing] facts showing that [NTT]'s facially-neutral policy of not hiring convicted felons is related to the statistical disparity in the numbers of African-

11

Americans arrested and convicted of crimes in proportion to their representative

numbers in the pool of qualified applicants for [NTT]'s positions."  Joint App'x at

70.  But the district court did not identify what that pool is, *see Malave v. Potter*,

320 F.3d at 327 (remanding for district court to consider "the most appropriate

labor pool"), and information as to NTT's "pool of qualified job applicants" --

whatever that pool is -- is not something that would be readily available without

discovery, *see Wards Cove Packing Co.*, 490 U.S. at 651 (noting that where statistics

as to racial composition of qualified persons in labor market and persons holding

at-issue jobs would be "difficult if not impossible to ascertain," other statistics,

including national statistics, could be considered).  Accordingly, it was error, in

my view, for the district court to conclude, on a motion to dismiss, before

plaintiffs had the opportunity to seek discovery, that the national statistics were

of no value.[3]

---

[3]      A number of courts have relied on national statistics in denying motions to
dismiss claims challenging criminal background checks as having a disparate impact
based on race.  *See, e.g.*, *Smith v. Home Health Solutions, Inc.*, No. 17 Civ. 30178, 2018 WL
5281743, at *3 (D. Mass. Oct. 24, 2018) (denying motion to dismiss disparate impact
claim where plaintiffs alleged African Americans "are arrested in numbers
disproportionate to their representation in the general population," citing "national
data"); *Williams v. Compassionate Care Hospice*, No. 16 Civ. 2095, 2016 WL 4149987, at **4-
5 (D.N.J. Aug. 3, 2016) (denying motion to dismiss disparate impact claim where
plaintiffs alleged "blanket criminal background check" led to a "disproportionate impact
on African Americans," relying on national statistics); *Williams v. Wells Fargo Bank, N.A.*,

## III.

Finally, plaintiffs plausibly alleged that NTT's policy had a disparate impact on African American job applicants in violation of Title VII.

First, plaintiffs alleged that NTT's policy had an adverse impact on them personally.  Mandala and Barnett both received offers of employment from NTT.  The offers were withdrawn, however, once NTT learned that they had prior convictions.  NTT never asked Mandala and Barnett for information about their convictions or rehabilitation or post-conviction conduct.  Barnett, for example, had obtained two degrees, including a masters in computer science technology -- *after* his conviction.  He also worked for four years for the Commonwealth of Kentucky doing information technology and administrative

---

No. 4-15-cv-38, 2015 WL 13753220, at *1 (S.D. Iowa Aug. 6, 2015) (denying motion to dismiss claim brought by seven African American plaintiffs alleging that bank's hiring and background check policy "disproportionately affected minorities"); *McCain v. United States*, No. 14 Civ. 92, 2015 WL 1221257, at *17 (D. Vt. Mar. 17, 2015) (denying motion to dismiss disparate impact claim challenging "blanket" background check policy, relying on national statistics); *see also Lee v. Hertz Corp.*, 330 F.R.D. 557, 561 (N.D. Cal. 2019) ("Since Plaintiffs aver Latinos were arrested and convicted of crimes at more than double the rates of whites, it is plausible that Defendants' Screening Policy has a disparate impact on Latinos by tending to deprive them of employment opportunities because of their race or national origin."); *Houser v. Pritzker*, 28 F. Supp. 3d 222 (S.D.N.Y. 2014) (certifying class of applicants denied employment because of criminal histories due to blanket criminal screen); *Gregory v. Litton Sys., Inc.*, 316 F. Supp. 401, 403 (C.D. Cal. 1970) (criminal arrest screen "has the foreseeable effect of denying black applicants an equal opportunity for employment"), *modified*, 472 F.2d 631 (9th Cir. 1972).

work -- *after* his conviction.  But these facts were not considered by NTT because

of its blanket policy.  Mandala and Barnett were clearly qualified for the NTT

positions -- they were offered employment -- but the policy barred them from

employment without any individualized consideration of the circumstances of

their convictions, the relationship between their criminal history and their ability

to perform the jobs, or their efforts to rehabilitate and post-conviction conduct.[4]

Second, the national statistics set forth in the complaint show that

"African Americans are arrested and incarcerated for crimes at higher rates than

Whites, relative to their share of the national population."  Joint App'x at 15.

Those statistics include:

> ● as of 2010, 40% of prisoners in the United States
> were African American, while African Americans represented only
> 13% of the overall U.S. population (Prison Policy Initiative study)[5];

---

[4]  The New York statute, for example, provides that an employer may not deny
employment because of an individual's prior conviction unless (1) there is "a direct
relationship" between the offense and the position sought or (2) the granting of
employment would present an "unreasonable risk" to property, specific individuals or
the general public.  N.Y. Correct. Law § 752 (McKinney 2019).  In making this
determination, the employer "shall consider," *inter alia*, the "bearing, if any," the offense
will have on the applicant's fitness or ability to perform his duties, the time elapsed
since the conviction, the applicant's age at the time the offense was committed, and
information concerning rehabilitation and good conduct.  N.Y. Correct. Law § 753
(McKinney 2019); *see also* N.Y. Exec. Law § 290 *et seq.* (McKinney 2019); N.Y. Correct.
Law § 750 *et seq* (McKinney 2019).  As a New York resident, Mandala asserted state law
claims, but the district court did not reach them.

[5]  The Prison Policy Initiative study reports racial disparities in incarceration rate
not just nationally but in every state.  *See* Leah Sakala, *Breaking Down Mass Incarceration*

- some 26.9% of arrests are of African Americans, double their percentage of the general population (FBI and Census statistics);

- projections based on recent trends in incarceration estimate that one out of every three African American males born today will go to prison, compared to just one out of every seventeen White males (Prison Journal study)[6];

- audit studies conducted by researchers at Harvard and Princeton found that African Americans with criminal records were particularly disadvantaged in the job market compared to Whites with criminal records (scholarly journals); and

- the Department of Justice found that Blacks are arrested and convicted at higher rates than Whites, leading the EEOC to conclude that "[n]ational data supports a finding that criminal record exclusions have a disparate impact based on race and national origin."  Joint App'x at 15.[7]

---

*in the 2010 Census: State-by-State Incarceration Rates by Race/Ethnicity*, Prison Pol'y Initiative (May 28, 2014) (https://www.prisonpolicy.org/reports/rates.html).

[6]     *See* Marc Mauer, *Addressing Racial Disparities in Incarceration*, 91 Prison J. 87S, 88S (2011).

[7]     The complaint does not cite the specific statistics relied on by the EEOC, but it cites an EEOC Enforcement Guidance that, in turn, cites Department of Justice statistics showing that, as of 2010, Black men were imprisoned at the rate of 3,074 per 100,000, while White men were imprisoned at the rate of 459 per 100,000.  *See* EEOC Enforcement Guidance on Consideration of Arrest and Conviction Records in Employment Decisions Under Title VII of the Civil Rights Act of 1964, at 9-10 (April 25, 2012) ("EEOC Guidance") (https://www.eeoc.gov/ laws/guidance/enforcement-guidance-consideration-arrest-and-conviction-records-employment-decisions) (citing U.S. Dep't of Justice, Bureau of Just. Stat., Prisoners in 2010, at 27 Table 14 (2011) (https://bjs.gov/content/pub/pdf/p10.pdf).

Based on these national statistics, plaintiffs plausibly alleged, at least as a general matter, that a policy that precludes employment opportunities based solely on an individual's criminal record, without consideration of the circumstances of the conviction or the individual's efforts at rehabilitation, has a disparate impact on African Americans seeking employment.

Finally, the question is whether the national statistics provide support, at the motion to dismiss stage, for plaintiffs' claim of disparate impact discrimination. They do. They are a logical starting point for a disparate impact analysis, as plaintiffs are alleging a national impact. It may be that statistics as to a specific applicant pool, *e.g.*, salesforce developers in upstate New York, software consultants in Massachusetts, software developers in Kentucky, "other positions" with NTT, or -- in the majority's words -- applicants "representative of the pool of potential applicants qualified for a position at NTT," Maj. Op. at 17, would be more accurate. But the absence of such statistics at the motion to dismiss stage should not be fatal to plaintiffs' claims, as the appropriate applicant pool likely cannot be defined until after discovery, when more details about NTT's job requirements and applicant pools would become available. Moreover,

some of this information would only be in NTT's possession and likely is not

publicly available.[8]  And even if specific applicant pool statistics would be more

precise, general population statistics would still be relevant and a logical part of

the analysis.  *See Williams*, 2016 WL 4149987, at *5 ("Although the Court agrees

with Defendant that the [national] statistics are not tailored to the New Jersey

counties in which Defendant does business, the Court finds that they lend

sufficient support to Plaintiff's allegations to survive the Motion to Dismiss.").

       It may turn out, after the parties have completed discovery and the

appropriate applicant pool is determined, that the probative value of the national

statistics is low, but it is certainly plausible that the racial disparities in the

general statistics will not disappear once the statistics for particular job markets

are ascertained.  It may turn out, I suppose, that NTT's applicant pool differs to

such an extent from the general population that the national statistics will be

entirely irrelevant, but it is certainly plausible, at the pleadings stage, that NTT's

---

[8]     Questions include, for example:  what were the positions in question?  what were the qualifications necessary for those positions?  what was "the pool of qualified candidates?"  what was the appropriate geographic area to be considered?  or was NTT considering applicants on a national basis because successful candidates would work remotely?  what are the contours of NTT's criminal history screen?  what were the demographics of the individuals in the pool of qualified candidates?  what were the demographics of those who applied?  were there individuals who did not apply because of the blanket policy?  and what were their demographics?

17

applicant pool will not differ significantly from the general population.  It is

unlikely, in my view, that the racial disparities in arrest and incarceration rates

that exist nationally and in every state somehow disappear at NTT.

*  *  *  *  *

As the statistics show, there are significant racial disparities in arrest,

conviction, and incarceration rates in this country.  As scholars and the EEOC

have recognized, criminal history screens can have a substantial adverse

disparate impact based on race,[9] and, as discussed above, a number of courts

have denied motions to dismiss disparate impact claims using general

population statistics to challenge such policies, concluding that plaintiffs had

plausibly stated a disparate impact claim under Title VII.  Some states, including

New York, recognize the harm that blanket criminal history screens can cause,

forbidding companies from denying employment solely because a job applicant

has a criminal record, and instead requiring employers to engage in an

---

[9]      *See* EEOC Guidance, *supra* (national data "supports a finding that criminal record exclusions have a disparate impact based on race and national origin"); Devah Pager, *The Mark of a Criminal Record*, 108 Am. J. Soc. 937, 959 (2003) ("The effect of a criminal record is . . . 40% larger for blacks than for whites."); Devah Pager, Bruce Western, & Naomi Sugie, *Sequencing Disadvantage: Barriers to Employment Facing Young Black and White Men with Criminal Records*, 623 Annals Am. Acad. Pol. & Soc. Sci., 195, 196 (2009) (finding a significant negative effect of a criminal record on employment outcomes, and one that appears substantially larger for African Americans").

individualized consideration.  If the facts alleged in the complaint are true, then

Mandala and Barnett are vivid examples of the adverse impact an absolute

convictions bar can have on individuals generally -- and African Americans in

particular -- seeking employment.  As the Eighth Circuit recognized many years

ago:

> We cannot conceive of any business necessity that would
> automatically place every individual convicted of any offense,
> except a minor traffic offense, in the permanent ranks of the
> unemployed.  This is particularly true for blacks who have suffered
> and still suffer from the burdens of discrimination in our society.  To
> deny job opportunities to these individuals because of some conduct
> which may be remote in time or does not significantly bear upon the
> particular job requirements is an unnecessarily harsh and unjust
> burden.

*Green v. Missouri Pac. R. Co.*, 523 F.2d 1290, 1298 (8th Cir. 1975).  These

observations still hold true today.

I respectfully dissent.