# Exhibit A

**OUTTEN & GOLDEN LLP**
Ossai Miazad
Christopher McNerney
685 Third Avenue, 25th Floor
New York, New York 10017

**NAACP LEGAL DEFENSE &
EDUCATIONAL FUND, INC.**
Rachel M. Kleinman
40 Rector Street, Fifth Floor
New York, NY 10006

## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| GEORGE MANDALA and CHARLES BARNETT, individually and on behalf of all others similarly situated, <br><br> Plaintiffs, <br><br> v. <br><br> NTT DATA, INC., <br><br> Defendant. | Case No. 6:18-cv-06591-CJS <br><br> FIRST AMENDED CLASS ACTION COMPLAINT <br><br> Jury Trial Demanded |

Plaintiffs George Mandala and Charles Barnett, individually and on behalf of all others similarly situated, allege, upon personal knowledge as to themselves and upon information and belief as to other matters, as follows:

## NATURE OF THE ACTION

1.       As the U.S. Commission on Civil Rights has found, "[w]hen the collateral consequences [of criminal convictions] are unrelated [either to the underlying crime for which a person has been convicted or to a public safety purpose], their imposition generally negatively affects public safety and the public good."[1]  Therefore, "[e]mployers should not automatically

---

[1]       U.S. Commission on Civil Rights, *Collateral Consequences: The Crossroads of Punishment, Redemption, and the Effects on Communities* (June 2019), at 133, *available at* https://www.usccr.gov/pubs/2019/06-13-Collateral-Consequences.pdf.

disqualify a candidate with a criminal record, except in circumstances when the criminal record directly conflicts with the scope of employment."[2]

2.    NTT Data, Inc. ("Defendant" or "NTT"), one of the largest information technology ("IT") services providers in the world, and with offices across the United States, routinely rejects job applicants with criminal records like George Mandala ("Mr. Mandala") and Charles Barnett ("Mr. Barnett"), pursuant to an overbroad criminal history screening policy and practice.

3.    Plaintiffs applied for and received an offer for a job with NTT.  However, NTT subsequently and unjustifiably withdrew their job offers based on an overly restrictive criminal history screening policy triggering rejection without any individualized analysis.

4.    Because African Americans, like Plaintiffs, are subjected to arrest and conviction at disproportionally higher rates than whites regardless of education level and across demographic groups, NTT's policy and practice of denying individuals job opportunities based on their criminal history has an unjustified disparate impact on African Americans, that is not job related or consistent with any business necessity.  NTT's policy also does not adequately measure whether (i) an applicant's criminal history has a direct relationship to the employment sought or (ii) the applicant poses an unreasonable risk to persons or property.

5.    Because these practices perpetuate gross racial disparities in the criminal justice system, Plaintiffs allege they are unlawful under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq* ("Title VII").

6.    Plaintiff George Mandala, who is a resident of New York, further alleges that NTT violated his rights and the rights of those similarly situated under the New York Human

---

[2]    *Id.* at 137.

Rights Law, N.Y. Exec. Law § 290 *et seq.* ("NYHRL"), Article 23-A of the New York State

Correction Law, N.Y. Corr. Law § 750 *et seq.* ("Correction Law"), and the New York State Fair

Credit Reporting Act ("NY FCRA"), N.Y. Gen. Bus. Law § 380 *et seq*.

7.    Through this lawsuit, Plaintiffs will show that the conduct outlined in this

Complaint constitutes unlawful discrimination and clearly violates Title VII as well as New York

State law and the stated public policy of New York to remove barriers to employment for New

Yorkers who have paid the penalties for any crimes they may have committed.

8.    Accordingly, Plaintiffs seeks damages and injunctive and declaratory relief on

behalf of themselves and all other NTT applicants similarly impacted in New York and

nationwide, as outlined further below.

## JURISDICTION AND VENUE

9.    This Court has jurisdiction over Plaintiffs' Title VII claims pursuant to 28 U.S.C.

§ 1331.  This Court also has jurisdiction over Plaintiffs' NYHRL and NY FCRA claims pursuant

to 28 U.S.C. § 1367 (supplemental jurisdiction).

10.    Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because a

substantial part of the events and omissions giving rise to the claims alleged herein occurred in

this District.

11.    This Court is empowered to issue a declaratory judgment pursuant to 28 U.S.C.

§§ 2201 and 2202.

12.    Plaintiffs have exhausted their administrative remedies and complied with all

statutory prerequisites to their Title VII claims.  Plaintiff Mandala filed a charge of

discrimination, individually and on behalf of individuals similarly situated with the Equal

Employment Opportunity Commission ("EEOC") on June 2, 2017.  By notice dated May 17,

2018, the EEOC issued a Notice of Right to Sue. The original Complaint in this action was filed within ninety days of the Notice of Right to Sue. Under the Second Circuit's application of the single-filing rule, Mr. Barnett may "piggy-back" on Mr. Mandala's previous filing, because Mr. Mandala's EEOC charge relates to the same claims that Mr. Barnett asserts.

## PARTIES

### Plaintiffs

13.      Plaintiffs and the proposed Class Members they seek to represent are each "persons," "individuals," "consumers," and "applicants for employment" within the meaning of the NYHRL, the NY FCRA, and Title VII.

14.      Plaintiffs have criminal convictions.

15.      Plaintiff Mandala is an African American resident of Rochester, New York, who received a job offer from NTT as a Salesforce Developer. NTT subsequently withdrew Plaintiff Mandala's job offer due to his criminal conviction, which was a non-violent conviction for DWI from 2014. NTT did not provide Plaintiff with a copy of Article 23-A of the Correction Law in the time and manner required by N.Y. Gen. Bus. Law § 380-g(d).

16.      Plaintiff Barnett is an African American resident of Frankfort, Kentucky who received a job offer from NTT as a web developer for the Commonwealth of Kentucky. NTT subsequently withdrew Plaintiff's job offer due to his criminal conviction.

### Defendant

17.      NTT is a global IT services company that employs over 110,000 people worldwide, including approximately 18,000 employees in North America.

18.      At all relevant times, NTT has been an employer as defined by Title VII and the NYHRL, and a private employer as defined by the Correction Law.

19.     At all relevant times, NTT has been an employer as defined by the NYHRL, and a private employer as defined by the Correction Law.

20.     At all relevant times, NTT has or should have been aware of the requirements of the NY FCRA, and yet has disregarded those requirements.

21.     At all relevant times, NTT has been a "person, firm, corporation or other entity" requesting "consumer reports" of Plaintiff and proposed Class Members for "employment purposes" and has taken "adverse action" against Plaintiff and similarly situated applicants, as defined by the NY FCRA, for example by preventing them from explaining or challenging their rejections of employment.  These adverse actions have been based wholly or in part on those consumer reports.

### STATEMENT OF FACTS

**Plaintiff George Mandala**

22.     In or around January or February of 2017, Mr. Mandala applied for a job as a Salesforce Developer with NTT.

23.     Mr. Mandala had two telephone interviews with NTT employees, during which the NTT employees asked him questions related to the position and he answered competently.

24.     Mr. Mandala successfully completed his two telephone interviews and supplied NTT with professional references.

25.     NTT subsequently told Mr. Mandala that, while employed by NTT, he would be contracted to a company based in Wellesley, Massachusetts, and working remotely based out of his home in Rochester, New York.

26.     NTT sent Mr. Mandala a formal offer letter on March 22, 2017, signed by Patricia Price, a Senior Recruiter with NTT, offering Mr. Mandala a job as an Application Software Development Senior Principal Consultant.

27.     The offer letter stated that NTT's "management team was impressed with [Mr. Mandala's] credentials and experience," and that Mr. Mandala would "work out of NTT DATA's remote home office to begin on April 3, 2017."

28.     Mr. Mandala accepted NTT's offer of employment via correspondence dated March 23, 2017.

29.     Mr. Mandala authorized a background check pursuant to NTT's policy, and NTT obtained a criminal background check on Mr. Mandala from a consumer reporting agency.

30.     On March 30, 2017, Mr. Mandala attended a pre-orientation telephone call with other new employees.

31.     On the same day, Mr. Mandala received an e-mail from Patricia Price, asking "Could you give me a call to discuss your background check?"

32.     Mr. Mandala called Ms. Price and Ms. Price informed Mr. Mandala that NTT had a policy not to hire persons with felonies on their records.

33.     Mr. Mandala thereafter received a letter from NTT, signed by Ms. Price, dated April 6, 2017, which stated that NTT was withdrawing Mr. Mandala's job offer, and that "[t]his action was influenced by information contained in a consumer report, made at [NTT's] request and provided by . . . ASURINT[.]"

34.     During the interview process, and afterwards, NTT never sought or considered information from Mr. Mandala which would enable it to fully evaluate the factors laid out in Section 753 of the Correction Law.  For example, after reviewing Mr. Mandala's background

6

check, NTT never asked Mr. Mandala for information regarding the circumstances of his convictions or evidence of Mr. Mandala's rehabilitation or good conduct.  Furthermore, NTT's action was indicative of a policy and practice of denying job opportunities to individuals with criminal convictions, which does not adequately measure risk or the relationship of the conviction to the job, and does not permit NTT to fully evaluate the factors laid out in Section 753 of the Correction Law.

35.    Had NTT performed a legally compliant analysis, NTT would not have denied employment to Mr. Mandala because of his criminal conviction, which is a non-violent felony conviction for Driving While Intoxicated ("DWI") from 2014.  That conviction had no direct relationship to the employment Mr. Mandala sought and did not create an unreasonable risk to property or to the safety or welfare of specific individuals or the general public.

36.    NTT did not provide Mr. Mandala with a copy of Article 23-A of the Correction Law in the time and manner required by N.Y. Gen. Bus. Law § 380-g(d).

37.    This experience is not unique to Mr. Mandala. NTT stated, when posting for a Network/Systems Administrator in New York City, that part of its "Basic Qualifications" for employment is a requirement that an applicant have "No prior felony arrests. No drug related arrests."  Ex. 1.

38.    On June 2, 2017, Mr. Mandala filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC"), filed contemporaneously with the the New York State Division of Human Rights, based on NTT's denial of employment.  On May 17, 2018, the EEOC issued Mr. Mandala a Notice of Right to Sue.

**Plaintiff Charles Barnett**

39.    In or around July 2017, NTT contacted Mr. Barnett regarding an opportunity to

work on a contract with the Commonwealth of Kentucky as a web developer. Mr. Barnett said that he would be interested in the position and signed a "Right to Represent" form agreeing that NTT could present him to the Commonwealth of Kentucky for the position.

40.    Mr. Barnett understood that the job to which he applied would involve working on websites for the Kentucky Department of Education, though he would be an employee of NTT.

41.    After several phone calls with Katie Sargent, an NTT recruiter who collected Mr. Barnett's application information, Mr. Barnett had a phone interview with Mark McChesney, the NTT project director, and another NTT employee, Fonyam Atanga.

42.    The interview was successful and Mr. Barnett advanced to the next round.

43.    Mr. Barnett had an in-person interview with NTT employee Mr. Atanga, and this interview was also successful.

44.    After Mr. Barnett's in-person interview, Ms. Sargent told Mr. Barnett he had received an offer of employment, and she sent Mr. Barnett an offer of employment via email, which Mr. Barnett accepted.

45.    Mr. Barnett authorized a background check pursuant to NTT's policy.

46.    NTT obtained a criminal background check on Mr. Barnett from a consumer reporting agency.

47.    After the background check was completed, Ms. Sargent informed Mr. Barnett via phone that NTT was withdrawing its offer of employment to Mr. Barnett as a result of Mr. Barnett's convictions.

48.    NTT provided Mr. Barnett with a "Right-To-Represent" contracts for other open positions, which he signed.

49.     Mr. Barnett subsequently sought to apply for other positions with NTT, but several weeks after he sought to apply for these positions, Ms. Sargent informed Mr. Barnett that NTT would not submit Mr. Barnett's profile for other positions because of his felony convictions.

50.     Notably, after the convictions at issue but prior to applying to NTT, Mr. Barnett was an employee of the Commonwealth of Kentucky for approximately four years, performing IT work and project coordination as an Administrative Specialist.

51.     During the interview process, and afterwards, NTT never sought or considered information from Mr. Barnett regarding the circumstances of his convictions or evidence of Mr. Barnett's rehabilitation or good conduct.  Furthermore, NTT's action was indicative of a policy and practice of denying job opportunities to individuals with criminal convictions, a policy and practice that does not permit NTT to consider the factors outlined by the 2012 EEOC Enforcement Guidance on the Consideration of Arrest and Conviction Records in Employment Decisions under Title VII of the Civil Rights Act of 1964.

**Factual Allegations Common to All Class Members**

***Title VII and NYHRL Disparate Impact Claims***

52.     As the U.S. Commission on Civil Rights recently reported, "when employers use criminal background checks to indiscriminately disqualify all applicants with criminal records, these employers severely curtail employment opportunities for formerly incarcerated people."[3] Moreover, "[b]ecause black and Latino individuals are likelier to have criminal records than white and Asian people, . . . black and Latino males are disproportionately affected by criminal

---

[3]     U.S. Commission on Civil Rights, *Collateral Consequences: The Crossroads of Punishment, Redemption, and the Effects on Communities* (June 2019), at 42, *available at* https://www.usccr.gov/pubs/2019/06-13-Collateral-Consequences.pdf.

background checks."[4]

53.    NTT's policy and practice of denying job opportunities to individuals with non-job-related convictions had and continues to have a significant and detrimental impact on African Americans, based on their race, color and/or national origin, as compared to white applicants.  African Americans are arrested, sentenced, and imprisoned for crimes at substantially higher rates than whites, relative to their share of the national population.[5]

54.    According to a report to the United Nations Special Rapporteur on Contemporary Forms of Racism, Racial Discrimination, Xenophobia, and Related Intolerance, "[i]n 2010, 8% of all adults in the United States had a felony conviction on their record" but "[a]mong African-American men, the rate was one in three."[6]  The same report showed that "African-American adults are 5.9 times as likely to be incarcerated than whites," based on Bureau of Justice Statistics from 2016, which derived estimates based on prisoners sentenced for more than one

---

[4]    *Id.*

[5]    *See* U.S. Department of Justice, Federal Bureau of Investigation, *Crime in the United States 2016*, Table 21A (Arrests by Race and Ethnicity), *available at* https://ucr.fbi.gov/crime-in-the-u.s/2016/crime-in-the-u.s.-2016/topic-pages/tables/table-21 (showing 26.9% of arrests are of Black or African American individuals, while 69.6% of arrests are of white individuals); U.S. Census Bureau, *Quick Facts, United States* (2017), *available at* https://www.census.gov/quickfacts/fact/table/US/PST045217 (showing Black or African American individuals make up approximately 13.4% and whites make up 76.6% of the United States population). *See also EEOC Enforcement Guidance on the Consideration of Arrest and Conviction Records in Employment Decisions Under Title VII of the Civil Rights Act of 1964*, at 9-10 (April 25, 2012) (national data showing Black individuals arrested and convicted at higher rates than whites "supports a finding that criminal record exclusions have a disparate impact based on race and national origin").

[6]    Report of The Sentencing Project to the United Nations Special Rapporteur on Contemporary Forms of Racism, Racial Discrimination, Xenophobia, and Related Intolerance: Regarding Racial Disparities in the United States Criminal Justice System, The Sentencing Project (2018) at 9, *available at* https://www.sentencingproject.org/wp-content/uploads/2018/04/UN-Report-on-Racial-Disparities.pdf.  As is widely acknowledged, racial disparities in arrest and conviction rates in the United States are themselves the result of systemic discrimination in the criminal justice system.  *See generally, id.*

year.[7]  Further, "[i]n 2016, black Americans comprised 27% of all individuals arrested in the United States—double their share of the total population."[8]  Projections based on recent trends in incarceration estimate that one out of every three African American males born today will go to prison, compared to just one out of every seventeen white males.[9]

55.     These trends are equally salient in New York State.  According to data compiled by the Sentencing Project, as of 2014, the Black imprisonment rate in New York State was 896 per 100,000, compared to a white imprisonment rate of 112 per 100,000.[10]  According to the Bureau of Justice Statistics, in 2016 there were 24,370 Black prisoners under the jurisdiction of state or federal correctional authorities in New York, nearly double the number of white prisoners (12,391).[11]  This is so even though Black people make up approximately 17.6% of the statewide population.[12]  Finally, the New York State Department of Corrections and Community Supervision reported in 2016 that African Americans made up 48.6% of inmates under state

---

[7]      *Id.* at 2 (citing U.S. Bureau of Justice Statistics, Prisoners in 2016, 8 tbl.6 (Jan. 2018), *available at* https://www.bjs.gov/content/pub/pdf/p16.pdf).

[8]      *Id.  See also* Leah Sakala, *Breaking Down Mass Incarceration in the 2010 Census: State-by-State Incarceration Rates by Race/Ethnicity*, Prison Pol'y Initiative (May 28, 2014), http://www.prisonpolicy.org/reports/rates.html.

[9]      Marc Mauer, *Addressing Racial Disparities in Incarceration*, 91 Prison J. 87S, 88S (2011), *available at* https://www.sentencingproject.org/wp-content/uploads/2016/01/Addressing-Racial-Disparities-in-Incarceration.pdf.

[10]     The Sentencing Project, State-by-State Data, *available at* https://www.sentencingproject.org/the-facts/#detail?state1Option=New%20York&state2Option=0.  Another estimate using 2010 Census data shows 1,655 Blacks incarcerated per 100,000 people in that racial/ethnic group, compared to 219 whites per 100,000.  Prison Policy Initiative, New York profile, *available at* https://www.prisonpolicy.org/profiles/NY.html.

[11]     U.S. Bureau of Justice Statistics, Prisoners in 2016, 24 tbl.21 (Jan. 2018), *available at* https://www.bjs.gov/content/pub/pdf/p16.pdf.

[12]     United States Census, QuickFacts: New York, *available at* https://www.census.gov/quickfacts/fact/table/NY/RHI225219#RHI225219.

custody, while whites made up 24.4% of inmates under state custody.[13]  As an additional example of the severe racial disparity in the New York justice system, New York has one of the largest disparities in marijuana possession arrest rates between Black and white people, with Black people over 4.5 times as likely to be arrested for marijuana possession as white people.[14]

56.     Unequal treatment persists throughout the criminal justice system. According to leading sociologists and criminologists, the differences in criminal conviction rates between white persons and Black persons in America are not only very large, but they are also historical and pervasive across geographic and demographic groups.  The racial disparities are so pervasive that there are no statistics available to suggest that Black and white people are treated equally at the hands of the criminal justice system in *any* segment of society, be it geographic location, educational level or socio-economic status.  *See* Ex. 2.

57.     Black men with some college education have imprisonment risks that are seven (7) times greater than white men with some college education (4.9% for Black men compared to 0.7% for white men). This is consistent with the racial disparities that exist among individuals with lesser educational attainment.[15]

58.     One clear example of how racial discrimination in the criminal justice system persists regardless of educational level concerns discriminatory policing on college campuses. In a recent study, more than two-thirds of college students surveyed agreed with the following

---

[13]     New York State Dep't of Corrections and Community Supervision, Under Custody Report: Profile of Under Custody Population as of January 1, 2016, at ii, 5, *available at* http://www.doccs.ny.gov/Research/Reports/2016/UnderCustody_Report_2016.pdf.

[14]     Ezekiel Edwards, Will Bunting, and Lynda Garcia, The War on Marijuana in Black and White, American Civil Liberties Union (2013) at 49, *available at* https://www.aclu.org/files/assets/1114413-mj-report-rfs-rel1.pdf.

[15]     BRUCE WESTERN, PUNISHMENT AND INEQUALITY IN AMERICA 27 (Russell Sage Foundation, 2006).

statement: "In general, most students on campus are treated differently by law enforcement officials based on their racial appearance."[16]

59.    Audit studies conducted by researchers at Harvard and Princeton Universities also found that even among people with criminal records, African Americans were particularly disadvantaged in the job market compared to white people with criminal records.[17]

60.    NTT's policies and practices as to screening applicants with criminal histories, including any blanket exclusions of individuals with felony or other types of convictions, are not consistent with business necessity.

61.    NTT's applicant screening policies and practices do not bear any direct relationship to the employment in question.

62.    For example, having a conviction is not an accurate proxy for determining whether an applicant would be able to perform the duties of the job. Upon information and belief, no reliable studies or empirical data suggest that applicants with criminal records are more

---

[16]    Jaylon Thomas & Kalen Russell, Black Students' Lived Experiences With and Perceptions of Law Enforcement, ASS'N AM. COLLEGES & U. (Winter 2019) https://www.aacu.org/diversitydemocracy/2019/winter/thomas. *See also,* Elizabeth Meizenzhal, Black Students*, Alumni Allege Pattern of Racial Profiling by Penn Police,* DAILY PENNSYLVANIAN, INC. (Aug. 7, 2020, 1:34 AM), https://www.thedp.com/article/2020/08/penn-police-racial-profiling-racism; Claire Hansen*, After Racial Profiling of a Student, Smith College Hires an Investigator to Review what Happened,* CHRON. HIGHER EDUC. (Aug. 3, 2018), https://www.chronicle.com/article/after-racial-profiling-of-a-student-smithcollege-hires-an-investigator-to-review-what-happened/; *Racial Profiling Problem on College Campuses*, WILLIAMS CEDAR LLC TRIAL LAW (June 27, 2019), https://www.williamscedar.com/racial-profiling-collegecampuses/.

[17]    Devah Pager et al., *Discrimination in a Low-Wage Labor Market: A Field Experiment*, 74 Am. Soc. Rev. 777, 785-86 (2009); Devah Pager et al., *Sequencing Disadvantage: Barriers to Employment Facing Young Black and White Men with Criminal Records*, 623 Annals Am. Acad. Pol. & Soc. Sci. 195, 199 (2009); Devah Pager, *The Mark of a Criminal Record*, 108 AM. J. SOC. 937, 955-61 (2003).

likely to engage in terminable offenses.[18]

63.    NTT's policy and practice of denying employment to individuals with criminal histories, including felony convictions, is far too over-inclusive to meet the standards of job-relatedness and consistency with business necessity.

64.    Upon information and belief, NTT does not have a process or policy to determine whether applicants convicted of crimes have made positive changes in their lives subsequent to their convictions.  NTT's policy and practice of banning individuals with convictions from employment has effectively foreclosed applicants' abilities to provide proof of rehabilitation, such as documentation of successful participation in drug treatment programs, educational achievements or relevant employment, or to submit certificates of relief from disabilities, which in many states create a presumption of rehabilitation.

65.    Upon information and belief, the policy and practice of rejecting individuals with criminal records has created significant barriers to employment that excluded many properly qualified persons, including disproportionate numbers of African American applicants.  There are less discriminatory alternatives that would have better achieved any legitimate business purpose.

66.    Less discriminatory alternatives include, but are not limited to: (1) considering all applicants with a record of conviction for a crime that by its nature does not pose a legitimate threat to the public safety or risk of workplace misconduct; and (2) giving each individual with a conviction a meaningful opportunity to demonstrate that he or she does not present a current threat, including providing evidence of rehabilitation, an explanation of events leading to the

---

[18]    *See, e.g.,* Ian B. Petersen, *Toward True Fair-Chance Hiring: Balancing Stakeholder Interests and Reality in Regulating Criminal Background Checks*, 94 Tex. L. Rev. 175, 187-88 (2015).

conviction, or information regarding other mitigating factors.

***The NYHRL Criminal History Discrimination Claim***

67.    The NYHRL states "[i]t shall be an unlawful discriminatory practice" to "deny . .

. employment to any individual" based on a criminal conviction "when such denial is in violation

of the provisions of article twenty-three-A of the correction law."  N.Y. Exec. Law § 296(15).

68.    Article 23-A of the Correction Law prohibits an employer from denying

employment to any person by virtue of their criminal record unless the employer can meet its

burden of demonstrating one of two narrow exceptions:

> (1) there is a direct relationship between one or more of the previous criminal offenses and the specific license or employment sought or held by the individual; or
>
> (2) the issuance or continuation of the license or the granting or continuation of the employment would involve an unreasonable risk to property or to the safety or welfare of specific individuals or the general public.

N.Y. Correct. Law § 752.

69.    In evaluating whether an employer meets one of these two narrow exceptions,

Article 23-A of the Correction Law further requires that the employer must consider *all* of the

following factors:

> (a) The public policy of this state, as expressed in this act, to encourage the licensure and employment of persons previously convicted of one or more criminal offenses.
>
> (b) The specific duties and responsibilities necessarily related to the license or employment sought or held by the person.
>
> (c) The bearing, if any, the criminal offense or offenses for which the person was previously convicted will have on his fitness or ability to perform one or more such duties or responsibilities.
>
> (d) The time which has elapsed since the occurrence of the criminal offense or offenses.

(e) The age of the person at the time of occurrence of the criminal offense or offenses.

(f) The seriousness of the offense or offenses.

(g) Any information produced by the person, or produced on his behalf, in regard to his rehabilitation and good conduct.

(h) The legitimate interest of the public agency or private employer in protecting property, and the safety and welfare of specific individuals or the general public.

N.Y. Correct. Law § 753.

70. It is impossible for an employer to conduct the legally required evaluation of all Article 23-A factors without first engaging in a conversation with the prospective candidate before making an employment determination or affirmatively soliciting evidence of rehabilitation. *See, e.g.*, N.Y. Correct. Law § 753.

71. It is impossible for an employer to conduct the legally required evaluation of all Article 23-A factors if the employer operates with a policy or practice of denying employment to all individuals with criminal records, or with specific types of criminal convictions. *See* N.Y. Correct. Law § 753.

72. For this reason, among others, the NYHRL forbids companies from denying employment simply because a job applicant has a criminal record. Instead, companies must engage in an evaluation of the factors outlined in the Correction Law before making an employment determination.

73. Despite the requirements of the NYHRL, NTT has denied, and continues to deny, employment to job applicants with certain convictions, without undertaking the inquiry required by New York law.

74. The ability to find employment is an essential aspect of reentering society for people with criminal histories. Recidivism declines when those individuals have viable

employment prospects and other stabilizing resources in their communities.  NTT's policy of discriminating against individuals with criminal records frustrates such public policy objectives.

75.     The New York City Commission on Human Rights' guidance about the recently enacted Fair Chance Act explains that "[e]mployers must carefully conduct the Article 23-A analysis."[19]  This means that "[o]nce an employer extends a conditional offer and learns of an applicant's conviction history, it must solicit the information necessary to properly consider each Article 23-A factor, including the applicant's evidence of rehabilitation."[20]

76.     NTT's criminal history policies and practices do not adequately assess whether an applicant's criminal history poses an unreasonable risk or whether there is a direct relationship between that conviction and the job.

77.     Upon information and belief, NTT has not validated its criminal history policies and practices.

78.     By denying employment to job applicants before soliciting such information, NTT violated Article 23-A and therefore violated the NYHRL.

79.     On information and belief, NTT has acted consciously and/or recklessly in breaching its duties and depriving Plaintiff Mandala and other job applicants of their rights under the NYHRL and the Correction Law, or in failing to make an appropriate inquiry to ascertain its obligations under the NYHRL and the Correction Law.

***The Notice of Rights Claim***

80.     The NY FCRA requires that:

When a consumer reporting agency provides a consumer report that contains criminal conviction information, permitted by paragraph one of subdivision (a) of

---

[19]     *See* Fair Chance Act: Legal Enforcement Guidance, NYC Commission on Human Rights Legal Enforcement Guidance on the Fair Chance Act, Local Law No. 63 (2015) *Revised 5/24/2019*, *available at* https://www1.nyc.gov/site/cchr/law/fair-chance-act.page.

[20]     *Id*.

section three hundred eighty-j of this article, to a user, the person, firm, corporation or other entity requesting such report shall provide the subject of such report a printed or electronic copy of article twenty-three-A of the correction law governing the licensure and employment of persons previously convicted of one or more criminal offenses.

N.Y. Gen. Bus. Law § 380-g(d).

81.    "The public policy of [New York] state, as expressed in [its Correction Law], [is] to encourage the licensure and employment of persons previously convicted of one or more criminal offenses."  N.Y. Correct. Law § 753(1)(a).

82.    Consistent with the public policy of New York, in 2008 the New York Legislature added Section 380-g.

83.    The purpose of this requirement is to inform individuals with criminal records of their rights and remedies under the law and for employers to be informed of their obligations under the law in order to avoid illegal discrimination.

84.    For example, the New York State Assembly's Memorandum in Support of the Legislation stated, in part: "Once [criminal history information] is obtained, employers have repeatedly dismissed qualified applicants and terminated employees based solely on their criminal histories, even if there is no direct relationship between the criminal offense(s) and the job and no unreasonable risk to the safety to the public or property, the criteria upon which an employer can deny a job to an applicant or terminate an existing employee.  The enactment of this bill will help ensure that employers and prospective employees are informed about the mandates of Article 23-A of the correction law.  This will help to avoid illegal discrimination against persons with a criminal conviction."  N.Y.S. Assembly's Memorandum in Support of the Legislation, Bill No. 10288A, 2007-2008 Term.

85.    Upon information and belief, NTT has routinely and systematically failed to provide Plaintiff Mandala and other job applicants with a copy of Article 23-A of the Correction

Law, in the timing and manner required under the law.

86.     This has caused Plaintiff Mandala and other job applicants concrete harm, including because it has prevented them from advocating fully for a job with NTT and from explaining why their conviction histories did not disqualify them from employment; it has denied them an opportunity to learn of their rights under Article 23-A of the Correction Law; and it has created the risk of future harm.

87.     For example, as discussed above, under the Correction Law, NTT cannot deny employment to an individual "when such finding is based upon the fact that the individual has previously been convicted of one or more criminal offenses, unless" NTT shows "a direct relationship" between the conviction(s) and the job or "an unreasonable risk to property or to the safety or welfare of specific individuals or the general public."  N.Y. Correct. Law § 752.

88.     NTT must consider all eight factors laid out in Section 753 of the Correction Law and whether the individual has a certificate of relief from disabilities or a certificate of good conduct.  N.Y. Correct. Law § 753.

89.     Section 754 of the Correction law allows an individual "previously convicted of one or more criminal offenses" to request a written explanation for the employer's denial of employment, which the employer is required to provide within 30 days of the request—providing applicants with crucial information as to the basis for the job denial.  N.Y. Correct. Law § 754.

90.     NTT's failure to provide Plaintiff Mandala and other job applicants with a copy of Article 23-A of the Correction law denied them information to advocate fully for a position with NTT and explain their suitability for employment, and information about their legal right to be free from discrimination and remedies for that discrimination once it had occurred.

91.     NTT's failure to provide this information also created the risk that Plaintiff

Mandala and other job applicants would fail to seek to vindicate their right to be free from discrimination—either from NTT's denial of employment or the denial of employment by another employer.

92.    NTT's violation of the NY FCRA frustrates New York's public policy to increase the employment of persons with criminal convictions.  *See* N.Y. Correct. Law § 753(1)(a).

93.    On information and belief, NTT has acted willfully in violating the requirements of the NY FCRA.  NTT knew or should have known about its obligations under the NY FCRA. These obligations are well-established by the longstanding and plain language of the NY FCRA.

94.    NTT has acted recklessly and willfully in breaching duties that it knew or should have known were required under the NY FCRA and depriving Plaintiff Mandala and other job applicants of their rights.

## CLASS ACTION ALLEGATIONS

95.    Plaintiffs bring this case as a proposed Class action pursuant to Fed. R. Civ. P. 23 on behalf of themselves and three classes of persons (collectively, the "Classes").

96.    Plaintiffs bring this class action pursuant to Federal Rules of Civil Procedure 23(a), (b)(2), and/or (c)(4) seeking liability-phase injunctive and declaratory relief.

97.    Plaintiffs also bring this class action pursuant to Federal Rules of Civil Procedure 23(a), (b)(3) and/or (c)(4) seeking backpay, monetary damages, and other make-whole relief.

98.    Plaintiffs asserts the First Cause of Action against NTT on behalf of the "Title VII Disparate Impact Class," defined as follows:

> **Title VII Disparate Impact Class:** All African American individuals who, from August 6, 2016, through the resolution of this action, were denied employment based in whole or in part because of NTT's policy and practice of denying employment to individuals with criminal convictions.

99.     Plaintiff Mandala asserts the Second Cause of Action against NTT on behalf of

the "NYHRL Disparate Impact Class," defined as follows:

> **NYHRL Disparate Impact Class**: All African American individuals who, from
> June 2, 2014, through the resolution of this action, were denied employment in New
> York State based in whole or in part on NTT's policy and practice of denying
> employment to individuals with criminal convictions.

100.    Plaintiff Mandala asserts the Third Cause of Action against NTT on behalf of the

"NYHRL Criminal History Discrimination Class," defined as follows:

> **NYHRL Criminal History Discrimination Class**: All individuals who, from June
> 2, 2014, through the resolution of this action, were denied employment in New
> York State based in whole or in part on NTT's policy and practice of denying
> employment to individuals with criminal convictions.

101.    Plaintiff Mandala asserts the Fourth Cause of Action against NTT on behalf of the

"Notice of Rights Class," defined as follows:

> **Notice of Rights Class**: All individuals in New York State who, from August 15,
> 2016, through the resolution of this action, did not receive a copy of Article 23-A
> of the Correction Law from NTT when NTT received their consumer reports.

102.    The members of the Title VII Disparate Impact Class, the NYHRL Disparate

Impact Class, the NYHRL Criminal History Discrimination Class and the Notice of Rights Class

are collectively referred to as "Class Members."

103.    Plaintiffs reserve the right to amend the definition of above-defined Classes based

on discovery or legal developments.

104.    The Class Members identified herein are so numerous that joinder of all members

is impracticable.  NTT is a large employer both in the United States and in New York, with over

twenty offices in the United States including four offices in New York State.  The number of job

applicants harmed by NTT's violations of the law is far greater than feasibly could be addressed

through joinder.  The precise number is uniquely within Defendant's possession, and Class

Members may be notified of the pendency of this action by published, mailed and/or e-mailed notice.

105.    There are questions of law and fact common to Class Members, and these questions predominate over any questions affecting only individual members.  Common legal and factual questions include, among others:

(a)    Whether it was Defendant's policy and practice to exclude job applicants with certain convictions who should have been eligible for employment based on valid factors assessing legitimate threat to public safety or risk of workplace misconduct;

(b)    Whether Defendant's policy and practice to exclude job applicants based on certain convictions had a discriminatory disparate impact on African Americans;

(c)    Whether Defendant's policy and practice to exclude job applicants based on their criminal history is job-related and/or consistent with business necessity;

(d)    Whether there was a less discriminatory policy and practice that would have met Defendant's legitimate needs;

(e)    Whether Defendant violated the NYHRL and the Correction Law when denying employment to Plaintiff and the NYHRL Criminal History Discrimination Class;

(f)    Whether Defendant violated the NY FCRA by failing to provide Plaintiff and the Notice of Rights Class with a timely copy of Article 23-A of the Correction Law, in violation of N.Y. Gen. Bus. Law § 380-g(d);

(g)    Whether Defendant was willful in its noncompliance with the requirements of the NY FCRA;

(h)    Whether compensatory damages and punitive damages for Class Members are warranted; and

(i)    Whether a declaratory judgement and/or injunctive relief is warranted regarding Defendant's policies and practices.

106.    Plaintiffs are members of the Classes they seek to represent.  NTT took discriminatory adverse action against Plaintiffs based on their criminal histories.  In addition,

NTT did not provide Plaintiff Mandala with a timely copy of Article 23-A of the Correction Law.

107.    Plaintiffs' claims are typical of the claims of the Classes they seek to represent: (1) Plaintiffs both applied for a job with NTT within the relevant time period; (2) Plaintiffs both were subjected to the hiring process screening applicants for criminal histories; (3) Plaintiffs both were denied the position because of their criminal history; and (4) NTT did not provide Plaintiff Mandala with a timely copy of Article 23-A of the Correction Law.  All of these claims are shared by each and every Class Member.  Upon information and belief, it is NTT's standard practice to take adverse actions against applicants based on criminal convictions in a manner that is discriminatory and inconsistent with business necessity and without properly considering the factors laid out in the Correction Law for New York Class Members.

108.    Plaintiffs will fairly and adequately represent and protect the interests of Class Members because their interests coincide with, and are not antagonistic to, the interests of the Class Members they seek to represent.  Plaintiffs have retained counsel who are competent and experienced in complex class actions, including litigation pertaining to Title VII, criminal background checks, the Correction Law, NY FCRA, disparate impact litigation, other employment litigation, and the intersection thereof.  There is no conflict between Plaintiffs and the Class Members.

109.    A class action is superior to other available methods for the fair and efficient adjudication of this litigation.  Class Members have been damaged and are entitled to recovery as a result of Defendant's uniform policies and practices.  NTT has acted and/or refused to act on grounds generally applicable to the Class Members, making declaratory and injunctive relief appropriate with respect to Plaintiff and the Class Members as a whole.  Because NTT has

maintained a common policy of denying employment to individuals with certain criminal convictions but may not have explained that policy to all Class Members, many Class Members may be unaware that their rights have been violated.  Judicial economy will be served by the maintenance of this lawsuit as a class action, in that it is likely to avoid the burden which would otherwise be placed on the judicial system by the filing of many similar suits by individually harmed persons.  There are no obstacles to the effective and efficient management of this lawsuit as a class action.

<u>**CAUSES OF ACTION**</u>

<u>**FIRST CLAIM FOR RELIEF**</u>
**Disparate Impact Discrimination**
**Title VII of the Civil Rights Act of 1964, 42 U.S.C §§ 2000e *et seq*.**
**(On Behalf of Plaintiffs and the Title VII Disparate Impact Class)**

110.    Plaintiffs incorporate by reference the allegations in all preceding paragraphs.

111.    Named Plaintiffs bring this claim on their own behalf and on behalf of the Title VII Disparate Impact Class.

112.    Plaintiff Mandala timely filed a charge with the EEOC, with class-wide allegations, and has thus exhausted the administrative remedies.

113.    Plaintiff Barnett may "piggy-back" off the previous filing of Mr. Mandala, because Mr. Mandala's EEOC charge relates to the same claims that Mr. Barnett asserts.

114.    Defendant's policy and practice of denying employment opportunities to individuals with criminal convictions has harmed, and continues to harm, Plaintiffs, and constitutes unlawful discrimination on the basis of race, color, and/or national origin in violation of 42 U.S.C. §§ 2000e *et seq.*

115.    Defendant's policy and practice of denying employment opportunities to individuals with criminal convictions had a disparate impact on African Americans and is neither

job related nor consistent with business necessity.  Even if Defendant's policy and practice of denying employment opportunities to individuals with criminal convictions could be justified by business necessity, a less discriminatory alternative exists that would have equally served any legitimate purpose.

116.    Defendant's conduct has caused, and continues to cause, Plaintiffs and the members of the Title VII Disparate Impact Class losses in earnings and other employment benefits.

117.    Plaintiffs and the Title VII Disparate Impact Class also seek injunctive and declaratory relief to correct Defendant's discriminatory policies and practices.

**SECOND CLAIM FOR RELIEF**
**Disparate Impact Discrimination**
**New York Human Rights Law**
**(On Behalf of Plaintiff Mandala and the NYHRL Disparate Impact Class)**

118.    Plaintiff Mandala, on behalf of himself and the NYHRL Disparate Impact Class, incorporates by reference the allegations in all preceding paragraphs.

119.    Plaintiff Mandala brings this claim on his own behalf and on behalf of the NYHRL Disparate Impact Class.

120.    Defendant's policy and practice of denying employment opportunities to individuals with criminal convictions has harmed, and continues to harm, Plaintiff Mandala, and constitutes unlawful discrimination on the basis of race, color, and/or national origin in violation of the NYHRL.

121.    Defendant's policy and practice of denying employment opportunities to individuals with criminal convictions has had a discriminatory disparate impact on African Americans and is neither job related nor consistent with business necessity.  Even if Defendant's policy and practice of denying employment opportunities to individuals with criminal

convictions could be justified by business necessity, a less discriminatory alternative exists that would have equally served any legitimate purpose.

122. Defendant's conduct has caused, and continues to cause, Plaintiff Mandala and the members of the NYHRL Disparate Impact Class losses in earnings and other employment benefits.

123. Plaintiff Mandala and the NYHRL Disparate Impact Class also seek injunctive and declaratory relief to correct Defendant's discriminatory policies and practices.

### THIRD CLAIM FOR RELIEF
**Discriminatory Denial of Employment**
**New York Human Rights Law and Article 23-A of the Correction Law**
**(On Behalf of Plaintiff Mandala and the NYHRL Criminal History Discrimination Class)**

124. Plaintiff Mandala, on behalf of himself and the NYHRL Criminal History Discrimination Class, incorporates the preceding paragraphs as alleged above.

125. Defendant denied employment to Plaintiff Mandala and the NYHRL Criminal History Discrimination Class based in whole or in part on their criminal history.

126. Before denying employment to Plaintiff Mandala and job applicants in the NYHRL Criminal History Discrimination Class, Defendant failed to conduct a proper inquiry into the factors outlined in Article 23-A of the Correction Law (including an adequate assessment of risk or job-relatedness), in violation of N.Y. Exec. Law § 296(15).

127. As a result of Defendant's actions, Plaintiff Mandala and the NYHRL Criminal History Discrimination Class have been deprived of their rights and have lost employment opportunities, earnings and other employment benefits.

128. Plaintiff Mandala and the NYHRL Criminal History Discrimination Class also seek injunctive and declaratory relief to correct Defendant's discriminatory policies and practices.

## FOURTH CLAIM FOR RELIEF
### NTT's Failure to Provide a Copy of Article 23-A
### N.Y. Gen. Bus. Law § 380-g(d)
### (On Behalf of Plaintiff Mandala and the Notice of Rights Class)

129.    Plaintiff Mandala, on behalf of himself and the Notice of Rights Class, incorporates the preceding paragraphs as alleged above.

130.    NTT violated the NY FCRA by procuring consumer reports from Plaintiff Mandala and Class Members without providing them with a copy of Article 23-A of the Correction Law at that time.

131.    NTT caused concrete injury (including the risk of harm) to Plaintiff Mandala and the Notice of Rights Class Members, including because they were denied the opportunity to contextualize and explain their conviction histories in light of the Article 23-A factors; they could not bring to the attention of NTT their rehabilitative efforts and other employment; and they could not learn of their rights and opportunities under the NY FCRA in ways that would increase their chances of employment now and in the future.

132.    NTT acted willfully and in knowing or reckless disregard of its obligations and the rights of Plaintiff Mandala and the Notice of Rights Class.

133.    NTT's willful conduct is reflected by, among other things, the fact that it acted recklessly in violating a clear statutory mandate set forth in N.Y. Gen. Bus. Law § 380-g(d).

134.    As a result of NTT's actions, Plaintiff Mandala and the Notice of Rights Class have been deprived of their consumer rights, and prevented from timely and effectively contesting the adverse action.

135.    NTT's willful and/or negligent conduct makes it liable for actual damages, punitive damages, and attorneys' fees and costs, in an amount to be determined by the Court pursuant to N.Y. Gen. Bus. Law § 380-l and N.Y. Gen. Bus. Law § 380-m.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs and Class Members pray for relief as follows:

(a)  A declaratory judgment that the practices complained of herein are unlawful and violate NYHRL and the NY FCRA;

(b)  A preliminary and permanent injunction against NTT and all officers, agents, successors, employees, representatives, and any and all persons acting in concert with them, from engaging in each of the unlawful policies, practices, customs, and usages set forth herein;

(c)  An order that NTT institute and carry out policies, practices, and programs that provide equal employment opportunities for applicants with criminal records who would be eligible under application of Title VII and Article 23-A and that Defendant eradicate the effects of past and present unlawful employment practices;

(d)  Certification of the case as a class action on behalf of the proposed Classes;

(e)  Designation of Plaintiffs as representatives of Class Members;

(f)  Designation of Plaintiffs' counsel of record as Class Counsel;

(g)  Restoring of Plaintiffs and Class Members to their rightful positions at NTT or those positions equivalent at NTT (i.e., reinstatement), or in lieu of reinstatements, an order for front pay benefits;

(h)  An award of backpay and/or compensatory damages for violations of Title VII and the NYHRL;

(i)  An award of nominal and/or exemplary damages;

(j)  An award of all actual damages awardable for violations of the NY FCRA;

(k)  An award of punitive damages under applicable statutes;

(l)  An award of costs incurred herein, including reasonable attorneys' fees to the extent allowable by law;

(m)  Such other injunctive and/or declaratory relief that is necessary to correct Defendant's discriminatory policies and practices;

(n)  Pre-judgment and post-judgment interest, as provided by law;

(o)  Payment of a reasonable service award to Plaintiffs, in recognition of the services they have rendered and will continue to render to Class Members, and the risks they have taken and will take; and

(p)    Such other and further legal and equitable relief as this Court deems necessary, just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury in this action.

Dated:  New York, New York
         March 11, 2021

Respectfully submitted,

By:  */s/ Ossai Miazad*
**OUTTEN & GOLDEN LLP**
Ossai Miazad
Christopher M. McNerney
685 Third Avenue, 25th Floor
New York, New York 10017
Telephone:  (212) 245-1000
E-mail: om@outtengolden.com
E-mail: cmcnerney@outtengolden.com

Rachel Williams Dempsey*
One California Street, Ste 1250
San Francisco, CA 94111
Telephone: (415) 638-8800
E-mail: rdempsey@outtengolden.com

**NAACP LEGAL DEFENSE &
EDUCATIONAL FUND, INC.**
Rachel M. Kleinman
40 Rector Street, Fifth Floor
New York, NY 10006
Telephone: (212) 965-2200
E-mail: rkleinman@naacpldf.org

Catherine Meza*
700 14th Street, NW, Suite 600
Washington, DC 20005
Telephone: (202) 682-1300
E-mail: cmeza@naacpldf.org

*Attorneys for Plaintiff and the Putative Classes*

*\*pro hac vice forthcoming*

# Exhibit 1

# MONSTER

## Network/Systems Administrator

### NTT Data - New York City, NY 10008

**Posted:** 5/23/2015

Apply Now

Overview:

At NTT DATA, we know that with the right people on board, anything is possible. The quality, integrity, and commitment of our employees have been key factors in our company's growth and market presence. By hiring the best people and helping them grow both professionally and personally, we ensure a bright future for NTT DATA and for the people who work here.

A group company within NTT DATA currently seeks a Network/Systems Administrator to join our team in NYC, New York.

Position Functions or Responsibilities:

Daily Tasks will include but not limited to the following:

System administration, user on-boarding, and Active Directory management. Windows Server 2012 installation and maintenance. System backup of server OS and server applications including MS Exchange 2010, MS SQL 2012 using Veritas Backup Exec. Creation and maintenance of virtual servers using VMWare. Performance monitoring of systems. Maintain and support SAN, NAS, and tape storage devices/servers. Data Center equipment monitoring and support

Basic Qualifications:

5 years of experience in MS Windows servers,computer networks, messaging, cross-platform integration and large-scale, complex systems and applications design and implementation. 5 years of experience in disaster recovery/backup including production application such as Exchange and SQL Server Microsoft MCSE Certification 5 years of of experience VMWare virtualization 5 years of experience Active Directory and Group Policy Management design and configuration 3 years of experience Storage Attached Network (SAN) configuration No prior felony arrests. No drug related arrests. This is a full-time salaried position with a group company within NTT DATA. Please note, 1099 or corp-2-corp contractors will NOT be considered. This position is only available to those interested in direct staff employment opportunities. We offer a full comprehensive benefits package that starts from your first day of employment.

About NTT DATA

NTT DATA is your Innovation Partner anywhere around the world. With business operations in

more than 35 countries, we put emphasis on long-term commitment and combine global reach and local intimacy to provide premier professional services from consulting, system development, business process and IT outsourcing to cloud-based solutions.

Visit

Apply Now

# Exhibit 2

# 19-2308

## United States Court of Appeals

*for the*

## Second Circuit

GEORGE MANDALA and CHARLES BARNETT,

*Plaintiffs-Appellants,*

-v.-

NTT DATA, INC.,

*Defendant-Appellee.*

_____

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NEW YORK

## AMICI CURIAE'S BRIEF
## IN SUPPORT OF PLAINTIFFS-APPELLANTS' PETITION
## FOR EN BANC AND PANEL REHEARING

DANA E. LOSSIA
LEVY RATNER, P.C.
80 Eighth Avenue, 8th Floor
New York, New York 10011
(212) 627-8100

*Attorneys for Amici Curiae*
*Megan C. Kurlychek, Ph.D.*
*Ojmarrh Mitchell, Ph.D.*
*Christopher J. Uggen, Ph.D.*

## <u>TABLE OF CONTENTS</u>

INTERESTS OF AMICI CURIAE.............................................................1

SUMMARY OF THE ARGUMENT ........................................................4

ARGUMENT .............................................................................................5

   I.    There Are Enormous Disparities in Criminal Records in
        America by Race ...........................................................................5

   II.   These Disparities Are Extremely Likely to Exist in Any
        Applicant Pool, Irrespective of Educational Attainment ...........8

   III.  National Statistics on Criminal Convictions Are Routinely
        Relied Upon By Policymakers ..................................................12

   CONCLUSION .......................................................................................13

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Scholarly Articles**

AM. CIVIL LIBERTIES UNION, *A Tale of Two Countries: Racially Targeted Arrests in the Era of Marijuana Reform*,
AM. CIV. LIBERTIES UNION, https://www.aclu.org/report/tale-two-countries-racially-targeted-arrests-era-marijuana-reform....................................................11

Claire Hansen, *After Racial Profiling of a Student, Smith College Hires and Investigator to Review what Happened*,
CHRON. HIGHER EDUC. (Aug. 3, 2018), https://www.chronicle.com/article/after-racial-profiling-of-a-student-smith-college-hires-an-investigator-to-review-what-happened/.........................................................................11

David Cole, *Race, Policing, and the Future of Criminal Law*,
26 HUM. RTS. 2 (1999) ...........................................................................5

David A. Harris, *Driving While Black and All Other Traffic Offenses: The Supreme Court and Pretextual Traffic Stops*,
87 J. CRIM. L. & CRIMINOLOGY 544 (1997) ...........................................9

David A. Harris, *Driving While Black: Racial Profiling on our Nation's Highways*,
AM. CIV. LIBERTIES UNION (June 1999), https://www.aclu.org/report/driving-while-black-racial-profiling-our-nations-highways................................9

Elizabeth A. Gaynes, *The Urban Criminal Justice System: Where Young + Black +Male = Probable Cause*,
20 FORDHAM URB. L.J. 621 (1993) .......................................................5

Elizabeth Meizenzhal, *Black Students, Alumni Allege Pattern of Racial Profiling by Penn Police*,
DAILY PENNSYLVANIAN, INC. (Aug. 7, 2020, 1:34 AM),
https://www.thedp.com/article/2020/08/penn-police-racial-profiling-racism......11

E. Ann Carson, *Prisoners in 2016*,
2018 U.S. DEP'T OF JUST., OFF. OF JUST. PROGRAMS, BUREAU OF JUST. STATS. 1 ................................................................................................8

Jaylon Thomas & Kalen Russell, *Black Students' Lived Experiences With and Perceptions of Law Enforcement*, Ass'n Am. Colleges & U. (Winter 2019) https://www.aacu.org/diversitydemocracy/2019/winter/thomas ..........................11

New York State Office of the Attorney General, *New York City Police Department's "Stop & Frisk" Practices: A Report to the People of the State of New York From the Office of the Attorney General*, N.Y. St. Off. Att'y Gen. (1999) ......................................................................10

*Racial Profiling Problem on College Campuses*, Williams Cedar LLC Trial Law (June 27, 2019), https://www.williamscedar.com/racial-profiling-college-campuses/ ..................11

Robert Brame, Michael G. Turner, Raymond Paternoster & Shawn D. Bushway, *Cumulative Prevalence of Arrest From Ages 8 to 23 in a National Sample*, Pediatrics, Jan. 1, 2012 ...........................................................................6

Robert Brame, Shawn D. Bushway, Raymond Paternoster & Michael G. Turner, *Demographic Patterns of Cumulative Arrest Prevalence by Ages 18 and 23*, Crime & Delinq., Jan. 6, 2014 ...............................................................6

Sarah K.S. Shannon, Christopher Uggen, Jason Schnittler, Melissa Thompson, Sara Wakefield & Michael Massoglia, *The Growth, Scope and Spatial Distribution of People with Felony Records in the United States*, Demography, Oct. 2017 .....................................................................7

Tanzina Vega, *For Affluent Blacks, Wealth Doesn't Stop Racial Profiling*, CNN (July 14, 2016, 4:10 PM), https://money.cnn.com/2016/07/14/news/economy/wealthy-blacks-racial-profiling/index.html ..............................................................10

Thomas B. Bonczar, *Prevalence of Imprisonment in the U.S. Population, 1974-2001*, 2003 U.S. Dep't of Just. Bureau of Justice Stats., special rep. 1 .........8

**Other Sources**

Bruce Western, Punishment and Inequality in America, (Russell Sage Foundation, 2006) ..........................................................9

*Criminal Justice Fact Sheet*,
  NAACP, https://www.naacp.org/criminal-justice-fact-sheet/ ...............................7

EILEEN POE-YAMAGATA, AND JUSTICE FOR SOME: DIFFERENTIAL TREATMENT OF
  MINORITY YOUTH IN THE JUSTICE SYSTEM,
  (DIANE Publishing, 2009) ....................................................................5

FRANKLIN E. ZIMRING, THE CITY THAT BECAME SAFE: NEW YORK'S LESSONS
  FOR URBAN CRIME AND ITS CONTROL
  (Oxford University Press, 2012)..........................................................11

MICHELLE ALEXANDER, THE NEW JIM CROW: MASS INCARCERATION IN THE
  AGE OF COLORBLINDNESS
  (The New Press, 2010) .................................................................. 9, 12

SAMUEL WALKER, CASSIA SPOHN & MIRIAM DELONE, THE COLOR OF JUSTICE:
  RACE, ETHNICITY, AND CRIME IN AMERICA,
  (Cengage Learning, 5th ed. 2012) ......................................................5

# INTERESTS OF AMICI CURIAE[1]

Amicus Curiae Megan C. Kurlychek, Ph.D. is a professor at the Pennsylvania State University and Associate Director of the Penn State Criminal Justice Research Center. Dr. Kurlychek has a particular interest in using her expertise in criminology and social science to help courts understand the scholarship in her field regarding criminal justice system statistics.

Dr. Kurlychek, who holds a B.A. in Sociology from Penn State University (1991), a Master of Science in the Administration of Justice from Shippensburg University (1997), and a Ph.D. in Crime, Law and Justice from Penn State (2004), publishes work on juvenile justice and criminal justice in the field's major journals, including CRIMINOLOGY, JUSTICE QUARTERLY, JOURNAL OF CRIMINAL JUSTICE, YOUTH VIOLENCE AND JUVENILE JUSTICE, CRIME AND DELINQUENCY, CRIMINOLOGY AND PUBLIC POLICY, and JUSTICE RESEARCH AND POLICY. She has served as editor of JUSTICE QUARTERLY, the flagship journal of the American Criminal Justice Society, and on the Editorial Boards of the JOURNAL OF CRIMINAL JUSTICE EDUCATION and CRIMINOLOGY AND PUBLIC POLICY, and as a section editor for the WILEY BLACKWELL ENCYCLOPEDIA OF CRIMINOLOGY AND CRIMINAL JUSTICE.

---

[1] No portion of this brief was authored or funded by any party or counsel for any party, nor did any other person contribute money to fund this brief.

1

Dr. Kurlychek's research has been influential in shaping public policy. Her work was cited in the revisions of the U.S. Equal Employment Opportunity Commission's "Guidelines Regarding the Use of Criminal Records in Hiring Decisions." Two of her articles, "Scarlet Letters and Recidivism: Does an Old Criminal Record Predict Future Offending" and "Enduring Risk: Old Criminal Records and Predictions of Future Criminal Involvement" have been heavily cited and have spurred further research in the field of criminology. Dr. Kurlychek is regarded as a national and international expert on the subject of recidivism and desistance from crime and has been asked to present her research at the International Conference on Desistance in Sheffield, England. She was the Keynote Speaker at the National Symposium on "Contemporary Society and New approaches Towards Juvenile Delinquency Prevention" at Kyoto Sangyo University in Japan in 2014.

Dr. Kurlychek's research has received funding from the National Science Foundation, the National Institute of Justice, the New York Division of Criminal Justice Services, and the United States Department of Justice, Bureau of Justice Statistics. She was the co-principal investigator on a large grant from the National Institute of Justice, "State Mandated Criminal Background Employment Screening: A High Stakes Window into the Desistance Process," which was designed to examine the risk posed by hiring individuals with criminal records. Dr. Kurlychek's Curriculum Vitae is annexed hereto.

Amicus Curiae Ojmarrh Mitchell, Ph.D. is an associate professor in the School of Criminology and Criminal Justice at the Arizona State University. Professor Mitchell's scholarship centers on criminal justice policy, particularly in the areas of drug control, sentencing and corrections, and racial fairness in the criminal justice system.  He has a strong interest in providing social science to courts and judges, and his research has appeared in many criminology journals including Justice Quarterly, Journal of Experimental Criminology, Journal of Quantitative Criminology, Journal of Research in Crime and Delinquency, and Criminology & Public Policy. Dr. Mitchell recently won NIJ's W.E.B. Du Bois Scholars in Race and Crime award to study prosecutorial decision-making and case processing in the state of Florida. Dr. Mitchell has served on numerous advisory roles including the U.S. Department of Justice's Science Advisory Board, New York City's Pretrial Research Advisory Council, Philadelphia's Pretrial Reform Advisory Council, and the American Society of Criminology's Executive Board. Dr. Mitchell's Curriculum Vitae is annexed hereto.

Amicus Curiae Christopher J. Uggen, Ph.D. is Regents Professor, Martindale Chair, and Distinguished McKnight Professor in Sociology, Law, and Public Affairs at the University of Minnesota. He studies crime, law, and inequality from a life course perspective, firm in the belief that sound research can help build a more just and peaceful world. With Jeff Manza, he wrote *Locked Out: Felon*

3

*Disenfranchisement and American Democracy* (2006), and he publishes extensively in criminology, criminal justice, law, and sociology. Current projects include comparative study of reentry from different types of institutions, the long-term consequences of harassment and discrimination, crime and justice after genocide, monetary sanctions, and the health effects of incarceration. His outreach and engagement projects include co-editing *Contexts Magazine* (2007-2011) and *TheSocietyPages.Org*, a book series and multimedia social science hub that drew four million readers last year. He is a fellow of the American Society of Criminology and served as the 2017-2018 Vice President of the American Sociological Association. Dr. Uggen has a strong interest in providing his scholarship to the Court. Dr. Uggen's Curriculum Vitae is annexed hereto.

## SUMMARY OF THE ARGUMENT

The key issue for which we offer an opinion in this matter is the assertion by defendant, and the conclusion of the majority, that national statistics regarding racial disparities in criminal history records are not applicable to NTT's applicant pool. As we demonstrate below, the differences in criminal conviction rates between white persons and Black persons in America are very large, and these disparities are persistent and pervasive throughout the nation. There are no statistics available to suggest that Blacks and whites are treated equally at the hands of the criminal justice

system in any segment of society, be it geographic location, educational level or socio-economic status.

National statistics on criminal conviction rates are relied upon by social scientists and by policy makers.  There is no reasonable basis to believe that national statistics on disparities in criminal conviction rates would not apply to the potential employee pool of a national company such as NTT Data, Inc.

## ARGUMENT

### I.     There Are Enormous Disparities in Criminal Records in America by Race

The differences in rates of arrest and conviction between whites and Blacks in the United States have persisted over time, are engrained in our culture and criminal justice system, and have been expanding since the 1980s.[2]

While the social sciences are rich with theories about why such disparities exist, it is unarguably true that Black Americans are far more likely than whites to be arrested and convicted in the criminal justice system.

---

[2] David Cole, *Race, Policing, and the Future of Criminal Law*, 26 HUM. RTS. 2 (1999); Elizabeth A. Gaynes, *The Urban Criminal Justice System: Where Young + Black + Male = Probable Cause*, 20 FORDHAM URB. L.J. 621 (1993); EILEEN POE-YAMAGATA, AND JUSTICE FOR SOME: DIFFERENTIAL TREATMENT OF MINORITY YOUTH IN THE JUSTICE SYSTEM (DIANE Publishing, 2009); SAMUEL WALKER, CASSIA SPOHN & MIRIAM DELONE, THE COLOR OF JUSTICE: RACE, ETHNICITY, AND CRIME IN AMERICA (Cengage Learning, 5th ed. 2012).

Contact and involvement in the criminal justice system is not uncommon, and it is even more likely for Black Americans than other segments of the population, particularly since the 1980's and the war on drugs.  In 1980, an estimated 5% of the adult male population and 13% of the adult Black male population had a criminal record.  In 2010, this figure had increased to 13% of all adult males and 33% of Black males.  These disparities are highly statistically significant.



Other recent estimates show the rates of engagement with the justice system continuing to grow.  By age 23, about 30% of individuals have been arrested at least once,[3] and this number was almost 50% for Black males.[4]  Disparities exist not only

---

[3] Robert Brame, Michal G. Turner, Raymond Paternoster & Shawn D. Bushway, *Cumulative Prevalence of Arrest from Ages 8 to 23 in a National Sample*, PEDIATRICS, Jan. 1, 2012, at 21-27.

[4] Robert Brame, Shawn D. Bushway, Raymond Paternoster & Michael G. Turner, *Demographic Patterns of Cumulative Arrest Prevalence by Ages 18 and 23*, CRIME & DELINQ., Jan. 6, 2014, at 471-486.

in overall arrest rates but persist when looking at particular types of arrests. The 2016 Uniform Crime Report produced by the FBI shows the arrest rate of Black Americans is much larger than for white Americans for all types of violent crimes:

Arrest rates per 100,000 adults

|                    | White | Black |
|--------------------|-------|-------|
| Murder             | 2     | 12.2  |
| Robbery            | 15.8  | 119.8 |
| Aggravated Assault | 94.4  | 280   |

For drug arrests, the difference in the rate of arrest was 428.7 per 100,000 whites to 1,026.8 per 100,000 Blacks — more than twice as large.

The disparities in the rates of felony convictions for whites and Blacks is just as large. While only 8% of the adult male population has a felony conviction, 33% of Black males have a felony conviction.[5] When comparing the rates of felony convictions for white and Black males, the authors note that "the development of the population with felony convictions since 1980 has been one of widespread racialized growth."[6]

Black Americans are incarcerated at almost 6 times the rate of whites.[7] The imprisonment rate for white Americans in 2016 was 274 per 100,000 white adults,

---

[5] Sarah K.S. Shannon, Christopher Uggen, Jason Schnittler, Melissa Thompson, Sara Wakefield & Michael Massoglia, *The Growth, Scope and Spatial Distribution of People with Felony Records in the United States*, DEMOGRAPHY, Oct. 2017, at 1795-1818.

[6] *Id.* at 1814.

[7] *Criminal Justice Fact Sheet*, NAACP, https://www.naacp.org/criminal-justice-fact-sheet/ (last visited Mar. 2, 2020).

compared to 1,609 per 100,000 Black adults.[8] As of 2001, it was estimated that one in every three Black males born in America could expect to spend time in prison.[9]

While these numbers show that the mark of a criminal record is becoming increasingly felt by all members of society, they indicate large disparities in the rates of arrest, conviction and sentencing of Black people. These are not small differences that may be explained by other demographic or socioeconomic characteristics. These differences are stark and only trending upward.

## II. These Disparities Are Extremely Likely to Exist in Any Applicant Pool, Irrespective of Educational Attainment

As demonstrated above, a Black person living in America is far more likely to have a criminal record than a white person. There is no evidence in the record that applicants to NTT Data, Inc. tend to have greater educational attainment than average, but even if that were shown to be true, disparities in criminal conviction rates between blacks and whites with higher levels of education would, with reasonable certainty, persist.

The majority is incorrect when it concludes that race disparities will disappear among educated Blacks. **There are no available statistics to show that racial disparities in criminal conviction rates decrease, much less disappear, with**

---

[8] E. Ann Carson, *Prisoners in 2016*, 2018 U.S. DEP'T OF JUST., OFF. OF JUST. PROGRAMS, BUREAU OF JUST. STATS. 1.

[9] Thomas B. Bonczar, *Prevalence of Imprisonment in the U.S. Population, 1974-2001*, 2003 U.S. DEP'T OF JUST., BUREAU OF JUST. STATS., SPECIAL REP. 1.

**increased education**. In fact, Black men with some college education have imprisonment risks that are seven (7) times greater than white men with some college education (4.9% for Black men compared to 0.7% for white men).[10] This is consistent with the racial disparities that exist among individuals with lesser educational attainment.

The accepted view among social scientists working in the field of criminology is that the cause of these disparities is not confined to individual behavioral differences but to a great extent represents differential system response and policies that institutionalize racism.

Examples of such policies include racial profiling and stop and frisk policies that result in Black people having more frequent police contact.[11] Early studies such as "Driving While Black" show that officers are much more likely to pull over Black drivers for minor violations such as lane changes without a turn signal.[12] Such stops are not impacted by educational level.

---

[10] BRUCE WESTERN, PUNISHMENT AND INEQUALITY IN AMERICA 27 (Russell Sage Foundation, 2006).

[11] MICHELLE ALEXANDER, THE NEW JIM CROW: MASS INCARCERATION IN THE AGE OF COLORBLINDNESS 132-36 (The New Press, 2010).

[12] David A. Harris, *Driving While Black: Racial Profiling on our Nation's Highways*, AM. CIV. LIBERTIES UNION (June 1999), https://www.aclu.org/report/driving-while-black-racial-profiling-our-nations-highways; David A. Harris, *Driving While Black and All Other Traffic Offenses: The Supreme Court and Pretextual Traffic Stops*, 87 J. CRIM. L. & CRIMINOLOGY 544, 561-62 (1997).

Similarly, studies of New York City's stop-and-frisk policies found that Black people were six (6) times more likely to experience a stop than were whites.[13]  Again, at the time of conducting a stop and frisk, the officer does not routinely know the individual's education level.  It is race that spurs the encounter, as noted by South Carolina Senator Tim Scott, who revealed that he has been pulled over seven times in just one year.[14]

Professors Ronald S. Sullivan and Henry Louis Gates, Jr., both of Harvard University and both Black men, have experienced disparate treatment based upon race, despite being highly educated.[15]  Professor Gates was arrested and charged with disorderly conduct while attempting to enter his own home in Cambridge, Massachusetts.

These disparities in treatment are not uncommon on college campuses where one might attain a degree to apply for skilled employment.  More than two-thirds of students recently surveyed agreed with the following statement: "In general, most students on campus are treated differently by law enforcement officials based on

---

[13] New York State Office of the Attorney General, *New York City Police Department's "Stop & Frisk" Practices: A Report to the People of the State of New York From the Office of the Attorney General*, N.Y. St. Off. Att'y Gen. (1999).

[14] Tanzina Vega, *For Affluent Blacks, Wealth Doesn't Stop Racial Profiling*, CNN (July 14, 2016, 4:10 PM), https://money.cnn.com/2016/07/14/news/economy/wealthy-blacks-racial-profiling/index.html.

[15] *Id.*

their racial appearance."[16]  News reports nationwide continue to tell the stories of Black university students who are followed, stopped and frisked merely for walking on campus.[17] The problem is so widespread that one can even find advertisements for law firms offering to assist minority students with such profiling.[18]

Drug crimes on college campuses are particularly illustrative.  While self-report surveys show white youth are more likely than minority youth to use marijuana, studies continually show that minority youth are more likely to be arrested for such crimes, particularly marijuana possession.[19]  Indeed, the war on drugs could "have been waged primarily in overwhelmingly white suburbs or on

---

[16] Jaylon Thomas & Kalen Russell, *Black Students' Lived Experiences With and Perceptions of Law Enforcement*, ASS'N AM. COLLEGES & U. (Winter 2019) https://www.aacu.org/diversitydemocracy/2019/winter/thomas.

[17] Elizabeth Meizenzhal, *Black Students, Alumni Allege Pattern of Racial Profiling by Penn Police*, DAILY PENNSYLVANIAN, INC. (Aug. 7, 2020, 1:34 AM), https://www.thedp.com/article/2020/08/penn-police-racial-profiling-racism; Claire Hansen, *After Racial Profiling of a Student, Smith College Hires and Investigator to Review what Happened*, CHRON. HIGHER EDUC. (Aug. 3, 2018), https://www.chronicle.com/article/after-racial-profiling-of-a-student-smith-college-hires-an-investigator-to-review-what-happened/.

[18] *Racial Profiling Problem on College Campuses*, WILLIAMS CEDAR LLC TRIAL LAW (June 27, 2019), https://www.williamscedar.com/racial-profiling-college-campuses/.

[19] FRANKLIN E. ZIMRING, THE CITY THAT BECAME SAFE: NEW YORK'S LESSONS FOR URBAN CRIME AND ITS CONTROL (Oxford University Press, 2012); AM. CIVIL LIBERTIES UNION, *A Tale of Two Countries: Racially Targeted Arrests in the Era of Marijuana Reform*, AM. CIV. LIBERTIES UNION, https://www.aclu.org/report/tale-two-countries-racially-targeted-arrests-era-marijuana-reform (last visited Oct. 5, 2020)

college campuses."[20]  But, it was not.  Education neither precludes the commission of crime nor negates the disparate impact of race in the criminal justice system's interactions with individuals.

The granular statistics that the panel majority asks Plaintiffs to produce simply do not exist.  The inferences that Plaintiffs ask the Court to draw from the available statistics, however, are entirely reasonable from a social science perspective.  The best statistical evidence available in the field of criminology does not permit a conclusion that racial disparities would disappear from any particular employer's applicant or employee pools, nor is it reasonable to assume that national statistics would somehow fail to apply to NTT Data's applicant population.  Instead, these national statistics can appropriately be relied upon to draw inferences about race disparities irrespective of level of educational attainment.

### III.  National Statistics on Criminal Convictions Are Routinely Relied Upon By Policymakers

National statistics, which demonstrate enormous disparities between whites and blacks in rates of criminal conviction, are routinely used as the basis for local, state, and national policy changes.  These statistics are broadly accepted and relied upon by policy makers.  For example, the drafters of "Ban the Box" legislation, which prohibits questions about an applicant's criminal record on initial job

---

[20] ALEXANDER, *supra* note 10, at 124.

applications, until the employer has conditionally offered the applicant a position, have not relied upon statistics for one particular industry, educational level or other segment of society, nor are such granular statistics available. Where adopted, "Ban the Box" laws and policies apply broadly, regardless of the characteristics of any particular applicant pool, and such policies are justified through the use of national statistics on criminal background disparities. President Trump in 2019 signed the Federal Fair Chance Act that expanded such "Ban the Box" policies to all government contractors, which includes highly-educated professionals.

Courts should not ignore well-documented national statistics or assume, without data, that disparities in criminal conviction rates would be different among any particular sample of applicants. The science does not support such an assertion. In sum, we strongly disagree with the majority's finding that national statistics are insufficient and with the requirement that Plaintiffs present data that does not exist.

## CONCLUSION

It is our professional opinion as social scientists and criminologists that given what we know about the likelihood of criminal justice system contact, arrest, and conviction, particularly felony convictions, any policy that denies an otherwise qualified individual from an employment opportunity based on the existence of a criminal record will undoubtedly exclude more Black than white applicants from employment opportunities.

13

Dated:  New York, New York
        October 13, 2020

Respectfully submitted,


Megan C. Kurlychek, Ph.D.
Professor of Sociology and
Criminology, Pennsylvania
State University


Ojmarrh Mitchell, Ph.D.
Associate Professor of
Criminology and Criminal
Justice, Arizona State
University


Christopher J. Uggen, Ph.D.
Regents Professor and
Distinguished McKnight
Professor of Sociology & Law,
The University of Minnesota

LEVY RATNER, P.C.

By:   Dana E. Lossia
       80 Eighth Avenue, 8th Floor
       New York, New York 10011
       (212) 627-8100
       (212) 627-8182 (fax)
       dlossia@levyratner.com

*Attorneys for Amici Curiae*
*Megan C. Kurlychek, Ph.D.,*
*Ojmarrh Mitchell, Ph.D.,*
*Christopher J. Uggen, Ph.D.*

15

## **CERTIFICATE OF COMPLIANCE**

The undersigned hereby certifies that the foregoing Brief of Amicus Curiae Megan Kurlychek complies with the type-volume limitation specified in the Federal Rule of Appellate Procedure 32(a)(7)(B) and the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5). The brief has been prepared using a proportionately spaced typeface using Microsoft Word, in Times New Roman 14-point font. It contains 2,875 words, excluding those parts of the brief exempted by Federal Rule of Appellate Procedure 32(f).

Dated: New York, New York
     October 13, 2020

                                 /s/ Dana E. Lossia
                                 Dana E. Lossia, Esq.

Kurlychek Vitae

## CURRICULUM VITAE
**Megan C. Kurlychek**
Professor
Department of Sociology and Criminology
Associate Director, The Criminal Justice Research Center
The Pennsylvania State University

901 Oswald Tower
University Park, PA 16801
Email: mck6@psu.edu
Phone: 518-362-6153

### Areas of Interest

Juvenile Justice and Delinquency, Courts and Sentencing, Reentry and Employment, Statistics and Quantitative Research Methods.

### Education

Ph.D. 2004 Crime, Law and Justice The Pennsylvania State University
Dissertation: "*The Multilevel Context of School Disorder and Victimization: Assessing the Relative Contributions of Student, School and Community Characteristics*."
*Chair: D. Wayne Osgood*

M.S. 1997 Administration of Justice Shippensburg University

B.A. 1991 Sociology (*honors & high distinction*) The Pennsylvania State University

### Professional Experience

***Professor, 2020-present***
Department of Sociology and Criminology
The Pennsylvania State University

***Associate Director, 2020-present***
The Penn State Criminal Justice Research Center

***Executive Director*** *2018 to 2019*
New York State Youth Justice Institute

1

***Professor, 2018-2019***
School of Criminal Justice
University at Albany

***Associate Professor 2011-2018***
School of Criminal Justice
University at Albany

***Editor*** 2016 to 2019
Justice Quarterly
Academy of Criminal Justice Sciences

***Executive Director*** 2014 -2018
Hindelang Criminal Justice Research Center
University at Albany, SUNY

***Visiting Fellow*** 2014 to 2018
Bureau of Justice Statistics
United States Department of Justice

***Assistant Professor*** 2007-2011
School of Criminal Justice
University at Albany, SUNY

***Assistant Professor*** 2004-2007
Department of Criminology and Criminal Justice
University of South Carolina

***Research Support Associate*** 1999-2004
Pennsylvania Commission on Sentencing University Park, Pennsylvania

***Research Associate*** 1994 - 1999
National Center for Juvenile Justice
Pittsburgh, Pennsylvania.

***Legislative Policy Analyst*** 1991 - 1994
Senate Policy Development and Research Office
Senate of Pennsylvania
Harrisburg, Pennsylvania

***Intern, Research Analyst*** 1990-1991
House Judiciary Committee,
Pennsylvania House of Representatives
Harrisburg, Pennsylvania


**Academic Awards and Honors**

2017 National Sociology Honors Society, 21st Annual Honors Lecturer.

2013  Article of the Year.  Youth Violence and Juvenile Justice.
Sage

2012 Tory J. Caeti Memorial Award for excellence in research in the area of juvenile justice.
Academy of Criminal Justice Sciences

2004 Excellence in Research in the Social Sciences Graduate Student Award.
Penn State University, College of the Liberal Arts

2003 Dissertation Grant.
American Educational Research Association

2003 1st Place, Gene Carte Student Paper Competition
American Society of Criminology

2003 1st Place, Student Paper Competition Crime, Law and Deviance Division
American Sociological Association

2003 Joan Huber and William Form
Graduate Scholarship in Sociology

2002 Summer Institute on Youth Violence Prevention
NCOVR

1991 Phi Beta Kappa
The Pennsylvania State University

1990 Phi Kappa Phi
The Pennsylvania State University

1989 The Golden Key National Honor Society
The Pennsylvania State University

1988 Alpha Lambda Delta
The Pennsylvania State University


**Publications**
**Bold** indicates student coauthor

***Books***

3

Kurlychek, Megan C.  2018.  *Juvenile Justice: Connecting Theory to Practice*.  Kendal Hunt Publishing.

Bernard, Thomas J., and Megan C. Kurlychek. 2010. *The Cycle of Juvenile Justice*. Second Edition New York: Oxford Academic Press.

*Peer Reviewed Journal Articles and Book Chapters*

Kurlychek, Megan C. and **Alysha Gagnon**.  2020.  Reducing Recidivism in Serious and Violent Youthful Offenders:  Fact, Fiction and a Path Forward. Forthcoming Marquette Law Review.

Kurlychek, Megan C., Shawn D. Bushway and **Megan Denver**.  2019. Defensible Decisions: Balancing Employer and Prospective Employee Rights in an Era of Criminal Background Checks.  Equality, Diversity and Inclusion: An International Journal.  Article Number: 627893

Kurlychek, Megan C. and John H. Kramer. 2019.  Transformations in Sentencing in the 21st Century.  Handbook of Sentencing and Corrections.  Editors: Cassia Spohn and Pauline Brennan. Routledge.

**Robinson, Kendall** and Megan C. Kurlychek.  2019. Differences in Justice, Differences in Outcomes:  An Evaluation of Connecticut's Raise the Age Policy.  *Justice Evaluation Journal*

Kurlychek, Megan C. and Brian D. Johnson. 2019. Cumulative Disadvantage in the Criminal Justice System.  *Annual Review of Criminology*.  2(1): 291-319.

Kurlychek, Megan C. and Riya Shah.  2018. The Hidden Consequences of Visible Juvenile Records.  Chapter 6 in *The Consequences of Sentencing and Punishment Decisions*, Editors Natasha Frost and Beth Huebner.  Routledge.

Kurlychek, Megan C. and **Megan Denver**.  2018.  Translating Theories of Desistance to Policy Chapter 7  In Criminology & Public Policy: Putting Theory to Work (3rd edition) edited by Scott H. Decker and Kevin A. Wright. Temple University Press.

**Fowler, Eric** and Megan C. Kurlychek.  2018. Drawing the Line:  Empirical Recidivism Results from a Natural Experiment Raising the Age of Criminal Responsibility.  *Youth Violence and Juvenile Justice*.  p.1541204017708017.

Kurlychek, Megan C. 2018.  Mitigation for Minors:  Exploring the nuances of social constructs and legal status in structuring sentences for youthful offenders.  *Punishment and Society* 20(4): 498-522.

Kurlychek, Megan C. and Heather Washington. 2017. Escape from Punishment: Exploring the Sealing of a Criminal Record and Potential Disparities in its Application. In Handbook on Punishment Decision. Eds. Jeff T. Ulmer and Mindy Bradley. (pp. 127-150) Routledge.

*DeWitt, Samuel E*. Shawn D. Bushway, **Garima Siwach**, and Megan C. Kurlychek. 2017. Redeemed compared to whom? Comparing the distributional properties of arrest risk across populations of provisional employees with and without a criminal record. *Criminology & Public Policy*, 16(3):963-997.

Juan Shao-Chiu, Heather M. Washington and Megan C. Kurlychek**.** 2017. Breaking the Intergenerational Cycle: Interparental Violence, Child-Parent Attachment and Children's Aggressive Behaviors. *Journal of Interpersonal Violence*. p.0886260517692996.

Kurlychek, Megan C. 2016. Effectiveness of Juvenile Transfer to Adult Court: Implications from Current Research and Directions for Future Study. *Criminology and Public Policy* 14(3): 1-4.

Kurlychek, Megan C., Shawn D. Bushway and **Megan Denver**. 2016. Understanding and Identifying Desistance. In *Global Perspective on Desistance*. Eds. Joanna Shapland and Anthony Bottoms. (p. 260-280). Routledge Press.

Fader, Jamie, Megan C. Kurlychek and **Kirsten Morgan**. 2014. The Color of Juvenile Justice: Racial disparities in dispositional decisions *Social Science Review*. Volume 44: 126-140.

Johnson, Brian Daniel and Megan C. Kurlychek. 2012. Juvenile Offenders in the Era of Sentencing Guidelines: An examination of judicial departures for juveniles transferred to adult criminal court. *Criminology 50(2):525-564.*

Kurlychek, Megan C., Shawn D. Bushway and Robert Brame. 2012. Long-Term Crime Desistance and Recidivism Patterns—Evidence from the Essex County convicted felon study. *Criminology 50(1):71-104.*

Kurlychek, Megan C**.,** Alan J. Lizotte, Marv D. Krohn, **Dong Bendi**, **Gina Penly-Hall**. 2012. Protection from Risk: An exploration of when and how neighborhood-level factors can reduce violent youth outcomes. *Youth Violence and Juvenile Justice* Volume 10(1):83-106.

Kurlychek, Megan C. 2011. What is my left hand doing? The need for unifying purpose and policy in the criminal justice system. *Criminology and Public Policy* 10(4):909-916.

Kurlychek, Megan C., **Andrew Wheeler, Leigh Tinik** and Cynthia A. Kempinen. 2011. Does Dosage Matter? The impact of aftercare program length, a continued experiment. *Crime and Delinquency* Vol.57(5):778-800.

Kurlychek, Megan C**.** 2010. Pathways to Adult Court: Does the road traveled impact the final destination? *Justice Research and Policy* Vol. 12(2) 1-24.

Kurlychek, Megan C. and Brian Daniel Johnson. 2010. Juvenility and Punishment: Sentencing juveniles in adult criminal courts. *Criminology* Vol. 48(3): 725-758.

**Barnes, J.C**.,  Megan C. Kurlychek, Holly Ventura Miller, J. Mitch Miller and Robert J. Kiminski. 2010. A Partial Assessment of South Carolina's Project Safe Neighborhoods Strategy: Evidence from a sample of supervised offenders. *Journal of Criminal Justice*. Vol.38(4):383-389.

Kurlychek, Megan C. 2010. Transforming Attitudinal Change into Behavioral Change: The missing link. *Criminology and Public Policy*. Vol.9(1) 119-126.

J. Mitchell Miller, Megan C. Kurlychek, **Andrew Hansen**, and **Kristine Wilson**. 2008. Examining Child Abduction by Offender Type Patterns. *Justice Quarterly*. Vol. 25(3) 523-543.

Ulmer, Jeffery T., Megan C. Kurlychek, and John Kramer. 2007. Prosecutorial Discretion and the Imposition of Mandatory Minimums. *Journal of Research in Crime and Delinquency* Vol. 44(4):427-458.

Kurlychek, Megan C., Robert Brame and Shawn Bushway. 2007. "Enduring Risk: Old criminal records and prediction of future criminal involvement." *Crime and Delinquency*. Vol. 53(1): 64-83.

Kurlychek, Megan C., Robert Brame and Shawn Bushway. 2006. "Scarlet Letters and Recidivism: Does an old criminal record predict future offending?" *Criminology and Public Policy*. Vol.(3):64-83.

Kurlychek, Megan C. and Cynthia Kempinen. 2006. "Beyond Boot Camp: The impact of aftercare on offender reentry. *Criminology and Public Policy*. Vol.(2):363-388.

Kurlychek, Megan C. and Brian Daniel Johnson. 2004. "The Juvenile Penalty: A comparison of juvenile and young adult sentencing outcomes in a criminal court." *Criminology* Vol. 42(2): 485-517.

Kempinen, Cynthia and Megan C. Kurlychek. 2003. "An Outcome Evaluation of Pennsylvania's Boot Camp: Does rehabilitative programming within a disciplinary setting reduce recidivism?" *Crime and Delinquency*, Vol. 49(4):518-602.

Kurlychek, Megan C., Patricia Torbet, and Melanie Boznyski. 1999. "Focus on Accountability: Best Practices for Juvenile Court and Probation." U.S Department of Justice, Office of Juvenile Justice and Delinquency Prevention, Washington DC.

***Articles Under Review:***

Kurlychek, Megan C.   Politics and Prison: The impact of the political rhetoric of the get tough movement on the sentencing of youth.

Garima Siwach**,** Megan C. Kurlychek and Shawn D. Bushway.  Crime Type versus Totality of Factors: An empirical evaluation of different strategies for criminal background checks.

Kurlychek, Megan C., **Alysha Gagnon** and **Matthew Kijowski**.  Life Sentences:  The lasting impact of time served by youth in adult jails and prisons.

Kurlychek, Megan C, and Theodore Wilson. The Race from Arrest to Sentencing:  Racial differences at key decision-making points in the criminal justice process.

### *In Progress*

Kurlychek, Megan C., **Emerson Waite** and James Lee.  In Search of the Smoking Gun:  Public Opinion on Gun Control and the Influence of Mass Shootings.

Kramer, John H. and Megan C. Kurlychek.  Where the Rubber Meets the Road: Marrying Sentencing Philosophies and Practices to their Real World Outcomes.

Wilson, Theodore and Megan C. Kurlychek.  Distance Traveled and Desistance: Estimating the impact of charge and sentencing reductions on perceptions of the severity of punishment and deterrence.

### *Government and Professional Reports*

Kurlychek, Megan C., Kimberly Martin and Matthew Durose.   2019. *The Impact of Criminal Record Sealing and Expunging Practices on National Estimates and State Comparisons of Offenders and Offending Careers*.  Working Paper.  The Bureau of Justice Statistics, United States Department of Justice, Washington D.C.

Kurlychek, Megan C., and Eric Fowler.  Preliminary Evaluation of Connecticut's Raise the Age Legislation.  Presented to the Judicial Branch of Connecticut. February, 2014.

Kurlychek, Megan C. and Eric Fowler.  Final Report:  Nassau County Juvenile Detention Diversion Project.  Prepared for the New York Division of Criminal Justice Services, May, 2014.

Kurlychek, Megan C.  Corianne P. Scally and Christine E. Mayeur.  2013.   Finding of the CORe Data Collection Pilot Initiative for Albany, New York: Albany's South End and West Hill Neighborhoods.  State CORe Team, New York State Governor's Office of Public Safety.

Kempinen, Cynthia A. and Megan C. Kurlychek. (2002) "Pennsylvania's Motivational Boot Camp: 2002 Report to the Legislature." The Pennsylvania Commission on Sentencing.

Kempinen, Cynthia A. and Megan C. Kurlychek, (2001) "Pennsylvania's Motivational Boot Camp: 2001 Report to the Legislature." The Pennsylvania Commission on Sentencing.

Kempinen, Cynthia A. and Megan C. Kurlychek (2000) "Pennsylvania's Motivational Boot Camp: 2000 Report to the Legislature." The Pennsylvania Commission on Sentencing.

The Pennsylvania Juvenile Advisory Committee. (1998). "Managed Care and Pennsylvania's Juvenile Justice System: Recommendations of the Juvenile Advisory Committee's Managed Care Subcommittee." Commissioned report to the Honorable Tom Ridge, Governor of Pennsylvania. (Primary Researcher and Reporter**:** Megan Kurlychek).

The Pennsylvania Juvenile Advisory Committee. (1997). "Pennsylvania Juvenile Justice: Analysis and Recommendations." Commissioned report to the Honorable Tom Ridge, Governor of the Commonwealth of Pennsylvania. (Primary Researcher and Reporter: Megan C. Kurlychek).

Kurlychek, Megan C. (1994-1998). Pennsylvania Progress: Juvenile Justice Achievements in Pennsylvania. The National Center for Juvenile Justice. *Author of series* Vol. 1 No. 1 (1994) through Vol. 5 No.3 (1998).

The Pennsylvania Juvenile Justice Task Force. (1995). "Pennsylvania Juvenile Justice: 1995." Report to the Honorable Tom Ridge, Governor of the Commonwealth of Pennsylvania. (Primary Researcher and Reporter: Megan Kurlychek).

Kurlychek, Megan C. (1994). "Issue Briefing Book: Summary of Major Issues before the Legislature." Senate Policy Development and Research Office, The Pennsylvania State Senate.

Kurlychek, Megan C. (1994). "Population Migration of Pennsylvanian's Ages 20-24." Senate Policy Development and Research Office, The Pennsylvania State Senate.

Kurlychek, Megan C. (1994). "Early Childhood Education Professional Loan Forgiveness Program." Senate Policy Development and Research Office, The Pennsylvania State Senate.

Kurlychek, Megan C. (1994). "Collective Bargaining Contracts for Employees of the Commonwealth and the State System of Higher Education." Senate Policy Development and Research Office, The Pennsylvania State Senate.

Kurlychek, Megan C. (1994). "Pennsylvania's Juvenile Justice System and Violent Juvenile Offenders." Senate Policy Development and Research Office, The Pennsylvania State Senate.

Kurlychek, Megan C. (1994). "Crime and Criminal Justice Policy in Pennsylvania." Senate Policy Development and Research Office, The Pennsylvania State Senate.

Kurlychek Megan C. (1993). "Comparison of Florida and Pennsylvania Statutes Relating to Juvenile Firearm Possession." Senate Policy Development and Research Office, The Pennsylvania State Senate.

Kurlychek, Megan C. (1992). "Issue Briefing Book: Summary of Major Issues before the Legislature." Senate Policy Development and Research Office, The Pennsylvania State Senate.


### Other Publications


Kurlychek Megan C**.** 2012. A History of Juvenile Courts. *Encyclopedia of Crime and Criminal Justice*. Gerben Jan Nicolass Bruinsma and David Lee Wiesburd, Editors. Springer.

Kurlychek Megan C**.** 2012. Multi-level Social Control. *Encyclopedia of Crime and Criminal Justice.* Gerben Jan Nicolass Bruinsma and David Lee Wiesburd, Editors. Springer.

Kurlychek, Megan C. 2011 Juvenile Courts. Encyclopedia of Criminology and Criminal Justice. Jay Albanese, Editor in Chief. Wiley-Blackwell.

Kurlychek, Megan C. 2011. Book Review.  Youth Justice By Jenny Johnstone and Michele Burman (Editors). 2010. Edinburgh, Scotland: Dunedin. Reviewed for International Criminology Review.

Kurlychek, Megan C. 2011.  Book Review. Sex, Drugs and Body Counts: The Politics of Numbers in Global Crime. By Peter Andreas and Kelly M. Greenhill (Editors) 2010. New York: Cornell University Press. Reviewed for Contemporary Sociology.

Kurlychek, Megan C. 2010. Enduring Questions*:* Should violent juvenile offenders be processed and sentenced as adults? *Academic Solutions Database*. Ed. R. Barri Flowers. ABC-CLIO Publishers.

Kurlychek, Megan C. The Juvenile Death Penalty. In *Juvenile Crime and Justice*. Eds. William Chambliss and J. Geoffrey Golson. Thousand Oaks, CA: Sage.

Kurlychek, Megan C**.** Trying Juveniles as Adults. In *Juvenile Crime and Justice*. Eds William Chambliss and J. Geoffrey Golson. Thousand Oaks, CA: Sage.
.
Ulmer, Jeffrey T., Kurlychek, Megan C. and John Kramer, J. 2009 "Mandatory Sentences: The role of prosecutorial discretion." In Sentencing Guidelines, Lessons from Pennsylvania. John H. Kramer and Jeffrey T. Ulmer (eds). Boulder, CO: Lynne Rienner Publishers. (Reprint of 2007 Ulmer, Kurlychek and Kramer article).

Kurlychek, Megan C**.** and Brian Daniel Johnson. 2008. *The Juvenile Penalty: A comparison of juvenile and young adult sentencing outcomes in a criminal court.* In Courts: A Text/Reader. Craig Hemmens and Cassia C. Spohn (eds). Thousand Oaks,CA: Sage Publications. (reprint of 2004 Kurlychek and Johnson article).

Kurlychek, Megan C. 2008. Book Review. Out of Sight: Crime, Youth and Exclusion in Modern Britain. By Robert McAuley. 2007. Devon, United Kingdom: Willan Publishing. Reviewed for Law and Society Review Vol 42(4).

Kurlychek, Megan C. 2003. Book Review. The Juvenile Court and the Progressives. By Victoria Getis. Urbana: University of Illinois Press (2000). Reviewed for Criminal Justice Review. Vol.28(1).


**Invited and Government Presentations**

National Sociology Honors Society, 21st Annual Honors Lecturer:    Drawing the Line: Empirical Results from a Natural Experiment Raising the Age of Criminal Responsibility.  SUNY Polytechnic Institute, Utica NY:  April, 2017.

Growth Curves and Group Trajectories:  Implications of Model Selection for Criminal Career Research. Bureau of Justice Statistics, U.S. Department of Justice, Washington D.C. June 26th, 2017.

Predicting Risk:  Lessons from Employment Research for Risk-Based Firearm Policy Records from Public Safety.  National Consortium on Risk-Based Firearm Policy.  Washington D.C.  February 2017.

Rebutting Defenses: Disconnecting Criminal Records from Public Safety.   A Place to Call Home: Protecting Housing Rights for Justice-Involved Individuals.  The Shriver Center. Washington D.C.: November 2016. (co-presenter Shawn D. Bushway).


Modeling Development: An Introduction to Growth Curve and Trajectory Group Approaches. American Society of Criminology Pre-Conference Workshop.  New Orleans.  November, 2016.

Formalized Criminal Background Checks in Employment Practice: The National Perspective and a Case Study.  Invited Presentation:  Los Angeles Regional Summit on Fair Hiring.  Los Angeles (Co-authors Shawn D. Bushway, Megan Denver and Garima Siwach) May 12, 2016.

Outcome Evaluation on Connecticut's Raise the Age Policy:  Phase 1.  Invited Presentation Connecticut State Legislature, Juvenile Justice and Policy Oversight Committee. (Co-author: Eric Fowler) February 11, 2015.

The Truth about Risk: Legal and Practical Analysis of Candidates.  Invited Presentation: Midwest Regional Summit on Fair Hiring.  Chicago, Illinois. October, 2015.

Addressing Emerging Trends and Problems in Juvenile Delinquency.  Invited Presentation: Key Note Speech.  . Institute for Criminal Justice, Kyoto Sangyo University, Kyoto, Japan. October 2014.

Identifying and Understanding Desistance:  An Example Exploring the Utility of Sealing Criminal Records for Employment Purposes.  Invited Presentation: International Conference: Desistance-Sketching the Future.  The University of Sheffield Centre for Criminological Research. Sheffield, U.K. (Co-Authors: Megan Denver and Shawn D. Bushway) September, 2014.

(Re)Starting and Stopping: Breaks between Criminal Activity vs. Permanent Cessation from Crime.  (3/26/10). John Jay College, Prisoner Reentry Institute, Occasional Series on Reentry Research, March, 2010.

New Research Developments for Reentry.  Equal Employment Opportunity Commission meeting. Washington, DC. (Co-author Shawn D. Bushway) April, 2008.

Youth Violence: A picture of the problem to help frame solutions for the future. New York Department of Criminal Justice Services. Albany, New York, February, 2008.

Assessing Aftercare: Evaluating the impact of Aftercare provision to graduates from a shock incarceration program.  University at Albany, SUNY. October, 2006.

Enduring Risk: Old Criminal Records and Short-Term Predictions of Criminal Involvement. National Consortium on Violence Desistance Workshop. Washington, D.C., May, 2006.

Scarlet Letters and Recidivism." Invited Presentation. John Jay College of Criminal Justice Offender Reentry Institute. New York, New York. (Co-authors Robert Brame and Shawn D. Bushway). March 2006.


**Conference and Other Select Presentations**

Escape from Punishment:  Exploring the Sealing of Criminal Records and Potential Disparity. Academy of Criminal Justice Sciences.  Kansas City, MO:  March 2017.

The Impact of the Get Tough Movement on the Sentencing of Juveniles in Juvenile Courts. American Society of Criminology.  New Orleans, LA:  November 2016.

Editor meets Author:  Roundtable.  Invited Presenter. American Society of Criminology.  New Orleans, LA: November 2016.

Criminal History Enhancement and Criminal Careers:  Roundtable.  Invited Presenter.  American Society of Criminology.  New Orleans, LA:  November 2016.

Defensible Decisions:  An Examination of Formalized Criminal Background Checks in Employment Practice.  Law and Society Conference.  New Orleans.  May, 2016.

State Mandated Criminal Background Checks:  A High Stakes Window into the Desistance Process.  American Society of Criminology.  Washington. D.C.  November, 2015.

11

The Impact of New York's Youthful Offender Law: American Society of Criminology.  San Francisco, USA  November, 2014.

Do Juveniles in Adult Court Really "Do Adult Time?" A Six-State Analysis. Academy of Criminal Justice Sciences. New York, New York March 2012.

Gangs in the Hood: Can Neighborhood Characteristics Protect High Risk Youth from Gang Involvement? American Society of Criminology.  Washington DC, November 2011.

Sentencing Juveniles in the Context of Sentencing Guidelines. Academy of Criminal Justice Sciences. Toronto, Canada March 2011.

Starting and Stopping: Distinguishing True Desistance From Intermittency in a Criminal Career. American Society of Criminology, 2009.

Juvenility and Punishment. American Society of Criminology.  American Society of Criminology. St. Louis Missouri, November, 2008.

A Tale of Two Counties: Exploring the role of prosecutorial discretion in the motion to file for juvenile waiver hearings" With John Burrow. American Society of Criminology. Los Angeles, CA, November, 2006.

 Scarlet Letters and Recidivism: Does an Old Criminal History Record Predict Future Offending? Rockefeller College Policy Lunch. November, 2006.

The Role of Aftercare on Offender Re-entry. American Society of Criminology Annual Meeting. Denver, Colorado. November, 2005.

The Multilevel Context of School Crime and Violence. American Society of Criminology Annual Meeting.  Denver, Colorado, November 2004.

The Sentencing of Juveniles in the Adult Criminal Justice System. American Society of Criminology Annual Meeting. Chicago, Illinois, November 2003.

Pennsylvania's Boot Camp Offender Survey: Initial Findings on Inmate Characteristics and Attitudinal Changes. American Society of Criminology Annual Meeting. Chicago, Illinois, 2002.


**Funded Research**

*Youth Justice Best Practice Institute*
Funding Agency:  New York State:  Juvenile Justice Advisory Committee
PI/Faculty Affiliate:  Megan C. Kurlychek
Award Date:  December 2015.
Amount: $1,600,000

*BJS Visiting Fellow*
PI: Megan C. Kurlychek
Funding Agency: United States Department of Justice
Award Date: October 1, 2013
Amount: $144,000

*Nassau County Detention Division Project*
PI: Megan C. Kurlychek
Funding Agency: New York Division of Criminal Justice Services
Award Date: *April 2013*
Amount: $60,665

*State-Mandated Criminal Background Employment Screening: A High Stakes Window into the Desistance Process*
PI: Shawn D. Bushway, Co-PI: Megan C. Kurlychek
Funding Agency: National Institute of Justice
Award Date: January 2013
Amount: $750,000

*Juvenile Offenders in Adult Criminal Courts: How Varying State Laws and Transfer Mechanisms Impact Sentencing Outcomes.*
PI: Megan C. Kurlychek
Funding Agency: National Science Foundation
Award Date: October 2012
Amount: $59,900

*Does it Take a Village? An Examination of the Relationship Between Neighborhood Protective Factors and Youths' Risk of Violent Outcomes."*
PI; Megan C. Kurlychek
Funding Agency: University at Albany Faculty Research Awards Program
Award Date: May 2010
Amount, $2,364

*SOAR residential treatment center program study: Implementing a permanent plan for clinical record keeping."*
PI: Amanda Nickerson Co-PI: Megan C. Kurlychek
Funding source: New York State office of Child and Family Services
Award Date: June 2010
Amount: $132,000

*SOAR Residential treatment center program study: converting the pilot study into a permanent plan for clinical record keeping.*

13

Funding Agency: New York State Office of Child and Family Services
 Award Date: August 2008
Amount: $132,000
PI: David Duffee, Faculty Associate Megan C. Kurlychek

*Performance Enhancing Drugs: A feasibility study in assessing motives, correlates and outcomes among a general population of young adults.*
Funding Agency: South Carolina Research Consortium on Children and Families
Award Date: August 2006.
Amount: $19,998
Principal Investigator: Megan C. Kurlychek
Collaborators: I. David Schwartz M.D. (University School of Medicine, Pediatrics), Bradley Smith Ph.D.(Department of Arts and Sciences, Psychology), Cheri Shapiro, Ph.D. (Department of Arts and Sciences, Psychology), James A. Carson, Ph.D. (Exercise Science Department, Arnold School of Public Health) and Steven Cuffe, M.D.(University School of Medicine, Neuropsychiatry and Behavioral Science).

*Knowledge and use of performance Enhancing Drugs among Young Adults: Focus Group Study*
Funding Agency: South Carolina Research Consortium on Children and Families
Award Date: November 2005
Award Amount: $4,000
Principal Investigator: Megan C. Kurlychek
Collaborators: I. David Schwartz M.D. (University School of Medicine, Pediatrics), Bradley Smith Ph.D.(Department of Arts and Sciences, Psychology), Cheri Shapiro, Ph.D. (Department of Arts and Sciences, Psychology), James A. Carson, Ph.D.(Exercise Science Department, Arnold School of Public Health) and Steven Cuffe, M.D.(University School of Medicine, Neuropsychiatry and Behavioral Science).

*Exploring the Role of Legal and Extra-legal factors in Juvenile Waiver in Two South Carolina Counties*
Funding Agency: South Carolina Research Consortium on Children and Families
Award Date: July 2005
Amount: $15,000
Principal Investigator: John Burrow (Department of Criminology and Criminal Justice)
Co-Investigator: Megan C. Kurlychek


**Teaching Experience**

***University at Albany***
*Graduate*
Ph.D. Comprehensive Exam Writing Seminar (RCRJ 701)
Ph.D. Research Methods I (RCRJ 682)
Ph.D. Research Methods II (RDRJ 688)
Theories of Crime (RCRJ 607 and 507)

Juvenile Justice and Delinquency (RCRJ 636)

*Undergraduate*
Criminology (RCRJ 203)
Criminology (RCRJ 203 on-line version)
Honors Criminology (TRCRJ 203)
Freshman Seminar: American Violence
Juvenile Justice (RCRJ 308)
Issues in Delinquency, Writing Intensive (RCRJ 416z)


**University of South Carolina**
Seminar on Offender Reentry and Reintegration
American Violence
Juvenile Justice
Alternatives to Incarceration

**The Pennsylvania State University**
The Sociology of Deviance
Juvenile Delinquency

**Independent Study Classes**:
Issues in Reentry and Aftercare
Courts in Context (writing intensive)
Immigration and Adolescent Delinquency: An Exploration Over Time and Space

**Undergraduate Honors Thesis Committees**
Sean Hollihan
Melissa McGreal
Yaaqob Alshugaa
Kate Massina
Uraina Owens


**Comprehensive Exam Committees**
* indicates chair

Melissa Noel*
Shao-Chiu Juan*
Megan Denver
Siyu Liu
Jeok Kim
Arna Carlock
Eric Fowler*
Shi Yan
Amanda Emert
Raquel Moriority*

Jeanee Miller*
Michelle Naples
Victoria Shall

### *Dissertation Committees*

Eric Fowler*, (anticipated 2020) Senior Crime Analyst, New York City Police Department
Vanessa Shall-Nelson*, (anticipated 2019) Data Analyst, Center for Behavioral Health and
  Justice
Shao-Chiu Juan*, 2018  Unknown (departed back to Taiwan for a family emergency)
Raquel Moriarty, 2018, New York Division of Criminal Justice Services, Juvenile Justice Unit
Megan Denver, 2017, North Eastern University
Arna Carlock, 2016, United States Secret Service
Jaeok Kim, 2016, Vera Institute
Amanda Emmert, 2015, William Patterson College
Siyu Liu, 2014, John Jay College, Misdemeanor Project
Shi Yan, 2013, Arizona State
Craig Dunton, 2013, SUNY Plattsburg
Camela Steinke,* 2012, College of St. Rose and Program Assessment and Effectiveness
  Research Specialist, La Salle Institute for Boys

## University and Departmental Service

### *University at Albany*

| | |
|---|---|
| University Strategic Planning Committee, | |
|   Excellence in Research Subcommittee | 2017 |
| Committee on Academic Standing | |
|   of the Undergraduate Academic Council | 2015-2017 |
| Juvenile Justice Best Practice Institute | |
|   School of Criminal Justice, Established | 2016 |
| School of Criminal Justice, Graduate Curriculum Committee, | 2013-2016 |
| University Committee on Academic Support | 2012-2013, 2015-2016 |
| School of Criminal Justice, Student Performance Committee | 2008-2010 |
| School of Criminal Justice Admissions Committee | 2007-2008, 2011-2013 |
| School of Criminal Justice, Post-Doctoral Search Committee | 2012 |
| School of Criminal Justice, Faculty Search Committee | 2011, 2015-Present |
| Discipline-Based Freshman Seminar: (invited instructor) | 2010 |
| Explore UAlbany Program: (invited lecturer) | 2010 |
| Pedagogy and Technology Workshop (invited participant) | 2009 |
| Media Relations Workshop (participant) | 2008 |

### *University of South Carolina*

| | |
|---|---|
| Methods Committee | 2004-2005 |
| Undergraduate Curriculum Committee | 2005-2006 |
| Faculty Search Committee | 2006 |

16

| | |
|---|---|
| Ambassador: United Way Campaign | 2006 |
| Judge: USC Region II Science and Engineering Fair | 2006 |
| Volunteer: Student "move-in" day | 2005 |
| Guest Coach Program: Gamecock Basketball | 2005 |
| Carolina Master Scholars Summer Adventure Program | 2005-2006 |

**Service to Field**

| | |
|---|---|
| Editor, Justice Quarterly | 2016-present |
| Chair, American Society of Criminology | |
|   Collaborative Research Initiatives Committee | 2018 |
| Office of Juvenile Justice and Delinquency Prevention, | |
|     Grant Review Panel | 2016 |
| American Society of Criminology Annual meeting Program Committee | |
|     Area Chair: Juvenile Justice | 2017 |
| American Society of Criminology Awards Committee | 2017 |
| American Society of Criminology, Chair, Methods Workshop Committee | 2015 |
| Editor: Encyclopedia of Criminology and Criminal | |
|     Justice. Wiley Blackwell | 2013 |
| National Science Foundation: Law and Social Science | |
|     Dissertation Grant Review Panel | 2011 |
| Editorial Board*: Criminology and Public Policy* | 2010 |
| Editorial Board: *Journal of Criminal Justice Education* | 2008/2009 |
| American Society of Criminology Annual Meeting Program Committee | 2009 |
| American Society of Criminology Annual Meeting Program Committee | 2007 |

Articles reviewed for (among others) *Criminology, Crime and Delinquency, Criminology and Public Policy, Campbell Collaboration, European Journal of Criminology, Journal of Research in Crime and Delinquency, Journal of Crime and Justice*, *Justice Quarterly, Journal of Quantitative Criminology*, *Race and Justice, Social Problems, Social Forces*, *Western Criminology Review.* Textbooks reviewed for *Sage* and *Pearson Allyn, & Bacon*

**Professional Affiliations**

| | |
|---|---|
| American Society of Criminology | 2002-Present |
|   Division on Corrections and Sentencing | 2002-Present |
| Academy of Criminal Justice Sciences | 2009-Present |
|   Juvenile Justice Section | 2009-Present |
| Research Consortium on Children and Families | 2004-2007 |
| New York Division of Criminal Justice Services, Strategic | |
|   Action Planning Committee Data Working Group | 2011-2013 |
| New York State Senate's Undergraduate Session Assistant Program | 2008, 2012 |

# Ojmarrh Mitchell

Associate Professor
School of Criminology and Criminal Justice
Arizona State University
411 N. Central Ave.
Suite 600, Mail Code 4420
Phoenix, AZ 85004-0685
Office: 602-496-0580
ojmarrh.mitchell@asu.edu

## EDUCATION

Ph.D. Criminology and Criminal Justice, University of Maryland, 2003
    Dissertation Title: "Race and Sentencing: Making Sense of the Inconsistencies"
    Dissertation Chair: Doris Layton MacKenzie

Doctoral Minor in Measurement, Statistics and Evaluation, University of Maryland, 2003
    Adviser: James Roberts

M.A., Criminology and Criminal Justice, University of Maryland, 1999
    Thesis Title: "The Impact of Organizational and Individual Attributes on Voluntary
    Juvenile Correctional Staff Turnover"
    Thesis Chair: Doris Layton MacKenzie

B.A., Sociology, University of Washington, 1996

## PROFESSIONAL EXPERIENCE

*Associate Professor,* School of Criminology and Criminal Justice, Arizona State University,
    2019-Present.

*Associate Professor,* Department of Criminology, University of South Florida, 2012-19.

*Graduate Director,* Department of Criminology, University of South Florida, 2014-17.

*Assistant Professor,* Department of Criminology, University of South Florida, 2008-12.

*Assistant Professor,* Division of Criminal Justice, University of Cincinnati, 2005-08.

*Assistant Professor,* Department of Criminal Justice, University of Nevada Las Vegas, 2003-05.

*Jerry Lee Research Associate*, Department of Criminology and Criminal Justice, University of
    Maryland, 2001–03.  Supervisor: Dr. Doris Layton MacKenzie.

*Research Associate*, Justice Policy Center, The Urban Institute, 1999-2002. Supervisor: Dr.
    Adele V. Harrell.

## PUBLICATIONS

<u>Journal Articles</u>

Mitchell, Ojmarrh. 2018. "The Continuing Evolution of Race and Sentencing Research and Reviews of This Research." *Journal of Criminal Justice* 59: 29-31.

Mitchell, Ojmarrh and Greg Ridgeway. 2018. "Assessing the Fairness and Effectiveness of Bicycle Stops in Tampa." *Police Quarterly* 21(4): 461-485.

Toth, Alexander G.* and Ojmarrh Mitchell. 2018. "A Qualitative Examination of the Effects of International Counter-Drug Interdictions." *International Journal of Drug Policy, 55*, 70-76.

Mitchell, Ojmarrh and Melissa Morales*. 2018. "The Effects of Switching to Mandatory Online Course Assessments on Response Rates and Course Ratings." *Assessment and Evaluation in Higher Education* 43(4): 629-639.

Mitchell, Ojmarrh, Monica Landers* and Melissa Morales*. 2017. "The Contingent Effects of Fatherhood on Offending." *American Journal of Criminal Justice* 43(3): 603-626.

Mitchell, Ojmarrh, Joshua C. Cochran, Daniel P. Mears and William D. Bales. 2017. "The Effectiveness of Prison for Reducing Drug Offender Recidivism: A Regression Discontinuity Analysis." *Journal of Experimental Criminology* 13(1): 1-27.

Mitchell, Ojmarrh and Michael Caudy*. 2017. "Race Differences in Drug Offending and Drug Distribution Arrests." *Crime & Delinquency* 63(2):91-112.

Mitchell, Ojmarrh, Joshua C. Cochran, Daniel P. Mears and William D. Bales. 2017. "Examining Prison Effects on Recidivism: A Regression Discontinuity Approach." *Justice Quarterly* 35(4):571-596.

Eggers, Amy S.* and Ojmarrh Mitchell. 2016. "The Emotional Guardianship of Foreign-Born and Native-Born Hispanic Youth and Its Effect on Violent Victimization." *Race and Justice: An International Journal* 6(4):283-302.

Mitchell, Ojmarrh. 2016. "The Effect of Drug Arrest on Subsequent Drug Offending and Social Bonding." *Journal of Crime and Justice* 39(1):174-88.

> Reprinted in *Race and Ethnicity in the Juvenile and Criminal Justice Systems: Contemporary Issues of Offending Behavior and Judicial Responses.* 2017. Editor Jennifer H. Peck. New York: Routledge.

Landers, Monica,* Ojmarrh Mitchell and Erica Coates*. 2015. "Teenage Fatherhood as a Potential Turning Point in the Lives of Delinquent Youth." *Journal of Child & Family Studies* 24(6):1685-96.

Mitchell, Ojmarrh and Michael Caudy*. 2015. "Examining Racial Disparities in Drug Arrests." *Justice Quarterly* 32(2):288-313.

Mitchell, Ojmarrh, Michael S. Caudy* and Doris Layton MacKenzie. 2013. "A Reanalysis of the Self-Appraisal Questionnaire: Psychometric Properties and Predictive Validity." *International Journal of Offender Therapy & Comparative Criminology* 57(4):445-59.

Borysova, Meghan E., Ojmarrh Mitchell, Dawood H. Sultan and Arthur R. Williams. 2012. "Racial and Ethnic Health Disparities in Incarcerated Populations." *Journal of Health Disparities Research and Practice* 5(2):92-100.

Mitchell, Ojmarrh, David B. Wilson, Amy Eggers* and Doris L. MacKenzie. 2012. "Assessing the Effectiveness of Drug Courts on Recidivism: A Meta-Analytic Review of Traditional and Non-Traditional Drug Courts." *Journal of Criminal Justice* 40:60-71.

Mitchell, Ojmarrh. 2009. "Is the War on Drugs Racially Biased?" *Journal of Crime & Justice* 32(2):49-75.

Mitchell, Ojmarrh. 2009. "Ineffectiveness, Financial Waste, and Unfairness: The Legacy of the War on Drugs." *Journal of Crime & Justice* 32(2):1-19.

MacKenzie, Doris Layton, David Bierie* and Ojmarrh Mitchell. 2007. "An Experimental Study of a Therapeutic Boot Camp: Impact on Impulses, Attitudes and Recidivism." *Journal of Experimental Criminology* 3(3):221-46.

Mitchell, Ojmarrh, David B. Wilson and Doris L. MacKenzie. 2007. "Does Incarceration-Based Drug Treatment Reduce Recidivism? A Meta-Analytic Synthesis of the Research." *Journal of Experimental Criminology* (4):353-75.

Miethe, Terance D., Jodi Olson* and Ojmarrh Mitchell. 2006. "Specialization and Persistence in the Arrest Histories of Sex Offenders: A Comparative Analysis of Alternative Measures and Offense Types." *Journal of Research in Crime & Delinquency* 43(3):204-29.

Mitchell, Ojmarrh and Adele Harrell. 2006. "Evaluation of the Breaking the Cycle Demonstration Project: Jacksonville, FL and Tacoma, WA." *Journal of Drug Issues* 36(1):97-118.

Mitchell, Ojmarrh and Doris Layton MacKenzie. 2006. "The Stability and Resiliency of Self-Control in a Sample of Incarcerated Offenders." *Crime & Delinquency* 52(3):432-49.

Mitchell, Ojmarrh and Doris Layton MacKenzie. 2006. "Disconfirmation of the Predictive Validity of the Self-Appraisal Questionnaire in a Sample of High-Risk Drug Offenders." *Criminal Justice & Behavior* 33(4):449-66.

Wilson, David B., Ojmarrh Mitchell and Doris L. MacKenzie. 2006. "A Systematic Review of Drug Court Effects on Recidivism." *Journal of Experimental Criminology* 2(4):459-87.

Mitchell, Ojmarrh. 2005. "A Meta-Analysis of Race and Sentencing Research: Explaining the Inconsistencies." *Journal of Quantitative Criminology* 21(4):439-66.

Mitchell, Ojmarrh, Doris L. MacKenzie and Deanna M. Pérez.* 2005. "A Randomized Evaluation of the Maryland Correctional Boot Camp for Adults: Effects on Offender Antisocial Attitudes and Cognitions." *Journal of Offender Rehabilitation* 40(3/4):71-86.

| Ojmarrh Mitchell | Curriculum Vitae | 4 |
|---|---|---|

Harrell, Adele, Ojmarrh Mitchell, Alexa Hirst and Douglas Marlowe. 2002. "Breaking the Cycle of Drugs and Crime: Findings from the Birmingham BTC Demonstration." *Criminology & Public Policy* 1(2):189-216.

Mitchell, Ojmarrh, Doris Layton MacKenzie, Angela R. Gover and Gaylene J. Styve. 2001. "The Influences of Personal Background on Perceptions of Juvenile Correctional Environments." *Journal of Criminal Justice* 29(1):67-76.

Mitchell, Ojmarrh, Doris Layton Mackenzie, Gaylene Styve and Angela Gover. 2000. "The Impact of Individual, Organizational, and Environmental Attributes on Voluntary Turnover among Juvenile Correctional Staff Members." *Justice Quarterly* 17(2):333-57.

Styve, Gaylene J., Doris Layton MacKenzie, Angela R. Gover and Ojmarrh Mitchell. 2000. "Perceived Conditions of Confinement: A National Evaluation of Juvenile Boot Camps and Traditional Facilities." *Law & Human Behavior* 24(3):297-308.

> Reprinted in *Correctional Boot Camps: Military Basic Training of a Model for Corrections?* 2004. Editors Doris Layton MacKenzie and Gaylene Styve Armstrong. Thousand Oaks, CA: Sage.

Mitchell, Ojmarrh, Doris Layton MacKenzie, Angela R. Gover and Gaylene J. Styve. 1999. "The Environment and Working Conditions in Juvenile Boot Camps and Traditional Facilities." *Justice Research and Policy* 1(2):1-22.

> Reprinted in *Correctional Boot Camps: Military Basic Training of a Model for Corrections?* 2004. Editors Doris Layton MacKenzie and Gaylene Styve Armstrong. Thousand Oaks, CA: Sage.

<u>Books</u>

Mitchell, Ojmarrh. In progress. Working Title: *What's Wrong with Racial Profiling and How to Fix It*. Routledge.

<u>Book Chapters</u>

Mitchell, Ojmarrh. 2020. "Racial Disparities in Drug Sanctions: Sources and Solutions." Pp. 141-159 in *Bias in the Law: A Definitive Look at Racial Bias in the U.S. Criminal Justice System*, edited by J. J. Avery and J. Cooper. Lanham, Maryland: Lexington Books.

Mitchell, Ojmarrh. 2018. "The Paradox of a Black Incarceration Boom in an Era of Declining Black Crime: Causes and Consequences." Pp. 343-67 in *Making a Black Criminology: Race, Theory, and Crime: Advances in Criminological Theory, Vol. 24*, edited by J. D. Unnever, S. L. Gabbidon and C. Chouhy. New Brunswick, NJ: Transaction.

Mitchell, Ojmarrh. 2018. "The War on Drugs and American Corrections." Pp. 245-253 in *Handbook of Corrections in the United States*, edited by O. H. Griffith and V. Woodward. New York: Routledge.

Mitchell, Ojmarrh. 2017. "Research Designs in Crime and Violence Prevention." Pp. 177-85 in *Preventing Crime and Violence*, edited by B. E. Teasdale and M. S. Bradley. New York: Springer.

Mitchell, Ojmarrh. 2011. "Drug and Other Specialty Courts." Pp. 843-71 in *Oxford Handbook of Crime and Criminal Justice*, edited by M. Tonry. New York: Oxford University Press.

Mitchell, Ojmarrh. 2011. "Meta-Analysis and the Relative Support for Various Theories." Pp. 335-57 in *Measuring Crime and Criminality: Advances in Criminological Theory*, Vol. 17, edited by J. MacDonald. New Brunswick, NJ: Transaction.

Mitchell, Ojmarrh and Michael J. Lynch. 2011. "Criminal Justice, Race, and the War on Drugs." Pp. 139-58 in *Disproportionate Minority Contact: Current Issues and Policies*, edited by N. Y. Parsons-Pollard. Durham, NC: Carolina Academic Press.

MacKenzie, Doris Layton, Ojmarrh Mitchell and David B. Wilson. 2011. "The Impact of Drug Treatment Provided in Correctional Facilities." Pp. 183-204 in *Handbook of Evidence Based Substance Abuse Treatment Practice in Criminal Justice Settings*, edited by C. Leukefield, T. Gullotta and J. Gregrich. New York: Springer.

Mitchell, Ojmarrh, Doris Layton MacKenzie and David B. Wilson. 2006. "The Effectiveness of Incarceration-Based Drug Treatment: An Empirical Synthesis of the Research." Pp. 103-16 in *Preventing Crime: What Works for Children, Offenders, Victims, and Places*, edited by D. P. Farrington and B. C. Welsh. Dordrecht, Netherlands: Springer.

Mitchell, Ojmarrh and Doris Layton MacKenzie. 2003. "Crime Prevention Via Prison-Based Drug Treatment: A Systematic Review and Assessment of the Research." Pp. 390-410 in *Crime Prevention: New Approaches*, edited by H. Kury and J. Obergfell-Fuchs. Weberstraße, Mainz: Weisser Ring.

Butts, Jeffrey A. and Ojmarrh Mitchell. 2000. "Brick by Brick: Dismantling the Border between Juvenile and Adult Justice." Pp. 167-213 in *Criminal Justice 2000*, Vol. Volume 2: Boundary Changes in Criminal Justice Organizations, edited by C. M. Friel. Washington, D.C.: Office of Juvenile Justice and Delinquency Prevention, U.S. Department of Justice.

Encyclopedia Entries

Mitchell, Ojmarrh. 2019. "Correctional Boot Camps." Pp. 176-183 in *The SAGE Encyclopedia of Criminal Psychology*, edited by R. D. Morgan. Thousand Oaks, CA: Sage Publications.

Mitchell, Ojmarrh. 2019. "Drug Crime Sentencing Disparities." 402-405 in *The SAGE Encyclopedia of Criminal Psychology*, edited by R. D. Morgan. Thousand Oaks, CA: Sage Publications.

Mitchell, Ojmarrh. 2017. "Boot Camps." Pp. 1-5 in *The Encyclopedia of Juvenile Delinquency and Justice*, edited by C. J. Schreck: John Wiley & Sons, Inc.

Mitchell, Ojmarrh. 2016. "Experimental Research Design." Pp. 1-6 in *Encyclopedia of Crime and Punishment*, edited by W. G. Jennings. Hoboken, NJ: John Wiley & Sons, Inc.

Mitchell, Ojmarrh. 2013. "The History of Boot Camps." Pp. 2099-106 in *Encyclopedia of Criminology and Criminal Justice*, edited by G. Bruinsma and D. Weisburd. New York: Springer.

Wilson, David B., Ojmarrh Mitchell and Doris Layton MacKenzie. 2013. "Drug Courts." Pp. 1170-78 in *Encyclopedia of Criminology and Criminal Justice*, edited by G. Bruinsma and D. Weisburd. New York: Springer.

Mitchell, Ojmarrh and Fawn Ngo. 2011. *Boot Camps and Shock Incarceration Programs*, Edited by R. B. Rosenfeld: Oxford Bibliographies Online.

Other

Mitchell, Ojmarrh. 2018. "Understanding Police Use of Force via Hospital Administrative Data: Prospects and Problems." [Invited Commentary] *JAMA Network Open* 1(5).

Mitchell, Ojmarrh. 2018. "A Review of *Judging Addicts*: Drug Courts and Coercion in the Justice System by Rebecca Tiger." [Book Review] *Journal of Criminal Justice Education* 29(2):310-13.

Gabbidon, Shaun and Ojmarrh Mitchell. 2015. "How to Prevent Profiling." *Security Management* (November): 35-36.

Eggers, Amy,* David B. Wilson, Ojmarrh Mitchell and Doris Layton MacKenzie. 2013. *Drug Courts' Effects on Criminal Offending for Juveniles and Adults*. Washington, D.C: U.S. Department of Justice, Office of Community Oriented Policing Services.

Mitchell, Ojmarrh, David B. Wilson, Amy Eggers* and Doris Layton MacKenzie. 2012. *The Effects of Drug Court on Criminal Offending*: The Campbell Collaboration, Crime and Justice Group.

Mitchell, Ojmarrh, David B. Wilson and Doris Layton MacKenzie. 2012. *The Effectiveness of Incarceration-Based Drug Treatment on Criminal Behavior: 2012 Update*: The Campbell Collaboration, Crime and Justice Group.

Mitchell, Ojmarrh, David B. Wilson and Doris Layton MacKenzie. 2006. *The Effectiveness of Incarceration-Based Drug Treatment on Criminal Behavior*: The Campbell Collaboration, Crime and Justice Group.

Mitchell, Ojmarrh. 2006. "Student Handbook of Criminal Justice and Criminology." [Book Review] *Crime, Law and Social Change* 46(3):181-83.

MacKenzie, Doris Layton, Angela R. Gover, Gaylene S. Armstrong and Ojmarrh Mitchell. 2001. *A National Study Comparing the Environments of Boot Camps to Traditional Facilities for Juvenile Offenders. Research in Brief*. Washington, D.C.: U.S. Department of Justice, National Institute of Justice.

Reprinted in *Criminal Justice: Concepts and Issues (An Anthology), 4th Edition.* 2004. Editor Chris W. Eskridge. Thousand Oaks, CA: Sage.

## TECHNICAL/GOVERNMENT REPORTS

Ridgeway, Greg, Ojmarrh Mitchell, Sheila Gunderman, Cedric Alexander and
   James Letten. 2016. *An Examination of Racial Disparities in Bicycle Stops and Citations
   Made by the Tampa Police Department: A Technical Assistance Report.* Washington,
   D.C: Office of Community Oriented Policing Services.

Mitchell, Ojmarrh. 2013. *Race and Drug Arrests: Specific Deterrence and Collateral Consequences.
   (Final Report to National Institute of Justice).* Tampa, FL: University of South Florida.

MacKenzie, Doris Layton, Ojmarrh Mitchell, David Bierie*, Lauren O'Neil, Derrick Franke and Fawn N.
   Mitchell. 2004. *A Randomized Study of the Maryland Correctional Boot Camp for Adults (Final
   Report to the Maryland Governor's Office of Crime Control and Prevention).* College Park, MD:
   University of Maryland.

Mitchell, Ojmarrh and Doris Layton MacKenzie. 2003. *The Relationship between Race, Ethnicity, and
   Sentencing Outcomes: A Meta-Analysis of Sentencing Research (Final Report to the National
   Institute of Justice).* College Park, MD: University of Maryland.

Harrell, Adele, Alexa Hirst, Ojmarrh Mitchell, Douglas Marlowe and Jeffrey Merrill. 2001. *Evaluation of
   the Breaking the Cycle Demonstration in Birmingham, Alabama (Final Report to the National
   Institute of Justice).* Washington D.C.: The Urban Institute.

Harrell, Adele V., Alexa M. Hirst and Ojmarrh Mitchell. 2000. *Implementing System-Wide Interventions
   for Drug-Involved Offenders in Birmingham, Alabama: Evaluation of Breaking the Cycle
   Demonstration (Final Report to the National Institute of Justice).* Washington, D.C.: The Urban
   Institute.

Harrell, Adele V., Alexa M. Hirst and Ojmarrh Mitchell. 2000. *Implementing System-Wide Interventions
   for Drug-Involved Offenders in Jacksonville, Florida: Evaluation of Breaking the Cycle
   Demonstration (Final Report to the National Institute of Justice).* Washington, D.C.: The Urban
   Institute.

## INVITED PRESENTATIONS

Mitchell, Ojmarrh. 2019. "What's Wrong with Racial Profiling." Presented at the University of
   Pennsylvania as part of the Department of Criminology's Seminar series, Philadelphia,
   Pennsylvania.

Mitchell, Ojmarrh. 2018. "Racial Disparities in Drug Sanctions and Their Effects:
   Specific Deterrence and Collateral Consequences." Presented at the Georgia State as part
   of its Provost Visiting Scholar program, Atlanta, Georgia.

Mitchell, Ojmarrh. 2017. "Racial Disparities in Drug Sanctions and Their Effects:
   Specific Deterrence and Collateral Consequences." Presented at the University of North
   Carolina as part of its Race and Crime lecture series, Charlotte, North Carolina.

Gabbidon, Shaun and Ojmarrh Mitchell. 2015. "Assessing the Prevalence and Extent of
   Racial Profiling in Retail Settings Using 21st Century Scientific Methods." Presented at
   the Retail Symposium on Shopping Equity, New York, New York.

Mitchell, Ojmarrh, David B. Wilson and Doris Layton MacKenzie. 2006. "The Effectiveness of Incarceration-Based Drug Treatment on Criminal Behavior." Presented at the *Hvad Virker? (What Works?) Conference*, Denmark, Copenhagen.

Mitchell, Ojmarrh, David B. Wilson and Doris Layton MacKenzie. 2006. "The Effectiveness of Incarceration-Based Drug Treatment on Criminal Behavior." Presented at the *Sixth Annual Jerry Lee Crime Prevention Symposium*, Washington, D.C.

Wilson, David B., Ojmarrh Mitchell and Doris Layton MacKenzie. 2005. "Effects of Drug Courts on Recidivism: A Systematic Review." Presented at the *Fifth Annual Jerry Lee Crime Prevention Symposium*, Washington, D.C.

Mitchell, Ojmarrh. 2003. "The Relationship between Race, Ethnicity, and Sentencing Outcomes: A Meta-Analysis of Sentencing Research." Presented at the *10th Annual Conference of Criminal Justice Research and Evaluation*, Washington, D.C.

Mitchell, Ojmarrh. 2003. "Implementing System-Wide Drug Intervention for Offenders: Findings of the Breaking the Cycle Evaluation." Presented at the *10th Annual Conference of Criminal Justice Research and Evaluation,* Washington, D.C.

## SELECTED PROFESSIONAL PRESENTATIONS

Mitchell, Ojmarrh, Tracey Sticco, Daniela Oramas Mora, and Sarah Harper. 2019. "Understanding Prosecutorial Discretion in Florida Circuit Courts: Cumulative Effects of Social Disadvantage on Case Outcomes." Paper presented at the *Annual Meetings of the American Society of Criminology*. San Francisco, CA.

Mitchell, Ojmarrh, and Lyndsay N. Boggess. 2019. "Neighborhood Characteristics and Sentencing Decisions." Paper presented at the *Academy of Criminal Justice Sciences*. Baltimore, MD.

Mitchell, Ojmarrh, Nathaniel L. Lawshe and Melissa Morales. 2018. "Racial Profiling: A Meta-Analytic Synthesis of the Research." Paper presented at the Annual Meetings of the American Society of Criminology, Atlanta, GA.

Mitchell, Ojmarrh. 2017. "The Incarceration Boom and African Americans: Causes and Consequences." Paper presented at the Annual Meetings of the American Society of Criminology, Philadelphia, PA.

Mitchell, Ojmarrh, Joshua C. Cochran, Daniel P. Mears and William D. Bales. 2016. "The Effects of Imprisonment on Recidivism." Paper presented at the Annual Meetings of the American Society of Criminology, New Orleans, LA.

Mitchell, Ojmarrh, David B. Wilson, Amy Eggers and Doris Layton MacKenzie. 2014. "Drug Courts' Effects on Criminal Offending." Paper presented at the Annual Meetings of the American Society of Criminology, San Francisco, CA.

Mitchell, Ojmarrh. 2013. "Race/Ethnicity and Drug Arrests: Specific Deterrence and Collateral Consequences." Paper presented at the Annual Meetings of the American Society of Criminology, Atlanta, GA.

Mitchell, Ojmarrh. 2012. "The Collateral Consequences of Drug Arrest on Social Bonds." Paper presented at the Annual Conference of the Academy of Criminal Justice Sciences, New York, NY.

Mitchell, Ojmarrh, Thomas A. Loughran and Michael S. Caudy. 2010. "The Effect of Drug Sanctions on Desistance from Drug Offending." Paper presented at the Annual Conference of the Academy of Criminal Justice Sciences, San Diego, CA.

Mitchell, Ojmarrh, Thomas A. Loughran and Michael S. Caudy. 2010. "The War on Drugs, Race, and Cumulative Disadvantage." Paper presented at the Annual meetings of the American Society of Criminology, San Francisco, CA.

Mitchell, Ojmarrh. 2008. "Completers, Dropouts, and Comparisons: Problems and Prospects in the 'Three Group' Analyses." Paper presented at the Annual meetings of the American Society of Criminology, St. Louis, MO.

Mitchell, Ojmarrh. 2007. "Latino Sentencing Disparity: A Meta-Analysis of the Research." Paper presented at the Annual Conference of the Academy of Criminal Justice Sciences, Seattle, WA.

Mitchell, Ojmarrh. 2006. "Race and Sentencing Aggregation Bias Masks Unwarranted Disparity." Paper presented at the Annual Meetings of the American Society of Criminology, Los Angeles, CA.

Mitchell, Ojmarrh and Adele Harrell. 2005. "On the Procedural Justice and Perceived Deterrence of Coerced Drug Treatment." Paper presented at the Annual Meetings of the American Society of Criminology, Toronto, Canada.

Mitchell, Ojmarrh, David B. Wilson and Doris Layton MacKenzie. 2005. "The Effectiveness of Incarceration-Based Drug Treatment in Reducing Recidivism: A Campbell Collaboration Systematic Review." Paper presented at the 14th World Congress of Criminology, Philadelphia, PA.

Mitchell, Ojmarrh, David B. Wilson and Doris Layton MacKenzie. 2004. "Incarceration-Based Drug Treatment." Paper presented at the Societies of Criminology 1st Key Issues Conference, Paris, France.

Wilson, David B., Ojmarrh Mitchell and Doris Layton MacKenzie. 2004. "A Systematic Review of Drug Court Effects on Recidivism." Paper presented at the Societies of

Mitchell, Ojmarrh. 2003. "The Relationship between Race, Ethnicity, and Sentencing Outcomes." Paper presented at the Annual Meetings of the American Society of Criminology, Denver, CO.

Mitchell, Ojmarrh. 2003. "System-Wide Drug Interventions for Offenders: The Breaking the Cycle Impact Evaluation." Paper presented at the Annual Conference of the American Evaluation Association, Reno, NV.

Mitchell, Ojmarrh, Doris Layton MacKenzie and David B. Wilson. 2002. "The Effectiveness of Prison- and Jail-Based Drug Treatment in Reducing Recidivism." Paper presented at the Annual Meetings of the American Society of Criminology, Atlanta, GA.

Mitchell, Ojmarrh, Adele V.  Harrell and Alexa Hirst. 2001. "Assessing the Effectiveness of Breaking the Cycle: Birmingham, Al." Paper presented at the Annual Meeting of the Academy of Criminal Justice Sciences, Washington, D.C.

Mitchell, Ojmarrh, Doris Layton MacKenzie, Angela R. Gover and Gaylene J. Styve. 1998. "National Evaluation of Juvenile Correctional Facilities: Staff Perceptions of the Environment and Working Conditions." Paper presented at the Annual Meetings of American Society of Criminology, Washington, D.C.

### EXTERNAL FUNDS SEEKING

Mitchell, Ojmarrh. 2018-19, Funded. *Understanding Prosecutorial Discretion in Florida Criminal Courts*. National Institute of Justice, FY2018. W.E.B. Du Bois Scholars in Race and Crime, $438,152.

Mitchell, Ojmarrh. 2011, Funded. *Race and Drug Arrests: Specific Deterrence and Collateral Consequences*: National Institute of Justice, FY2011 W.E.B. Du Bois Fellowship, $93,553.

Boggess, Lyndsay and Ojmarrh Mitchell. 2010, Not Funded. *Investigating Violent Crime Victimization in Immigrant Communities and Ethnic Enclaves*: National Institute of Justice $162,600.

Mitchell, Ojmarrh. 2010, Not Funded. *The War on Drugs, Race, and Cumulative Disadvantage*: National Institute of Justice, W.E.B. Du Bois Fellowship, $97,839.

Mitchell, Ojmarrh. 2010, Not Funded. *Second Chance Act Initiatives for Offender Reentry: Identifying Successful Educational and Vocational Programs*: Subcontract with George Mason University, $116,222.

Mitchell, Ojmarrh and Doris Layton MacKenzie. 2002-2003, Funded. *The Relationship between Race, Ethnicity, and Sentencing Outcomes: A Meta-Analysis of Sentencing Research*: National Institute of Justice, $85,507.

MacKenzie, Doris Layton and Ojmarrh Mitchell. 2001-2002, Funded. *An Experimental Study of the Maryland Correctional Boot Camp*: Maryland Governor's Office of Crime Control and Prevention, $124,000.

MacKenzie, Doris Layton and Ojmarrh Mitchell. 2002-2003, Funded. *An Experimental Study of the Maryland Correctional Boot Camp*: Maryland Governor's Office of Crime Control and Prevention, $124,000.

### SERVICE

Professional

Executive Counselor, American Society of Criminology, 2019-Present
Science Advisory Board Member, Office of Justice Programs, 2015-2018
Standing Committee on Policy, American Society of Criminology, 2018-Present
Standing Review Panel Chair, National Institute of Justice, 2014-16
Standing Review Panel, National Institute of Justice, 2013
Associate Editor, *Criminology & Public Policy*, 2019-Present
Deputy Editor, *Journal of Crime and Justice,* 2010-2019

Editorial Board, *Criminology*, 2017-Present
Editorial Board, *Journal of Experimental Criminology*, 2011-Present
Editorial Board, *Journal of Criminal Justice Education,* 2017-Present
Editorial Board, *Race and Justice: An International Journal*, 2018-Present
Editorial Board, *American Journal of Criminal Justice*, 2011-2017
Editorial Board, *Journal of Crime and Justice*, 2007-09
Grant Peer Reviewer, National Institute of Justice 2011, 2012, 2015-10
Grant Peer Reviewer, Office of Juvenile Justice and Delinquency Prevention, 2015, 2018
Grant Peer Reviewer, Office of Community Oriented Policing Services, 2016-18
Campbell Collaboration Methods Group, 2014-2016
Area Chair, American Society of Criminology, Annual Meetings, 2014
Program Committee, ACJS 2009, 2011
Minority Affairs Committee, American Society of Criminology,2008
Program Committee, American Society of Criminology, 2007
August Vollmer Award Committee, American Society of Criminology, 2007
Gene Carte Student Paper Competition Committee, American Society of Criminology, 2004-05

University

USF Faculty Senate, 2018-2019
USF Faculty Development Leave Committee Member, 2004-05

College

Curriculum Committee, 2016-18
Faculty Search Committee for FMHI's Mental Health Law and Policy, 2012 (2 positions)
NIDA P30 Search Committee Member, 2009-10 (3 positions)
Governance Committee, 2009
Faculty Search Committee Member: Policy & Services Research Data Center Director, 2008-09
Technology Board Member, University of Cincinnati, 2006-07

Department

Faculty Evaluation Committee, 2016-18
Graduate Committee, 2008-17
PhD. Comprehensive Exam Committee, 2008-14
Tenure and Promotion Committee, 2013-14
Chair Search Committee, 2010-11
Faculty Search Committee, 2009-10 (2 positions)
Faculty Search Committee, 2008-9 (2 positions)
Graduate Committee, 2007-08
Re-appointment, Tenure, and Promotion Committee, 2006-08
Faculty Search Committee, 2005-06
Masters Comprehensive Exam Committee, 2005-06
Faculty Search Committee, 2003-04

## PROFESSIONAL ASSOCIATIONS

American Society of Criminology
Academy of Criminal Justice Sciences

**Ojmarrh Mitchell**                    **Curriculum Vitae**                         **12**

### COURSES TAUGHT

Race and Crime, Undergraduate and Graduate
Drugs and Crime, Undergraduate and Graduate
Corrections, Undergraduate and Graduate, Undergraduate
Sentencing and Corrections, Graduate
Introduction to Research Methods, Undergraduate and Graduate
Advanced Research Methods, Graduate
Introduction to Statistics, Undergraduate and Graduate
Regression Analysis, Graduate

# CHRISTOPHER UGGEN

## May 2020

University of Minnesota
Department of Sociology
909 Social Science Tower
267 19th Avenue South
Minneapolis, MN 55455

office: 612-624-4016
department: 612-624-4300
email: uggen001@umn.edu
fax: 612-624-7020
web: www.chrisuggen.com

## EDUCATION

| | |
|---|---|
| 1995 | Ph.D., Sociology, University of Wisconsin  *Advisor*: Ross Matsueda |
| | *Major:* Criminology, Social Stratification  *Minor*: Industrial Relations |
| 1990 | M.S., Sociology, University of Wisconsin  [Entered graduate school 1989] |
| 1986 | B.A., Behavioral Science and Law/Criminal Justice, University of Wisconsin |

## POSITIONS HELD

| | |
|---|---|
| Current | Regents Professor of Sociology and Law, University of Minnesota (2016) |
| | Martindale Chair in Sociology (2015-) |
| | Distinguished McKnight Professor (2006-) |
| | Faculty Affiliate, Minnesota Population Center |
| 2006-12 | Sociology Department Chair (30 faculty, 100 graduate & 600 undergraduate students) |
| 2005-06 | Professor. Sociology, University of Minnesota |
| 2001-05 | Associate Professor. Sociology, University of Minnesota |
| 1995-01 | Assistant Professor. Sociology, University of Minnesota |

## LEADERSHIP

| | |
|---|---|
| 2018-20 | *Co-Chair,* Department Development Committee, UMN sexual misconduct initiative |
| 2019 | *Chair,* external review committee, Ohio State University |
| 2017-18 | *Vice President,* American Sociological Association |
| 2010- | *Editor and Publisher,* TheSocietyPages.org (with D. Hartmann) |
| 2014-15 | *Vice Chair*, University of Minnesota Faculty Consultative Committee (university-wide) |
| 2014-15 | *Section Chair*, American Sociological Association (Crime, Law, and Deviance section) |
| 2010-11 | *Chair*, College of Liberal Arts Council of Chairs (2010-2011) (28 departments) |
| 2006-12 | *Department Chair* (30 faculty, 100 graduate and 600 undergraduate students) |
| 2009-11 | *Chair,* College of Liberal Arts plan committee (CLA 2015) (with G. Oehlert) |
| 2007-11 | *Editor, Contexts* magazine (with D. Hartmann) |

## HONORS AND FELLOWSHIPS

| | |
|---|---|
| 2018 | *James F. Short Distinguished Article Award,* American Sociological Assn. (CLD Section) |
| 2018 | *Publication Award,* American Sociological Assn. (Soc. Practice & Public Soc. Section) |
| 2016 | *Hindelang Speaker Award* for career contributions to criminology, University at Albany |
| 2014 | *Peterson-Krivo Mentoring Award,* American Sociological Assn. (CLD Section) |
| 2013 | *Fellow,* American Society of Criminology |
| 2013 | Invited Speaker, White House parental incarceration forum |
| 2009-12 | *Investigator Award in Health Policy Research,* Robert Wood Johnson |
| 2011 | *Equal Justice Award for Research,* The Council on Crime and Justice |
| 2011 | *Outstanding Service as Editor*, American Sociological Association |
| 2009 | Public Sociology Keynote, Indiana University |
| 2004 | *New York Times Magazine 2003 "Ideas of the Year"* |
| 2004 | Elected *Member*, Sociological Research Association |
| 2002-03 | *U.S. Delegate,* U.S.-Japan Foundation Leadership Exchange |
| 2000-02 | *Fellow,* Soros Foundation Open Society Institute |
| 2001 | *Outstanding Faculty Award,* Mortar Board National Honor Society |
| | (for superior dedication to undergraduate research) |
| 2000 | *Ruth Shonle Cavan Young Scholar Award,* American Society of Criminology |

(for outstanding scholarly contributions to the field of criminology)
1998          *Junior Scholar Award*, International Society for Criminology
1992          1st Prize, *ASA Crime, Law and Deviance Section Student Paper Award*
1991          1st Prize, *Gene Carte Paper Award* American Society of Criminology
1990-92      *National Science Foundation Graduate Research Fellowship*
1986          *Undergraduate Scholarship*, AMEV/Fortis Company

### MINNESOTA AND WISCONSIN AWARDS

2019          *Outstanding Research Award*. Minnesota Population Center
2016          *Regents Professorship*, University of Minnesota
2015          *Martindale Chair*, University of Minnesota Department of Sociology
2011, 1998   *Faculty Mentor Award*, University of Minnesota Department of Sociology
2009          *Outstanding Service Award*, University of Minnesota Department of Sociology
2007          *Ten Year Certificate of Appreciation*, TRIO Ronald E. McNair Scholars Program
2006          *Distinguished McKnight University Professorship*, University of Minnesota
2005          *Public Sociology Award*, University of Minnesota Department of Sociology
2004          *Sociological Education Award*, Sociologists of Minnesota
1999          *College Nominee*, Morse Alumni University Teaching Award
1999          *Student Board Nominee*, College of Liberal Arts Outstanding Faculty Award
1996          *Katherine DuPree Lumpkin Dissertation Award*, University of Wisconsin
1990          *Distinction*, University of Wisconsin Sociology Preliminary Examination
1989          *Graduate Fellowship*, University of Wisconsin

### PUBLICATIONS

(GS=*Graduate Student*, UGS=*Undergraduate Student*, PD=*Postdoc Coauthor*)

### *BOOKS*

2021     Jason Schnittker, Michael Massoglia, and Christopher Uggen. Under
         contract. *Prisons and Health in the Age of Mass Incarceration*. New
         York: Oxford University Press. [research monograph]

2019     Heather McLaughlin and Kyle Green, with Christopher Uggen, editors.
         2019. ***Engaging Helen Hacker: Collected Works and
         Reflections of a Feminist Pioneer***. Minneapolis: University of
         Minnesota Libraries. [edited volume]



2016     Lisa Wade, Douglas Hartmann, and Christopher Uggen, editors. 2016.
         ***Assigned: Life with Gender***. New York: W.W. Norton. [edited
         volume]

2015     Douglas Hartmann and Christopher Uggen, editors. 2015. ***Getting
         Culture***. New York: W.W. Norton. [edited volume]

2015    Douglas Hartmann and Christopher Uggen, editors. 2015. *__Owned__*. New York: W.W. Norton. [edited volume]



2014    Douglas Hartmann and Christopher Uggen, editors. 2014. *__Color Lines and Racial Angles__*. New York: W.W. Norton. [edited volume]



2014    Douglas Hartmann and Christopher Uggen, editors. 2014. *__Crime and the Punished__*. New York: W.W. Norton. [edited volume]



2013    Douglas Hartmann and Christopher Uggen, editors. 2013. *__The Social Side of Politics__*. New York: W.W. Norton. [edited volume]



2012    Douglas Hartmann and Christopher Uggen, editors. 2012. *__The Contexts Reader__*. 2nd ed. New York: W.W. Norton. [edited volume]



2006    Jeff Manza and Christopher Uggen. Locked Out: Felon Disenfranchisement and American Democracy. 2006, 2008. New York: Oxford University Press. [research monograph]
        * Choice Outstanding Academic Title (2006); Finalist, C. Wright Mills Award (2006)



## *EDITING*

2010-    Editor and Publisher. 2010-Now. *__The Society Pages__* (with Douglas Hartmann).



2018     Kyle Green and Sarah Lageson, editors. *__Give Methods a Chance__*. New York: W.W. Norton. Series editors, Douglas Hartmann and Christopher Uggen.



2008-    Editor. 2008-2011. *__Contexts__* (with Douglas Hartmann). Volumes 7, 8, 9 and 10, Numbers 1-4.
2011     American Sociological Association.

2008    ***Criminology and Public Policy***. The Effect of Criminal Background Checks on Hiring Ex-Offenders, Volume 7, Number 3. American Society of Criminology.

2005    ***Journal of Contemporary Criminal Justice***. Special issue: *Collateral Consequences of Criminal Sanctions*, Volume 21, Number 1.

## ARTICLES AND BOOK CHAPTERS

2021    Christopher Uggen, Ráchael A. Powers, Heather McLaughlin, and Amy Blackstone. 2021. "Toward a Criminology of Sexual Harassment." Forthcoming in ***Annual Review of Criminology***.

2020.    Nyseth Brehm, Hollie, Louisa Roberts, Christopher Uggen, and Jean-Damascéne Gasanabo. 2021. "'We Came to Realize We Are Judges': The Moral Careers of Elected Lay Jurists in Rwanda's Gacaca Courts." Forthcoming in ***International Journal of Transitional Justice***.

Alexes Harris, Sarah Shannon, Beth Huebner, Karin Martin, Mary Pattillo, Becky Pettit, Bryan Sykes, and Christopher Uggen. 2020. "The Broad Scope and Variation of Monetary Sanctions: Evidence from Eight States." ***UCLA Criminal Justice Law Review*** 4:269-81.

2019    Veronica Horowitz[GS] and Christopher Uggen. 2019. "Consistency and Compensation in Mercy: Commutation in the Era of Mass Incarceration." ***Social Forces*** 97:1205-1230.

2018    Emily Bryant[GS], Emily Schulz[GS], Hollie Nyseth Brehm, and Christopher Uggen. 2018. "Techniques of Neutralization and Identity Work among Genocide Perpetrators." ***Social Problems*** 65:584-602.

Christopher Uggen, Robert Stewart[GS], and Veronica Horowitz[GS]. 2018. "Why Not Minnesota? Norway, Justice Reform, and 50-Labs Federalism." ***Federal Sentencing Reporter*** 31:5-13.

Rachael A. Woldoff and Christopher Uggen. 2018. "Community and Crime: Now More than Ever." ***City & Community*** 17:939-944.

Hollie Nyseth Brehm, Suzy McElrath[GS], and Christopher Uggen. 2018. "A Dynamic Life-Course Approach to Genocide." ***Social Currents*** 5:107-119.

Mike Vuolo, Christopher Uggen, and Sarah Lageson. 2018. "To Match or Not to Match? Statistical and Substantive Considerations in Audit Design and Analysis." Pages 119-140 in ***Audit Studies: Behind the Scenes with Theory, Method, and Nuance***, edited by Michael S. Gaddis. New York: Springer.

2017    Sarah Shannon, Christopher Uggen, Jason Schnittker, Michael Massoglia, Melissa Thompson, and Sara Wakefield. 2017. "The Growth, Scope, and Spatial Distribution of People with Felony Records in the United States, 1948-2010." ***Demography*** 54:1795-1818.
        * Awarded a 2018 Outstanding Research Award from the Minnesota Population Center.

Heather McLaughlin, Christopher Uggen, and Amy Blackstone. 2017. "The Economic and Career Effects of Sexual Harassment on Working Women." ***Gender & Society*** 31:333-358.

Mike Vuolo, Sarah Lageson, and Christopher Uggen. 2017. "Criminal Record Questions in the Era of 'Ban the Box'." ***Criminology & Public Policy*** 16:139-165.

Mike Vuolo, Christopher Uggen, and Sarah Lageson. 2017. "Race, Recession, and Social Closure in the Low Wage Labor Market." ***Research in the Sociology of Work*** 30:141-183.

Christopher Uggen and Ryan Larson. 2017. "Is the Public Getting Smarter on Crime?" ***Contexts*** 16:76-78. DOI 10.1177/1536504217742400.

Christopher Uggen, Sarah Shannon, and D. Wayne Osgood. 2017. "From Daddy's Liquor Cabinet to Home Depot: Shifts in Leisure Activity in the Transition to Adulthood." Pages 165-189 in ***Crossings to Adulthood: How Diverse Young Americans Understand and Navigate Their Lives,*** edited by Teresa Swartz, Douglas Hartmann, and Ruben Rumbaut. Leiden: Brill.

Christopher Uggen, Veronica Horowitz[GS], and Robert Stewart[GS]. 2017. "Public Criminology and Criminologists with Records." ***The Criminologist*** 42:3-7.

Ryan Larson[GS] and Christopher Uggen. 2017. "Felon Disenfranchisement." In ***Encyclopedia of Corrections,*** edited by Kent R. Kerley. Oxford: Wiley-Blackwell. DOI: 10.1002/9781118845387.wbeoc053

2016    Hollie Nyseth Brehm, Christopher Uggen, and Jean-Damascéne Gasanabo. 2016. "Age, Gender, and the Crime of Crimes: Toward a Life-Course Theory of Genocide Participation." ***Criminology*** 54: 713-43.
        * Awarded the 2018 James F. Short Distinguished Article Award from the American Sociological Association Crime, Law, and Deviance section.

Mike Vuolo, Christopher Uggen, and Sarah Lageson[GS]. 2016. "Statistical Power in Experimental Audit Studies: Cautions and Calculations for Matched Tests with Nominal Outcomes." ***Sociological Methods & Research*** 45:260-303.

Shelly Schaefer and Christopher Uggen. 2016. "Blended Sentencing Laws and the Punitive Turn in Juvenile Justice." ***Law & Social Inquiry*** 41:435-63.

Christopher Uggen. 2016. "Records, Relationships, and Reentries: How Specific Punishment Conditions Affect Family Life." ***ANNALS of the American Academy of Political and Social Science*** 665:142-48.

Christopher Uggen, Ryan Larson, and Sarah Shannon. 2016. ***6 Million Lost Voters: State-Level Estimates of Felony Disenfranchisement, 2016.*** Washington, DC: Sentencing Project.
        * Awarded the 2018 Publication Award from the American Sociological Association Section on Sociological Practice and Public Sociology.

Christopher Uggen & Lindsay Blahnik[UGS]. 2016. "The Increasing Stickiness of Public Labels." Pages 222-43 in ***Global Perspectives on Desistance,*** edited by Joanna Shapland, Stephen Farrall, and Anthony Bottoms. Routledge.

2015    Jason Schnittker, Christopher Uggen, Sarah Shannon, and Suzy McElrath[GS]. 2015. "The Institutional Effects of Incarceration:  Spillovers from Criminal Justice to Health Care." ***Milbank Quarterly*** 93:516-60

Veronica Horowitz[GS] and Christopher Uggen. 2015. "Crime, Punishment, and Politics." In ***Encyclopedia of American Political Culture,*** edited by Michael Shally-Jensen. Santa Barbara, CA: ABC-CLIO.

2014    Christopher Uggen and Sarah Shannon[GS]. 2014. "Productive Addicts and Harm Reduction: How

Work Reduces Crime – But Not Drug Use." *Social Problems* 61:105-30.

Christopher Uggen, Mike Vuolo, Sarah Lageson[GS], Ebony Ruhland[GS], and Hilary Whitham[GS]. 2014. "The Edge of Stigma: An Experimental Audit of the Effects of Low-Level Criminal Records on Employment." *Criminology* 52:627-654.

Michael Vuolo, Christopher Uggen, and Sarah Lageson[GS]. 2014. "Taste Clusters of Music and Drugs: Evidence from Three Analytic Levels." *British Journal of Sociology* 65:520-54.

Sarah Lageson[GS,] Mike Vuolo, and Christopher Uggen. 2014. "Legal Ambiguity in Managerial Assessments of Criminal Records." *Law & Social Inquiry* 40:175-204.

Christopher Uggen and Suzy McElrath[GS]. 2014. "Parental Incarceration: What we Know and Where we Need to Go." *Journal of Criminal Law and Criminology* 104:597-604.

Hollie Nyseth Brehm[GS], Christopher Uggen, and Jean-Damascène Gasanabo. 2014. "Genocide, Justice, and Rwanda's Gacaca Courts." *Journal of Contemporary Criminal Justice* 30:333-52.

Christopher Uggen and Robert Stewart[GS]. 2014-2015. "Piling On: Collateral Consequences and Community Supervision." *Minnesota Law Review* 99:1871-1910

Amy Blackstone, Jason N. Houle, and Christopher Uggen. 2014. "'I Didn't Recognize it as a Bad Experience until I was Much Older": Age, Experience, and Workers' Perceptions of Sexual Harassment." *Sociological Spectrum* 34:314-37.

Christopher Uggen and Suzy McElrath[GS]. 2014. "Six Social Sources of the U.S. Crime Drop." Pages 3-20 in *Crime and the Punished,* edited by Douglas Hartmann and Christopher Uggen.

Sarah Shannon[GS] and Christopher Uggen. 2014. "Visualizing Punishment." Pages 42-62 in *Crime and the Punished,* edited by Douglas Hartmann and Christopher Uggen.

2013    Sarah Lageson and Christopher Uggen. 2013. "How Work Affects Crime—And Crime Affects Work—Over The Life Course." Pages 201-212 in *Handbook of Life-Course Criminology: Emerging Trends and Directions for Future Research*, edited by Chris L. Gibson and Marvin D. Krohn. New York: Springer.

2012    Heather McLaughlin[GS], Christopher Uggen, and Amy Blackstone. 2012. "Sexual Harassment, Workplace Authority, and the Paradox of Power." *American Sociological Review* 77:625-47.

Ryan D. King, Michael Massoglia, and Christopher Uggen. 2012. "Employment and Exile: U.S. Criminal Deportations, 1908-2005." *American Journal of Sociology* 117:1786-1825. [authorship is alphabetical, reflecting equal contributions]

Jason Schnittker, Michael Massoglia, and Christopher Uggen. 2012. "Out and Down: Incarceration and Psychiatric Disorders." *Journal of Health and Social Behavior* 53:448-64.

Melissa Thompson and Christopher Uggen. 2012. "Dealers, Thieves, and the Common Determinants of Drug and Non-Drug Illegal Earnings." *Criminology* 50:1057-87.

Elaine Hernandez and Christopher Uggen. 2012. "Institutions, Politics, and Mental Health Parity." *Society and Mental Health* 2:154-71.

Jason N. Houle[GS], Jeremy Staff, Jeylan T. Mortimer, Christopher Uggen, and Amy Blackstone. 2011. "The Psychological Impact of Sexual Harassment during the Early Occupational Career." *Society and Mental Health* 1:89-105.

Alec Ewald and Christopher Uggen. 2012. "The Collateral Effects of Imprisonment on Prisoners, Their Families, and Communities." Pages 83-103 in *The Oxford Handbook on Sentencing and Corrections*, edited by Joan Petersilia and Kevin Reitz. New York: Oxford University Press.

Sarah Shannon[GS] and Christopher Uggen. 2012. "Incarceration as a Political Institution." Pages 214-225 in *The Wiley-Blackwell Companion to Political Sociology*, edited by Kate Nash, Alan Scott, and Edwin Amenta. Oxford: Blackwell Publishing.

Terence P. Thornberry, Peggy C. Giordano, Christopher Uggen, Mauri Matsuda[GS], Ann S. Masten, Erik Bulten, and Andrea G. Donker. 2012. "Explanations for Offending." Pages 47-85 in *From Juvenile Delinquency to Adult Crime: Criminal Careers, Justice Policy, and Prevention*, edited by Rolf Loeber and David Farrington. New York: Oxford University Press

2011      Jason Schnittker, Michael Massoglia, and Christopher Uggen. 2011. "Incarceration and the Health of the African American Community." *Du Bois Review* 8:133–41.

Darren Wheelock, Christopher Uggen, and Heather Hlavka. 2011. "Employment Restrictions for Individuals with Felon Status and Racial Inequality in the Labor Market." Pages 278-307 in *Global Perspectives on Re-Entry*, edited by Ikponwosa O. Ekunwe and Richard S. Jones. Tampere, Finland: Tampere University Press.

2010      Michael Massoglia and Christopher Uggen. 2010. "Settling Down and Aging Out: Toward an Interactionist Theory of Desistance and the Transition to Adulthood." *American Journal of Sociology* 116:543-82. [authorship is alphabetical, reflecting equal contributions]

Sara Wakefield and Christopher Uggen. 2010. "Incarceration and Stratification." *Annual Review of Sociology* 36:387-46.
*Reprinted 2013 in *Introduction to Criminal Justice: A Sociological Perspective,* edited by Charis Kubrin and Thomas Stucky. Stanford University Press.

Christopher Uggen and Michelle Inderbitzin. 2010. "Public Criminologies." *Criminology and Public Policy* 9: 725-750 [with introduction by Todd Clear and Policy Essay responses by Paul Rock, Kenneth Land, Ian Loader and Richard Sparks, Michael Tonry, and Daniel Mears, pp. 751-805].

Christopher Uggen and Michelle Inderbitzin. 2010. "The Price and the Promise of Citizenship: Extending the Vote to Nonincarcerated Felons." Pages 61-68 in *Contemporary Issues in Criminal Justice Policy: Policy Proposals From the American Society of Criminology Conference*, edited by Natasha A. Frost, Joshua D. Freilich, and Todd R. Clear. Belmont, CA: Cengage/Wadsworth.

2009      Amy Blackstone, Christopher Uggen, and Heather McLaughlin[GS]. 2009. "Legal Consciousness and Responses to Sexual Harassment." *Law & Society Review* 43:631-68.

Teresa Swartz, Amy Blackstone, Christopher Uggen, and Heather McLaughlin[GS]. 2009. "Welfare and Citizenship: The Effects of Government Assistance on Voting Behavior." *The Sociological Quarterly* 50:633-65.

Jesse Wozniak[GS] and Christopher Uggen. 2009. "Real Men Use Non-Lethals: Appeals to Masculinity in Marketing Police Weaponry." *Feminist Criminology* 4:274-93.

Christopher Uggen and Chika Shinohara[GS]. 2009. "Age, Gender, and *Sekuhara* in the United States and Japan." *The Sociological Quarterly* 50:201-34.

Shelly Schaefer[GS] and Christopher Uggen. 2009. "Juvenile Delinquency and Desistance." Pages 423-430 in *Handbook of Youth and Young Adulthood*, edited by Andy Furlong. Abingdon, Oxfordshire: Routledge.

Christopher Uggen, Mischelle Van Brakle[GS], and Heather McLaughlin[GS]. 2009. "Punishment and Social Exclusion: National Differences in Prisoner Disenfranchisement." Pages 59-78 in *Criminal Disenfranchisement in an International Perspective*, edited by Alec Ewald and Brandon Rottinghaus. Cambridge, UK: Cambridge University Press.

2008    Christopher Uggen. 2008. "Editorial Introduction: The Effect of Criminal Background Checks on Hiring Ex-Offenders." *Criminology and Public Policy* 7:367-370.

Heather Hlavka[GS] and Christopher Uggen. 2008. "Does Stigmatizing Sex Offenders Drive Down Reporting Rates? Perverse Effects and Unintended Consequences" *Northern Kentucky Law Review* 35:347-371.

Heather McLaughlin[GS], Christopher Uggen, and Amy Blackstone. 2008. "Social Class and Workplace Harassment During the Transition to Adulthood." *New Directions for Child and Adolescent Development* 119:85-98. [invited]

Christopher Uggen and Heather Hlavka[GS]. 2008. "No More Lame Pro-sems: Professional Development Seminars in Sociology." Pages 191-216 in *Academic Street Smarts: Informal Professionalization of Graduate Students*, edited by Ira Silver and David Shulman. New York: American Sociological Association.

Darren Wheelock[GS] and Christopher Uggen. 2008. "Race, Poverty and Punishment: The Impact of Criminal Sanctions on Racial, Ethnic, and Socioeconomic Inequality." Pages 261-292 in *The Colors of Poverty: Why Racial and Ethnic Disparities Persist*, edited by Ann Chih Lin and David Harris. New York: Russell Sage.

2007    Michael Massoglia and Christopher Uggen. 2007. "Subjective Desistance and the Transition to Adulthood." *Journal of Contemporary Criminal Justice* 23:90-103.

Christopher Uggen. 2007. "Who We Punish: The Carceral State." *Social Research* 74: 467-469 and "Dirty Bombs and Garbage Cases." *Social Research* 74:707-711 [invited, non-refereed]

Christopher Uggen. 2007. "Thinking Experimentally." Pages 181-189 in Christine J. Horne and Michael J. Lovaglia, *Experiments in Criminology and Law: A Research Revolution*. Lanham, MA: Rowman and Littlefield.

Christopher Uggen and Sara Wakefield.[GS] 2007. "What Have We Learned from Longitudinal Studies of Adolescent Employment and Crime?" Pages 189-218 in *The Long View of Crime: A Synthesis of Longitudinal Research*, edited by Akiva Liberman. New York: Springer.

Michelle Inderbitzin, Kelly Fawcett, Christopher Uggen, and Kristin A. Bates. 2007. "'Revolutions May Go Backwards': The Persistence of Voter Disenfranchisement in the United States." Pages 37-53 in Kristin A. Bates and Richelle S. Swan (Eds.), *Through the Eye of Katrina: Social Justice in the United States*. Durham, NC: Carolina Academic Press.

2006    Christopher Uggen, Jeff Manza, and Melissa Thompson. 2006. "Citizenship, Democracy, and the Civic Reintegration of Criminal Offenders." *ANNALS of the American Academy of Political and Social Science* 605:281-310.

Angela Behrens[UGS] and Christopher Uggen. 2006. "Felon Disenfranchisement." Pages 582-585 in Paul Finkelman (Ed.), *Encyclopedia of American Civil Liberties*. New York: Routledge.

2005    Christopher Uggen, Angela Behrens[UGS], and Jeff Manza. 2005. "Criminal Disenfranchisement." *Annual Review of Law and Social Science* 1:307-322. [invited, non-refereed]
*\* Reprinted* in *Boundaries: Readings in Deviance, Crime, and Justice*, edited by B.R.E. Wright, Jr. and R.B. McNeal, Jr. Allyn & Bacon/Pearson Custom Publishing.

Christopher Uggen and Sara Wakefield[GS]. 2005. "Young Adults Reentering the Community from the Criminal Justice System: Challenges to Adulthood." Pages 114-144 in *On Your Own Without a Net: The Transition to Adulthood for Vulnerable Populations*, edited by D. Wayne Osgood, E. Michael Foster, Constance Flanagan, and Gretchen R. Ruth. Chicago: University of Chicago Press.

Christopher Uggen, Sara Wakefield[GS], and Bruce Western. 2005. "Work and Family Perspectives on Reentry." Pages 209-243 in *Prisoner Reentry and Crime in America*, edited by Jeremy Travis and Christy Visher. Cambridge, UK: Cambridge University Press.

Christopher Uggen and Jeff Manza. 2005. "Disenfranchisement and the Civic Reintegration of Convicted Felons." Pages 67-84 in *Civil Penalties, Social Consequences*, edited by Christopher Mele and Teresa Miller. New York: Routledge.

2004    Christopher Uggen and Amy Blackstone[GS]. 2004. "Sexual Harassment as a Gendered Expression of Power." *American Sociological Review* 69:64-92.

Jeff Manza, Clem Brooks, and Christopher Uggen. 2004. "Public Attitudes toward Felon Disenfranchisement in the United States." *Public Opinion Quarterly* 68:276-87.

Christopher Uggen and Jeff Manza. 2004. "Voting and Subsequent Crime and Arrest: Evidence from a Community Sample." *Columbia Human Rights Law Review* 36:193-215.

Jeff Manza and Christopher Uggen. 2004. "Punishment and Democracy: The Disenfranchisement of Nonincarcerated Felons in the United States." *Perspectives on Politics* 2:491-505.

Sara Wakefield[GS] and Christopher Uggen. 2004. "The Declining Significance of Race in Federal Civil Rights Law: The Social Structure of Discrimination Claims." *Sociological Inquiry* 74:128-57.

Christopher Uggen and Jeff Manza. 2004. "Lost Voices: The Civic and Political Views of Disenfranchised Felons." Pages 165-204 in *Imprisoning America: The Social Effects of Mass Incarceration*, edited by Mary Pattillo, David Weiman, and Bruce Western. New York: Russell Sage Foundation.

Jeremy Staff[GS], Jeylan Mortimer, and Christopher Uggen. 2004. "Work and Leisure in Adolescence." Pages 429-450 in *The Handbook of Adolescent Psychology*, edited by Richard Lerner and Laurence Steinberg. New York: John Wiley and Sons.

Christopher Uggen, Jeff Manza, and Angela Behrens[UGS]. 2004. "Less than the Average Citizen: Stigma, Role Transition, and the Civic Reintegration of Convicted Felons." Pages 258-290 in *After Crime and Punishment: Pathways to Offender Reintegration*, edited by Shadd Maruna and Russ Immarigeon. Cullompton, Devon, UK: Willan Publishing.

2003    Angela Behrens[UGS], Christopher Uggen, and Jeff Manza. 2003. "Ballot Manipulation and the 'Menace of Negro Domination': Racial Threat and Felon Disenfranchisement in the United States, 1850-2002." *American Journal of Sociology* 109:559-60.

* *Reprinted* 2006 in ***Crime and Criminal Justice: International Library of Essays in Law & Society***, edited by William T. Lyons, Jr. Aldershot, UK: Ashgate Publishing.

Christopher Uggen and Melissa Thompson[GS]. 2003. "The Socioeconomic Determinants of Ill-Gotten Gains: Within-Person Changes in Drug Use and Illegal Earnings." ***American Journal of Sociology*** 109:146-85.

Christopher Uggen, Jeff Manza, and Angela Behrens[UGS]. 2003. "Felon Voting Rights and the Disenfranchisement of African Americans." ***Souls: A Critical Journal of Black Politics, Culture, and Society*** 5:47-55.
* *Reprinted* 2007 in ***Racializing Justice, Disenfranchising Lives***, edited by Manning Marable. (New York: Palgrave Macmillan).

Jeremy Staff[GS] and Christopher Uggen. 2003. "The Fruits of Good Work: Early Work Experiences and Adolescent Deviance." ***Journal of Research in Crime and Delinquency*** 40:263-90.

Christopher Uggen and Michael Massoglia[GS]. 2003. "Desistance from Crime as a Turning Point in the Life Course." Pages 311-29 in ***Handbook of the Life Course***, edited by Jeylan T. Mortimer and Michael J. Shanahan. New York: Kluwer Academic/Plenum.

Christopher Uggen. 2003. "Criminology and the Sociology of Deviance." ***The Criminologist*** 28: 1-5.

2002    Christopher Uggen and Jeff Manza. 2002. "Democratic Contraction? The Political Consequences of Felon Disenfranchisement in the United States." ***American Sociological Review*** 67:777-803.
* *Reprinted* in ***Crime, Inequality, and the State***, edited by Mary E. Vogel (New York: Routledge). *Excerpted* 2004, pp. 264-65 in ***Sociology: Exploring the Architecture of Everyday Life*** ("Prisoners and Presidents") by David M. Newman. Thousand Oaks, CA: Pine Forge Press; Excerpted 2003 in American Sociological Association's ***Footnotes*** ("Sociology News for the Dinner Table") 31:8; Excerpted 2003 in ***Contexts*** ("Discoveries") 2:6.

Michael Massoglia[GS] and Christopher Uggen. 2002. "Life Course Theories." Pages 1008-12 in ***Encyclopedia of Crime and Punishment***. Thousand Oaks, CA: Sage Publications.

2001    Christopher Uggen and Jeremy Staff[GS]. 2001. "Work as a Turning Point for Criminal Offenders." ***Corrections Management Quarterly*** 5:1-16.
* *Reprinted* 2004, Pp. 141-66 in ***Crime and Employment: Critical Issues in Crime Reduction for Corrections***, edited by Jessie L. Krienert and Mark S. Fleisher. Walnut Creek, CA: Altamira Press.

Christopher Uggen. 2001. "Crime and Class." Volume 5, pages 2906-10 in ***International Encyclopedia of the Social and Behavioral Sciences***, edited by Neil J. Smelser and Paul B. Baltes. New York: Elsevier.

Christopher Uggen and Melissa Thompson[GS]. 2001. "Prevention: Juveniles as Potential Offenders." Pages 1152-55 in ***Encyclopedia of Crime and Justice***. New York: MacMillan.

2000    Christopher Uggen. 2000. "Work as a Turning Point in the Life Course of Criminals: A Duration Model of Age, Employment, and Recidivism." ***American Sociological Review*** 65:529-46.
* *Reprinted* in ***Boundaries: Readings in Deviance, Crime, and Justice***, edited by B.R.E. Wright, Jr. and R.B. McNeal, Jr. Allyn & Bacon/Pearson Custom Publishing.
* *Awarded* International Society for Criminology Junior Scholar Article Prize.

Christopher Uggen. 2000. "Class, Gender, and Arrest: An Intergenerational Analysis of Workplace Power and Control." ***Criminology*** 38:101-28.

Barbara McMorris[PD] and Christopher Uggen. 2000. "Alcohol and Employment in the Transition to Adulthood." *Journal of Health and Social Behavior* 41:276-94.

Elizabeth Chambliss and Christopher Uggen. 2000. "Men and Women of Elite Law Firms: Reevaluating Kanter's Legacy." *Law and Social Inquiry* 25:41-68.
* *Reprinted* 2009 in *Rosabeth Moss Kanter*, edited by John C. Wood and Michael C. Wood, Routledge.

Candace Kruttschnitt, Christopher Uggen, and Kelly Shelton[GS]. 2000. "Predictors of Desistance among Sex Offenders: The Interaction of Formal and Informal Social Controls." *Justice Quarterly* 17:61-87.

Jessica Huiras[UGS], Christopher Uggen, and Barbara McMorris[PD]. 2000. "Career Jobs, Survival Jobs, and Employee Deviance: A Social Investment Model of Workplace Misconduct." *The Sociological Quarterly* 41:245-63.

1999    Lauren B. Edelman, Christopher Uggen, and Howard S. Erlanger. 1999. "The Endogeneity of Legal Regulation: Grievance Procedures as Rational Myth." *American Journal of Sociology* 105:406-54.
*Reprinted* 2007 in *The Legal Lives of Private Organizations*, edited by Lauren B. Edelman and Mark C. Suchman, Ashgate.

Christopher Uggen and Jennifer Janikula[UGS]. 1999. "Volunteerism and Arrest in the Transition to Adulthood." *Social Forces* 78:331-62.

Christopher Uggen. 1999. "Ex-Offenders and the Conformist Alternative: A Job Quality Model of Work and Crime." *Social Problems* 46:127-51.

1998    Christopher Uggen and Candace Kruttschnitt. 1998. "Crime in the Breaking: Gender Differences in Desistance." *Law and Society Review* 32:401-28.
* *Reprinted* 2012 in *Gender and Crime*, edited by Sandra Walklate, Routledge.
* *Reprinted* 2000 in *The Termination of Criminal Careers*, edited by Stephen Farrall. International Library of Criminology and Criminal Justice, Hampshire, UK: Ashgate.

Christopher Uggen and Irving Piliavin. 1998. "Asymmetrical Causation and Criminal Desistance." *Journal of Criminal Law and Criminology* 88:1399-1422.
* *Reprinted* in *Boundaries: Readings in Deviance, Crime, and Justice*, edited by B.R.E. Wright, Jr. and R.B. McNeal, Jr. Allyn & Bacon/Pearson Custom Publishing.
* *Excerpted* 1998 in National Institute of Justice *NIJ Journal* 237:20 (October).

1993    Christopher Uggen. 1993. "Beyond Calvin and Hobbes: Rationality and Exchange in a Theory of Moralizing Shaming." *Law and Social Inquiry* 18:513-16. A rejoinder to John Braithwaite's "Pride in Criminological Dissensus."

Christopher Uggen. 1993. "Reintegrating Braithwaite: Shame and Consensus in Criminological Theory." *Law and Social Inquiry* 18:481-99. An article-length review essay.

## *REVIEWS, COMMENTARY, AND OTHER SHORT PIECES*

2018    Douglas Hartmann and Christopher Uggen. 2018. "Series Preface." Pages xi-xv in Kyle Green and Sarah Lageson, editors. *Give Methods a Chance*. New York: W.W. Norton.

2018    Heather McLaughlin, Christopher Uggen, and Amy Blackstone. 2018. "When Sexual Harassment is Used to Equalise Power." *LSE Business Review*. London: London School of Economics.

May 2020                                                                    CURRICULUM VITAE

2018    Sarah Shannon and Christopher Uggen. 2018. "Restoring the Vote to those Convicted of a Felony Sentence is not Just the Right Thing to Do, it's Good Social Science." ***LSE United States Politics and Policy Blog***. London: London School of Economics.

2018    Amy Blackstone, Heather McLaughlin, and Christopher Uggen. 2018. "Workplace Sexual Harassment." Pages 38-41 in *Pathways Magazine, State of the Union 2018*. Stanford Center on Poverty and Inequality.

2016    Christopher Uggen. 2015-16. "Crime, Punishment, and American Inequality." ***Focus*** 32:1-6.

        Christopher Uggen. 2016. "The 2016 Election and the Vocation of Social Science." In *Speak for Sociology,* a blog by the American Sociological Association. December 2.

2015    Christopher Uggen. 2015. "Public Criminology and the Social Media Echo Chamber." ***Crime, Law & Deviance News***, Crime, Law & Deviance section of the American Sociological Association.

2014    Christopher Uggen. 2014. "Violence Against Women is on the Decline – but We can Still Do More." ***Pacific Standard***. June 4, 2014. [originally appeared in *Public Criminology* and *Sociological Images* on *TheSocietyPages*].

        Christopher Uggen. 2014. "Should Drug Treatment Aim to End Use or Reduce Harm." ***Pacific Standard***. February 24, 2014. [originally appeared in *Public Criminology* and *Sociological Images* on *TheSocietyPages*].

2013    Marc Mauer and Christopher Uggen. 2013. "The Missing Black Voters." ***Huffington Post***. May 28, 2013.

2012    Christopher Uggen. 2012. "A Tragic Distraction." ***National Post*** (Canada). December 21, p. A16. Originally appeared on *TheSocietyPages*. Reprinted in *Pacific Standard, Vancouver Sun* and elsewhere.

        Christopher Uggen. 2012. ***Crime and the Great Recession***. Stanford, CA: Stanford Center on Poverty and Inequality. Reprinted as "The Crime Wave that Wasn't" *Pathways* magazine, Fall 2012, pp. 14-18.

2011    Doug Hartmann and Christopher Uggen. 2008-2011. "From the Editors," an introductory column in each quarterly issue of ***Contexts.***

2010    Christopher Uggen. 2010. "Law enforcement death rate falling, not rising." ***Minnpost.*** May 14.

        Christopher Uggen. 2010. "The link between education and police use of force." ***Minnpost.*** April 28.
        * Reprinted as "The Link Between Use of Force and Education" on PoliceLink.com May, 2010.

2009    Chika Shinohara and Christopher Uggen. 2009. "Sexual Harassment: The Emergence of Legal Consciousness in Japan and the US." ***The Asia-Pacific Journal*** 31:2-09.

2008    Christopher Uggen. 2008. "Who are the Outlaws? A Freakonomics Quorum," ***The New York Times Online***. October 16.

        Christopher Uggen. 2008. "Sociology of Deviance in the Real World," "Journaling Interns -- Tell them to Write it *All* Down," and course syllabus. Pp. 91-97, 209-214, and 235-238 in Bruce Hoffman (ed.) ***Teaching the Sociology of Deviance*** (6th edition). Washington, D.C.: American Sociological Association.

2006    Christopher Uggen. 2006. "The Disenfranchised of History ... and Now." ***The Wall Street Journal***, September 2, p. A9, Letters section.

Christopher Uggen[GS] and Mike Vuolo. 2006. "Getting the Truth about Consequences." ***Amici: Newsletter of the Sociology of Law Section of the American Sociological Association*** 13:6-8.

2005    Christopher Uggen. 2005. "Editorial Comment." Guest editor for special issue on Collateral Consequences of Criminal Sanctions. ***Journal of Contemporary Criminal Justice*** 21:4-5.

Christopher Uggen. 2005. "Public Criminologies and Sociological Education." Sociological Education award address. ***Sociograph*** 23 (1):7.

2004    Christopher Uggen. 2004. "Where the Tough Guys Go." Review of John H. Laub and Robert J. Sampson's ***Shared Beginnings, Divergent Lives***. ***Contexts*** 3:64-66.

Jeff Manza and Christopher Uggen. 2004. "The President Is Right: Ex-Felons Need Aid." ***Newsday***, February 5, p. A33, Op-Ed section.
* *Reprinted* 2004 under various titles, e.g., "Ex-cons Deserve a Chance to Right their Lives."

2003    Christopher Uggen and Jeff Manza. 2003. "They've Paid Their Debt; Let Them Vote." ***Los Angeles Times***, July 18, p. B15, Op-Ed section.
* *Reprinted* 2003 under various titles.

2002    Christopher Uggen. 2002. "Crime and Punishment to the Core." Brief invited comment on Bruce Western and Becky Pettit. ***Contexts*** 1:4.


## *MANUSCRIPTS AND PAPERS UNDER REVIEW*

Christopher Uggen, Jason Schnittker, Mike Massoglia, and Sarah Shannon. "The Contingent Effect of Incarceration on State Health Outcomes." [revise and resubmit]

Evelyn Gertz, Hollie Nyseth Brehm, and Christopher Uggen. "Judging Genocide: Emotional Labor During Transitional Justice"

Hollie Nyseth Brehm, Christopher Uggen, Jean-Damascene Gasanabo, Donatien Nikuze, Evelyn Gertz, and Allison Nobles. "'We Came To Realize We Are Judges': The Moral Careers Of Elected Lay Jurists In Rwanda's Gacaca Courts."

## *TECHNICAL REPORTS AND WORKING PAPERS*

2017    Alexes Harris, Beth Huebner, Karin Martin, Mary Pattillo, Becky Pettit, Sarah Shannon, Bryan Sykes, Chris Uggen, April Fernandes. 2017. ***Monetary Sanctions in the Criminal Justice System.*** Washington, DC: Arnold Foundation.

2016    Christopher Uggen, Ryan Larson, and Sarah Shannon. 2016. ***6 Million Lost Voters: State-Level Estimates of Felony Disenfranchisement, 2016.*** Washington, DC: Sentencing Project.
* Awarded the 2018 Publication Award from the American Sociological Association Section on Sociological Practice and Public Sociology.

*Report cited in *New York Times, Washington Post, Quartz, Vox, Pittsburgh Post-Gazette, Florida Times-Union, Jackson Free Press, Albany Times-Union, Louisville Courier-Journal, Daily Beast, The Grio, Richmond Times-Dispatch, New Orleans Times Picayune* and elsewhere.

2012    Christopher Uggen, Sarah Shannon, and Jeff Manza. 2012. ***State-level Estimates of Felon Disenfranchisement in the United States, 2010.*** Washington, DC: Sentencing Project. *report cited in *New York Times, Washington Post, Slate, Mother Jones, Philadelphia Inquirer, Tampa Tribune, Tampa Bay Times, Florida Sun-Sentinel, Louisville Courier-Journal, Daily Beast, The Grio, Richmond Times-Dispatch, New Orleans Times Picayune* and elsewhere.

Christopher Uggen. 2012. ***Felon Disenfranchisement in Minnesota.***

Christopher Uggen and Suzy McElrath. 2012. ***Felon Disenfranchisement in Wisconsin.***

1999    Christopher Uggen and Melissa Thompson[GS]. 1999. National Institute of Justice Final Report: ***Careers in Crime and Substance Use***.

Christopher Uggen, Irving Piliavin, and Ross Matsueda. [publication status unknown]. "Jobs Programs and Criminal Desistance." Written for ***The Potential of Publicly Funded Jobs Programs***, edited by D. Lee Bawden and Robert Lerman. Washington D.C.: Urban Institute Press.

## WORK IN PROGRESS

- "Voting and the Civic Reintegration of Former Prisoners" with Shelly Schaefer .
- "A Survey and Analysis of Programs for Inmate Fathers: Basic Questions and Future Directions" with Sarah Shannon and Sara Wakefield.
- "Having a Kid Changes Everything? The Effects of Parenthood on Subsequent Crime." with Sara Wakefield.

# GRANTS

## EXTERNAL GRANTS AND AWARDS

2020-22    [PENDING] *W.T. Grant Foundation*. "Assessing the Relative Impacts of School, Family, and Community Interventions in Closing Current Opportunity Gaps." 1/1/20-12/31/22. $248,612.

2019-21    [PENDING] *Spencer Foundation*. "The Effect of Neighborhood, School, and Place-Based Interventions on Addressing Educational Inequities." [co-PI with Paul Glewwe and Anusha Nath]. 4/1/2019-3/31/2021. $49,499

2015-20    *Laura and John Arnold Foundation*. "Multi-state Study of Monetary Sanctions." [co-I with Alexes Harris (PI), Beth Huebner, Karin Martin, Mary Pattillo, Becky Pettit, Bryan Sykes, and Sarah Shannon]. 7/1/15-6/30/20. $3,506,048 ($391,051 at Minnesota).

2016-19    *National Science Foundation*. "Collaborative Research: Genocide and Transitional Justice in Rwanda." [co-PI with Hollie Nyseth Brehm] 8/1/16-7/31/18. $487,822 ($88,594 at Minnesota).

2018-19    *Institute for Research on Poverty*. "Dual Debtors: Child Support and Criminal Financial Legal Obligations." [PI with co-Is Robert Stewart, Veronica Horowitz, Kimberly Spencer-Suarez, Emmi Obara, and Frank Edwards]. 3/1/18-2/28/19. $18,938.

2015-16    *Spencer Foundation*. "Criminal Records, Race, and College Admission." [co-PI with Robert Stewart]. 10/15/15-10/14/16. $49,975.

2015-16    *Sentencing Project*. "Felon Disenfranchisement Research Support." [co-PI with Sarah Shannon]. 10/1/15-9/30/16. $8,000.

2014-16    *American Sociological Association, Fund for the Advancement of the Discipline*. "Genocide, Justice, and Rwanda's Gacaca Courts." [co-PI with Hollie Nyseth Brehm]. 7/1/14-6/30/15. $6,960.

2014-16    *Mershon Center, Ohio State University*. "Genocide, Justice, and Rwanda's Gacaca Courts." [co-PI with Hollie Nyseth Brehm]. 7/1/14-6/30/15. $10,000.

2010-14    *Robert Wood Johnson Foundation, Investigator Award in Health Policy Research*. "The Effects of Incarceration on the Health of Individuals, Families, and Communities." [Co-PI with Jason Schnittker] 6/1/10-5/30/13. $415,216.

2008-13    *NIH - National Institute of Child Health and Human Development*. "Work Experience and Mental Health: A Panel Study of Youth." [Co-Investigator with Jeylan Mortimer (PI) et al.]. 4/1/08-3/31/13. $1,250,000.

2007-09    *National Science Foundation*. "Gender Differences in the Causes and Consequences of Drug Use." [Co-PI with Melissa Thompson]. 5/13/07-4/29/09. $108,074 ($24,700 at Minnesota).

2007-08    *National Institute of Justice*. "The Effects of Low-Level Offense Records and Race on Employability" [PI with The Council on Crime and Justice]. 5/1/07-10/31/08. $35,000.

2007-08    *JEHT Foundation*. "The Effects of Low-Level Offense Records and Race on Employability" [PI with The Council on Crime and Justice]. [PI with The Council on Crime and Justice]. 5/1/07-10/31/08. $265,300 ($80,000 at Minnesota).

2006-08    *The Sentencing Project*. "Voting and Civic Reintegration in Oregon." [Co-PI with Michelle Inderbitzin]. 6/1/06-12/31/08. $5,500.

2002-07    *NIH - National Institute of Mental Health and National Institute of Child Health and Human Development*. "Work Experience and Mental Health: A Panel Study of Youth" [Co-Investigator with Jeylan Mortimer (PI) et al.]. 8/12/02-8/11/07. $1,557,287.

1996-06    National Institute of Mental Health, Institutional Ruth L. Kirschstein National Research Service Award (NRSA). "Mental Health and Adjustment in the Life Course." [Core Faculty Member and Co-Investigator on this training grant with Jeylan Mortimer (PI) et al.]

2000-02    *Soros Foundation*. Open Society Institute Individual Project Fellowship [with Jeff Manza, Northwestern]. 7/1/00-12/31/02. $101,164 ($50,602 at Minnesota).

1999-02    *National Science Foundation*. "Political Consequences of Felon Disenfranchisement." [with Jeff Manza, Northwestern] 6/1/99-12/31/02. $210,000 ($101,570 at Minnesota).

1997-02    *NIH - National Institute of Mental Health*. "Work Experience and Mental Health: A Panel Study of Youth." [Co-Investigator with Jeylan Mortimer (PI) and Michael Finch]. 3/1/97-2/28/02. $845,304.

1998-99    *National Institute of Justice*. "Careers in Crime and Substance Use." $45,903.

## *INTERNAL GRANTS AND AWARDS*

2018-20    Grand Challenge Interdisciplinary Work Group Collaboration. "Identifying and Addressing Disparities in the Criminal Justice and Health Care Systems." [on research team with PIs Michelle Phelps, Tyler Winkelman, Kevin Reitz, Rebecca Shlafer]. 1/1/18-6/30/20. $570,000

2017-18    Undergraduate Research Opportunity. "Public Housing and Perceptions of Crime in Urban and Suburban Contexts." [Co-Investigator with Chelsea Carlson]

2016-18    Grand Challenge Interdisciplinary Work Group Collaboration. "Assessing Interventions for Justice and Equity." [Co-PI with Myron Orfield]. 9/1/16-9/1/18. $249,000.

2010       Office of Vice President for Research. "Working with the IRB: A Discussion for Social Scientists" [Co-Investigator with William O. Beeman]. 6/1/10-11/30/10. $3,380.

2008-09    Undergraduate Research Opportunity. "Effect of Vitamin-D Supplementation on the Mental Health and Behavior of Prison Inmates." [Co-Investigator with Lindsey Merritt].

2006-08    *College of Liberal Arts*. "Minnesota Exits and Entries Project." [with Candace Kruttschnitt and faculty and graduate student collaborators].$65,000.

2006       *Graduate Research Partnership*. "Why Did They Attack Us? Extending Stark's Theory of Police Riots." 5/29/06-8/27/06. [with Jesse Wozniak]. $5,948.

2005       *Graduate Research Partnership*. "Do Former Felons Vote?  Turnout among Prison Releasees 1978 to 2004." [with Shelly Schaefer]. 5/26/05-8/22/05. $5,269.

2004-06    *Life Course Center*. "Age, Gender, and Sexual Harassment in Japan and the United States." [with Chika Shinohara]. Research assistance.

2003       *Graduate Research Partnership*. "The Effect of Children on Crime and Recidivism." [with Sara Wakefield]. 5/26/03-8/22/03. $5,269.

2003       *Sociology/College of Liberal Arts*. Underrepresented Graduate Partnership. "Collateral Civil Penalties and Consequences." [with Darren Wheelock]. 5/26/03-8/24/03. $3,750.

2002-03    *Sabbatical Supplement Award,* University of Minnesota.

2002       *Graduate Research Partnership*. Sexual Harassment in Adolescence and Adulthood." [with Amy Blackstone] $7,951.

2002       *Undergraduate Research Opportunity*. "Racial Threat and Changes in Felon Disfranchisement Law in the United States, 1850-2000." [with Angela Behrens] $1,661.

2001-04    *McKnight Presidential Fellow*, University of Minnesota.

2001       *Undergraduate Research Opportunity*. "The Diffusion of Anti-Discrimination Legislation Based on Sexual Orientation." [with Brian Duginske]. $1,650.

2000       *Life Course Center*. "Sexual Harassment and Legal Mobilization in Adolescence and Young Adulthood." Semester research assistance.

1999       *Undergraduate Research Opportunity*. "Employee Theft and Career Goals." [with Jessica Huiras]. $1,100.

1998        *Undergraduate Research Opportunity.* "Trends in Equal Employment Opportunity
            Complaints" [with Sara Wakefield]. $1,080.

1996-98     *Graduate School Grant-in-Aid.* "Adolescent Employment, Status Origins, and Deviant
            Behavior." $14,050.

1997        *Faculty Summer Research Fellowship.* "Age, Crime, and the School-to-Work Transition: A
            Comparative Analysis." $5,000.

1996-97     *Life Course Center.* "Status Origins, Youth Employment, and Deviance." Single quarter
            research assistance.

1995-96     *Graduate School Grant-in-Aid.* "Work, Crime, and Drug Use: A Life Course Model of
            Desistance from Deviant Roles." $13,080.

## RECENT PRESENTATIONS

### INVITED TALKS

2019        *University of Maryland,* 21st Annual Rosenberg Lecture (Crime and Punishment in the Life
            Course). November 22, 2019
            *Harvard Law* (Monetary Sanctions). September 12, 2019
            *University of Missouri-St. Louis* (Crime). April 19, 2019
            *P&A Women's Council and Women's Center faculty and staff* (Sexual Harassment). April 2, 2019
            *University of Texas* (Crime). March 7, 2019

2018        *University of Minnesota Women's Faculty Cabinet* (Sexual harassment). May 16, 2018
            *Hebrew University* (Disenfranchisement). April 30, 2018
            *National Academies of Sciences, Engineering, & Medicine* (Social exclusion). April 3, 2018
            *Southern Poverty Law Center Convening on Economic Justice* (Fines and fees). January 23, 2018

2017        *Harvard Kennedy School of Government* (Sexual Harassment)*, December 11, 2017.
            *Organizing for Action Minnesota,* July 20, 2017
            *National Network of Criminal Justice Coordinating Councils* (Multi-state Study of Monetary
            Sanctions), June 26, 2017
            *Columbia University,* May 19, 2017
            *University of Georgia* (annual Talarico lecture), March 15, 2017
            *Ohio State* (Criminal Justice Research Center Excellence in Justice address), February 15, 2017
            *University of British Columbia* (Sociology)*, January 10, 2017

2016        *National Institute of Justice* (Justice Involved Young Adults), December 12, 2016.
            *National Academies of Sciences, Engineering & Medicine* (Sexual Harassment)*, May 24, 2016.
            *University at Albany, SUNY,* May 5th, 2016.
            *Harvard Kennedy School of Government,* May 14, 2016
            *National Academies of Sciences, Engineering & Medicine* (Crime and Health)*, March 29, 2016.
            *Bowling Green State University,* March 16, 2016.
            *Universitat Pompeu Fabra (Spain),* January 29, 2016.

2015        *Yale Sociology.* December 12, 2015.
            *University of Kansas* (annual Clark lecture). October 1, 2015.
            *New York University Law School.* September 28, 2015.
            *Rutgers School of Criminal Justice.* September 29, 2015.
            *University of Washington.* May 28, 2015.
            *Georgia State University.* January 30, 2015.
            *Bremen University (Germany).* January 15, 2015.

2014    *Harvard Kennedy School of Government*. December 15, 2014.
        *Colorado State Sociology*. April 23, 2014.
        *University of California-Irvine*. Annual Graduate Student Invited Speaker. April 7, 2014.
        *University of Wisconsin-Madison*. Annual IRP New Perspectives Lecture. March 27, 2014.
        *National Commission for the Fight Against Genocide (Rwanda)*. "Foundations of Research
        Methodology." With Hollie Nyseth Brehm.  March 14, 2014.
        *University of South Carolina*. Annual Bruce Mayhew lecture. March 19, 2014.
        *New York University*. February 12, 2014.

2013    *University of North Carolina*. "From Petty Crimes to Epic Records: Crime, Punishment, and
        American Inequality." October 23, 2013.
        *White House*. "Parental Incarceration in the United States." August 20, 2013.
        *Queens University (Belfast) ICCJ Annual Lecture*. "Public Criminology and Civic Reintegration."
        May 21, 2013.
        *Minnesota Justice Forum,* University of Minnesota Law School. October 19, 2012.

2012    Mindstretch, McLean Seminar. May 9, 2012.
        *Rutgers University*. "Race, Place, and Punishment, 1948-2010." February 29, 2012.

2011    *Big 10 Law Enforcement Directors Conference,* "Prisoner Reintegration and the College
        Campus." Minneapolis. December 5, 2011.
        *Robert Wood Johnson Foundation*. "Growth in the U.S. Ex-Felon and Ex-Prisoner Population,
        1948 to 2010 – and Some Early Evidence on Health Effects." October 13, 2011.
        *Princeton University,* "Growth in the U.S. Ex-Felon and Ex-Prisoner Population, 1948 to 2010."
        October 12, 2011.
        *National Institute of Justice*. "Transitions from Juvenile to Adult Crime." Washington. June 20,
        2011.
        *National Science Foundation*. "The Future of Law and Social Science." Chicago. May 25, 2011.
        *University of Northern Iowa*. "Felon Voting and Game-Changing Social Science." [College-wide
        keynote address]. Cedar Falls. April 9, 2011.

2010    *Cornell University* (PAM), "Sex and Stigma: Experiments and Observations on Discrimination
        and Harassment." March 16, 2010.
        *University of Georgia,* "The Price and Promise of Justice Reform." January 29, 2010.

2009    *Graterford (PA) Prison*, "Collective Transformation: Building Just Communities from the Inside
        Out." November 3, 2009
        *Cornell University* (ILR), Netter Conference. "Race, Criminal Records, and Employment."
        October 9, 2009.
        *Princeton University,* "The Price and Promise of Justice Reform." September 21, 2009.
        *National Civic Summit,* July 16, 2009
        *Minnesota Senate, Elections Committee*, February 27, 2009.
        *Indiana University,* "Public Criminologies and Social Research." January 22, 2009 [keynote].

2008    *Ohio State University,* "Entries, Exits, and Public Criminologies." October 24, 2008.
        *Harvard University,* "Exits, Entries, and Public Criminologies." May 14, 2008.
        *University of California – Irvine,* "Felon Disenfranchisement and American Democracy."
        January 15, 2008

2007    Minnesota legislature reentry working group, "Employment and Crime," October 27, 2007.
        *Stanford University,* "Incarceration and Poverty," Debate with Larry Bobo. May 11, 2007.
        *Cornell University*. "A Survey and Analysis of Programs for Inmate Fathers: Basic Questions and
        Future Directions." Ithaca. April 14, 2007.
        *Stanford University,* "Half my Exes are Successes." Stanford. April 11, 2007.

2006    *University of Chicago,* "Public Criminologies." Chicago. October 27, 2006.

*John Jay College,* "Felon Disenfranchisement and American Democracy." New York. June 16, 2006.
*Demos,* "Felon Disenfranchisement and American Democracy." New York. May 18, 2006.
*National Coalition on Violence Research,* "Subjective Desistance in the Transition to Adulthood." Washington, DC. May 4, 2006.
*Pennsylvania State University,* "Felon Disenfranchisement and American Democracy." State College. April 28, 2006.
*University of Pennsylvania,* "Felon Disenfranchisement and Civic Reintegration." Philadelphia. April 27, 2006.
Minnesota Supreme Court Racial Fairness Committee. "Felon disenfranchisement," November 29, 2006.
Minnesota Senate, "Convicted felons civil rights and voting eligibility restoration," Crime Prevention and Public Safety Committee, March 28, 2006.
Minnesota Senate, Elections Committee, March 20, 2006.

2005    *Washington State University,* "Felon Disenfranchisement." October 21, 2005.
*Macalester College,* "Felon Disenfranchisement," October 18, 2005.
*HIRED*, St. Paul. "Work, Crime, and Adulthood." July 5, 2005.
*University of Maryland.* Economics of Crime and Justice Policy Series. "Desistance from Crime and the Transition to Adulthood." College Park. March 16, 2005.

2004    *University of Wisconsin* Department of Sociology. "Public Criminologies and the Life Course." Madison. December 17, 2004.
*Princeton University* Department of Sociology. "Public Criminologies - Crime and the Transition to Adulthood." December 6, 2004.
"Illegal Earnings Imperatives" and "Sexual Harassment and Legal Consciousness." *University of California, Davis.* Davis. November 4-5, 2004.
*Northwestern University* Department of Sociology and law school. October 14, 2004.
*Cornell University* Center for the Study of Inequality. "Race and Felon Disenfranchisement." Ithaca. September 10, 2004.
*Duke University* Department of Sociology. "Felon Disenfranchisement and American Democracy." September 3, 2004.
*Ohio State University* Department of Sociology Inequality Symposium. "Race and Felon Disenfranchisement." Columbus. July 22, 2004.
*University of Michigan* National Poverty Center. Ann Arbor. "Crime, Punishment, and Poverty." [with Darren Wheelock] June 11, 2004.
"Felon Disenfranchisement and American Democracy." *North Carolina State University* Department of Sociology and Anthropology. Raleigh. March 26, 2004.
*University of California, Berkeley* Department of Sociology. "Public Criminologies." Berkeley. March 18, 2004.

2003    *National Consortium on Violence Research* Roundtable on Reentry of Prisoners to Society. "Prisoner Reentry" panel discussion. Pittsburgh. December 15, 2003.
"Civic Reinvestment" panel discussion. *The Brooklyn Prisoner Reentry Conference.* Brooklyn. December 1, 2003.
*New York University* Law School. "Voting and Subsequent Crime and Arrest: Evidence from a Community Sample." [with Jeff Manza] New York. October 10, 2003.
*University of Iowa* Department of Sociology. "Felon Disenfranchisement and American Democracy." Iowa City. May 2, 2003.
*Columbia University.* "Ballot Manipulation and the 'Menace of Negro Domination': Racial Threat and Felon Disfranchisement." New York. April 11, 2003.

2002    *University at Buffalo* Law School. "Perspectives on Civil Disabilities: Felon Disfranchisement." Buffalo. October 18, 2002.
*National Symposium on Felony Disfranchisement.* "Political Impact of Felon Disfranchisement." Washington, D.C. September 30, 2002.
*U.S.-Japan Foundation.* "America's Criminal Class in Perspective." Seattle. August 17, 2002.

*Demos* Election Reform Spotlight on Voting Rights. "Political Consequences of Felon Disfranchisement." Atlanta. June 14, 2002.
*University of Washington* Department of Sociology. "Felon Disfranchisement and the Civic Reintegration of Criminal Offenders." Seattle. April 11, 2002.
*Urban Institute*. "Barriers to Democratic Participation." Washington D.C. March 20, 2002.

2001    *Russell Sage Foundation*. "Labor Market Effects of Employer Access to Criminal History Records." New York. [with Shawn Bushway] March 9, 2001.
*University of Wisconsin* Department of Sociology. "The Socioeconomic and Civic Reintegration of Criminal Offenders." Madison. February 9, 2001.

2000    *Economic Policy Institute*. "Work as a Turning Point for Released Offenders." United States Capitol, Washington, D.C., December 6, 2000.

1999    *National Institute of Justice* working group. "Crime and Labor Markets." Washington, D.C., 1999.

## DIDACTIC SEMINARS

2014    "Foundations of Research Methodology." Half-day seminar for *National Commission for the Fight Against Genocide (Rwanda)*. [with Hollie Nyseth Brehm]. March 14, 2014.
2013    "Writing for a Public Audience." Midwest Sociological Society Mtgs. Chicago [with Letta Page]. March 29, 2013.
2000    "Designing Research to Answer Criminal Justice Questions." Half-day seminar for *Bureau of Justice Statistics* Justice Research Statistics Association. Minneapolis. [with Barbara McMorris] October 31, 2000.

## PRESENTATIONS AT PROFESSIONAL MEETINGS (SINCE 2010)

2020    "The Scandinavian Prison Project: Challenges and Opportunities Identified in a Scandinavian-American Correctional Reform Effort." [with Synøve Andersen, Jordan Hyatt, and Veronica Horowitz]. Am. Society of Crim. Accepted for presentation, conference canceled.
"Criminal Punishment, Child Abuse, and Violent Injury in Minnesota, 2010-2014. [with Jeanie Santaularia and Ryan Larson]. Am. Society of Crim. Accepted for presentation, conference canceled.

2019    "Scandinavian Correctional Exceptionalism in an American Context: Building the Foundations for Actionable Penal Reform." [with Synøve Andersen, Jordan Hyatt, Rob Stewart, and Veronica Horowitz]. Am. Society of Crim. November 15, 2019.
"How Housing and Education Interventions Shape Justice System Involvement: Evidence from Minnesota" [with Caity Curry and Natalia Ordaz Reynoso]. Am. Society of Crim. November 15, 2019.
"The Socio-Cultural Effects of Race and Indigeneity on Monetary Sanctions in Minnesota." [with Ryan Larson, Robert Stewart, and Veronica Horowitz]. Am. Society of Crim. November 15, 2019.
"Consequences of Judging in Transitional Justice Courts." [with Hollie Nyseth Brehm, Evelyn Gertz, and Lauara Frizzell]. Am. Sociological Association. August 10, 2019.
"Publishing Public Commentary on Crime and Justice Research." Am. Sociological Association. August 12, 2019.

2018    "How Key Inequality Actors Account for Racial and Ethnic Inequities." [with Caity Curry]. Am. Sociological Association. August 11, 2018.
"Consistency and Compensation in Mercy: Commutation in the Era of Mass Incarceration." [with Veronica Horowitz]. Am. Sociological Association. August 12, 2018.
"Former Felons and U.S. Labor Force Participation [with Ryan Larson, Sarah Shannon, and Aaron Sojourner]. Am. Society of Crim. November 14, 2018.
Panel: Teaching in the Global Village. Am. Society of Crim. November 15, 2018.

Policy Panel: The Causes and Consequences of Racial and Ethnic Disparities in the Justice System: Promising Strategies and Remaining Challenges. Am. Society of Crim. November 15, 2018.

2017    "Policies & Practices Regarding Mercy and Wrongful Conviction." [with Veronica Horowitz]. Am. Society of Crim. November 17, 2017.
        "Atrocity Crimes & Transitional Justice: Procedural Justice." [with Brooke Chambers, Allison Nobles, Hollie Nyseth Brehm]. Am. Society of Crim. November 15, 2017.
        "Banning the Box, Keeping the Stigma? Sustaining Attitudes Post Ban-the-Box." [with Lesley Schneider, Michael Vuolo, Sarah Lageson]. Am. Sociological Association. August 12, 2017.
        "Challenges and Consequences of Imprisonment across the Globe." Am. Sociological Association. August 13, 2017.
        "Why is Commutation an Aberration?" [with Veronica Horowitz]. Am. Sociological Association. August 13, 2017.
        "Opportunity, Vulnerability, and Duty: Women's Experiences as Elected Lay Judges on Rwanda's Gacaca Courts." [with Allison Nobles and Hollie Nyseth Brehm]. Am. Sociological Association. August 13, 2017.

2016    "Before and After Ban the Box: Employer Responses in Minnesota." [with Lesley Schneider, Mike Vuolo, and Sarah Lageson]. Am. Society of Crim. November 16, 2016.
        "The Impact and Legacy of the Obama Presidency for Crime and Justice." Am. Society of Crim. November 17, 2016.
        "A Modified Experimental Audit of Criminal Records and College Admissions." [with Robert Stewart]. Am. Society of Crim. November 17, 2016.
        "Work and Crime: A Casual Treatment Effects Survival Model." [with Jun Hwang, Ross Matsueda, Elena Erosheva]. Am. Society of Crim. November 18, 2016.
        "A Competing Risk Analysis of Immigrant Detention and Case Outcomes." [with Ryan Larson] Am. Society of Crim. November 18, 2016.
        "The Obama Presidency." Am. Sociological Association. August 21, 2016.
        "Engaging the Media and Public with Academic Research." August 20, 2016.
        "Who Belongs, Who Doesn't - Law, Citizenship and Political Economy in the 21st Century." Law & Society Mtgs. New Orleans. June 4, 2016.
        "We are Judges Now": The Elected Lay Jurists of Rwanda's Gacaca Courts." [with Hollie Nyseth Brehm]. Law & Society Mtgs. New Orleans. June 4, 2016.

2015    "The Case for Commutation" [with Veronica Horowitz]. Am. Society of Crim. November 19th, 2015.
        "Connecting Punitive and Restorative Responses to Genocide with Long-Term Crime Patterns" [with Lindsay Blahnik and Hollie Nyseth Brehm]. Am. Society of Crim. November 20th, 2015.
        "Estimating the Crime Effects of Criminal Record Clearing" [with Charles Loeffler, Jens Ludwig, and Jason Schnittker] Am. Society of Crim. November 21st, 2015.
        "Mercy and Commutation in the Mass Incarceration Era" [with Veronica Horowitz]. American Sociological Association. August 24th, 2015.
        "Accounting for Actions: Techniques of Neutralization and the Maintenance of Identity Among Perpetrators of Genocide" [with Emily Phillipp and Emily Schulz]. American Sociological Association, August 24th, 2015.
        "Tough on Crime, Tough on Families? Criminal Justice and Family Life in America" Annals Conference, July 17-19, 2015.
        "Appealing Genocide Convictions in Rwanda's Gacaca Courts" Law and Society Association. May 30th th, 2015.
        "The Return of the Medical Model? The Explosion of Healthcare Spending in U.S. Prisons and Jails" Law and Society Association. May 28th, 2015.
        "Age, Sex, and the Crime of Genocide" [with Hollie Nyseth Brehm and Jean-Damascene Gasanabo]. Population Association of America. April 30th, 2015.
        "Social Science and Public Engagement" [with Kevin Leicht and Theda Skocpol]. Midwest Sociological Society. March 28th, 2015.

2014    "Punishing Mass Atrocity Crimes: The Case of Rwanda." Am. Society of Crim. San Francisco. [with Hollie Nyseth Brehm]. November 21, 2014.

"Criminological Research Past and Present." Am. Society of Crim. San Francisco. November 20, 2014.

"How Do Employers Ask about Criminal Records on Entry-Level Job Applications." Am. Society of Crim. San Francisco. [with Mike Vuolo and Sarah Lageson]. November 19, 2014.

"The Increasing Stickiness of Public Labels." Desistance – Sketching the Future: An International Conference. Sheffield. September 16, 2014.

"Genocide, Justice, and Rwanda's Gacaca Courts." Am. Sociological Assn. San Francisco. [with Hollie Nyseth Brehm]. August 17, 2014.

"Accounting for Actions: Techniques of Neutralization, Identity Maintenance, and Narrative Construction in the Rwandan Genocide." Am. Sociological Assn. San Francisco. [with Emily Philipp and Emily Schulz]. August 16, 2014.

"Genocide, Justice, and Rwanda's Gacaca Courts." International Assn. Of Genocide Scholars. Winnipeg. [with Hollie Nyseth Brehm and Jean-Damascene Gasanabo]. July 19, 2014.

"Genocide, Justice, and Rwanda's Gacaca Courts." Law and Society Assn. Minneapolis. [with Hollie Nyseth Brehm]. May 30, 2014.

2013    "Estimating the Labor Market Effects of Criminal Record Clearing: Evidence from a Legal Aid Help Desk." [with Charles Loeffler, Jens O. Ludwig, Jason Schnittker]. Am. Society of Crim. Atlanta. November 21, 2013.

"Before and After Genocide: State Capacity, Complicity, and Control." [with Suzy McElrath and Hollie Nyseth Brehm]. Am. Society of Crim. Atlanta. November 21, 2013.

"Visualizing Punishment and the Crime Drop." [with Suzy McElrath and Sarah Shannon]. Am. Society of Crim. Atlanta. November 22, 2013.

"Statistical Power in Experimental Audit Studies: Cautions and Calculations for Paired Tests with Dichotomous Outcomes." [with Michael Vuolo and Sarah Lageson]. Am. Society of Crim. Atlanta. November 22, 2013.

"Social Consequences of Punishment and Incarceration." Am. Sociological Assn. Mtgs. New York. [with Jason Schnittker] August 11, 2013.

"Minor Crimes, Epic Records, and Inequalities in Employment and Health." Am. Sociological Assn. Mtgs. New York. August 10, 2013.

"New Media and Sociology." Society for the Study of Social Problems. New York. August 9, 2013.

"Writing for a Public Audience." Midwest Sociological Society Mtgs. Chicago [with Letta Page]. March 29, 2013.

2012    "A New Crime Control Era in the Juvenile Justice System." Am. Society of Crim. Mtgs. Chicago [with Shelly Schaefer]. November 16, 2012.

"The Contingent Effect of Incarceration on State Health Outcomes." Am. Society of Crim. Mtgs. Chicago [with Jason Schnittker, Mike Massoglia, and Sarah Shannon]. November 16, 2012.

"Genocide and the Age Distribution of Crime" Am. Society of Crim. Mtgs. Chicago [with Hollie Nyseth Brehm]. November 14, 2012.

"Alternative Approaches to Punishment" Am. Sociological Assn. Mtgs. Denver. August 18, 2012.

"Disentangling the Effects of Different Forms of Volunteering on Subsequent Arrest." Am. Sociological Assn. Mtgs. Denver. [with Brianna Remster and Michael Massoglia]. August 18, 2012.

"Theory, Policy, and Public Criminologies." Am. Sociological Assn. Mtgs. Denver. [with Michelle Inderbitzin]. August 17, 2012.

"The Growth, Scope, and Consequences of America's Criminal Class, 1948–2010." Am. Academy for the Advancement of Science Mtgs. February 18, 2012.

"Race, Place, and Punishment, 1948-2010 -- With Some Early Evidence on Health Effects." Rutgers University. February 29, 2012.

2011    "Discrimination and Mental Health." Am. Society of Crim. Mtgs. Washington [with Heather McLaughlin and Jessica Molina]. November 18, 2011.

"Discrimination, Strain, and Violence." Am. Society of Crim. Mtgs. Washington [with Jessica Molina and Heather McLaughlin]. November 17, 2011.

"Gender Equality and the Great Rape Decline." Am. Society of Crim. Mtgs. Washington [with Suzy Maves McElrath. November 17, 2011.

"Music and Drugs: Evidence from Three Analytical Levels." Am. Sociological Assn. Mtgs. Las Vegas. [with Mike Vuolo and Sarah Lageson]. August 20, 2011.

"Does Context Matter? Disentangling the Effects of Different Forms of Volunteering on Subsequent Arrest." Am. Sociological Assn. Mtgs. Las Vegas. [with Brianna Remster and Michael Massoglia]. August 23, 2011.

"Growth in the U.S. Ex-Felon and Ex-Prisoner Population, 1948-2010." Pop. Assn. of Am. Mtgs. Washington. [with Sarah Shannon, Jason Schnittker, and Melissa Thompson]. April 1, 2011.

"The Effects of Incarceration on Psychiatric Disorders and Disability." Pop. Assn. of Am. Mtgs. Washington. [with Jason Schnittker and Michael Massoglia]. April 1, 2011.

2010     "Employer Decisions Regarding Criminal Records: A Comparison of Self-Reported and Observed Behavior." Am. Society of Crim. Mtgs. San Francisco [with Sarah Lageson and Mike Vuolo]. November 18, 2010.

"Departmental Program Reviews." Sociologists of Minnesota. Red Wing. October 1, 2010.

"The Political Sociology of Poverty, Participation, and Citizenship." Am. Sociological Assn. Mtgs. Atlanta. August 17, 2010.

"A Basic Work Opportunity Reduces Crime – But not Drug Use." Am. Sociological Assn. Mtgs. Atlanta [with Sarah Shannon]. August 15, 2010.

"Citizenship in the Era of Mass Incarceration." Am. Sociological Assn. Mtgs. Atlanta. August 15, 2010.

"Employment and Exile: U.S. Criminal Deportations, 1908-2005." Law & Society Mtgs. Chicago [with Ryan King and Mike Massoglia]. May 30, 2010.

## *OTHER ACTIVITIES AT PROFESSIONAL MEETINGS (SINCE 2010)*

2019     Discussant, "The Direct and Vicarious Health Consequences of Criminal Justice Involvement across the Life Course." Am. Society of Crim. November 15, 2019.

Discussant, "Predictors of Employment and Consequences for Crime." Am. Society of Crim. November 15, 2019.

Organizer and Presider, "Tools for Communicating Sociology Outside the Discipline: What Works, What Doesn't Work, and What's Promising." Am. Sociological Association. August 12, 2019.

2018     Organizer and Presider, "First-time Attendees." Am. Sociological Association. August 10, 2018.

Presider, ASA Awards Ceremony and Presidential Address. August 12, 2018.

Organizer and presider, Author Meets Critics for John Eason's *Big House on the Prairie* and Alexes Harris' *A Pound of Flesh*. August 13, 2018.

2017     Organizer and Chair. "Matsueda Meets Critics: Sampson, Nagin, and Giordano on the 2016 Sutherland Address." Am. Society of Crim. Philadelphia. November 15, 2017.

2016     Presider, "New Applications and Controversies in Survival and Trajectory Models." Am. Society of Crim. New Orleans. November 16, 2016.

2014     Discussant, "Criminology and Media – Getting the Story Out." Am. Society of Crim. San Francisco. November 21, 2014.

Author Meets Critic Session, "The Punishment Imperative: The Rise and Failure of Mass Incarceration in America." Am. Society of Crim. San Francisco. November 20, 2014.

Chair, "Policy Panel: Felon Disenfranchisement." Am. Society of Crim. San Francisco. November 20, 2014.

Chair, "Section on Crime, Law, and Deviance Council and Business Meeting." Am. Sociological Assn. San Francisco. August 18, 2014.

Author Meets Reader Session, "The Modern Prison Paradox: Politics, Punishment, and Social Community." Law and Society Assn. Minneapolis. May 30, 2014

2013    Organizer and Presider. "Author Meets Critics." *Am. Soc. Of Criminology Mtgs.* Atlanta, 2013. Organizer and Presider, "From Crime to Punishment." *Am. Sociological Assn. Mtgs.* New York 2013.

2010    Discussant, "Employment and Change in Criminal Behavior." *Am. Soc. Of Criminology Mtgs.* San Francisco, 2010.

### *SELECTED MINNESOTA PRESENTATIONS*

2019    Minnesota Justice Research Center (Reimagining Justice). October 30, 2019
2019    P&A Women's Council and Women's Center Faculty and Staff (Sexual Harassment). April 2, 2019
2018    Mill City Commons. "Voting Rights and the Criminal Justice System. November 13, 2018
2018    Minnesota Second Chance Coalition (Collateral consequences). October 25, 2018
2018    University of Minnesota (First generation students panel). October 2, 2018
2018    University of Minnesota Life Course Center. "Sexual Harassment and the Life Course." September 12, 2018
2018    University of Minnesota Women's Faculty Cabinet. "Sexual Harassment and the Paradox of Power." May 16, 2018.
2018    Minnesota Population Center. "Balancing Teaching with Research." March 30, 2018.
2017    Minnesota Medicine Residency Program. "Incarceration, Reentry, and Health." September 12, 2017.
2017    Children of Incarcerated Caregivers. "Alternatives to Incarceration." September 6, 2017.
2014    Minnesota Population Center. "Petty Crimes and Epic Records." February 17, 2014.
2014    Center for Study of Politics and Governance. "Get Smart on Crime." December 10, 2014
        Minnesota Population Center. "Petty Crimes and Epic Records." February 17, 2014.
2013    Humphrey Forum.  "How America's Public Safety System Hurts our Democracy." April 30, 2013.
2011    Law School. Minnesota Justice Forum. "Race, Place, Punishment, and Impacts." October 18, 2011.
2010    Carlson School of Business. "Sexual Harassment and Workplace Authority." April 2, 2010
2009    Department of English. "The Engaged Department." October 19, 2009
        Distinguished Faculty Luncheon. "Felon Disenfranchisement and American Democracy." February 11, 2009.
2006    Featured speaker. "Silenced Voices: the constitutionality and legality of felon disenfranchisement provisions." Law School. January 28, 2006.
2005    Voting rights panelist. "Bringing Human Rights Back Home." Law School. December 9, 2005.
2004    "Sexual Harassment and Legal Consciousness." Sociology. January 20, 2004.
2003    "Political Impact of America's Criminal Class." Elder Learning Institute. May 6, 2003.
2001    "Political Consequences of Felony Disfranchisement Laws." Sociology. March 2, 2001.
2000    "Sexual Harassment in the Transition to Adulthood." Life Course Center. December 1, 2000.
1999    Discussant for Governor Arne Carlson, Life Course Center. 1999.
1998    Faculty speaker for "Campus Preview Days" (1998; 1999; 2001; 2004; many times since)

## TEACHING

### *COURSES TAUGHT AND STUDENT EVALUATION SCORES*

| Course Information | | Evaluation Scores on 1-7 Scale (1996-2007) | | | |
|---|---|---|---|---|---|
| Course number and name | Term | Overall teaching | Knowledge of subject | Respect & concern | Amount learned |
| 5141-Juvenile Delinquency | Winter 96 | 6.1 | 6.3 | 6.5 | 5.7 |
| 5966-Senior Projects | Spring 96 | 6.0 | 6.4 | 6.5 | 5.9 |
| 5966-Senior Projects | Fall 96 | 6.6 | 6.7 | 6.5 | 5.9 |
| 3801-Descriptive Statistics | Fall 96 | 5.9 | 6.3 | 6.4 | 5.7 |
| 3802-Inferential Statistics | Winter 97 | 6.0 | 6.6 | 6.3 | 5.3 |

CURRICULUM VITAE

| Course Information | | Evaluation Scores on 1-7 Scale (1996-2007) | | | |
|---|---|---|---|---|---|
| Course number and name | Term | Overall teaching | Knowledge of subject | Respect & concern | Amount learned |
| 5141-Juvenile Delinquency | Winter 97 | 5.7 | 6.2 | 5.6 | 5.2 |
| 3801-Descriptive Statistics | Winter 98 | 6.2 | 6.5 | 6.5 | 5.8 |
| 5141-Juvenile Delinquency | Winter 98 | 5.9 | 6.4 | 6.4 | 5.8 |
| 5960-Topics (Work/Crime) | Spring 98 | 6.3 | 6.4 | 6.7 | 4.7 |
| 3802-Inferential Statistics | Spring 98 | 6.2 | 6.6 | 6.6 | 5.9 |
| 3801-Descriptive Statistics | Winter 99 | 5.8 | 6.4 | 6.5 | 5.5 |
| 3802-Inferential Statistics | Spring 99 | 5.9 | 6.4 | 6.1 | 5.6 |
| 8105-Crime Policy Seminar | Spring 99 | 6.6 | 6.8 | 6.4 | 5.9 |
| 4141-Juvenile Delinquency | Fall 99 | 6.0 | 6.4 | 6.5 | 5.5 |
| 3991-Jr. Honors Seminar | Spring 00 | 6.3 | 6.9 | 6.7 | 6.3 |
| 3811-Social Statistics | Spring 00 | 6.1 | 6.6 | 6.4 | 5.0 |
| 4977-Sr. Honors Seminar I | Fall 00 | 6.6 | 6.9 | 6.9 | 6.2 |
| 4978-Sr. Honors Seminar II | Spring 01 | 6.7 | 6.7 | 6.9 | 6.7 |
| 4141-Juvenile Delinquency | Spring 02 | 6.2 | 6.5 | 6.5 | 5.8 |
| Sabbatical Year | Fall 02-03 | sabbatical year | | | |
| 4111-Deviance | Spring 04 | 6.6 | 6.9 | 6.8 | 6.2 |
| 4141-Juvenile Delinquency | Spring 04 | 6.5 | 6.9 | 6.8 | 6.0 |
| 8001-Soc. as a Profession | Fall 04 | 6.8 | 6.8 | 7.0 | 5.8 |
| 4141-Juvenile Delinquency | Spring 05 | 6.4 | 6.7 | 6.6 | 6.0 |
| 8111-Criminology | Spring 05 | 6.6 | 7.0 | 6.7 | 6.3 |
| 8001-Soc. as a Profession | Spring 05 | 6.8 | 6.9 | 7.0 | 6.4 |
| 4111-Deviance | Fall 05 | 6.6 | 6.9 | 6.8 | 6.1 |
| 8001-Soc. as a Profession | Fall 05 | 6.9 | 6.9 | 6.7 | 6.3 |
| 8001-Soc. as a Profession | Spring 06 | 6.8 | 7.0 | 6.8 | 6.2 |
| 4111-Deviance | Fall 06 | 6.7 | 6.9 | 6.9 | 6.2 |
| 4141-Delinquency | Spring 07 | 6.4 | 6.7 | 6.7 | 5.7 |
| Uggen's Mean (1996-2007) | | 6.3 | 6.7 | 6.6 | 5.9 |
| Dept. Mean (1994-2005) | | 5.9 | 6.5 | 6.2 | 5.5 |

| Course Information | | Evaluation Scores on 1-6 Scale (2008-present) | | | |
|---|---|---|---|---|---|
| Course number and name | Term | Well-prepared | Presented clearly | Provided feedback | Treat w/ Respect |
| 4141-Delinquency | Spr. 08 | 5.9 | 5.8 | 5.7 | 6.0 |
| 8090-Contexts seminar | Fall 08 | 5.8 | 5.9 | 5.7 | 5.9 |
| 8090-Contexts seminar | Spr. 09 | 5.7 | 5.6 | 5.7 | 5.7 |
| 8090-Contexts seminar | Fall 09 | 5.8 | 6.0 | 6.0 | 6.0 |
| 4111-Deviance | Spr. 10 | 5.9 | 5.7 | 5.6 | 5.9 |
| 8090-Contexts seminar | Fall 10 | 5.9 | 5.7 | 5.1 | 6.0 |
| 8090-Contexts seminar | Spr. 10 | 6.0 | 6.0 | 6.0 | 6.0 |
| 8111-Criminology | Spr. 11 | 6.0 | 6.0 | 6.0 | 6.0 |
| 8090-Contexts seminar | Spr. 11 | 6.0 | 6.0 | 6.0 | 6.0 |
| 4111-Deviance | Spr. 12 | 5.9 | 5.6 | 5.4 | 5.8 |
| 8890-Event & panel models | Spr. 13 | 5.9 | 5.6 | 5.9 | 6.0 |
| 4111-Deviance | Spr. 13 | 5.9 | 5.6 | 5.7 | 5.9 |
| 4141-Delinquency | Fall 13 | 5.8 | 5.4 | 5.3 | 5.8 |
| 4141-H-Honors Delinquency | Fall 13 | 6.0 | 6.0 | 6.0 | 6.0 |
| 8111-Criminology | Fall 13 | 6.0 | 6.0 | 6.0 | 6.0 |
| 4977-Honors Prosem | Fall 14 | 5.7 | 5.5 | 5.8 | 5.9 |
| 4111-Deviance | Fall 14 | 6.0 | 5.8 | 5.7 | 6.0 |
| 4978-Honors Prosem II | Spr. 15 | 5.8 | 5.5 | 6.0 | 6.0 |
| 8090-TSP topics (w/ Hartmann) | Fall 15 | 5.8 | 5.6 | 5.6 | 5.8 |
| 4141-Delinquency | Spr. 16 | 6.0 | 5.7 | 5.6 | 5.9 |
| 8090-Soc & Publics (w/ Hartmann) | Spr. 16 | 5.9 | 5.6 | 5.7 | 6.0 |

| Course Information | | Evaluation Scores on 1-7 Scale (1996-2007) | | | |
|---|---|---|---|---|---|
| Course number and name | Term | Overall teaching | Knowledge of subject | Respect & concern | Amount learned |
| 8090-Soc & Publics (w/ Hartmann) | Fall 16 | 6.0 | 6.0 | 5.8 | 6.0 |
| 8111-Criminology | Fall 16 | 6.0 | 6.0 | 5.7 | 6.0 |
| 8090-Soc & Publics (w/ Hartmann) | Spr. 17 | 5.8 | 5.8 | 5.4 | 5.8 |
| 4141-Delinquency & 4141H-Honors | Fall 17 | 5.8 | 5.2 | 5.1 | 5.8 |
| 8090-Soc & Publics (w/ Hartmann) | Fall 17 | 6.0 | 5.8 | 5.7 | 5.8 |
| 8090-Soc & Publics (w/ Hartmann) | Spr 18 | 6.0 | 6.0 | 5.9 | 6.0 |
| 8090-Soc & Publics (w/ Hartmann) | Fall 18 | 5.9 | 5.9 | 5.9 | 5.9 |
| 8090-Soc & Publics (w/ Hartmann) | Spr. 19 | 5.5 | 5.5 | 5.5 | 5.3 |
| 4141-Delinquency & 4141H-Honors | Fall 19 | 5.9 | 5.9 | 5.6 | 5.8 |
| 8090-Soc & Publics (w/ Hartmann) | Fall 19 | 6.0 | 6.0 | 6.0 | 6.0 |
| Uggen's Mean (2008-present) | | 5.9 | 5.8 | 5.7 | 5.9 |
| Dept. Mean (current) | | 5.6 | 5.4 | 5.2 | 5.7 |

## TEACHING HONORS AND AWARDS

2018    *Section on Social Practice and Public Sociology Publication Award,* American Sociological Assn.
2014    *Peterson-Krivo Mentoring Award,* American Sociological Assn. (CLD Section)
2011    *Faculty Mentor Award,* University of Minnesota Department of Sociology
2010    *Small grant,* Office of Vice President for Research. "Working with IRB: A Discussion for Social Scientists." $3,380.
2007    *Ten Year Certificate of Appreciation,* TRIO Ronald E. McNair Scholars Program
2004    *Sociological Education Award,* Sociologists of Minnesota
2001    *Outstanding Faculty Award,* Mortar Board National Honor Society (for superior dedication to undergraduate research)
1999    *College Nominee,* Morse Alumni University Teaching Award
1999    *Student Board Nominee,* College of Liberal Arts Outstanding Faculty Award
1998    *Faculty Mentor Award,* University of Minnesota Department of Sociology

## SUPERVISION OF STUDENTS

## GRADUATE ADVISING

- Rob Stewart (2020 Ph.D. Advisor), Assistant Prof., University of Maryland
- Suzy McElrath (2020 Ph.D. Co-Advisor), Assistant Prof., Montana State University
- Jessica Molina Cuthbert (2020 Ph.D. Advisor), Visiting Assistant Prof., Spelman College
- Veronica Horowitz (2019 Ph.D. Co-Advisor), Assistant Prof., SUNY University at Buffalo
- Sarah Lageson (2015 Ph.D. Advisor), Assistant Prof., Rutgers University
- Sarah Shannon (2013 Ph.D. Advisor), Associate Prof., University of Georgia
- Heather McLaughlin (2013 Ph.D. Advisor), Associate Prof., Oklahoma State University
- Jesse Wozniak (2012 Ph.D. Advisor), Associate Prof., West Virginia University
- Shelly Schaefer (2011 Ph.D. Advisor), Associate Prof., Hamline University
- Julie Barrows (2010 Ph.D. Advisor), Federal Agent
- Michael Vuolo (2009 Ph.D. Advisor), Associate Prof., Ohio State
- Heather Hlavka (2008 Ph.D. Co-Advisor), Associate Prof., Marquette University
- Sara Wakefield (2007 Ph.D. Advisor), Associate Prof., Rutgers
- Andrew Odubote (2006 Ph.D. Advisor), Assistant Prof., Bethel University
- Darren Wheelock (2006 Ph.D. Co-Advisor), Associate Prof., Marquette University
- Kristin Carbone-Lopez (2006 Ph.D. committee), Associate Prof., University of Missouri-St. Louis
- Michael Massoglia (2005 Ph.D. Advisor), Professor, University of Wisconsin
- Jeremy Staff (2004 Ph.D. Co-Advisor), jeanProfessor, Pennsylvania State University
- Melissa Thompson (2003 Ph.D. Co-Advisor), Associate Prof., Portland State University

- Ryan Larson (Ph.D. Advisor)
- Stephen Wulff (Ph.D. Advisor)
- Amber Powell (Ph.D. Advisor)
- Caity Curry (Ph.D. Advisor)
- Anna DalCortivo (Ph.D. Advisor)
- Alyssa Oursler (initial Ph.D. Advisor)
- Chris Levesque (Ph.D. committee)
- Allison Nobles (Ph.D. committee)
- Aimzhan Iztayeva (Ph.D. committee)
- Brit Henderson (Ph.D. committee)
- Marie Wu (Ph.D. committee)
- Jeanie Santaularia (epidemiology, 2019-2020 MPC-T32 pre-doctoral mentor)
- J'Mag Karbeah, Ph.D. student (public health, 2019-20 IDF Life Course Center mentor)
- Gui Deng Say (2018 Ph.D. committee, Management)
- Tina Barr (Sims) (2019 Ph.D. Committee, Social Work, assistant prof. at UNC- Pembroke)
- Emre Eftelioglu (2018 Ph.D. committee, Computer Science)
- Andre Montoya-Barthelemy (2018 MPH committee, Environmental Health Sciences)
- Ashir KaneRisman (MPP, Public Affairs)
- Synøve Nygaard Andersen (2017 Ph.D. committee ("opponent"), University of Oslo)
- Ebony Ruhland (2016 Ph.D. committee, Social Work), Assistant Prof., University of Cincinnati
- Valerio Baćak (2015 Ph.D. committee, University of Pennsylvania), Assistant Prof., Rutgers
- Hollie Nyseth Brehm (2014 Ph.D. committee), Assistant Prof., Ohio State University
- Andrew Johnson (2012 Ph.D. committee chair), post-doc, Princeton University
- Gina Erickson (2011 Ph.D. committee chair), Assistant Prof., Hamline University
- Sarah Walker (Ph.D. Advisor)
- Pao Lee Vue (2009, Ph.D. committee), Associate Prof., St. John Fisher College
- Jennifer C. Lee (2007 Ph.D. committee), Associate Prof., Indiana University
- Amy Blackstone (2003 Ph.D. Co-Investigator), Professor, University of Maine
- Deborah Eckberg (2001 Ph.D. committee), Associate Prof., Metropolitan State University
- Ann Beutel (1997 Ph.D. committee), Associate Prof., University of Oklahoma
- Arturo Baiocchi (Ph.D. committee), Assistant Professor, Sacramento State University
- Jeanette Hussemann (Ph.D. committee chair), Urban Institute
- Virginia Lane (Ph.D. committee)
- Cindy Crimmins (Ph.D. committee)
- Kenneth Wu Hopkins (Ph.D. committee)
- Lisette Haro (Initial Ph.D. Advisor)
- Donna Cernohous (M.A. Thesis committee)
- Kelly Shelton (M.A. Thesis committee)
- Glenna Siekert (M.A. Thesis committee)
- Jim Zaffiro (M.A. Thesis committee)
- Valentine Namakula (Advisor to Humphrey International Fellow)
- Leon Dundas (Advisor to Humphrey International Fellow)
- Rebecca Colwell (Geography, M.S. Thesis committee)
- Kristin Gallagher (Industrial Relations, M.A. Thesis committee)
- Amir Ijaz (Industrial Relations, M.A. Thesis committee)

## GRADUATE RESEARCH SUPERVISION AND INDEPENDENT READINGS

- Sarah Lageson, 2012 (experiments)
- Sarah Shannon, 2006 (criminology)
- Shelly Schaefer, Fall 2005
- Valentine Namakula, Advisor to Humphrey International Fellow, 2004-2005
- Rebecca Colwell, Spring 2004

- Leon Dundas, Advisor to Humphrey International Fellow, 2003-2004
- Sara Wakefield, Fall 2003
- Darren Wheelock, Summer 2003
- Amy Blackstone, Summer 2002
- Julie Barrows, Summer 2001
- Jeremy Staff, Summer 2000
- Lori Schabo-Grabowski, Winter 1999 and Fall 1998
- Andrew Odubote, Spring and Summer 1998
- Anne Hoffman, Winter 1997
- Alexandra Goulding, Winter 1996
- Jaime Lugo (Geography), Winter 1996

## UNDERGRADUATE RESEARCH AND MENTORING

- Nayelli Guerrero (2019 McNair scholar)
- Shaina Barreau (2019 Honors thesis committee)
- Kania Johnson (2018 McNair scholar)
- Chelsea Carlson (2017-2018 UROP grant and senior project)
- Molly Matteson (2015-2016 directed study senior project)
- Taylor Day (2015-2016 senior honors project)
- Lesley Schneider (2015-2016 senior honors project)
- Anja Eichinger (2013-2014 senior project directed study)
- Emily Schulz (2012-2013, senior project directed study, published in *Social Problems*)
- Tonja Shudy (2013 senior projects directed study)
- Saydie White (2013 senior project directed study)
- Taylor Day (2013 directed study)
- Aly Scrignoli (2013 directed study)
- Kevin Vanek (2013 directed study)
- Yuting Wu (2013 directed study)
- Joua Yang (2013 directed study)
- Amber Kraemer (2012-2013 honors thesis committee)
- Charissa Jones, McNair fellowship faculty advisor, 2011
- Nate Gibbs, McNair fellowship faculty advisor, 2010
- Shanicia Goston and Chantel Johnson, McNair fellowship faculty advisor, 2009
- Lindsey Merritt, Undergraduate research opportunity project, 2009
- Janelle Rainwater and Jessica Molina, McNair fellowship faculty advisor, 2008
- Claudio Perez and Jessica Molina, McNair fellowship faculty advisor, 2007
- Hayley Castro, Multicultural summer research opportunities program advisor, 2007
- Shannon Ryan, McNair fellowship faculty advisor, 2006
- Heather Anderson, Aubrie Beske, Tanisha Jones, Kimberly Gardner, Rick Kreyer, Trumaine Lindsey, Jr., Independent research, 2006
- Elisabeth Wells, Heather Leyse, Kimberly Gardner, Trumaine Lindsey, Jr., Maurice Solarin, Independent Research 2005-2006
- Jessica Gonzalez, McNair fellowship faculty advisor, 2005
- Sarah Davis, Adam Basil, Moua Xiong, Independent Research 2004
- Pamela Parnell, McNair fellowship faculty advisor, 2004
- Amanda Allen, Sean Elder, Gina Kubits, and Danielle Saracino, Independent research, 2004
- Julie Korts, Corey Boyer, Chris Hogg, and Marsha Skalsky, Independent research, 2003
- Justine Jones, McNair fellowship faculty advisor, 2003
- Angela Behrens, Undergraduate research opportunity project, 2002 (published in *American Journal of Sociology*)
- Ebony Ruhland, McNair fellowship faculty advisor; senior project, 2002-3
- Kanika (Vic) Nhul, 2002-2003, President's distinguished faculty mentor program

- Danielle Riester, Independent research, 2002
- Michelle Lopez, McNair fellowship faculty advisor, 2001
- Stephanie Miller, MacArthur honors program faculty advisor, 2001
- Brian Duginske, Undergraduate research opportunity project, 2001
- Les Andrist, Megan Carollo, Kelly Healey, Eric Hedberg, Martin Lloyd, and Ann Hewitt, Independent research, 2000
- Keia Johnson, McNair fellowship faculty advisor, 2000
- Janna Cheney, Honors project reader, 2000
- Shushanie Isaacson, Honors project reader, 1999 (ASA Sociology of Law section undergraduate award winner, college award nominee)
- Ryan King, Mark Fredkove, Honors project reader, 1999
- Molly Koscianski, Sara Miller, Michael Johnson, Michael Steiner, and Kelly Simons, Independent research, 1999
- Miriam Rea and Sindy Lopez, McNair fellowship faculty advisor, 1999
- Jessica Huiras, UROP research, 1999 (published in *Sociological Quarterly*)
- Sara Peterson, Individualized major reader, 1998-99
- Seema Gundgavi, 1997-1999, president's distinguished faculty mentor program
- Shani Greene, McNair fellowship faculty advisor, 1998
- Sara Wakefield, Undergraduate research opportunity project, 1998 (published in *Sociological Inquiry*)
- Jeremy Blackowicz, Greg Gentz, and Sara Wakefield, Honors project reader, 1998
- Melissa Buffalo, 1998-2000, president's distinguished faculty mentor program
- Christopher Page and Bridget Cleary, Independent research, 1997
- Jennifer Halko, Undergraduate research opportunity project, 1997 (published in *Social Forces*)
- Chikako Sato, Kimberly Lemcke, Tina Platt, Independent research, 1997
- Rachel Greene, Tami Lin Grimmer, Andrea Andrews, Independent research, 1996
- Humara Ali, Individualized major reader, 1996
- Jennifer Holden and Jody Matteson, SPAN research project, 1996-8
- James Warren, Honors project reader, 1996
- Carolyn Murphy, Senior project and independent study, 1995-96

## PROFESSIONAL SERVICE

### *PROFESSIONAL ASSOCIATIONS*

- American Society of Criminology, 1991-
- American Sociological Association, 1992-
- Sociological Research Association, 2004-
- Law and Society Association
- Population Association of America
- Midwest Sociological Society
- Society for the Study of Social Problems
- Academy of Criminal Justice Sciences

### *PROFESSIONAL ASSOCIATION ACTIVITIES*

- ASA Program Committee, 2021-2022
- ASA Council, American Sociological Association, 2017-2019
- Chair, Collaborative Research Initiatives Committee, American Society of Criminology, 2019-2020
- Vice President, American Sociological Association, 2017-2018
- Chair, Committee on Nominations, American Sociological Association, 2017-2018
- 2018 Program Committee, American Sociological Association, 2016-2018
- Sociology Action Network Committee, American Sociological Association, 2017-

- Video Subcommittee, American Sociological Association, 2017
- Campus Carry Evaluation Committee, American Sociological Association, 2017
- Public Understanding of Sociology Committee, American Sociological Association, 2015-2017
- Fellows Selection Committee, American Society of Criminology, 2016-2017
- Membership Committee, ASA Section on Crime, Law, and Deviance, 2015-2016
- Chair, ASA Section on Crime, Law, and Deviance, 2014-2015
- Nominations Committee, ASA Section on Crime, Law and Deviance, 2010-2011
- Publications Committee, *Am. Sociological Assn.*, 2007-2010
- Executive Secretary and Executive Board Member, *Am. Soc. of Criminology*, 2003-2009
- Chair, New Article Award Committee, *Am. Soc. of Criminology*, 2004
- A.J. Reiss Distinguished Scholar Award Committee, *Am. Sociological Assn.* Crime, Law, and Deviance Section, 2002-2003
- Ruth Shonle Cavan Award Committee, *Am. Soc. of Criminology*, 2002-2003
- Candidate for Council, *Am. Sociological Assn.* Sociology of Law Section, 2002
- Life Course Division Chair, *Am. Soc. of Criminology*, 2001
- National Policy Committee, *Am. Soc. of Criminology*, 1998-1999
- Chair, Graduate Student Prize Committee, *Am. Sociological Assn.*, 1997
- Sociology of Law Section Graduate Student Paper Award Committee, *Am. Sociological Assn.*, 1996
- Undergraduate Award Committee, *Midwest Sociological Society*, 1996

## EDITORSHIPS

- Editor and Publisher. *TheSocietyPages.org* (with Doug Hartmann).
- Editor, 2008-2011. American Sociological Association's *Contexts* (with Doug Hartmann).
- Guest Editor, *Criminology and Public Policy*, 2008. The Effect of Criminal Background Checks on Hiring Ex-Offenders.
- Guest Editor, *Journal of Contemporary Criminal Justice*, February 2005
- Associate Editor, *Law and Society Review*, 2003-2006

## EDITORIAL ADVISORY BOARDS

- Deputy Editor, *Justice Quarterly*, 2016-
- Editorial Board, *American Sociological Review*, 2011-2014
- Editorial Board, *Criminology*, 2003-2006; 2006-2009
- Editorial Board, *Journal of Research in Crime and Delinquency*, 2006-2009
- Consulting Editor, *American Journal of Sociology*, 2001-2003
- Advisory Board, *Journal of Criminal Law and Criminology*, 1996-2013
- Student Advisory Board, *American Sociological Review*, 1992-1993

## PARTICIPATION (OF VARYING DEGREES) IN WORKING GROUPS

- WT Grant Emerging Adult Justice Learning Community, 2016-
- National Civic Summit, July 16, 2009
- National Coalition on Violence Research (Presenter), 2003, 2006
- Urban Institute Reentry Roundtable, 2002
- Macarthur Network on the Transition to Adulthood, 2001 -
- Russell Sage Foundation Mass Incarceration Working Group, 2000

## ADVISORY ACTIVITIES, EXPERT TESTIMONY, AND OUTREACH

- Board of Overseers, General Social Survey (GSS), National Opinion Research Center at the University of Chicago. 2016-2020.

- Minnesota Justice Research Center, 2018-
- Annual Review of Criminology Guest Editor, 2019
- Cited in Tennessee House Judiciary Committee Issues Testimony, September 5, 2019
- Minnesota Department of Corrections Human Subjects Committee, 2009-2018.
- Webinar on felony voting rights and state-level changes, September 27, 2012.
- Huffpost Live webinar on the New Jim Crow, September 1, 2012.
- Minnesota Corrections Strategic Management and Operations Advisory Task Force, 2009-2010.
- Minnesota Senate, "Felon Disenfranchisement," February 27, 2009.
- Voting Rights Forum with U.S. Rep. Keith Ellison, October 6, 2008.
- Minnesota legislature reentry working group, "Employment and Crime," October 27, 2007.
- Minnesota Supreme Court Racial Fairness Committee. "Felon disenfranchisement," November 29, 2006.
- Minnesota Senate, "Convicted felons civil rights and voting eligibility restoration," Crime Prevention and Public Safety Committee, March 28, 2006.
- Minnesota Senate, Elections Committee, March 20, 2006.
- *Johnson v. Bush*, 2000-2004 (a federal class action lawsuit seeking to overturn an indefinite voting ban on ex-felons in Florida).
- "Work as a Turning Point for Released Offenders." *Economic Policy Institute*. United States Capitol, Washington, D.C., December 6, 2000.

## REVIEWS

**Grants**: National Science Foundation, National Institute of Justice

**Journals**: *American Journal of Sociology, American Sociological Review, Annual Review of Criminology, Criminology, Developmental Psychology, Journal of Criminal Law & Criminology, Journal of Personality & Social Psychology, Journal of Policy Analysis and Management, Journal of Quantitative Criminology, Journal of Research in Crime & Delinquency, Law & Society Review, Social Forces, Social Problems, Social Science Research, Sociological Inquiry, Work and Occupations*

**Books**: Oxford University Press, Temple University Press, Roxbury Publishing

**Promotion and Tenure**: University of Connecticut, 2003; North Carolina State University, 2005; University of Iowa, 2005; University of Washington, 2007; Indiana University, 2008; Vanderbilt University, 2008; Ohio State University, 2008; Stanford University, 2008; University of Washington, 2008; University of Pennsylvania, 2009; Ohio State University, 2010; University of Wisconsin-Milwaukee, 2010; Pennsylvania State University, 2010; University of Washington, 2010; Rutgers, 2011; Northern Illinois University, 2011; University of Massachusetts-Amherst, 2011; University of Massachusetts-Boston, 2011; University of Illinois, 2012; Yale, 2012; University of California-Irvine, 2013; University of California-Berkeley, 2013; Cornell University, 2014; University of California-Irvine 2014; Indiana University-Purdue 2015; University of Missouri-St. Louis 2015; Rutgers 2015; Rutgers-Newark 2015; Colorado State 2015; University of Maryland 2015; Penn State 2015; University of Colorado-Denver 2015; University of Massachusetts-Boston 2015; University of Washington 2015; Temple 2016; Purdue 2016; Santa Clara 2016; Vanderbilt 2016; Wisconsin 2017; Columbia 2017; Princeton 2017; New York University 2017; Northwestern 2017; University of Arizona 2018; SUNY Albany 2018; Harvard 2018; Villanova 2018; Rutgers 2018; Vanderbilt 2018; Maryland 2019; Florida State 2019; John Jay 2019; UC-Irvine 2019; Yale 2019; Maryland 2020

**Departmental External Reviews:** Ohio State University (Chair), 2009; University of Massachusetts-Boston, 2013; University of Colorado 2013; Ohio Sate University (Chair) 2019

## UNIVERSITY SERVICE

## COLLEGE AND UNIVERSITY

- University
  - Co-Chair, Sexual Misconduct Department Development Committee (2017-)
  - Executive Team, President's Initiative to Prevent Sexual Misconduct (2017-)
  - Grand Challenges Review Committee (2018-2019)
  - General Counsel Search Committee (2015-2016)
  - Executive Advisory Board, University Research Outreach Center (2015-)
  - Faculty Representative, Athletics Oversight Committee (2015-2016)
  - Research and Scholarly Advisory Panel (RSAP) (2012-2016)
  - Vice Chair, Faculty Consultative Committee (2013-2014; 2014-2015)
  - All-University Tenure Committee (2014-2015)
  - President's Strategic Planning Workgroup (2013-2015)
  - Faculty Consultative Committee (2013-2016)
  - Graduate Education Administrative Processes Work Group (2009-2010)
  - Promotion Workshops (2008-2009)
  - Graduate School *Faculty Summer Research Committee* (2003-2005)
  - *Social Science Research Facility Advisory Committee* (2003-present)
  - *Web Course Tools Advisory Committee* (1999-2001)
  - *Campus Preview Days* Invited speaker (1998; 1999; 2001)
  - *President's Distinguished Faculty Mentor Program* (1995-present)
  - *Commencement* Representative (1995; 1999)

- College of Liberal Arts
  - Open Access Monograph Initiative Review Committee (2018-2020)
  - Promotion and Tenure Committee (2016-2017)
  - MN Futures Committee (2017)
  - Aldous Award Committee (2015-2016)
  - CLA Engagement Committee (2014-2015)
  - Dean Search Committee (2013-2014)
  - Co-Chair, *CLA 2015 Committee* (2009-2010)
  - Orientation for new chairs (2008-2009, 2011-2012; 2012-2013)
  - *Chairs, Executives, Deans, and Directors Committee* (2006-2012)
  - Chair, *Council of Chairs* (2010-2011)
  - Chair-elect, *Council of Chairs* (2009-2010)
  - *Council of Chairs* Committee (2006-)
  - Geography *Search Committee* (2007-2008)
  - Political Science *Personnel Committee* (4 searches in 2005-2006)
  - *Budget Affairs Committee* (2003-2005)
  - *Assembly* (1997-1998; 2001-2003; 2003-2005)
  - *Dean's Recruiting Reception* (2005)
  - *Assembly Co-Chair* (2003-2004)
  - *Executive Committee* (2003-2004)
  - *Chairs, Executives, Deans, and Directors Committee* (2003-2004)
  - *Instructional Awards Committee* (2001-2002)
  - *Information Technology Committee* (1998-2001)

## *DEPARTMENT*

- Department Chair (2006-2012; elected to two terms)
- Graduate Admissions and Awards (1999-2000; 2000-2001; 2015-2016; 2019-2020)
- Chair, Promotion, Tenure, and Salary Committee (2018-2019)
- Promotion, Tenure, and Salary Committee (elected) (1996-97; 1999-2000; 2016-2019)
- Executive Committee (elected) (2001-2002; 2003-2004; 2012-2016; 2017-2018)
- Life Course Center Advisory Board (2012-2019)
- Personnel Committee Chair (2004-2005; 2001-2002 (4 Searches); 2012-2013)
- Associate Chair (2004-2006)
- Personnel Committee (1995-1996; 2003-2004)

- Qualifying Examination Committee (1998-1999)
- Ethics/Grievance Committee (1996-1997)
- Graduate Affairs Committee (1996-1998)
- Life Course Center Advisory Committee (1998-)
- Department representative at *ASA* (1999)
- Core Faculty, National Institute of Mental Health training grant (1998-2006)

## COMMUNITY AND OUTREACH AFFILIATIONS

- Advisory Board, Minnesota Justice Research Center (2018-)
- Executive Advisory Board, University Research Outreach Center (2015-)
- Minnesota Department of Corrections Human Subjects Committee (2009-)
- Minnesota Corrections Strategic Management and Operations Advisory Task Force, 2009-2010.
- Mexican American Legal Defense Fund (Los Angeles)
- Sentencing Project (Washington, D.C.)
- Wilhelm and Conlon/Safer Foundation (reentry programs) (Chicago)
- Council on Crime and Justice (Minneapolis)
- HIRED (Minneapolis)
- Demos (New York)
- Soros Foundation Open Society Institute (New York)
- Hennepin County (Minneapolis) Attorney's Office
- Volunteers in Probation
- College for Kids
- Future Problem Solving

## MEDIA

### PRESS RELEASES AND POLICY BRIEFS

- Ohio State, October 5, 2017, "Perpetrators of Genocide say they're Good People."
- UMN News, April 20, 2017, "U of M Research Team Tracks Complex Web of Monetary Sanctions."
- UMN News, June 22, 2016, "Christopher Uggen Named Regents Professor."
- *American Sociological Association*. 2013. "Study Examines Link Between Incarceration and Psychiatric Disorders."
- *Sentencing Project*. 2012. "New Report: Record 5.85 Million Disenfranchised, Broad Racial Disparities."
- *American Sociological Association,* 2009. "Female Supervisors More Susceptible to Workplace Sexual Harassment."
- *Network on Transitions to Adulthood Policy Brief,* 2005. "Weaving Young Ex-Offenders Back into the Fabric of Society."
- *American Political Science Association*. 2004. "Disenfranchised Voters."
- *American Sociological Association*. 2004. "Males and Adolescents Are Increasingly Victims of Sexual Harassment."
- *American Sociological Association*. 2004. "*New York Times* Year in Ideas."
- *American Sociological Association*. 2003. "If Felons Could Have Voted, National Election Outcomes Would Have Been Different."

### RESEARCH CITED IN MEDIA

- KTCA-TV, *Almanac,* October 26, 2019, disenfranchisement, November 4, 2016, July 15, 2016, December 11, 2015, gun violence; August 29, 2014, September 28, 2012, workplace violence; July 24, 2009, crime rates
- Daily Nous, August 29, 2019, sexual harassment

- Center for American Progress, October 2, 2019 community safety; August 7, 2019, inequality and democracy
- *New York Times* April 28, 2019, prison voting; September 26, 2018, felon voting; May 11, 2018, rights restoration; April 21, 2018; January 2, 2018, felon voting; October 6, 2016, February 28, 2015, December 9, 2014, November 18, 2014, June 2, 2013 and July 15, 2012, link to SP felon voting report; *New York Times Online - Freakonomics,* October 16, 2008, modern outlaws; September 14, 2008, felon disenfranchisement;, September 17, 2004, research cited in op-ed; March 28, 2004, felon voting – Florida; *The New York Times Magazine,* December 13, 2003, "ideas issue"; December 29, 2002: ex-felons; May 15, 2001, felon voting*;* November 3, 2000, felon voting
- NBCNEWS.com, May 3, 2019, Florida voting; September 10, 2012, felon voting
- MSNBC, April 24, 2019, prisoners voting; April 25, 2016, disenfranchisement.
- *Huffington Post,* April 26, 2019, voting; January 8, 2019, disenfranchisement; December 24, 2018; December 18, 2018; November 28, 2017, disenfranchisement; October 27, 2018; October 2, 2018; November 7, 2017;  October 25, 2017; October 2, 2017; April 28, 2017; March 11, 2016, democracy; November 2, 2015, felon voting; May 28, 2013, felon turnout, September 1, 2012, drug convictions; July 12, 2012, felon voting; June 11, 2008, research cited
- *Pacific Standard,* May 2, 2019, prison voting; November 21, 2017, sexual harassment
- *Minnpost,* March 12, 2019, felon voting; September 20, 2010, felon voting
- *Quartz,* December 24, 2018, jails and voting; October 6, 2016
- *Washington Post,* November 12, 2018, partisanship and disenfranchisement; November 7, 2018, Florida; December 11, 2017, disenfranchisement; November 30, 2017; July 21, 2017; October 7, 2016, March 31, 2016, December 2, 2015, felon partisanship;  February 23, 2015, September 17, 2014, August 20, 2014, Ferguson; January 11, 2013; July 29, 2012, link to felon voting report
- *The Atlantic,* November 4, 2018, jails and voting; March 26, 2016, felon voting; January 7, 2014, felon voting; October 10, 2013, prisons and politics
- *PRI's The World,* October 9, 2018, voting rights restoration
- *Mother Jones,* Nov/Dec 2018 felon voting; October 3, 2018, voting rights movements; October 2, 2017;  July 13, 2012, felon voting
- *CBS News,* August 30, 2018; June 15, 2018, illegal voting
- *KARE11 News* June 11, 2018, marijuana enforcement
- *Vox,* June 9, 2018, sexual harassment; May 9, 2018, reenfranchisement; November 7, 2017
- *Politifact,* April 25, 2018, rights restoration; November 4, 2014; October 27, 2014; January 23, 2014
- *Los Angeles Times* January 6, 2018, sexual harassment; July 18, 2003, ex-felon voting (Op-Ed); June 23, 2008, voting
- *Toronto Star,* January 5, 2018, sexual harassment
- *Bloomberg,* January 4, 2018, sexual harassment; May 19, 2015, Clinton voting
- *PBS Newshour,* January 2, 2018, former felons; November 13, 2016, voting
- *Salon,* January 1, 2018, Florida voting; November 29, 2017, disenfranchisement; May 12, 2017 ; May 26th, 2015, mass incarceration; April 15th, 2015, disenfranchisement ; April 6, 2007, Florida disenfranchisement; October 19, 2006, disenfranchisement
- *The Nation,* December 20, 2017, disenfranchisement; September 5, 2012; August 27, 2007; August 9, 2007; December 5, 2006; November 6, 2003, interview with Rebecca Perl
- *Fortune,* December 11, 2017, sexual harassment
- *Wall Street Journal,* December 10, 2017, felon disenfranchisement; September 7, 2012, prison demographics; July 14, 2010, felon voting; November 11, 2009, criminal records; May 4, 2007, Florida disenfranchisement; September 8, 2006, felon disenfranchisement; September 2, 2006, felon disenfranchisement; March 7, 2005; August 12, 2004, former felons and election
- *Elle,* December 20, 2017, sexual harassment; September 16, 2016
- *Newsweek,* December 10, 2017, felon voting; October 24, 2016, October 11, 2004, interview with Sarah Childress
- *Harvard Business Review,* November 29, 2017, sexual harassment

- *The Economist,* December 19, 2017, sexual harassment; August 6, 2009, sex offenders; July 9, 2005, Iowa ex-felons; August 10, 2002, ex-felons as a criminal class
- *CNN Money,* November 9, 2017, sexual harassment
- *NPR Marketplace,* November 3, 2017, sexual harassment
- *Financial Times,* October 25, 2017, sexual harassment
- *NPR,* October 21, 2017, disenfranchisement
- *FiveThirtyEight,* October 11, 2017, sexual harassment
- *Science Daily,* October 9, 2017 genocide perpetrators; September 28, 2017, felon population; January 16, 2013, incarceration and mental health
- *International Business Times,* October 6, 2017, genocide perpetrators
- *Business Insider,* August 19, 2017, sexual harassment
- *Science News,* August 8, 2017, genocide perpetrators
- *MTV,* June 12, 2017, disenfranchisement
- *Minnesota Public Radio,* May 1, 2017, monetary sanctions; March 8, 2017, reentry; December 21, 2016, sexual assault; November 25, 2015, criminal records; December 16, 2014, crime rates; September 20, 2010, felon voting; May, 2010, crime rates; April 27, 2010, higher education; November 19, 2009, employment and recidivism; October 31, 2008; October 1, 2008, felon voting; *Morning Edition,* July 7, 2004, felon reenfranchisement; January 21, 2004: prisoner reentry; November 16, 2001, felon voting; *Morning Edition,* January 8, 2003, felon voting
- *Commentary,* February 15, 2017, felon population
- *Minneapolis Star-Tribune,* December 20, 2016, sexual assault; January 30, 2015; October 20, 2012; November 8, 2010; May 21, 2008; January 30, 2007; December 31, 2005; June 5, 2005; June 13, 2004; April 1, 2004; October 15, 2003; May 30, 2001; May 8, 2000; September 17, 1998; November 15, 1995
- *PBS Newshour* November 13, 2016
- NJTV *News,* November 8, 2016, census; November 3, 2016, disenfranchisement
- *In These Times,* September 12, 2016, August 10, 2004, former felons
- *New Yorker,* August 18, 2016
- BBC News, April 24, 2016, felon voting
- *New York Post,* April 4, 2016, criminal class
- *FactCheck.org,* December 1, 2015, Ted Cruz statements
- *Newsmax,* April 15, 2015
- *Slate*, March 18, 2015, felon voting; June 23, 2014, felon voting; August 17, 2012, SP report; April 27, 2007
- *WCCO-TV News*, December 19, 2013, sports and crime; June 5, 2013, cold-case investigations; August 6, 2012, trends in violent crime
- *National Review Online ,*February 12, 2014; October 18, 2004; January 8, 2004, felon voting; May 2, 2002, felon voting
- *Time Magazine,* October 25, 2012, public opinion on felon voting; January 21, 2002, felon voting
- *The Guardian,* July 13, 2012, felon voting; July 3, 2012, felon voting; February 10, 2011, felon voting
- *Reuters,* October 24, 2012, felon voting
- *Royal Gazette* (Bermuda*),* December 20, 2012, voting
- *Reason.com,* September 20, 2012, kids and violence
- *Human Resources Journal*, August 29, 2012, sexual harassment
- *Philadelphia Inquirer,* August 15, 2012, felon voting
- *Daily Beast,* July 12, 2012, felon voting
- *The Grio,* July 12, 2012, felon voting
- *New Orleans Times Picayune,* July 12, 2012, felon voting
- *ESPN-The Magazine,* May 20, 2011, athletes and crime
- *Fox News,* July 12, 2010, felon voting; October 20, 2008, felon voting; February 2, 2004, felon voting;
- *Inside Higher Ed,* June 18, 2010, criminology and sociology; June 23, 2008, criminology and sociology

- *The Right Focus On…,* December 2009, criminal records (1-hour television panel)
- *Atlanta Journal Constitution*, August 12, 2009, sexual harassment
- *MSN Health and Fitness,* August 12, 2009, sexual harassment
- *US News & World Report Healthday,* August 12, 2009, sexual harassment
- *Globe and Mail* (Canada), August 11, 2009, sexual harassment
- *UPI.com,* August 11, 2009 sexual harassment
- *Economic Times* (India), August 10, 2009, sexual harassment
- *Times of India,* August 9, 2009, sexual harassment
- *E! Science News,* August 9, 2009, sexual harassment
- *Fox 9 News* (Minneapolis)*,* August 8, 2009, sexual harassment
- *Minnesota Daily*, several appearances, December 8, 2014, November 24, 2008; November 23, 2008; February 19, 2008; February 14, 2008; February 13, 2008; November 1, 2007; February 6, 2006; January 17, 2006; April 7, 2004
- *Fedgazette,* March 2009, economy and crime
- *St. Paul Pioneer Press*, March 1, 2009; February 28, 2009; May 30, 2007; November 14, 2005; January 1, 2005; April 18, 2004; March 28, 2004; January 1, 2004; January 4, 2004; January 9, 2003; January 3, 2003; November 6, 2002; October 30, 2002; April 17, 2002; February 12, 2002; December 30, 2001; December 18, 2001; July 15, 2001; May 30, 2001; April 23, 2001; December 19, 2000, May 17, 1998
- *The Seattle Times,* June 24, 2008
- *Air America Radio's Considering Faith,* May 18, 2008, prisoner reintegration
- *Chicago Tribune,* October 3, 2007, sexual harassment; October 29, 2004; (reprinted in *Kansas City Star, Macon Telegraph, St. Paul Pioneer Press*) July 20-28, 2004, felon voting – Florida
- *Footnotes,* July/August, 2007, *Contexts; Footnotes,* February 2003: felon voting
- *Milwaukee Journal-Sentinel,* June 2, 2007, research cited; July 23, 2005, building lives after prison*; Milwaukee Journal-Sentinel, Lincoln Journal Star, Charleston Post and Courier, St. Louis Post-Dispatch* September 17th, 2014 April 26-28, 2004, sexual harassment
- *ZNet,* April 21, 2007, research cited; *ZNet,* March 4, 2007, research cited
- *New York Review of Books,* April 12, 2007, *Locked Out*
- *USA Today*, June 1, 2006, felon disenfranchisement
- *American Urban Radio* (Kelsey Hill), May 16, 2006, *Locked Out*
- USA Network/Daybreak (Al Lerner), May 8, 2006, *Locked Out*
- *Al Franken Show* (Air America radio), April 4, 2006, felon voting
- *The New Standard,* March 31, 2006, felon "poll tax"
- *The Chronicle of Higher Education,* March 24, 2006, *Locked Out*
- *Associated Press (New York Newsday)*, June 21, 2005, sex offenders*;* March 2, 2005, interview with Malia Rulon
- *The Seattle Post-Intelligencer*, April 21, 2005
- *The Washington Times,* March 8, 2005; March 24, 2004, sexual harassment; *The Washington Times*, July 23, 2003, felon voting; *The Washington Times,* July 14, 2002, felon voting
- *Financial Times Deutschland* (Germany), October 27, 2004
- *Village Voice*, October 12, 2004; December 6-12 2000, election
- National Public Radio, *Day to Day,* October 5, 2004, interview with Kathy Witkowsky; *Sound Money,* National Public Radio, May 22, 2004, sexual harassment; *Whose Vote Counts?*, National Public Radio affiliates (November 4, 2003; *All Things Considered*, National Public Radio, February 7, 2001, prison reentry
- *The Boston Globe*, October 4, 2004, research cited in op-ed
- *Istoé Independente* (Brazil), September 29, 2004, sexual harassment
- KDXU radio (St. George, UT), *The Donovan Report*, September 22, 2004
- WNWS radio (Jackson, TN), *FYI,* September 21, 2004, interview and callers
- *Taiwan News*, September 20, 2004
- *Sacramento Bee*, September 12, 2004
- *For the People* (syndicated talk radio), September 7, 2004

- *KMOX* radio (St. Louis, MO), August 30, 2004
- *Al Franken Show* (syndicated talk radio), August 26, 2004, felon voting
- *The Wire*, 2SER-FM Radio (Sydney, Australia), August 23, 2004, felon voting
- *The Bev Smith Show* (syndicated talk radio), August 23, 2004, interview and callers
- *Make it Plain*, XM-169 Radio, August 12, 2004, race and felon voting
- *Making Contact* (syndicated radio)*,* August 4, 2004, felon voting
- *Ohio Public Radio*, July 23, 2004, felon voting - Ohio
- *BET.com*, Black Entertainment Television, July 7, 2004, race and felon voting
- *San Francisco Chronicle,* February 28, 2004, felon voting
- *The American Prospect,* December 2003, employment and crime
- *Pravda,* December 4, 2003, research cited on felon voting
- *Christian Science Monitor*, September 25, 2003, public opinion on felons
- *Brisbane Courier-Mail* (Australia)*,* December 30, 2002: incarceration
- KMSP-TV (Minneapolis), December 30, 2001, crime rates
- *Rolling Stone,* August 20, 2001, felon voting
- ABC-TV (*World News Tonight*), March 26, 2001, felon voting
- *The Independent,* January 14, 2001: Noam Chomsky on 2000 election
- *National Law Journal*, October 24, 2000, felon voting
- *National Post* (Toronto, Canada), October 2, 2000, felon voting
- *Knight-Ridder/Tribune News Service,* May 8, 2000, crime rates

### PROFILES AND EXTENDED INTERVIEWS

- *U News,* June 22, 2016, "Christopher Uggen Named Regents Professor."
- *Brief,* October 2, 2012, "The Right to Vote"
- *Brief,* November 17, 2010, "Profile of criminologist Chris Uggen -- Sociology chair Chris Uggen on felons, faculty, blogging, and more."
- *The Rights Stuff,* April 2009, "Providing a Second Chance."
- *Footnotes,* July/August 2007, "Hartmann and Uggen are the New Editors of Contexts."
- *Facets,* Spring 2005, "Doing Justice to Criminals."
- *CLA Today,* Summer 2002, "Behrens and Uggen: From Questioning to Discovery."
- *University of Minnesota Foundation 2002 Report,* "Vote of Confidence."

### REFERENCES

By request.