# EXHIBIT 1

# EXHIBIT 1

UNITED STATES  DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
---------------------------x        18-CV-6591(CJS)
GEORGE MANDALA and
CHARLES BARNETT,

              Plaintiffs,
vs.
                                    Rochester, New York
NTT DATA, INC.                      June 27, 2018
              Defendant.
---------------------------x

**MOTION HEARING**

                     TRANSCRIPT OF PROCEEDINGS
            BEFORE THE HONORABLE CHARLES J. SIRAGUSA
                  UNITED STATES DISTRICT JUDGE


FOR PLAINTIFFS:        OUTTEN & GOLDEN LLP
                       BY:  CHRISTOPHER M. McNERNEY, ESQ.
                       BY:  ELIZABETH V. STORK, ESQ.
                       685 Third Avenue
                       25th Floor
                       New York, New York 10017

FOR PLAINTIFFS:        NAACP LEGAL DEFENSE & EDUCATIONAL
                          FUND, INC.
                       BY:  ALEXIS J. HOAG, ESQ.
                       BY:  RACHEL M. KLEINMAN, ESQ.
                       40 Rector Street
                       5th Floor
                       New York, New York 10006

FOR DEFENDANT:         LITTLER MENDELSON, PC
                       BY:  JESSICA F. PIZZUTELLI, ESQ.
                       375 Woodcliff Drive
                       2nd Floor
                       Fairport, New York 14450


COURT REPORTER:        Diane S. Martens, FCRR, RPR
                       Kenneth B. Keating Federal Building
                       100 State Street
                       Rochester, New York 14614

Mandala, et al v. NTT Data, Inc. – 18-CV-6591

1                    **P R O C E E D I N G S**

2                        *            *            *

3

4        **THE COURT:**  The Court notes Christopher McNerney,

5   Elizabeth Stork, Ms. Kleinman and Ms. Hoag on behalf of the

6   plaintiffs.

7            And Ms. Pizzutelli on behalf of the defendant.

8            Let me just start with the plaintiffs.  I really

9   only need to hear argument on the 12(b)(6) motion.  I

10  understand the other arguments.  But really what I'm most

11  concerned about is the 12(b)(6) motion and going to the

12  plaintiff's memorandum of law in opposition –– if you bear

13  with me a moment.

14        **MR. McNERNEY:**  Yes, your Honor.

15        **THE COURT:**  You make this statement.  I'm reading

16  at Page 7.

17            "Thus, an allegation that a neutral employment

18  practice denied equal opportunity to members of a protected

19  class will suffice."

20            Is that really what you mean?  So all I have to do

21  to satisfy the Twombly/Iqbal standard of pleading is say in

22  my complaint that this practice of requiring all your

23  employees to wear red ties negatively impacted on Hispanic

24  individuals, that would be enough?

25        **MR. McNERNEY:**  Well ––

Mandala, et al v. NTT Data, Inc. – 18-CV-6591

1      **THE COURT:**  Because that's exactly what you said

2    there, right?  And also I want to point somewhere

3    plaintiff -- if you'll bear with me a moment -- it's

4    mentioned that you argued in some of your cases on pre-Iqbal

5    pleading standards and they point to, if I can say it right,

6    *Swierkiewicz v. Sorema*, which, if memory serves me correctly,

7    relies on *Conley* pleading which is pre-Iqbal and that's where

8    on any kind of, any interpretation, you got a claim that goes

9    forward but that's not the present pleading standard.

10            And let's just -- and if I don't get the issues

11    correct, please point them out.  What the defense maintains

12    is this:  That to have a disparate impact case, you have to

13    demonstrate how the policy, the policy impacts on the

14    protected class.  And what the defense is suggesting is this:

15    They're saying you have to show how this policy -- and I

16    think it's pretty well fleshed out, although we go back and

17    forth between convictions and incarceration -- it's felonies.

18    I think your clients testified they weren't hired because

19    they had felony convictions.

20            And they suggest that statistics about how

21    generally African-Americans have more criminal convictions,

22    generic criminal convictions than Caucasians doesn't cut it.

23    You somehow have to demonstrate how the policy that the

24    defendant put in place disparately impacts on the protected

25    class who have the qualifications for the position and,

Mandala, et al v. NTT Data, Inc. - 18-CV-6591

1    essentially, I think the defense is arguing you haven't done

2    that.

3              Is that correct, Counsel, is that your position?

4              **MS. PIZZUTELLI:**  Yes, your Honor.

5              **THE COURT:**  So just to recap.  They're saying,

6    that's great, you got the statistics, you got the studies but

7    that's not what we're talking about.  What we're talking

8    about is how this policy that's in place would adversely

9    impact African-Americans and to do that, you got to do

10   something more than just conclusory allegations.  You got to

11   show how people who are qualified -- how disproportionately

12   African-Americans who are qualified for the position get

13   denied over Caucasians who are qualified for the position and

14   have felony records.  I think those are the two extremes.

15             And I started out with what you said because,

16   obviously, if you're right and all you got to do is allege,

17   to satisfy the Twombly/Iqbal plausibility standard, all you

18   have to do is allege that, look, we have this neutral policy:

19   They want everybody to wear red ties.  Well, we've got

20   studies that show that African-Americans don't wear red ties

21   so that adversely affects on our -- nothing to do with

22   their -- obviously if there was an argument that it was a

23   requisite of the job but there's no such argument here,

24   correct?

25             **MS. PIZZUTELLI:**  We're not at this stage --

Mandala, et al v. NTT Data, Inc. - 18-CV-6591

1      **THE COURT:**  Not at this stage.

2      **MS. PIZZUTELLI:**  -- making that argument.

3      **THE COURT:**  So we're just at the pleading stage.

4      So I'll throw you the ball.  Is she right or wrong?

5      **MR. McNERNEY:**  Well, your Honor, we believe that

6   she's wrong.

7      **THE COURT:**  Why?

8      **MR. McNERNEY:**  To cite the governing precedent in

9   Iqbal, the question here is whether we raised a plausible

10  inference and that's the point of the statistics here.

11      It is not at this stage to say conclusively that we

12  have proven our case.  That would be premature.  What these

13  statistics show is that African-Americans are more likely to

14  be arrested and they're more likely to be incarcerated which

15  raises the inference that they're more likely to be convicted

16  of crimes; therefore, a policy that excludes --

17      **THE COURT:**  Let me just stop you because are we

18  talking crimes or are we talking felonies?  If they're more

19  likely to be convicted of crimes, are we drawing on an

20  inference -- you're saying, okay, they're more likely to be

21  arrested and incarcerated.  So we can infer they're more

22  likely to be convicted of crimes and from there we can infer

23  they're more likely to be convicted of felonies?  Because

24  isn't that the policy that you're challenging that you're

25  saying that the protected class is more likely to be

6

Mandala, et al v. NTT Data, Inc. – 18-CV-6591

1   adversely affected by this policy of NTT not to hire people

2   with felony convictions?

3          **MR. McNERNEY:**  Well, your Honor, I think there's a

4   distinction there.  While it's true that our two plaintiffs

5   had felony convictions, the policy we're challenging is

6   broadly NTT's policy of screening out applicants because of

7   their criminal records.  At this point we have very strong

8   evidence showing that they have this blanket policy.  We have

9   Mr. Mandala being told that he was being denied pursuant to a

10  policy to deny people the job if they have felony

11  convictions.  We have Mr. Barnett being told that he was

12  denied because of his conviction and then when he tried to

13  reapply for other positions, he was told that he could not

14  because of his felony.  So we know that there's a criminal

15  history screen out there and we know that it's a blanket

16  screen that is denying people because of their criminal

17  record.  And so these --

18         **THE COURT:**  Let me stop you because I'm confused.

19  Have you alleged in the complaint that they're denying it

20  because of their criminal record or denying -- so you're

21  suggesting that they have a policy if you have any criminal

22  record, if you've been convicted of a petit larceny, we're

23  not going to hire you, if you've been convicted of

24  misdemeanors, of menacing, a B misdemeanor, we're not going

25  to hire you or is the policy that you're challenging that

Mandala, et al v. NTT Data, Inc. – 18-CV-6591

1   we're not hiring if you have a felony conviction?  What is

2   the policy?  I'm looking at the complaint.  Where do you

3   state the policy?  I thought, and, again, I thought in the

4   complaint both of the aggrieved individuals, Mr. Barnett and

5   Mr. Mandala, say they were told they weren't hired because

6   they had felony convictions.

7          **MR. McNERNEY:**  Yes, your Honor, that is correct

8   that they weren't hired because of their felony convictions.

9   If you'll turn to Paragraph 93, the class definition, it's

10  all African-American individuals who were denied employment

11  based in whole or in part of NTT's policy and practice of

12  denying employment to individuals with criminal convictions.

13  To be sure, we'll need discovery on the precise contours of

14  the policy.  But what -- we have concrete allegation showing

15  the existence of the policy and that is a criminal history

16  screen.

17         **THE COURT:**  So you're -- I guess I'm losing you.

18  You're suggesting that their policy is if you have a

19  conviction, we don't hire you -- of any kind.

20         **MR. McNERNEY:**  Well, discovery will show the

21  precise contours of the policy.

22         **THE COURT:**  What does this mean?  I'm looking at

23  this language.  Because Iqbal makes clear a plausible claim

24  must come before discovery, not the other way around, citing

25  a Southern District case, observing that, "pursuant to Iqbal

Mandala, et al v. NTT Data, Inc. – 18-CV-6591

1  pleading standard, the Federal Rules of Civil Procedure do
2  not" -- quoting Iqbal -- "do not unlock the doors of
3  discovery for a plaintiff armed with nothing more than
4  conclusions or speculation."

5       **MR. McNERNEY:**  But, your Honor, here we do have
6  more than conclusions and speculation.  We have statistics
7  showing that it is more like -- that African-Americans are
8  more likely to have a criminal record.

9       We've identified a mutual policy that because it
10  screens out people because of their criminal records, is more
11  likely to screen out African-Americans.  We cited two audit
12  studies showing that African-Americans with criminal
13  convictions are less likely to get a job even when compared
14  to whites with convictions.

15       Beyond that, we cited to the EEOC enforcement
16  guidance on criminal records which itself has reviewed the
17  statistics and said that it is a plausible inference to make
18  that a criminal record screen that screens out on the basis
19  of criminal records is going to have a disparate impact on
20  African-Americans because of their race.

21       And then we have our two clients who were denied
22  multiple separate jobs because of their criminal records and
23  are African-American.  This is a very robust showing at this
24  stage for a disparate impact case.

25       And I would also like to point your Honor to the

Mandala, et al v. NTT Data, Inc. – 18-CV-6591

1   two notices of supplemental authority that we provided, one

2   as to *Jackson v. Tryon Park Apartments* and one to *Lee v.*

3   *Hertz Corporation* where the Court found that general

4   statistics of incarceration rates, when combined with a

5   neutral policy that screens out applicants because of their

6   criminal records -- in the Jackson case it was applicants to

7   housing; in the *Hertz* case, it was applicants under Title VII

8   for a job -- those, combined with the individual harm to the

9   named plaintiffs, was more than sufficient to state a

10  plausible claim at this stage.

11          **THE COURT:**  I understand your position.  Let me ask

12  you this.  Is there a distinction between -- and I understand

13  your position -- but is there a distinction between not --

14  the allegation that they're screening people based on a

15  criminal record and they're not hiring people if you have a

16  felony conviction, are you saying that's a distinction

17  without a difference?

18          **MR. McNERNEY:**  Yes, your Honor, I think --

19          **THE COURT:**  All right.  Let me stop.  Let me go

20  over to the other side.

21          Counsel, what's your position?  Essentially their

22  position is correct, these general population statistics and

23  this language from the guidance section disparate treatment

24  discrimination criminal records which says a covered employer

25  is liable for violating Title VII when the plaintiff

Mandala, et al v. NTT Data, Inc. - 18-CV-6591

1   demonstrates that he was treated differently because of his

2   race, national origin, for example, there's a Title VII

3   disparate treatment liability where the evidence shows that a

4   covered employer rejected an African-American applicant based

5   on his criminal record but hired a similarly-situated white

6   applicant with a comparative criminal record.  In other

7   words, these general statements, statistics from wherever

8   they come from, are sufficient.

9          It's clearly not -- I don't think you're disputing

10  that the statistics show that African-Americans are more

11  likely to have criminal convictions than perhaps Caucasian

12  counterparts but you're maintaining that's not enough, is

13  that correct?

14         **MS. PIZZUTELLI:**  That's absolutely right, your

15  Honor.

16         **THE COURT:**  Why?

17         **MS. PIZZUTELLI:**  That's not enough because it has

18  absolutely no connection to what my client did or my client

19  or my client's policy.

20         And so what they've alleged in the complaint, the

21  facts -- which is what the Court needs to focus on under

22  Iqbal is the facts.  The facts that they've alleged in this

23  complaint is that their clients were told that there's a

24  felony conviction policy and what they've done is they've

25  alleged in their complaint general, nonspecific, nationwide

Mandala, et al v. NTT Data, Inc. – 18-CV-6591

1    statistics that, one, have absolutely nothing to do with

2    felony convictions, two, have absolutely nothing to do with

3    convictions -- by the way, they only address arrests and

4    incarceration statistics and if you look at the EEOC

5    guidance, the EEOC guidance doesn't even rely on convictions.

6    They say that they're using incarceration as a proxy for

7    conviction data.

8          And on top of all that in these other cases as

9    well, which was a distinguishing factor with the *Lee* case and

10   the *Jackson* case, we're talking about a different group of

11   people here.  We're talking about people who are applying for

12   IT and technical positions and general population statistics

13   are completely in-opposite when you're considering the types

14   of positions that we're discussing here.  And that comes from

15   *Wards Cove*.  According to *Wards Cove*, skill matters when

16   you're analyzing a disparate impact case.

17         And so my position is, one, general statistics are

18   not enough because they're completely divorced from what my

19   client, my client period, has nothing to do with NTT data but

20   on top of that, it's completely divorced from the facts that

21   are alleged in this complaint.

22         **THE COURT:**  Let's take the other side.  Aren't they

23   in a catch 22 then?  They're suggesting it's enough because

24   they need some discovery, cited what I think is the

25   applicable law in discovery, but they're saying how could

Mandala, et al v. NTT Data, Inc. – 18-CV-6591

1   they ever find out what the real situation is unless they get

2   some discovery.

3        **MS. PIZZUTELLI:**  Well, my response to that would

4   be, your Honor, you shouldn't have filed a complaint in court

5   then.  Under Rule 11, you need to have facts.  Under Iqbal

6   and Twombly, you need to have facts before you come into

7   court and before you file a complaint, period, let alone a

8   nationwide class action with these types of serious and

9   complex allegations.

10       **THE COURT:**  So, is counsel wrong when he says it's

11  sufficient -- and I'll ask you point blank -- he's

12  maintaining that it's sufficient to allege in the complaint,

13  one, that there's this neutral policy, two, that it adversely

14  affects the protected class, in this case African-Americans,

15  at least he suggested in his pleading that I read that that

16  in and of itself is enough; but beyond that supported by

17  allegations of general statistics from wherever that

18  African-Americans are more likely to be incarcerated,

19  convicted of crimes than Caucasians.  He's maintaining that

20  that's sufficient.  Is that right or wrong?

21       **MS. PIZZUTELLI:**  That's wrong.  That's wrong.

22  Under Iqbal and Twombly and I'd ask the Court to go back and

23  look at the basic Black Letter pleading standards announced

24  by the Supreme Court.

25       **THE COURT:**  So what would he have to plead to go

13

Mandala, et al v. NTT Data, Inc. – 18-CV-6591

1  forward?

2          **MS. PIZZUTELLI:**  That's not, that's not on me.

3          **THE COURT:**  I know it's --

4          **MS. PIZZUTELLI:**  I think what we --

5          **THE COURT:**  -- not on you.

6          **MS. PIZZUTELLI:**  -- need to do, we need to look

7  at --

8          **THE COURT:**  But I'm asking you:  What would he have

9  to plead to go forward?  Would he have to plead -- what facts

10  would you plead?  Would you have to plead that -- if they

11  said that a disproportionate number of African-Americans with

12  felony convictions were denied -- were offered jobs and the

13  offer was retracted than Caucasians, would that be enough?

14          **MS. PIZZUTELLI:**  No.  That would be a similar

15  conclusory allegation under Iqbal.  I think what he needs to

16  plead is he needs to go back, he needs to look at the text of

17  the statute.  Look at Title VII.  Title VII says you need to

18  plead a particular employment practice that causes a

19  disparate impact on the basis of race.  You need to look at

20  what the Second Circuit has said you need to plead.  That's

21  *Brown versus Coach Stores* which addresses and affirms a

22  district court dismissal on a 12(b)(6) motion of a disparate

23  impact claim.  And what *Brown* said was you need to plead

24  facts that show a facially neutral employment policy or

25  practice has a significant disparate impact.

Mandala, et al v. NTT Data, Inc. - 18-CV-6591

1      **THE COURT:**  So he'd --

2      **MS. PIZZUTELLI:**  It's a difficult standard to meet.

3      **THE COURT:**  So he'd have to prove something like

4    this, according to you, he'd have to say, listen, over the

5    last X number of years, NTT has offered jobs to 100 people,

6    then withdrawn those job applications because they have

7    felony records.  Of those 100 people, 75 are

8    African-Americans, that would be enough, right?

9      **MS. PIZZUTELLI:**  Your Honor, I think that that's

10   not, that's not a question for me.  That's a question of

11   whether the Court then would agree --

12     **THE COURT:**  No, it is a --

13     **MS. PIZZUTELLI:**  -- that --

14     **THE COURT:**  No, it is a question for you.

15     **MS. PIZZUTELLI:**  But that's not --

16     **THE COURT:**  I'm trying --

17     **MS. PIZZUTELLI:**  -- up to me.

18     **THE COURT:**  I know it's not on you.  I'm asking you

19   a hypothetical.  Is that the specificity that they would need

20   to plead?  Is that the specificity that would satisfy -- let

21   me put it this way.

22     If we came here with that complaint, if the

23   complaint said -- just listen to me, please -- the complaint

24   said that over the last five years, NTT has offered jobs to

25   100 individuals, whatever the job was, and then withdrawn

Mandala, et al v. NTT Data, Inc. – 18-CV-6591

1   those offers after a record check had revealed that each had

2   felony convictions.  Of those 100 individuals, 75 were

3   African-American.  If that was the allegation for disparate

4   treatment, would you be moving to dismiss the complaint?

5          **MS. PIZZUTELLI:**  Your Honor, I think I would be in

6   a more difficult position to move to dismiss but I would also

7   need to review, again, the *Wards Cove* decision and be guided

8   by what the Supreme Court said in *Wards Cove*.  And what *Wards*

9   *Cove* said is you also need to look at who's in that applicant

10  pool, who's making those applications.

11         **THE COURT:**  Well, again, I should have qualified it

12  by qualified individuals.  If they allege that, that -- well,

13  obviously they were qualified because they were offered the

14  job.  If they said they were interviewed for a tech

15  supervisor position -- over the last six years, 100 people

16  who were offered a position as tech supervisor, were deemed

17  qualified and offered positions as tech supervisors were then

18  denied after a record check revealed they had felony

19  convictions.  75 were African-Americans.  I mean, that would

20  seem to me pretty specific.

21         I don't know how you would ever do that without

22  having access.  I don't even know if you could do that if you

23  had access.  I mean, I don't know how you'd ever -- even if

24  you had discovery, you'd have to, what, go interview

25  everybody and say, by the way, are you African-American?  I

Mandala, et al v. NTT Data, Inc. – 18-CV-6591

1   mean, I don't know how you would -- what you would even get

2   in discovery?

3          What would you be looking for in discovery?  Let's

4   assume I said -- and I'm not saying I will -- but, for

5   argument sake, I said, okay, you've convinced me, you've got

6   enough go to discovery.  Now what do you do?

7          **MR. McNERNEY:**  Sure, your Honor.  And there'd be,

8   there'd be other areas of discovery we'd be looking for.

9   But, broadly, we'd be looking for discovery on the contours

10  of the precise policy and, second, we'd be asking for

11  applicant data.  And so we'd be looking at data as to who

12  applied and who was hired and who was denied employment and

13  the reasons for that.

14         **THE COURT:**  All right.  So I give you data that 100

15  people were denied employment after they were offered

16  positions -- determined qualified -- because of a policy

17  that we don't hire people with felonies.  Now what do you do

18  with that?

19         **MR. McNERNEY:**  Well --

20         **THE COURT:**  You go out and interview each of the

21  hundred -- first of all, you'd have to determine which of the

22  hundred are African-Americans.  The application's not going

23  to tell you that.

24         **MR. McNERNEY:**  Well, your Honor, the application

25  might.  That is a question that we're going to have to

Mandala, et al v. NTT Data, Inc. – 18-CV-6591

1  discuss with defendants as to what their data actually

2  contains.  A lot of employers do ask applicants to

3  self-disclose.

4        **THE COURT:**  But you don't have to.  I've never seen

5  one that requires you --

6        **MR. McNERNEY:**  Sure.

7        **THE COURT:**  -- to self-disclose.

8        **MR. McNERNEY:**  And in those cases I would point the

9  Court to *Houser v. Pritzker*, class cert decision where the

10  Court granted class cert where the census, even though they

11  were not obligated -- they were obligated to maintain race

12  data, they did not.

13        So we got experts to take a look at the names of

14  the people who applied and their locations, their addresses

15  and to draw statistically defensible conclusions from that as

16  to the overarching --

17        **THE COURT:**  But we're not even --

18        **MR. McNERNEY:**  -- racial composition.

19        **THE COURT:**  -- at that stage.  You haven't sought

20  preliminary class certification yet, correct?

21        **MR. McNERNEY:**  But, your Honor, that's one of the

22  ways we could prove the case with discovery, to directly

23  answer your question.

24        **THE COURT:**  So you could prove the case by what, an

25  expert to look at the last names of the individuals and where

18

Mandala, et al v. NTT Data, Inc. – 18-CV-6591

1   they reside?

2       **MR. McNERNEY:**  To determine race, to the extent

3   it's not maintained.  The question here, this is a disparate

4   impact case so we're looking at the amount of people who got

5   the job, the amount of people who didn't get the job because

6   of their criminal records and the races of those individuals

7   to determine whether NTT's policy, which screens out

8   applicants because of their criminal records, screens out

9   more African-Americans.  And so that's why we're looking at

10  race and that's also why, going back to the pleading stage,

11  why the statistics that we pled raise a plausible inference

12  of --

13      **THE COURT:**  But the policy is not not giving them

14  the jobs because they both had jobs.  Two African-Americans

15  were offered positions.  It wasn't -- right -- it wasn't

16  until they signed this release to get their criminal record

17  check that they were then denied the positions?

18      **MR. McNERNEY:**  Yes, your Honor.  So they were given

19  the offer and then that offer was revoked.

20      **THE COURT:**  Right.

21      **MR. McNERNEY:**  And it was revoked because of their

22  criminal record.

23      **THE COURT:**  Well, it was revoked according to

24  them -- I'm not trying to make a big distinction -- it was

25  revoked because, they were told, because they had a felony

Mandala, et al v. NTT Data, Inc. – 18-CV-6591

1  conviction.

2      **MR. McNERNEY:**  It was first revoked because of the

3  information on their consumer report, which is the background

4  check, report from the consumer reporting agency.  So the

5  employer received that report, looked at the information and

6  determined that this criminal history, we're going to knock

7  them because of it.

8      And then both Mr. Mandala and Mr. Barnett followed

9  up.  Mr. Mandala was told specifically it was pursuant to a

10 policy not to hire people with felony convictions.

11 Mr. Barnett was told it was because of his convictions and

12 then only later when he applied to other jobs it was because

13 of felonies.

14     But I would say that -- to go back to something

15 that you said earlier, your Honor -- I believe that this is a

16 distinction that doesn't really matter at this stage because

17 whether the policy is am -- whether they're screening people

18 with felony convictions or they're screening a broader set of

19 misdemeanor convictions as well, either way, the statistics

20 that we pled raise a plausible inference that that policy is

21 going to disproportionately impact African-Americans because

22 African-Americans are more likely to have the conviction, be

23 it felony or other.

24     **THE COURT:**  And the fact the client is offering the

25 statistics don't carry the day because they don't relate -- I

Mandala, et al v. NTT Data, Inc. – 18-CV-6591

1  think you're indicating that you have to show the group that

2  was qualified for the position and out of the group that was

3  qualified, how many were denied the position because of

4  whatever, felony criminal records, and did that group, was

5  that group disproportionately unfair to African-Americans?

6      **MR. McNERNEY:**  So --

7      **THE COURT:**  And you're saying you don't have to do

8  that now?

9      **MR. McNERNEY:**  Your Honor, I believe what this

10  comes down to is a question of causation and, as some of the

11  case law we cited analyzing disparate impact at the motion to

12  dismiss stage has said, you don't have to establish causation

13  at this stage.  What defendants are asking us to do is to

14  prove our claims at this stage, to prove that there actually

15  was impact but that is improper at a motion to dismiss stage.

16  At the motion to dismiss stage we just need to raise a

17  plausible inference.

18      And I think it's telling that counsel is citing to

19  *Wards Cove* because that was a decision decided after a bench

20  trial after discovery, after they got the statistics, the

21  Court was saying that's not enough.  But we're not there yet.

22  We're at the --

23      **THE COURT:**  Let me ask you another what-if

24  question.  So we get by this.  We know it's not a jury trial,

25  right, it's a trial before the Court?

21

Mandala, et al v. NTT Data, Inc. – 18-CV-6591

1     **MR. McNERNEY:**  For the disparate impact claim, yes,

2  your Honor.

3     **THE COURT:**  So how do you prove it?  If we went to

4  trial, how would you prove it?

5     **MR. McNERNEY:**  Well, your Honor, we get the

6  statistics -- well, first we establish a neutral policy.

7     **THE COURT:**  Okay.  Done.  Let's say we establish a

8  neutral policy.  The neutral policy -- and let's make it in

9  your favor -- we don't hire people with criminal convictions.

10     **MR. McNERNEY:**  Mm-mm.

11     **THE COURT:**  Okay, neutral policy, done.

12     **MR. McNERNEY:**  So then we would look at the

13  applicant data.  We would -- and we would have experts

14  testify that this applicant data shows that this policy

15  screens out more African-Americans than, like, the absence of

16  this policy otherwise should.  So because of this policy --

17     **THE COURT:**  What would you show?  How do you make

18  your case?  So let's say you get the applicant data, that

19  somehow you put together and say all right -- and what

20  timeframe are we looking at?  How far back can you look at

21  applicant data?

22     **MR. McNERNEY:**  Well, we'd ask for applicant data

23  through the class period so 300 days before the filing of the

24  EEOC.

25     **THE COURT:**  So what date does that give us?

Mandala, et al v. NTT Data, Inc. - 18-CV-6591

1        **MR. McNERNEY:**  I believe that's August 6th, 2016,

2   your Honor.

3        **THE COURT:**  All right.  Let's say -- and, again, I

4   have no idea -- but let's pick a number.  Let's say from that

5   period, 200 people were denied positions.  I mean, does it

6   have to be comparable to the position your clients applied

7   for?  Could it be any position in NTT, is it any position?

8        **MR. McNERNEY:**  Well, your Honor, we believe this is

9   a policy that applies across all positions at NTT.

10        **THE COURT:**  So let's say it applies across, whether

11   you're a janitor at NTT, whether you're a tech specialist,

12   you convinced me you look at all the positions, okay.

13        And however you do it, you determine that over this

14   period of time 500 people have been denied positions because

15   they have criminal convictions.  We're extending it, not

16   saying felony conviction.

17        And of those 500 people, 245 were Caucasian and 255

18   were African-American.  Do you win?  Lose?

19        **MR. McNERNEY:**  So, your Honor, it depends on the

20   percentage of African-Americans and Caucasians that applied.

21   So, if that percentage --

22        **THE COURT:**  No, it doesn't.  It doesn't pertain to

23   the ones who applied.  You just said it pertains to the ones

24   that were offered positions and then the offer was refused

25   because they have criminal convictions.

Mandala, et al v. NTT Data, Inc. – 18-CV-6591

1       **MR. McNERNEY:**  So assuming that their policy is, in

2  fact, you're given a conditional offer --

3       **THE COURT:**  And let me stop you because you're not

4  claiming in this case disparate treatment.  You're not saying

5  they were denied positions because if you were, I'm sure you

6  would have made that claim on their behalf that they were

7  denied positions for which they were qualified for under

8  circumstances that raise an inference of discrimination.

9  You're not.

10       So I'm saying that under the posture of this

11  lawsuit, you're maintaining that there was a disparate impact

12  and the disparate impact is that people who are qualified for

13  positions were offered positions and were then denied them

14  because of their criminal records, felony or otherwise,

15  disparately impacts on African-Americans.

16       And my question to you was specifically:  Okay, you

17  go through all this data.  You find 245 Caucasians were

18  denied positions.  You find 255 African-American were not

19  denied but offers were withdrawn.  Do you win?  Lose?

20       **MR. McNERNEY:**  Well, your Honor, taking this

21  hypothetical, it still depends on the number of applicants

22  who were given a conditional offer.  So the question is --

23       **THE COURT:**  I'm telling you 500 were given a

24  conditional offer.

25       **MR. McNERNEY:**  Okay.  And then it depends on how

24

Mandala, et al v. NTT Data, Inc. – 18-CV-6591

1    many of those were African-American.

2            **THE COURT:**  200.  The pool we're talking about is

3    500 were given a conditional offer.  The offer was withdrawn

4    after a criminal record check.  That's the neutral policy

5    you're complaining about.  And I'm saying of those 500, 245

6    were Caucasian, 255 were African-American.

7            Is that disparate -- I'm just asking -- is that

8    disparate impact because 5 more were affected?

9            **MR. McNERNEY:**  Well, at this stage we're talking

10   about who was given a conditional offer.  So then it depends

11   on how many of those people in each racial group then was

12   denied because of their criminal record.  And if a

13   statistically significant number of the African-Americans --

14           **THE COURT:**  Well, how would I -- if we were at

15   trial, how would I -- it would be in front of me -- how would

16   I determine what's statistically significant?  I'm asking you

17   if it was 250 and 250 that were denied -- remember what I'm

18   saying?

19           **MR. McNERNEY:**  Yes.

20           **THE COURT:**  The policy is 500.  500 people were

21   offered positions across the board to NTT, janitors, techs,

22   whatever, and they were offered positions.  Each of those 500

23   we said we need to do a record check.  Record check was done

24   on each of those 500.  The record check revealed that, with

25   respect to those 500, each had some type of criminal

Mandala, et al v. NTT Data, Inc. – 18-CV-6591

1    conviction, felony, misdemeanor, whatever and on each of

2    those 500 offers, the offer was withdrawn.  245 are

3    Caucasian, 255 are African-American.  That's what you proved

4    to me at trial.  We're now at summation.  Now, you're going

5    to argue that that's a disparate impact?

6           **MR. McNERNEY:**  Well, with the caveat, your Honor,

7    that depending on the state -- some states you can run the

8    background check before the conditional offer and, so, there

9    may be a larger pool.  It may not just be individuals who

10   were conditionally offered employment and then have it

11   revoked.  They may have screened out individuals because of

12   their criminal records before that point.  But with that

13   caveat --

14          **THE COURT:**  Right.

15          **MR. McNERNEY:**  -- to the extent you're saying that

16   more African-Americans were screened out by this policy, then

17   that potentially could state a disparate impact claim.

18          **THE COURT:**  10 more were screened out because of

19   this policy, that would be a disparate impact claim?

20          **MR. McNERNEY:**  Well, your Honor, I'm not able to

21   do -- tell you right now whether that's a statistically

22   significant number.  We have an expert to do that.  We have

23   methodology.  This would be a Daubert question as to whether

24   that methodology --

25          **THE COURT:**  Well, what if it was 250 and 250?

Mandala, et al v. NTT Data, Inc. – 18-CV-6591

1    **MR. McNERNEY:**  The same amount were screened out?

2    **THE COURT:**  Then you lose, right?  Or would you

3    argue that it should be less because then we go back and

4    argue that, no, 75 percent of the population or 25 percent of

5    the population or 30, whatever it is, were African-American?

6    Or is it because it's the same number?

7    **MR. McNERNEY:**  Well, your Honor, it still depends

8    on, like, the percentage of the applicant pool that is white

9    and black.  That is sort of the first point that then you're

10   comparing the amount of people then screened out and whether

11   the people being screened out that are African-American is a

12   higher percentage than, than their portion of the applicant

13   pool.

14   **THE COURT:**  Okay.  When you say the applicant pool,

15   we're not talking about the applicant pool because the

16   applicant pool may include people who aren't qualified for

17   the positions, right?

18   **MR. McNERNEY:**  Well --

19   **THE COURT:**  I applied for the job.  I don't get it

20   because I don't have a qualification and I didn't get turned

21   down -- you're talking about you have to be turned down for

22   the job because of your criminal record, isn't that what

23   we're talking about?

24   **MR. McNERNEY:**  Well, the pool, your Honor, is

25   broader than this because it also includes the individuals

Mandala, et al v. NTT Data, Inc. – 18–CV–6591

1   who were given the job, right, who are not screened out

2   because of this policy?

3        **THE COURT:**  I understand that.  You're saying the

4   pool includes –– but the reason you didn't get the job, the

5   reason that the offer was withdrawn is because you had a

6   criminal record.

7        **MR. McNERNEY:**  Right and so ––

8        **THE COURT:**  That's the pool you're talking about.

9        **MR. McNERNEY:**  Well, your Honor, like –– let's take

10  a total applicant pool of maybe 1,000 applicants or, as you

11  said, 500, a certain percentage of those are going to get the

12  job, right, you know, that's –– that's also relevant to the

13  analysis to the extent that those are white people who are

14  getting the job because they're less likely to get a criminal

15  record than African-Americans.  And so we also have to

16  consider those people, too.

17       **THE COURT:**  I'm not following this because, to me,

18  your argument is this:  You get by the complaint.  Now we're

19  at trial.  You're trying to show me that, listen, this policy

20  that NTT has of whether it's offering people jobs and then

21  getting a record check in states that don't allow you to do

22  the record check until the job is offered apparently or

23  whether it's refusing them in the first instance and not

24  making any offer on record checks, that's the policy we're

25  concerned about.

Mandala, et al v. NTT Data, Inc. – 18-CV-6591

1    So what I'm giving you is, okay, you go through

2  your discovery and across the nation you determine that you'd

3  have to look at a comparison.  So you look at, all right,

4  there were an equal number of Caucasians who were denied jobs

5  who were -- offers were withdrawn and there was an equal

6  number of -- I mean, I'm trying to figure out what is your

7  pool?  I mean your pool is people who were denied a job

8  because of a criminal record, isn't that what you're looking

9  at?

10    **MR. McNERNEY:**  No, the pool would be, your Honor,

11  using this model is all applicants given a conditional offer

12  of employment and then the question we'd be looking at is who

13  was hired and who was being screened out because of their

14  criminal records and what are their races and are more

15  African-Americans being screened out disproportionately.

16    **THE COURT:**  Right.  And that's where we started.

17    **MR. McNERNEY:**  Yeah.

18    **THE COURT:**  First of all, you said it's not just

19  people who were given conditional offers.  You told me that

20  the pool also includes people who were never given offers in

21  the first place because the record check was done before the

22  conditional offer.

23    **MR. McNERNEY:**  Well, that's one possibility, your

24  Honor, that we'd need discovery on.

25    **THE COURT:**  But the bottom line is, what I'm saying

Mandala, et al v. NTT Data, Inc. – 18-CV-6591

1 is you identify -- if you went through discovery, you would

2 have to identify who didn't get jobs because of a criminal

3 record, fair statement?

4       **MR. McNERNEY:**  Yes, and that's something that --

5       **THE COURT:**  And then you'd have to see, okay, of

6 those people who didn't get jobs because of a criminal

7 record, how many were Caucasian, correct, how many were

8 African-American?

9       **MR. McNERNEY:**  Yes, your Honor.

10      **THE COURT:**  And then you'd have to say, okay, this

11 policy had a disparate impact on African-Americans because a

12 higher percentage of African-Americans didn't get the jobs

13 than Caucasians, isn't that right?

14      **MR. McNERNEY:**  Yes, your Honor.

15      **THE COURT:**  Isn't that how you have to prevail?

16      **MR. McNERNEY:**  That's correct, your Honor.

17      **THE COURT:**  And you're telling me that to determine

18 whether -- to prevail, you have to show that it's

19 statistically significant and you'd have to get some expert

20 who I'd have to have a Daubert hearing to determine, okay,

21 you're qualified, this isn't junk science, I'm going to let

22 you testify and you can tell me that.

23       So, if one more African-American didn't get the job

24 than a Caucasian, that's statistically significant -- I'm not

25 suggesting you'd say that -- but that could be the opinion.

Mandala, et al v. NTT Data, Inc. - 18-CV-6591

1   And I'd have to decide whether there was this disparate

2   impact, whether more African-Americans than Caucasians didn't

3   get the job because of a criminal record and if that was the

4   case, whether that I determine that's statistically

5   significant --

6           **MR. McNERNEY:**  Yes.

7           **THE COURT:**  -- is that how it would go?

8           **MR. McNERNEY:**  Your Honor, I would just note that

9   in these cases -- and this is the routine practice in these

10  cases -- defendants would also be putting on a competing

11  expert.

12          **THE COURT:**  Right.

13          **MR. McNERNEY:**  So you'd have the benefit of two

14  separate experts.

15          **THE COURT:**  Or they'd put on an expert to say, you

16  know what, somehow this policy has this business-related

17  reason, right?

18          **MR. McNERNEY:**  Right.  That's the next, the second

19  inquiry after the disparate impact inquiry.

20          **THE COURT:**  It's interesting.  Mr. Pedersen just

21  read some study that said people who have licenses, who drive

22  with a license are more likely to be on time at work than

23  people who have, like, suspended licenses.  So, if you were

24  here saying that this policy of the widget company to only

25  hire people who have valid licenses disparately impacts an

Mandala, et al v. NTT Data, Inc. – 18-CV-6591

1  identifiable protected group, then the widget company could

2  come back and say, well, yeah, we do it for a legitimate

3  business reason because statistics show, studies show that

4  people with licenses get to work on time.  Would that --

5          **MR. McNERNEY:**  Right, your Honor.  And that's the

6  cross check on the disparate impact analysis, that it has to

7  be, the policy in question, defendants can then show it's

8  job-related and consistent with business necessity.  We don't

9  believe that this policy will show it to be.

10         **THE COURT:**  No.  And no one's made that argument.

11 Whether they would or not, I have no idea but we're not at

12 that stage.  I understand the issues.

13         Put it back simply.  I come back to where I

14 started.  You maintain that what you pled is enough, even I

15 think at least in your memorandum without the statistics,

16 you're claiming that what you pled is enough, that the policy

17 disparately impacts on African-Americans.

18         And I understand the defense position.

19         We'll issue a written decision.

20         Thank you, Counsel.

21         **MS. PIZZUTELLI:**  Thank you, your Honor.

22         **MR. McNERNEY:**  Thank you, your Honor.

23         (**WHEREUPON**, proceedings were adjourned.)

24

25

Mandala, et al v. NTT Data, Inc. – 18-CV-6591

1

2                          *           *           *

3                    **CERTIFICATE OF REPORTER**

4

5          In accordance with 28, U.S.C., 753(b), I

6    certify that these original notes are a true and correct

7    record of proceedings in the United States District Court

8    of the Western District of New York before the

9    Honorable Charles J. Siragusa on June 27, 2018.

10

11

12   S/ Diane S. Martens

13   Diane S. Martens, FCRR, RPR
     Official Court Reporter

14

15

16

17

18

19

20

21

22

23

24

25