# EXHIBIT 2

# EXHIBIT 2

# United States Court of Appeals
# For the Second Circuit

August Term 2019

Argued: March 9, 2020
Decided: September 21, 2020

No. 19-2308

GEORGE MANDALA, CHARLES BARNETT
INDIVIDUALLY AND ON BEHALF OF ALL
OTHERS SIMILARLY SITUATED,

*Plaintiffs-Appellants*,

*v.*

NTT DATA, INC.,

*Defendant-Appellee.*

Appeal from the United States District Court
for the Western District of New York
No. 18-cv-6591, Charles J. Siragusa, *Judge*.

Before:      CHIN, SULLIVAN, AND NARDINI, *Circuit Judges*.

Plaintiffs are African-American men who were hired at a technology services provider before their offers of employment were revoked because of past criminal convictions. Citing national statistics showing that African Americans are arrested and incarcerated at higher rates than whites relative to their share of the national population, Plaintiffs brought a Title VII disparate impact class action

against their would-be employer.  The district court (Siragusa, *J.*) dismissed the complaint for failure to state a claim.  We agree with that decision.  While national statistics may be used to advance a disparate impact claim if there is reason to believe that the general population is representative of the qualified applicant pool subject to the challenged policy, Plaintiffs' complaint suggests that the jobs they applied for required substantial educational and technical credentials, and Plaintiffs have provided no basis on which to presume that their proffered statistics are representative of the applicant pool in question.  Since Plaintiffs have provided no other allegations to demonstrate that the challenged hiring policy has a disparate impact on African Americans, we AFFIRM the district court's judgment.

AFFIRMED.

Judge Chin dissents in a separate opinion.

> RACHEL BIEN, Outten & Golden LLP, Los Angeles, CA; Ossai Miazad, Lewis M. Steel, Christopher M. McNerney, Elizabeth V. Stork, *on the brief*, Outten & Golden LLP, New York, NY; RACHEL M. KLEINMAN (Sherrilyn A. Ifill, Janai S. Nelson, Samuel Spital, *on the brief*), NAACP Legal Defense & Education Fund, Inc., New York, NY; Catherine Meza, *on the brief*, NAACP Legal Defense & Education Fund, Inc., Washington, DC, *for Plaintiffs-Appellants*.

> JESSICA F. PIZZUTELLI (Jacqueline Phipps Polito, *on the brief*), Littler Mendelson P.C., New York, NY, *for Defendant-Appellee*.

R<span>ICHARD</span> J. S<span>ULLIVAN</span>, *Circuit Judge*:

Facts are stubborn things, but statistics are pliable. As Mark Twain's saying suggests, though statistics are often a helpful tool, they must be consulted cautiously. This lawsuit provides a case study as to why that is.

Plaintiffs George Mandala and Charles Barnett have brought a Title VII disparate impact class action against Defendant NTT Data, Inc., arguing that the company's alleged policy not to hire persons with certain criminal convictions has a disproportionately large effect on African-American applicants. To support that assertion, Plaintiffs rely on national statistics showing that, on average, African Americans are more likely to be arrested and incarcerated than whites. But the fact that such a disparity exists among the general population does not automatically mean that it exists among the pool of applicants qualified for the jobs in question – what is true of the whole is not necessarily true of its parts. In fact, because the complaint indicates that the positions that Plaintiffs applied for require certain educational and technical credentials, there is good reason to think that these national statistics are *not* representative of the qualified applicant pool.

Consequently, Plaintiffs have set forth no allegations plausibly suggesting that the company's hiring policy has a disparate impact on African Americans

within the relevant hiring pool.  We therefore AFFIRM the judgment of the district

court (Siragusa, *J.*) dismissing the complaint.

## I.    Background

In early 2017, George Mandala applied for a position as a Salesforce

Developer at NTT Data, Inc., a global information technology services provider.[1]

Impressed by his work experience and his answers to various "technical

questions" during the interview process, Compl. ¶ 24, NTT offered Mandala a job

as an "Application Software Development Senior Principal Consultant," *id.* ¶ 27.

But upon conducting a routine background check, the company discovered that

Mandala had been convicted of a felony and quickly withdrew its offer of

employment.  When a member of NTT's recruitment team broke the news to

Mandala, she indicated that "NTT had a policy not to hire persons with felonies

on their records."  *Id.* ¶ 33.

Charles Barnett had a similar experience.  NTT reached out to him in

July 2017 about a "web developer" position on a project for the Kentucky

Department of Education.  *Id.* ¶ 38.  On paper, Barnett appeared to be a strong

---

[1] Because this appeal involves review at the motion to dismiss stage, we draw these facts from
the allegations in the Plaintiffs' complaint, J. App'x at 7–30 ("Compl."), which we accept as true,
and the documents incorporated by reference therein.  *See Littlejohn v. City of New York*, 795 F.3d
297, 303 n.1 (2d Cir. 2015).

4

candidate: he had relevant work experience, a "Masters of Science in Computer Science Technology[,] and an Associate degree in Applied Science/Computer Programming." *Id.* ¶ 50. And after a few rounds of interviews, NTT offered him the job. But the company pulled that offer once it learned that Barnett had been convicted of several felonies. Though Barnett asked NTT to consider hiring him for other positions, he was informed that he was ineligible "because of his felony convictions." *Id.* ¶ 48.

So, in August 2018, Mandala and Barnett filed a putative class action complaint against NTT, alleging that the company's hiring practices violate Title VII of the Civil Rights Act of 1964, as well as several New York State anti-discrimination laws. Specifically, they assert that NTT has a policy not to hire "individuals with certain criminal convictions including felonies (or similar criminal classifications)," *id.* ¶ 4, which Plaintiffs say is unlawful because it invariably disqualifies a disproportionate number of African-American applicants.

To support this assertion, Plaintiffs point to numerous studies showing that "African Americans are arrested and incarcerated for crimes at higher rates than [w]hites, relative to their share of the national population." *Id.* ¶ 52. This disparity

5

is compounded, they say, by evidence suggesting that employers place additional weight on criminal history when an applicant is African American as opposed to white. Notably, however, the complaint contains no allegations about racial disparities in NTT's existing workforce or the demographics of qualified applicants that NTT has rejected as a result of its hiring policy. It also fails to identify the precise contours of the policy itself – Plaintiffs equivocate as to whether the policy covers any prior criminal conviction or only felony convictions.

A little less than a year after it was filed, the district court dismissed the complaint for failure to state a claim. *See Mandala v. NTT Data, Inc.*, No. 18-cv-6591 (CJS), 2019 WL 3237361 (W.D.N.Y. July 18, 2019). The court concluded that the national statistics on which Plaintiffs rely are "inadequate to show a relationship between the pool of [NTT] applicants who are Caucasian versus African Americans and their respective rates of felony convictions." *Id.* at *4. And without any remaining federal claims, the district court refused to exercise supplemental jurisdiction over Plaintiffs' state law claims and dismissed their complaint in its entirety. *Id.*

6

Plaintiffs now appeal that decision, arguing that the district court imposed an improperly high pleading standard, and that national arrest and conviction statistics are more than sufficient to state a plausible claim for relief under Title VII.

## II.    Standard of Review

We review *de novo* a district court's decision to dismiss a complaint under Federal Rule of Civil Procedure 12(b)(6). *Littlejohn*, 795 F.3d at 306. A complaint will survive a motion to dismiss so long as it "contain[s] sufficient factual matter . . . to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation marks omitted). In making that assessment, we accept the plaintiff's factual allegations as true and draw all reasonable inferences in her favor. *Menaker v. Hofstra Univ.*, 935 F.3d 20, 30 (2d Cir. 2019).

But while this plausibility pleading standard is forgiving, it is not toothless. It does not require us to credit "legal conclusion[s] couched as . . . factual allegation[s]" or "naked assertions devoid of further factual enhancement." *Iqbal*, 556 U.S. at 678 (internal quotation marks and brackets omitted). Nor are allegations that are "merely consistent with" liability enough to defeat a motion to dismiss. *Id.* (internal quotation marks omitted). Lastly, it bears mentioning that "we are free to affirm a decision [dismissing a complaint] on any grounds

7

supported in the record, even if it is not one on which the trial court relied." *Thyroff v. Nationwide Mut. Ins. Co.*, 460 F.3d 400, 405 (2d Cir. 2006).

## III.    Discussion

### A.    The Elements of a Title VII Disparate Impact Claim

Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, as amended, prevents employers from discriminating against employees or job applicants based on race, color, religion, sex, or national origin.   As originally enacted, "Title VII's principal nondiscrimination provision held employers liable only for" intentional discrimination (known as "disparate treatment").  *Ricci v. DeStefano*, 557 U.S. 557, 577 (2009).   But in *Griggs v. Duke Power Co.*, the Supreme Court construed the statute to prohibit "not only overt discrimination but also practices that are fair in form, but discriminatory in operation" – that is, practices that have a "disparate impact."  401 U.S. 424, 431 (1971).  *Griggs* thus read Title VII to focus on "the consequences of employment practices, not simply the motivation" behind them.[2]  *Id.* at 432; s*ee also M.O.C.H.A. Soc'y, Inc. v. City of Buffalo*, 689 F.3d 263, 273 (2d Cir. 2012); *Gulino v. N.Y. State Educ. Dep't,* 460 F.3d 361, 382 (2d Cir. 2006).

---

[2] This interpretation was later codified in the Civil Rights Act of 1991, which includes a provision expressly prohibiting disparate impact discrimination.  *See Ricci*, 557 U.S. at 578 (citing 42 U.S.C. § 2000e–2(k)(1)(A)(i)).

Pursuing a disparate impact claim is often a complicated endeavor.  Such claims "follow a three-part analysis involving shifting evidentiary burdens." *Gulino*, 460 F.3d at 382 (citing 42 U.S.C. § 2000e–2(k)(1)).  The plaintiff "bears the initial burden of [making] a prima facie showing of disparate impact."  *Id.*  This requires the plaintiff to "(1) identify a specific employment practice or policy; (2) demonstrate that a disparity exists; and (3) establish a causal relationship between the two."  *Chin v. Port Auth. of N.Y. & N.J.*, 685 F.3d 135, 151 (2d Cir. 2012) (internal quotation marks and citations omitted).  Unlike a disparate treatment claim, however, a disparate impact claim does not require the plaintiff to show that the defendant *intended* to discriminate against a particular group.  *See Ricci*, 557 U.S. at 577–78; *M.O.C.H.A.*, 689 F.3d at 273; *see also Chaidez v. Ford Motor Co.*, 937 F.3d 998, 1006–07 (7th Cir. 2019).

Once that *prima facie* showing is made, "the defendant has two avenues of rebuttal."  *Gulino*, 460 F.3d at 382.  One approach is to undermine the plaintiff's disparate impact or causal analysis.  *Id.*; *see also Watson v. Fort Worth Bank & Tr.*, 487 U.S. 977, 996 (1988).  If the defendant is successful in doing so, that ends the matter.  Alternatively, the defendant can concede that the identified policy has a disparate impact, but nevertheless defend it as "job related for the position in

9

question and consistent with business necessity." *Ricci*, 557 U.S. at 578 (quoting

42 U.S.C. § 2000e–2(k)(1)(A)(i)); *see also Gulino*, 460 F.3d at 382.

Should the defendant succeed in demonstrating the business necessity of

the challenged policy, the burden then shifts back to the plaintiff, who has one last

chance to prove her case. Namely, she must show that other methods exist to

further the defendant's legitimate business interest "without a similarly

undesirable racial effect." *M.O.C.H.A.*, 689 F.3d at 274 (quoting *Watson*, 487 U.S.

at 998); *see Gulino*, 460 F.3d at 382.

## B.    The Applicable Pleading Standard

Over the years, this three-step analysis has caused confusion about the

pleading standard applicable to disparate impact claims. Are plaintiffs required

to plead a *prima facie* case, or is the standard something lower? And if something

lower, what is that lower threshold?

The Supreme Court appeared to put this issue to rest in *Swierkiewicz v.

Sorema N.A.*, when it clarified that *prima facie* sufficiency is "an evidentiary

standard, not a pleading requirement." 534 U.S. 506, 510 (2002). The Court went

on to explain that to survive a motion to dismiss, a Title VII complaint must

contain only enough facts to give the defendant fair notice of the claim and the

grounds upon which that claim rests. *Id.* at 512–14. And while *Swierkiewicz*

10

employed the *McDonnell Douglas* burden shifting framework developed for disparate treatment claims, *id.* at 510 (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)), its analysis nonetheless helped inform disparate impact cases. After all, both types of discrimination claims use multi-part analyses that require the plaintiff to put forward a *prima facie* case of discrimination.

But only seven years later, the Supreme Court cast doubt on *Swierkiewicz*'s vitality. In *Ashcroft v. Iqbal*, it held that mere notice pleading – the pleading standard underlying *Swierkiewicz*'s analysis – was inadequate, and that "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." 556 U.S. at 678 (internal quotation marks omitted). Unsurprisingly, litigants were anxious to know what *Iqbal* meant for Title VII cases.

Over a series of opinions, we clarified that *Iqbal* does not require a plaintiff to plead a *prima facie* case. Instead, it simply requires a plaintiff to "assert [enough] nonconclusory factual matter . . . to nudge [her] claim[] across the line from conceivable to plausible to proceed." *See EEOC v. Port Auth. of N.Y. & N.J.*, 768 F.3d 247, 254 (2d Cir. 2014) (internal quotation marks and alterations omitted); *see also Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 84 (2d Cir. 2015); *Littlejohn,*

11

795 F.3d at 311; *cf. NAACP v. Merrill*, 939 F.3d 470, 477 (2d Cir. 2019) (recognizing that *prima facie* "is an evidentiary standard, not a pleading requirement" (internal quotation marks omitted)).  And while many of those cases were again decided against the backdrop of the *McDonnell Douglas* framework, their reasoning is not limited to that context.  *Compare Vega*, 801 F.3d at 84 ("[I]f *Swierkiewicz* survives for Equal Pay Act cases it surely survives for Title VII cases."), *with Littlejohn*, 795 F.3d at 309 n.7 (acknowledging that "the Equal Pay Act does not fall under the burden-shifting framework of *McDonnell Douglas*").  In simple terms, then, this means that although a plaintiff need not plead a *prima facie* case, she must at least set forth enough factual allegations to plausibly support each of the three basic elements of a disparate impact claim. *See Adams v. City of Indianapolis*, 742 F.3d 720, 728, 733 (7th Cir. 2014).[3]

---

[3] The standard for pleading a disparate treatment claim is slightly different – all that a plaintiff need set forth to plausibly plead that her employer intended to discriminate against her (one of the basic elements of such a claim) are enough facts to "provide at least minimal support for the proposition that the employer was motivated by discriminatory intent." *Vega*, 801 F.3d at 86–87 (internal quotation marks omitted); *see also Menaker*, 935 F.3d at 30–31 (acknowledging that "minimal support for an inference of discriminatory intent" falls below the typical threshold required to satisfy the *Iqbal*-pleading standard).  The dissent appears to argue that we should import this "minimal support" standard into the disparate impact context.  Dissent at 6 ("While *Vega* and *Littlejohn* were disparate treatment cases, their reasoning applies here:  Mandala and Barnett had the 'minimal burden' of alleging facts 'suggesting' an 'inference' of a disparate impact based on race . . . .").  We disagree.  The purpose behind requiring only minimal support for an inference of discrimination at the pleading stage in a disparate treatment case is that the plaintiff must plausibly allege *intentional* discrimination, which "implicate[s] an employer's usually

## C. The Role of Statistics in Pleading a Disparate Impact Claim

To nudge a disparate impact claim across the line from conceivable to plausible – and, indeed, to ultimately prove such a claim – plaintiffs typically rely on statistical evidence to show a disparity in outcome between groups. *See Watson*, 487 U.S. at 987; *M.O.C.H.A.*, 689 F.3d at 273; *Malave v. Potter*, 320 F.3d 321, 325 (2d Cir. 2003). But not just any statistical assessment will do.

At the *prima facie* stage, a plaintiff's statistical analysis "must [demonstrate] that the disparity is substantial or significant, and must be of a kind and degree sufficient to reveal a causal relationship between the challenged practice and the disparity." *Chin*, 685 F.3d at 151 (internal quotation marks omitted); *see also Malave*, 320 F.3d at 325–26; *Brown v. Coach Stores, Inc.*, 163 F.3d 706, 712–13 (2d Cir. 1998). Naturally, that standard is relaxed at the pleading stage. For one thing,

---

unstated intent and state of mind." *Vega*, 801 F.3d at 86; *id.* (acknowledging that "rarely is there 'direct, smoking gun, evidence of [intentional] discrimination'" (internal citation omitted)). Because of the "elusive" nature of such unspoken motivations, it is perhaps understandable why minimal support can nonetheless render a plaintiff's allegations plausible. *Id.* (internal quotation marks omitted). But disparate impact claims are different. There is no need for a plaintiff to demonstrate motive or intent. *See M.O.C.H.A.*, 689 F.3d at 273. And as a result, there is no reason to hold that minimal support is all that it takes to render such a claim plausible. Rather, like any other claim, a disparate impact claim must be supported by allegations that "allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged" – allegations "that are merely consistent with a defendant's liability" won't do. *Iqbal*, 556 U.S. at 678 (internal quotation marks omitted). This is all somewhat academic, however, because even if we agreed with the dissent that a disparate impact claim is rendered plausible by mere "minimal support," we do not believe that Plaintiffs' complaint satisfies even that standard.

13

we do not require a plaintiff to prove in detail the methodological soundness of her statistical assessment to survive a motion to dismiss. *See John v. Whole Foods Mkt. Gr., Inc.*, 858 F.3d 732, 737 (2d Cir. 2017). For another, we do not expect a complaint to supplement its statistical analysis with corroborating evidence. *Cf. Littlejohn*, 795 F.3d at 311; *Malave*, 320 F.3d at 326. But even at this early juncture, the statistics must plausibly suggest that the challenged practice *actually* has a disparate impact. *See Adams*, 742 F.3d at 733 (noting that while "basic" "statistical methods and comparisons" can be enough for a Title VII complaint to survive a motion to dismiss, those statistics must still "move the disparate-impact claims over the plausibility threshold").

This means that the statistical analysis must, at the very least, focus on the disparity between appropriate comparator groups. *See Wards Cove Packing Co. v. Atonio*, 490 U.S. 642, 651 (1989) ("Measuring alleged discrimination in the selection of accountants, managers, boat captains, electricians, doctors, and engineers . . . by comparing the number of nonwhites occupying these [skilled] jobs to the number of nonwhites filling [unskilled] cannery worker positions is nonsensical."), *superseded by statute on other grounds*, 42 U.S.C. § 2000e–2(k), *as recognized in Tex. Dep't of Hous. & Cmty. Affs. v. Inclusive Cmtys. Project, Inc.*, 576 U.S. 519 (2015). In

other words, the statistical analysis must reveal disparities between populations that are relevant to the claim the plaintiff seeks to prove. *See Smith v. Xerox Corp.*, 196 F.3d 358, 368 (2d Cir. 1999), *overruled on other grounds by Meacham v. Knolls Atomic Power Lab.*, 461 F.3d 134 (2d Cir. 2006). For instance, it would make little sense to judge a hospital's physician-hiring policies by looking at the effect those policies have on a population of high school graduates; most members of that group will be ineligible for the job, irrespective of the challenged policy, because they lack a medical degree.

In a typical case concerning racially discriminatory hiring policies, the relevant comparison is between "the racial composition of the at-issue jobs and the racial composition of the qualified population in the relevant labor market."[4] *Wards Cove Packing*, 490 U.S. at 650 (internal alterations and quotation marks omitted); *see also Smith*, 196 F.3d at 368. Unfortunately, such figures are not always available, particularly before discovery. So we often allow plaintiffs to rely on other statistics that do not "conform to the *preferred* methodology" so long as they

---

[4] "[A] statistical showing of disparate impact need not, and in [certain] instances . . . should not, be premised on an analysis of the characteristics of *actual* applicants" because would-be applicants might refrain from applying for a position because of a "self-recognized inability . . . to meet the very standards challenged as being discriminatory." *EEOC v. Joint Apprenticeship Comm. of Joint Indus. Bd. Elec. of Indus.*, 186 F.3d 110, 119–20 (2d Cir. 1999) (emphasis added).

15

are probable of whether the challenged policy has a disparate impact on the qualified labor pool in question. *Malave*, 320 F.3d at 326; *see also Wards Cove Packing*, 490 U.S. at 651 (holding that "in cases where [the precise] labor market statistics [are] difficult if not impossible to ascertain, . . . [plaintiffs may rely on] certain other statistics . . . [so long as they] are equally probative").

One possible substitute is "figures for the general population." *Wards Cove Packing*, 490 U.S. at 651 n.6 (internal quotation marks omitted); *see also Joint Apprenticeship Comm.*, 186 F.3d at 119. But such national figures will not always be a viable alternative. General population statistics are a reliable surrogate only when there is reason to think that they "accurately reflect the pool of qualified job applicants" for the position in question. *Malave*, 320 F.3d at 326 (internal quotation marks omitted); *see also Dothard v. Rawlinson*, 433 U.S. 321, 330 (1977); *EEOC v. Freeman*, 961 F. Supp. 2d 783, 798 (D. Md. 2013) ("To use general population statistics to create an inference of disparate impact, the general populace must be representative of the relevant applicant pool."), *aff'd*, 778 F.3d 463 (4th Cir. 2015). Otherwise, relying on them to show a disparate impact is a bit like relying on apples to study oranges.

D.      **Plaintiffs Have Failed to State a Claim**

Plaintiffs allege that NTT has a "policy and practice of denying job opportunities to individuals with certain criminal convictions including felonies (or similar criminal classifications)."[5]  Compl. ¶ 4.  This policy has a disparate impact on qualified African-American applicants, Plaintiffs say, because "African Americans are arrested and incarcerated for crimes at higher rates than [w]hites, relative to their share of the national population."  *Id.* ¶ 52.  But while this reasoning is facially appealing, it ultimately succumbs to a fatal flaw.

Plaintiffs provide no allegations to demonstrate that national arrest or incarceration statistics are in any way representative of the pool of potential applicants qualified for a position at NTT.  All Plaintiffs offer is the conclusory and unsupported assertion that these figures are so stark that they must hold true for this (or any) segment of the population.  But that is not a plausible – or, for that matter, logical – inference.

---

[5] There is some dispute as to the nature of the hiring policy that Plaintiffs challenge.  According to NTT, Plaintiffs have pleaded facts showing only that the company does not hire convicted felons.  Plaintiffs disagree, arguing that they have set forth allegations demonstrating that NTT's policy covers convictions beyond just felonies.  We need not resolve this dispute because the precise contours of the alleged policy do not affect our analysis.

Plaintiffs' analysis fails to distinguish between group averages and total averages. To put it more plainly, it is error for Plaintiffs to simply presume that population-level statistics will accurately describe subgroups of that population. *See Jones v. City of Lubbock*, 730 F.2d 233, 235–36 (5th Cir. 1984) (Higginbotham, *J.*, concurring) (criticizing the assumption that a subgroup is necessarily a "microcosm" of the broader population); *Daye v. Cmty. Fin. Serv. Ctrs., LLC*, 233 F. Supp. 3d 946, 1017 (D.N.M. 2017) (warning that the assumption "that what is true for the whole is true for a subset of the whole . . . can be dramatically wrong").

The danger behind this presumption becomes even more pronounced when there is reason to think that some characteristic unique to the subgroup is related to the statistic in question – in other words, when a confounding variable exists. A simple example of this pitfall would be to apply national height averages to certain subgroups of the population, say NBA players or horse-racing jockeys.

Here, Plaintiffs have offered no allegations to suggest that the general population statistics on which they rely "might accurately reflect [NTT's] pool of qualified job applicants." *Malave*, 320 F.3d at 326 (internal quotation marks and alterations omitted). And while that alone is fatal to their claim, the trouble does not end there.

18

Plaintiffs' claim concerns hiring policies governing what Plaintiffs allege to be skilled positions. Indeed, the positions' titles alone – Salesforce Developer and web developer – reflect that they require at least some educational or technical experience that is not shared by the general population, and the complaint takes great pains to highlight Plaintiffs' qualifications, plainly indicating that those qualifications are relevant to the jobs at the heart of this dispute. And it is beyond cavil that "[w]hen special qualifications are required to fill particular jobs, comparisons to the general population (rather than to the smaller group of individuals who possess the necessary qualifications) may have little probative value." *Hazelwood Sch. Dist. v. United States*, 433 U.S. 299, 308 n.13 (1977); *see also City of Richmond v. J.A. Croson Co.*, 488 U.S. 469, 501–02 (1989) (same); *Burgis v. N.Y.C. Dep't of Sanitations*, 798 F.3d 63, 70 n.7 (2d Cir. 2015) (same).

We therefore see no basis for using national statistics as a proxy for the qualified applicant pools for the developer positions at issue here. After all, it is not much of a stretch to imagine that arrest and conviction rates are negatively correlated with education (at least to some degree). So while Plaintiffs' statistics show that African Americans are on average more likely to have been convicted of a crime than whites, that does not, without more, make it plausible that an

African-American web developer with the educational and technical
qualifications to work at NTT is more likely to have been convicted of a crime than
his Caucasian counterpart.[6]

What, then, are Plaintiffs to do at the pleading stage before they have access
to more granular data?  For one, they could provide additional allegations to
explain why their chosen national statistics are in fact likely to be representative
of NTT's qualified applicant pool.  *Cf. Dothard*, 433 U.S. at 330.  And if they are
unable to do so, they could attempt to identify other publicly available information
that could plausibly support a Title VII claim here.

Of course, we are sensitive to the fact that Plaintiffs are undoubtedly
working from an informational disadvantage at this early point in the
proceedings.  But that does not mean that they are free to rely on conclusory
statistical inferences to force their way into discovery.

---

[6] While Plaintiffs note that they "seek to represent a nationwide class of NTT applicants, covering
a broad range of positions," not just Salesforce Developer and web developer applicants, Pls.' Br.
at 27, that does not solve Plaintiffs' problem.  Setting aside the fact that no class has yet been
certified, the complaint's allegations are limited to Salesforce Developer and web developer
positions.  So we have no idea what other positions NTT offers, what the qualifications for those
positions might be, or even whether NTT applies the same alleged hiring policy to them.  All we
are told is that NTT allegedly does not hire Salesforce Developers or web developers who have
been convicted of certain crimes.

In short, if a Title VII plaintiff intends to rely on national statistics to plead a disparate impact claim, she must explain why those statistics can plausibly be expected to hold true for the qualified applicant pool in question.  And while we cannot provide a bright line rule for how to make such a showing, the statistics must at least be able to support the plaintiff's claim without resorting to a statistical fallacy.[7]

## IV.    Conclusion

For the reasons set forth above, we **AFFIRM** the district court's judgment.

---

[7] As the district court properly dismissed the sole federal claim, and because neither judicial economy nor principles of fairness would be advanced by keeping this case before the district court, we see no error with the district court's decision to decline supplemental jurisdiction over Plaintiffs' remaining state law claims.  *See Delaney v. Bank of Am. Corp.*, 766 F.3d 163, 170 (2d Cir. 2014); *Valencia ex rel. Franco v. Lee*, 316 F.3d 299, 306 (2d Cir. 2003).

**United States Court of Appeals for the Second Circuit**
**Thurgood Marshall U.S. Courthouse**
**40 Foley Square**
**New York, NY 10007**

**DEBRA ANN LIVINGSTON**
CHIEF JUDGE

Date: September 21, 2020
Docket #: 19-2308cv
Short Title: Mandala v. NTT Data, Inc.

**CATHERINE O'HAGAN WOLFE**
CLERK OF COURT

DC Docket #: 18-cv-6591
DC Court: WDNY
(ROCHESTER)
DC Judge: Siragusa

**BILL OF COSTS INSTRUCTIONS**

The requirements for filing a bill of costs are set forth in FRAP 39. A form for filing a bill of costs is on the Court's website.

The bill of costs must:
* be filed within 14 days after the entry of judgment;
* be verified;
* be served on all adversaries;
* not include charges for postage, delivery, service, overtime and the filers edits;
* identify the number of copies which comprise the printer's unit;
* include the printer's bills, which must state the minimum charge per printer's unit for a page, a cover, foot lines by the line, and an index and table of cases by the page;
* state only the number of necessary copies inserted in enclosed form;
* state actual costs at rates not higher than those generally charged for printing services in New York, New York; excessive charges are subject to reduction;
* be filed via CM/ECF or if counsel is exempted with the original and two copies.

**United States Court of Appeals for the Second Circuit**
**Thurgood Marshall U.S. Courthouse**
**40 Foley Square**
**New York, NY 10007**

**DEBRA ANN LIVINGSTON**
**CHIEF JUDGE**

Date: September 21, 2020
Docket #: 19-2308cv
Short Title: Mandala v. NTT Data, Inc.

**CATHERINE O'HAGAN WOLFE**
**CLERK OF COURT**

DC Docket #: 18-cv-6591
DC Court: WDNY
(ROCHESTER)
DC Judge: Siragusa

**VERIFIED ITEMIZED BILL OF COSTS**

Counsel for
_____

respectfully submits, pursuant to FRAP 39 (c) the within bill of costs and requests the Clerk to
prepare an itemized statement of costs taxed against the
_____

and in favor of
_____

for insertion in the mandate.

Docketing Fee        _____

Costs of printing appendix (necessary copies _____ )  _____

Costs of printing brief (necessary copies _____ ____)  _____

Costs of printing reply brief (necessary copies _____ )  _____

**(VERIFICATION HERE)**

_____
Signature