# EXHIBIT 5

# EXHIBIT 5

RICHARD J. SULLIVAN and WILLIAM J. NARDINI, *Circuit Judges*, joined by DEBRA ANN LIVINGSTON, *Chief Judge*, and JOSÉ A. CABRANES and MICHAEL H. PARK, *Circuit Judges*, concurring in the order denying rehearing *en banc*:

Unsurprisingly, we concur in the order denying rehearing *en banc* – we are, after all, the members of the majority that voted to affirm the district court's dismissal of the complaint in this matter. We add this brief concurrence only to explain our belief that the dissents misapprehend the nature and consequences of the panel majority opinion, which reflects a heartland application of the plausibility pleading standard that has been the law of this Circuit for more than a decade. Put simply, we see no reason to fear that requiring Title VII plaintiffs to allege a plausible link between their chosen statistics and the qualified labor pool for the jobs in question will fundamentally alter the existing Title VII architecture.

The thrust of the dissents' argument is that statistics concerning the general population can be used to "nudge" a disparate impact claim "across the line from conceivable to plausible" at the pleading stage. *Post*, Chin, J., dissenting from denial of rehearing *en banc*, at 6 (internal quotation marks and brackets omitted); *see also post*, Pooler, J., dissenting from denial of rehearing *en banc*, at 3. As a general proposition, we agree. *See Mandala v. NTT Data, Inc.*, 975 F.3d 202, 210–11 (2d Cir. 2020). But courts are not called on to announce general propositions; they are tasked with deciding particular cases based on specific pleadings. And the

specific pleadings here do not plausibly allege that the general population is likely to be representative of the qualified labor pool for the jobs in question. In fact, the allegations in the complaint suggest that the general population is *unlikely* to be representative of the qualified labor pool.

At the pleading stage, a Title VII disparate impact complaint must plausibly allege that (i) a specific employment practice or policy exists, (ii) a disparity exists, and (iii) there is a causal connection between the two. *Id.* at 207–09. While reference to statistics frequently satisfies this pleading burden, both caselaw and common sense make clear that not just any statistics will do. *Id.* at 209–11. After all, "statistics come in infinite variety and . . . their usefulness depends on all of the surrounding facts and circumstances." *Malave v. Potter*, 320 F.3d 321, 327 (2d Cir. 2003) (quoting *Watson v. Fort Worth Bank & Tr.*, 487 U.S. 977, 996 n.3 (1988)). In the disparate impact context, this means, among other things, that a plaintiff's chosen statistics must focus on disparities between appropriate comparator groups – that is, the individuals holding the jobs at issue and "the qualified population in the relevant labor market." *Mandala*, 975 F.3d at 210 (footnote omitted) (quoting *Wards Cove Packing Co. v. Atonio*, 490 U.S. 642, 650 (1989), *superseded by statute on other grounds*, 42 U.S.C. § 2000e–2(k)).

2

Naturally, information about these particular groups may be difficult to obtain during discovery, let alone at the pleading stage. So we often allow plaintiffs to rely on surrogate statistics to prove disparities between comparator groups that they otherwise could not measure directly. In many cases, this includes statistics for the general population. *Mandala*, 975 F.3d at 210–11; *see also Malave*, 320 F.3d at 326. But not always.

As the panel majority opinion concludes, general population statistics may be used only when there is reason to think that they will reflect the qualified labor pool for the positions in question. *See Mandala*, 975 F.3d at 211 (citing *Dothard v. Rawlinson*, 433 U.S. 321, 330 (1977); *Malave*, 320 F.3d at 326; and *EEOC v. Freeman*, 961 F. Supp. 2d 783, 798 (D. Md. 2013), *aff'd*, 778 F.3d 463 (4th Cir. 2015)); *see also Hazelwood Sch. Dist. v. United States*, 433 U.S. 299, 308 n.13 (1977) (explaining that "[w]hen special qualifications are required to fill particular jobs, comparisons to the general population . . . may have little probative value"). Not only is this rule consistent with precedent, it makes good sense. If there is no plausible link between the alleged disparate impact and the statistics that the plaintiff uses to plead his case, then those statistics are at most merely consistent with liability. And "[w]here a complaint pleads facts that are merely consistent with a

3

defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief."[1] *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation marks omitted).

Of course, as Judge Chin's dissent indicates, and as the panel majority opinion acknowledges, "at the pleading stage, a plaintiff need not prove the accuracy of a statistical study's findings or the rigor of its methodology; he need only generally allege the facts that, accepted as true, make his alleged injury plausible." *Post*, Chin, J., dissenting from denial of rehearing *en banc*, at 13–14 (brackets omitted) (quoting *John v. Whole Foods Mkt. Grp., Inc.*, 858 F.3d 732, 737 (2d Cir. 2017)); *see also Mandala*, 975 F.3d at 209–10 (citing *John*, 858 F.3d at 737). But one must be careful not to elide the distinction between testing the soundness of a statistical study, and determining whether that study and its statistics, if taken as true, make the plaintiff's claim plausible. While *John* concerns the former, 858 F.3d

---

[1] The Supreme Court's decision in *Dothard v. Rawlinson* does not counsel otherwise. To be sure, the plaintiffs in *Dothard* were permitted to rely on national height and weight data even though the defendants argued that the only relevant data was that of the Alabama-based pool of applicants for the corrections-officer position in question. 433 U.S. at 329–30; *see also post*, Chin, J., dissenting from denial of rehearing *en banc*, at 12. But that was only because "there was no reason to suppose that physical height and weight characteristics of Alabama men and women differ markedly from those of the national population." *Dothard*, 433 U.S. at 330; *see also Wards Cove Packing*, 490 U.S. at 651–52 (rejecting the plaintiffs' proffered statistics because there was no reason to believe that those statistics were representative of the qualified applicant pools for the positions in question).

4

at 737, the panel majority opinion turns on the latter. Put differently, *John* stands for the unremarkable proposition that, at the pleading stage, we accept as true the findings of statistical studies. But that does not mean that we must take as true every inference that a plaintiff asks us to draw from those findings no matter how attenuated.

In affirming the dismissal of Plaintiffs' complaint, the panel majority opinion reasoned that Plaintiffs had failed to provide any connective tissue between their proffered statistics and the qualified labor pool in question (indeed, just the opposite). The dissents assert that the panel majority opinion arrived at this conclusion by impermissibly drawing inferences *against* Plaintiffs. Not so.

To start, Judge Chin's dissent suggests that the panel majority opinion's conclusion was premature because "the applicant pool . . . has not yet been defined," *post*, Chin, J., dissenting from denial of rehearing *en banc*, at 23, and because we don't yet know whether the "Salesforce developer" and "web developer" positions at issue here require specialized training or education not shared among the general population, *id.* at 24–25.[2] But Plaintiffs' complaint says

---

[2] Judge Chin's dissent also suggests that the panel majority opinion overlooks the fact that Plaintiffs' claims apply to positions other than just Salesforce developer and web developer. *Post*, Chin, J., dissenting from denial of rehearing *en banc*, at 5, 24–25. But the complaint contains factual

5

otherwise. For one thing, "the positions' titles alone . . . reflect that they require at least some educational or technical experience that is not shared by the general population." *Mandala*, 975 F.3d at 211–12. For another, the complaint goes out of its way to highlight Plaintiffs' educational and technical credentials – including Charles Barnett's "Masters of Science in Computer Science Technology," J. App'x at 14 – which indicates that those credentials are relevant to the jobs in question. Importantly, Plaintiffs never allege that those credentials are shared by the general population.

Next, the dissents suggest that, even if the qualified labor pool in question is more educated than the general population, that does not prohibit Plaintiffs from pleading a plausible claim based only on general population statistics. *Post*, Chin, *J.*, dissenting from denial of rehearing *en banc*, at 25–26; *post*, Pooler, *J.*, dissenting from denial of rehearing *en banc*, at 3–7. Again, we disagree.

Conviction rates and educational attainment are nearly certain to be inversely correlated on an absolute basis. *See Mandala*, 975 F.3d at 212 (reasoning that "it is not much of a stretch to imagine that arrest and conviction rates are negatively correlated with education (at least to some degree)"). This is not to

---

allegations about only those two jobs; it does not identify any other positions that NTT offers. *See Mandala*, 975 F.3d at 212 n.6.

6

suggest any particular causal relationship between education and a decrease in conviction rates; there is simply a longstanding link between the two. In other words, the conviction rates for African Americans (and, for that matter, individuals of any race) will fall as we control for higher educational attainment.

This conclusion is not, as Judge Pooler's dissent suggests, "a negative inference [drawn] against the complaint that was not in the record." *Post*, Pooler, J., dissenting from denial of rehearing *en banc*, at 4. "The determination of whether a complaint states a plausible claim for relief is 'a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.'" *EEOC v. Port Auth. of N.Y. & N.J.*, 768 F.3d 247, 258 (2d Cir. 2014) (quoting *Iqbal*, 556 U.S. at 679). Here, common sense dictates that highly educated individuals can be expected to have lower conviction rates than the general population – indeed, Judge Pooler's dissent acknowledges as much. *See post*, Pooler, J., dissenting from denial of rehearing *en banc*, at 5. The panel majority opinion simply applied that understanding in considering whether the allegations in the complaint stated a plausible claim for relief. In other words, the panel majority opinion simply concluded that Plaintiffs were asking the district court to draw inferences that,

7

based on common sense, were too attenuated from the supplied statistics to be plausible.

Of course, as Judge Chin's dissent points out, that absolute conviction rates will fall as we consider more highly educated segments of the population does not mean that the *disparity* between the conviction rates for African Americans and whites will necessarily disappear. *Post*, Chin, J., dissenting from denial of rehearing *en banc*, at 26. But what it does mean is that, based on the allegations in the complaint, we have no idea what the difference between African American and white conviction rates will be once we limit our focus to highly educated individuals. And that is precisely the point. All we know is that, for highly educated individuals of any race, their conviction rates are unlikely to look like the rates for the general population. Without more, then, the disparities observed in general population statistics are merely consistent with Plaintiffs' disparate impact theory and do not make their claim plausible.[3]

---

[3] Judge Chin's dissent asserts that the panel majority opinion simply invented this "confounding variable" rationale on its own. *See post*, Chin, J., dissenting from denial of rehearing *en banc*, at 4 n.1. Again, not so. That the general population statistics in question do not single-handedly render Plaintiffs' claims plausible was addressed in the district court's opinion, *see Mandala v. NTT Data, Inc.*, No. 18-cv-6591 (CJS), 2019 WL 3237361, at *3 (W.D.N.Y. July 18, 2019) (reasoning that "[t]he statistics Plaintiffs cite in the complaint do not indicate whether the individuals in the general population cited shared qualifications that would make them viable candidates for either of the positions offered to Plaintiffs"), in NTT's brief, *see* NTT Br. at 20–21, 21 n.10 (arguing that

8

As the panel majority opinion was careful to explain, this does not mean that national statistics can never be used in disparate impact cases involving skilled positions. Plaintiffs simply need to "provide additional allegations to explain why their chosen national statistics are in fact likely to be representative of [the] qualified applicant pool" in question. *Mandala*, 975 F.3d at 212. Here, that could have taken the form of additional national statistics indicating that, even as education levels increase, racial disparities between conviction rates remain. But Plaintiffs failed to provide such allegations. It is for that limited reason that the panel majority opinion affirmed the district court's dismissal of Plaintiffs' complaint for failure to state a claim.

While that is sufficient to resolve the matter, it bears noting that new facts introduced by an *amicus* brief filed in support of rehearing the case confirm this conclusion and underscore the limited impact of the panel majority opinion. Specifically, a brief submitted by several criminology and sociology professors, Dkt. No. 146, identifies a study indicating that "Black men with some college education have imprisonment risks that are seven times greater than white men with some college education (4.9% for Black men compared to 0.7% for white

---

"general population statistics have no application to Plaintiffs['] claims" because "only qualified individuals" are subject to the at-issue policy), and at length during oral argument.

9

men)," *post*, Chin, *J.*, dissenting from denial of rehearing *en banc*, at 9 (quoting Kurlychek *Amicus* Br. at 9); *see also post*, Pooler, *J.*, dissenting from denial of rehearing *en banc*, at 6. In other words, the very figures that might have rendered Plaintiffs' claims plausible not only exist but also are publicly available; Plaintiffs simply failed to include them in their pleadings. *See Port Auth. of N.Y. & N.J.*, 768 F.3d at 258 (noting that "imprecise pleading is particularly inappropriate where the plaintiffs necessarily had access, without discovery, to specific information from which to fashion a suitable complaint" (internal quotation marks and alterations omitted)).

As a result, we see no reason to believe that the panel majority opinion will become "a dangerous precedent" that shuts the courthouse door to disparate impact claims. *Post*, Chin, *J.*, dissenting from denial of rehearing *en banc*, at 28. The fact that such publicly available statistics exist indicates that there is ample factual material on which future litigants may rely to plead plausible disparate impact claims.

\* \* \*

To be clear, we do not take issue with the dissents' descriptions of the significance of Title VII. *See, e.g., post*, Pooler, *J.*, dissenting from denial of

10

rehearing *en banc*, at 7–8.  Indeed, just the opposite.  But even on matters of great importance, we are required to apply the pleading standards as set forth by the Supreme Court and this Court, and under those standards, Plaintiffs' complaint falls short.

For decades, Title VII claims – just like all other claims – were subject to a plaintiff-friendly notice pleading standard.  *See Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 512 (2002).  That changed with the Supreme Court's announcement of the plausibility pleading standard in *Twombly* and *Iqbal*.  For better or for worse, that standard made it harder for all plaintiffs, not just Title VII plaintiffs, to state a claim for relief.  Although one can surely debate the merits of this approach, neither the Supreme Court nor this Court has ever suggested that Title VII claims are somehow exempt from the plausibility standard.  *See Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 87 (2d Cir. 2015) (applying the plausibility standard to a Title VII disparate treatment claim); *Littlejohn v. City of New York*, 795 F.3d 297, 311 (2d Cir. 2015) (same).  The panel majority opinion simply held Plaintiffs to that burden and agreed with the district court that they had failed to meet it in this particular case.  Accordingly, we concur in the order denying rehearing *en banc*.

11