# EXHIBIT 9

# EXHIBIT 9

Case 6:18-cv-06591-MAV-CDH   Document 38-10   Filed 05/03/21   Page 2 of 30

**OUTTEN & GOLDEN LLP**
Ossai Miazad
Christopher M. McNerney
Elizabeth V. Stork
685 Third Avenue, 25th Floor
New York, New York 10017

**NAACP LEGAL DEFENSE &**
**EDUCATIONAL FUND, INC.**
Rachel M. Kleinman
Catherine Meza
40 Rector Street, Fifth Floor
New York, NY 10006

**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF NEW YORK**
-----------------------------------------------------------
GEORGE MANDALA, individually and on behalf
of all others similarly situated,

                                 Plaintiffs,

          - against -

NTT DATA, INC.,

                                 Defendant.
-----------------------------------------------------------

:  **Index No.:**
:
:
:
:
:  **CLASS ACTION COMPLAINT**
:
:  Jury Trial Demanded
:
:

Plaintiff George Mandala ("Mandala" or "Plaintiff"), individually and on behalf of all

others similarly situated, alleges, upon personal knowledge as to himself and upon information

and belief as to other matters, as follows:

<u>**NATURE OF THE ACTION**</u>

1.      As the U.S. Commission on Civil Rights has found, "[w]hen the collateral

consequences [of criminal convictions] are unrelated [either to the underlying crime for which a

person has been convicted or to a public safety purpose], their imposition generally negatively

affects public safety and the public good."[1]  Therefore, "[e]mployers should not automatically

disqualify a candidate with a criminal record, except in circumstances when the criminal record

---

[1]     U.S. Commission on Civil Rights, *Collateral Consequences: The Crossroads of*
*Punishment, Redemption, and the Effects on Communities* (June 2019), at 133, *available at*
https://www.usccr.gov/pubs/2019/06-13-Collateral-Consequences.pdf.

Case 6:18-cv-06591-MAV-CDH    Document 38-10    Filed 05/03/21    Page 3 of 30

directly conflicts with the scope of employment."[2]

2.     NTT Data, Inc. ("Defendant" or "NTT"), one of the largest information technology ("IT") services providers in the world, and with a significant presence in New York State, rejects job applicants with criminal records, even where the criminal history has no bearing on the applicant's ability to perform the job.  Because this practice perpetuates discriminatory racial disparities in the criminal justice system, it is unlawful under the New York Human Rights Law, N.Y. Exec. Law § 290 *et seq.* ("NYHRL").

3.     Plaintiff George Mandala was qualified for, applied for, and received an offer for a job with NTT.  However, like with many others, NTT subsequently and unjustifiably withdrew his job offer based on a policy not to hire individuals with certain criminal convictions.  NTT did not did not properly consider the factors enumerated in Article 23-A of the New York State Correction Law, N.Y. Corr. Law § 750 *et seq.* ("Correction Law"), which would have established that Plaintiff's criminal record was unrelated to the job for which he had been hired, and did not provide him with a copy of Article 23-A of the Correction Law at that time.

4.     Accordingly, Plaintiff alleges that Defendant has in the past and continues to utilize a job applicant screening process that systematically eliminates qualified African-American applicants based on their race, color or national origin in violation of the NYHRL.

5.     Because African Americans, like Plaintiff, are subjected to arrest and conviction at disproportionally higher rates than whites, NTT's policy and practice of denying individuals job opportunities based on their criminal records has an unjustified disparate impact on African Americans in violation of the NYHRL.

---

[2]     *Id.* at 137.

2

6.      NTT's policy and practice of denying individuals with criminal convictions job opportunities is not job related and consistent with business necessity, because it does not have a "demonstrable relationship to successful performance of the jobs for which [the policy] used," *Griggs v. Dukes Power, Co.*, 401 U.S. 424, 431(1971), and is otherwise an invalid screening device rendering it improper under the NYHRL.

7.      Plaintiff further alleges that NTT violated his rights and the rights of those similarly situated under Article 23-A of the Correction Law, and the New York State Fair Credit Reporting Act ("NY FCRA"), N.Y. Gen. Bus. Law § 380 *et seq*.

8.      Specifically, Plaintiff was denied job opportunities based on NTT's policy and practice of denying job opportunities to individuals with criminal convictions without first evaluating the factors laid out in the Correction Law.

9.      Additionally, NTT's systemic failure to provide Plaintiff and others with a copy of Article 23-A of the Correction Law denied him and others similarly situated the opportunity to advocate for their jobs in light of their legal protections, and explain why their criminal records did not disqualify them from employment.

10.     Through this lawsuit, Plaintiff will show that the conduct outlined in this Complaint constitutes unlawful discrimination and clearly violates the stated public policy of New York to remove barriers to employment for thousands of persons who have paid the penalties for any crimes they may have committed and to inform those persons of their rights under Article 23-A of the Correction Law.

## JURISDICTION AND VENUE

1.      This Court has jurisdiction over the claims alleged in this Complaint pursuant to New York Civil Practice Law and Rules §§ 301 and 302.

3

Case 6:18-cv-06591-MAV-CDH    Document 38-10    Filed 05/03/21    Page 5 of 30

2.      NTT is subject to personal jurisdiction in New York because NTT is licensed to do business in New York and because NTT regularly transacts business in New York and has committed acts within New York that have caused injury to persons within New York including denying employment to New York residents.

3.      Venue is proper in this County pursuant to New York Civil Practice Law and Rule § 503 because, upon information and belief, Defendant's principal place of business in New York State is in New York County and therefore Defendant resides in New York County for the purposes of C.P.L.R. § 503.  Defendant's Certificate of Change of Application for Authority to do business in New York State lists 28 Liberty Street, New York, NY as the post office address to which the Secretary of State shall mail a copy of any process against Defendant.  In addition, NTT's challenged policy operates to exclude otherwise qualified applicants in New York City, as is evidenced by the fact that NTT has stated, when posting for a Network/Systems Administrator in New York City, that part of its "Basic Qualifications" is a requirement that applicant have "No prior felony arrests. No drug related arrests."  Ex. 1.

4.      This case is properly brought in the Commercial Division of the Supreme Court because this is a commercial class action, and, upon information and belief, the damages of Plaintiff and the putative Classes, exclusive of punitive damages, interests, costs, disbursements and counsel fees claimed, exceed the monetary threshold for New York County of $500,000.

## PARTIES

### Plaintiff

5.      Plaintiff and the proposed Class Members he seeks to represent are each "persons," "individuals," "consumers," and "applicants for employment" within the meaning of the NYHRL and the NY FCRA.

4

Case 6:18-cv-06591-MAV-CDH    Document 38-10    Filed 05/03/21    Page 6 of 30

6.       Plaintiff, an African American resident of Rochester, New York, received a job offer from NTT as a Salesforce Developer.  NTT subsequently withdrew Plaintiff's job offer due to his criminal conviction, which was a non-violent conviction for DWI from 2014.

**Defendant**

7.       NTT is a global IT services company that employs over 110,000 people worldwide, including approximately 18,000 employees in North America.

8.       NTT has four office locations in New York State, including one in New York County, one in Syracuse, one in Albany, and one in Hauppauge.

9.       NTT is licensed to do business in New York and its Certificate of Change of Application for Authority to do business in New York State lists 28 Liberty Street, New York, NY as the post office address to which the Secretary of State shall mail a copy of any process against Defendant.

10.      At all relevant times, NTT has been an employer as defined by the NYHRL, and a private employer as defined by the Correction Law.

11.      At all relevant times, NTT has been aware of the requirements of the NY FCRA, and yet has disregarded those requirements.

12.      At all relevant times, NTT has been a "person, firm, corporation or other entity" requesting "consumer reports" of Plaintiff and proposed Class Members for "employment purposes" and has taken "adverse action" against Plaintiff and similarly situated applicants, as defined by the NY FCRA, for example by preventing them from explaining or challenging their rejections of employment.  These adverse actions have been based wholly or in part on those consumer reports.

## STATEMENT OF FACTS

**Plaintiff George Mandala**

13.     In or around January or February of 2017, Mr. Mandala applied for a job as a Salesforce Developer with NTT.

14.     Mr. Mandala had two telephone interviews with NTT employees, during which the NTT employees asked him technical questions related to the position and he answered competently, based on his years of applicable work experience.

15.     Mr. Mandala successfully completed his two telephone interviews and supplied NTT with professional references.

16.     NTT subsequently told Mr. Mandala that he would be working at a company based in Wellesley, Massachusetts, though he would be working remotely based out of his home in Rochester, New York.

17.     NTT sent Mr. Mandala a formal offer letter on March 22, 2017, signed by Patricia Price, a Senior Recruiter with NTT, offering Mr. Mandala a job as an Application Software Development Senior Principal Consultant.

18.     The offer letter stated that NTT's "management team was impressed with [Mr. Mandala's] credentials and experience," and that Mr. Mandala would "work out of NTT DATA's remote home office to begin on April 3, 2017."

19.     Mr. Mandala accepted NTT's offer of employment via correspondence dated March 23, 2017.

20.     Mr. Mandala authorized a background check pursuant to NTT's policy, and NTT obtained a criminal background check on Mr. Mandala from a consumer reporting agency.

21.     On March 30, 2017, Mr. Mandala attended a pre-orientation telephone call with

6

Case 6:18-cv-06591-MAV-CDH    Document 38-10    Filed 05/03/21    Page 8 of 30

other new employees.

22.     On the same day, Mr. Mandala received an e-mail from Patricia Price, asking
"Could you give me a call to discuss your background check?"

23.     Mr. Mandala called Ms. Price and Ms. Price informed Mr. Mandala that NTT had
a policy not to hire persons with felonies on their records.

24.     Mr. Mandala thereafter received a letter from NTT, signed by Ms. Price, dated
April 6, 2017, which stated that NTT was withdrawing Mr. Mandala's job offer, and that "[t]his
action was influenced by information contained in a consumer report, made at [NTT's] request
and provided by . . . ASURINT[.]"

25.     During the interview process, and afterwards, NTT never sought or considered
information from Mr. Mandala which would enable it to fully evaluate the factors laid out in
Section 753 of the Correction Law.  For example, after reviewing Mr. Mandala's background
check, NTT never asked Mr. Mandala for information regarding the circumstances of his
convictions or evidence of Mr. Mandala's rehabilitation or good conduct.  Furthermore, NTT's
action was indicative of a policy and practice of denying job opportunities to individuals with
criminal convictions, which does not permit NTT to fully evaluate the factors laid out in Section
753 of the Correction Law.

26.     Had NTT performed a legally compliant analysis, NTT would not have denied
employment to Mr. Mandala because of his criminal conviction, which is a non-violent felony
conviction for Driving While Intoxicated ("DWI") from 2014.  That conviction had no direct
relationship to the employment Mr. Mandala sought and did not create an unreasonable risk to
property or to the safety or welfare of specific individuals or the general public.

27.     NTT never provided Mr. Mandala with a copy of Article 23-A of the Correction

Law as required by N.Y. Gen. Bus. Law § 380-g(d).

28.    In addition to Mr. Mandala's experience, NTT has stated, when posting for a Network/Systems Administrator in New York City, that part of its "Basic Qualifications" is a requirement that applicant have "No prior felony arrests. No drug related arrests." Ex. 1.

29.    On June 2, 2017, Mr. Mandala filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") based on NTT's denial of employment. Mr. Mandala's Charge was filed with the EEOC's Buffalo, New York office. Mr. Mandala's Charge was also dual filed, contemporaneously, with the New York State Division of Human Rights. On May 17, 2018, the EEOC issued Mr. Mandala a Notice of Right to Sue.

30.    On August 15, 2018, Mr. Mandala, along with another applicant denied employment by NTT because of criminal history unrelated to the job in question, on behalf of themselves and all on behalf of all others similarly situated, filed a Class Action Complaint in the United States District Court for the Western District of New York, alleging claims of disparate impact discrimination in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq* ("Title VII"), and violations of the NYHRL, the Correction Law, and the NY FCRA. On July 18, 2019, the District Court dismissed their Title VII claim, and declined to exercise supplemental jurisdiction over their NYHRL, Correction Law, and NY FCRA claims. Pursuant to 28 U.S.C. § 1367(d), Mr. Mandala's claims, and the claims of the putative Classes, have been tolled since the District Court's dismissal. Mr. Mandala and his co-plaintiff have appealed the District Court's dismissal of their federal complaint to the U.S. Court of Appeals for the Second Circuit.

8

Case 6:18-cv-06591-MAV-CDH    Document 38-10    Filed 05/03/21    Page 10 of 30

**Factual Allegations Common to All Class Members**

***The NYHRL Disparate Impact Claims***

31.    As the U.S. Commission on Civil Rights recently reported, "when employers use criminal background checks to indiscriminately disqualify all applicants with criminal records, these employers severely curtail employment opportunities for formerly incarcerated people."[3] Moreover, "[b]ecause black and Latino individuals are likelier to have criminal records than white and Asian people, . . . black and Latino males are disproportionately affected by criminal background checks."[4]

32.    NTT's policy and practice of denying job opportunities to individuals with non-job-related convictions had and continues to have a significant and detrimental impact on African Americans, based on their race, color and/or national origin, as compared to white applicants.  African Americans are arrested, sentenced, and imprisoned for crimes at substantially higher rates than whites, relative to their share of the national population.[5]

33.    According to a report to the United Nations Special Rapporteur on Contemporary

---

[3]    U.S. Commission on Civil Rights, *Collateral Consequences: The Crossroads of Punishment, Redemption, and the Effects on Communities* (June 2019), at 42, *available at* https://www.usccr.gov/pubs/2019/06-13-Collateral-Consequences.pdf.

[4]    *Id.*

[5]    *See* U.S. Department of Justice, Federal Bureau of Investigation, *Crime in the United States 2016*, Table 21A (Arrests by Race and Ethnicity), *available at* https://ucr.fbi.gov/crime-in-the-u.s/2016/crime-in-the-u.s.-2016/topic-pages/tables/table-21 (showing 26.9% of arrests are of Black or African American individuals, while 69.6% of arrests are of White individuals); U.S. Census Bureau, *Quick Facts, United States* (2017), *available at* https://www.census.gov/quickfacts/fact/table/US/PST045217 (showing Black or African American individuals make up approximately 13.4% and Whites make up 76.6% of the United States population).  *See also EEOC Enforcement Guidance on the Consideration of Arrest and Conviction Records in Employment Decisions Under Title VII of the Civil Rights Act of 1964*, at 9-10 (April 25, 2012) (national data showing blacks arrested and convicted at higher rates than whites "supports a finding that criminal record exclusions have a disparate impact based on race and national origin").

Case 6:18-cv-06591-MAV-CDH    Document 38-10    Filed 05/03/21    Page 11 of 30

Forms of Racism, Racial Discrimination, Xenophobia, and Related Intolerance: Regarding

Racial Disparities in the United States Criminal Justice System, "[i]n 2010, 8% of all adults in

the United States had a felony conviction on their record" but "[a]mong African-American men,

the rate was one in three."[6] The same report showed that "African-American adults are 5.9 times

as likely to be incarcerated than whites," based on Bureau of Justice Statistics from 2016, which

derived estimates based on prisoners sentenced for more than one year.[7] Further, "[i]n 2016,

black Americans comprised 27% of all individuals arrested in the United States—double their

share of the total population".[8] Projections based on recent trends in incarceration estimate that

one out of every three African-American males born today will go to prison, compared to just

one out of every seventeen White males.[9]

34.    These trends are equally salient in New York State. According to data compiled

by The Sentencing Project, as of 2014, the Black imprisonment rate in New York State was 896

per 100,000, compared to a white imprisonment rate of 112 per 100,000.[10] According to the

---

[6]    Report of The Sentencing Project to the United Nations Special Rapporteur on
Contemporary Forms of Racism, Racial Discrimination, Xenophobia, and Related Intolerance:
Regarding Racial Disparities in the United States Criminal Justice System, The Sentencing
Project (2018) at 9, *available at* https://www.sentencingproject.org/wp-
content/uploads/2018/04/UN-Report-on-Racial-Disparities.pdf. As is widely acknowledged,
racial disparities in arrest and conviction rates in the United States are themselves the result of
systemic discrimination in the criminal justice system. *See generally, id.*

[7]    *Id.* at 2 (citing U.S. Bureau of Justice Statistics, Prisoners in 2016, 8 tbl.6 (Jan. 2018),
*available at* https://www.bjs.gov/content/pub/pdf/p16.pdf).

[8]    *Id.* at 2. *See also* Leah Sakala, *Breaking Down Mass Incarceration in the 2010 Census:
State-by-State Incarceration Rates by Race/Ethnicity*, Prison Pol'y Initiative (May 28, 2014),
http://www.prisonpolicy.org/reports/rates.html.

[9]    Marc Mauer, *Addressing Racial Disparities in Incarceration*, 91 Prison J. 87S, 88S
(2011), *available at* https://www.sentencingproject.org/wp-content/uploads/2016/01/Addressing-
Racial-Disparities-in-Incarceration.pdf.

[10]    The Sentencing Project, State-by-State Data, *available at*
https://www.sentencingproject.org/the-
facts/#detail?state1Option=New%20York&state2Option=0. Another estimate using 2010
Census data shows 1,655 Blacks incarcerated per 100,000 people in that racial/ethnic group,

10

Case 6:18-cv-06591-MAV-CDH    Document 38-10    Filed 05/03/21    Page 12 of 30

Bureau of Justice Statistics, in 2016 there were 24,370 Black prisoners under the jurisdiction of

state or federal correctional authorities in New York, nearly double the number of white

prisoners (12,391).[11]  Finally, the New York State Department of Corrections and Community

Supervision reported in 2016 that African-Americans made up 48.6% of inmates under state

custody, while whites made up 24.4% of inmates under state custody.[12]  As an additional

example of the severe racial disparity in the New York justice system, New York has one of the

largest disparities in marijuana possession arrest between Blacks and whites, with Blacks over

4.5 times as likely to be arrested for marijuana possession as whites.[13]

35.    Compounding the racial disparities in criminal arrests and convictions is proven

employer bias against people with criminal records.  For example, audit studies conducted by

researchers at Harvard and Princeton Universities, including a study in New York City, found

that African Americans with criminal records were particularly disadvantaged in the job market

when compared to Whites with criminal records.[14]

36.    Any selection device that has a disparate impact must have a "manifest

relationship to the employment in question."  *Griggs v. Duke Power Co.*, 401 U.S. 424, 433

---

compared to 219 whites per 100,000.  Prison Policy Initiative, New York profile, *available at*
https://www.prisonpolicy.org/profiles/NY.html.
[11]    U.S. Bureau of Justice Statistics, Prisoners in 2016, 24 tbl.21 (Jan. 2018), *available at*
https://www.bjs.gov/content/pub/pdf/p16.pdf.
[12]    New York State Dep't of Corrections and Community Supervision, Under Custody
Report: Profile of Under Custody Population As of January 1, 2016, at ii, 5, *available at*
http://www.doccs.ny.gov/Research/Reports/2016/UnderCustody_Report_2016.pdf.
[13]    Ezekiel Edwards, Will Bunting, and Lynda Garcia, The War on Marijuana in Black and
White, American Civil Liberties Union (2013) at 49, *available at*
https://www.aclu.org/files/assets/1114413-mj-report-rfs-rel1.pdf.
[14]    Devah Pager et al., *Discrimination in a Low-Wage Labor Market: A Field Experiment*, 74
Am. Soc. Rev. 777, 785-86 (2009); Devah Pager et al., *Sequencing Disadvantage: Barriers to
Employment Facing Young Black and White Men with Criminal Records*, 623 Annals Am. Acad.
Pol. & Soc. Sci. 195, 199 (2009); Devah Pager, *The Mark of a Criminal Record*, 108 AM. J.
SOC. 937, 955-61 (2003).

Case 6:18-cv-06591-MAV-CDH Document 38-10 Filed 05/03/21 Page 13 of 30

(1971). "[A]n employment practice neutral on its face and in terms of intent which has a disparate impact upon a protected class of persons violates the Human Rights Law unless the employer can show justification for the practice in terms of employee performance." *People v. New York City Transit Authority*, 59 N.Y.2d 343, 348-49 (1983). A criminal record exclusion is valid only when it "operates to effectively link specific criminal conduct, and its dangers, with the risks inherent in the duties of a particular position." *EEOC Enforcement Guidance on the Consideration of Arrest and Conviction Records in Employment Decisions Under Title VII of the Civil Rights Act of 1964*, at 14 (April 25, 2012).

37. NTT's policies and practices as to screening applicants with criminal histories, including any blanket exclusions of individuals with felony or other types of convictions, are not consistent with business necessity.

38. NTT's applicant screening policies and practices do not bear a relationship to the employment in question.

39. For example, having a conviction is not an accurate proxy for determining whether an applicant would be able to perform the duties of the job. Upon information and belief, there are no reliable studies or empirical data to suggest that applicants with criminal records are more likely to engage in terminable offenses.[15]

40. NTT's policy and practice of denying employment to individuals with criminal histories, including felony convictions, is far too over-inclusive to meet the standards of job-relatedness and consistency with business necessity.

41. Upon information and belief, NTT does not have a process or policy to determine

---

[15] *See, e.g.,* Ian B. Petersen, *Toward True Fair-Chance Hiring: Balancing Stakeholder Interests and Reality in Regulating Criminal Background Checks*, 94 Tex. L. Rev. 175, 187-88 (2015).

12

whether applicants convicted of crimes have made positive changes in their lives subsequent to their convictions. NTT's policy and practice of banning individuals with certain convictions from employment has effectively foreclosed applicants' abilities to provide proof of rehabilitation, such as documentation of successful participation in drug treatment programs, educational achievements or relevant employment, or to submit certificates of relief from disabilities, which in many states create a presumption of rehabilitation.

42. Upon information and belief, the policy and practice of rejecting individuals with certain convictions has created significant barriers to employment that excluded many properly qualified persons, including disproportionate numbers of African American applicants. There are less discriminatory alternatives that would have better achieved any legitimate business purpose.

43. Less discriminatory alternatives include, but are not limited to: (1) considering all applicants with a record of conviction for a crime that by its nature does not pose a legitimate threat to the public safety or risk of workplace misconduct; and (2) giving each individual with a conviction a meaningful opportunity to demonstrate that he or she does not present a current threat, including providing evidence of rehabilitation, an explanation of events leading to the conviction, or information regarding other mitigating factors.

*The NYHRL Article 23-A Claim*

44. The NYHRL states "[i]t shall be an unlawful discriminatory practice" to "deny . . . employment to any individual" based on a criminal conviction "when such denial is in violation of the provisions of article twenty-three-A of the correction law." N.Y. Exec. Law § 296(15).

45. Article 23-A of the Correction Law prohibits an employer from denying employment to any person by virtue of their criminal record unless the employer can meet its

13

burden of demonstrating one of two exceptions:

(1) there is a direct relationship between one or more of the previous criminal offenses and the specific license or employment sought or held by the individual; or

(2) the issuance or continuation of the license or the granting or continuation of the employment would involve an unreasonable risk to property or to the safety or welfare of specific individuals or the general public.

N.Y. Correct. Law § 752.

46.    Article 23-A of the Correction Law further requires that when taking any adverse action on the basis of a criminal record, the employer must consider all the following factors:

(a) The public policy of this state, as expressed in this act, to encourage the licensure and employment of persons previously convicted of one or more criminal offenses.

(b) The specific duties and responsibilities necessarily related to the license or employment sought or held by the person.

(c) The bearing, if any, the criminal offense or offenses for which the person was previously convicted will have on his fitness or ability to perform one or more such duties or responsibilities.

(d) The time which has elapsed since the occurrence of the criminal offense or offenses.

(e) The age of the person at the time of occurrence of the criminal offense or offenses.

(f) The seriousness of the offense or offenses.

(g) Any information produced by the person, or produced on his behalf, in regard to his rehabilitation and good conduct.

(h) The legitimate interest of the public agency or private employer in protecting property, and the safety and welfare of specific individuals or the general public.

N.Y. Correct. Law § 753.

47.    It is impossible for an employer to conduct the legally required evaluation of all Article 23-A factors without first engaging in a conversation with the prospective candidate

14

Case 6:18-cv-06591-MAV-CDH   Document 38-10   Filed 05/03/21   Page 16 of 30

before making an employment determination. *See* N.Y. Correct. Law § 753.

48.     It is impossible for an employer to conduct the legally required evaluation of all Article 23-A factors if the employer operates with a policy or practice of denying employment to all individuals with criminal records, or with specific types of criminal convictions. *See* N.Y. Correct. Law § 753.

49.     For this reason, among others, the NYHRL forbids companies from denying employment simply because a job applicant has a criminal record. Instead, companies must engage in an evaluation of the factors outlined in the Correction Law before making an employment determination.

50.     Despite knowing of its obligations under the NYHRL, NTT has denied, and continues to deny, employment to job applicants with certain convictions, without undertaking the inquiry required by New York Law.

51.     For example, the New York City Commission on Human Rights' guidance about the recently enacted Fair Chance Act is helpful in illuminating the Article 23-A analysis. *See* https://www1.nyc.gov/site/cchr/law/fair-chance-act.page. That guidance explains that "[e]mployers must carefully conduct the Article 23-A analysis." *Id.* This means that "[o]nce an employer extends a conditional offer and learns of an applicant's conviction history, it must solicit the information necessary to properly consider each Article 23-A factor, including the applicant's evidence of rehabilitation." *Id.* By denying employment to job applicants before soliciting such information, NTT violated Article 23-A and therefore violated the NYHRL.

52.     NTT has acted consciously in breaching its known duties and depriving Plaintiff Mandala and other job applicants of their rights under the NYHRL and the Correction Law. At a minimum, NTT's conduct has been reckless in failing to make an appropriate inquiry to ascertain

its obligations under the NYHRL and the Correction Law.

53.     The ability to find employment is an essential aspect of reentering society for people with criminal histories.  Recidivism declines when those individuals have viable employment prospects and other stabilizing resources in their communities.  NTT's policy of discriminating against individuals with criminal records frustrates such public policy objectives.

***The NY FCRA Claim***

54. The NY FCRA requires that:

> When a consumer reporting agency provides a consumer report that contains criminal conviction information, permitted by paragraph one of subdivision (a) of section three hundred eighty-j of this article, to a user, the person, firm, corporation or other entity requesting such report shall provide the subject of such report a printed or electronic copy of article twenty-three-A of the correction law governing the licensure and employment of persons previously convicted of one or more criminal offenses.

N.Y. Gen. Bus. Law § 380-g(d).

55.     "The public policy of [New York] state, as expressed in [its Correction Law], [is] to encourage the licensure and employment of persons previously convicted of one or more criminal offenses."  N.Y. Correct. Law § 753(1)(a).

56.     Consistent with the public policy of New York, in 2008 the New York Legislature added Section 380-g.

57.     The purpose of this requirement is to inform individuals with criminal records of their rights and remedies under the law and for employers to be informed of their obligations under the law in order to avoid illegal discrimination.

58.     For example, the New York State Assembly's Memorandum in Support of the Legislation stated, in part: "Once [criminal history information] is obtained, employers have repeatedly dismissed qualified applicants and terminated employees based solely on their criminal histories, even if there is no direct relationship between the criminal offense(s) and the

16

job and no unreasonable risk to the safety to the public or property, the criteria upon which an

employer can deny a job to an applicant or terminate an existing employee. The enactment of

this bill will help ensure that employers and prospective employees are informed about the

mandates of Article 23-A of the correction law. This will help to avoid illegal discrimination

against persons with a criminal conviction." N.Y.S. Assembly's Memorandum in Support of the

Legislation, Bill No. 10288A, 2007-2008 Term.

59.     Upon information and belief, NTT has routinely and systematically failed to

provide Plaintiff Mandala and other job applicants with a copy of Article 23-A of the Correction

Law, as required under the law.

60.     This has caused Plaintiff Mandala and other job applicants concrete harm,

including because it has prevented them from advocating fully for a job with NTT and from

explaining why their conviction histories did not disqualify them from employment, it has denied

them an opportunity to learn of their rights under Article 23-A of the Correction Law, and it has

created the risk of future harm.

61.     For example, as discussed above, under the Correction Law, NTT cannot deny

employment to an individual "when such finding is based upon the fact that the individual has

previously been convicted of one or more criminal offenses, unless" NTT shows "a direct

relationship" between the conviction(s) and the job or "an unreasonable risk to property or to the

safety or welfare of specific individuals or the general public." N.Y. Correct. Law § 752.

62.     NTT must consider all eight factors laid out in Section 753 of the Correction Law

and whether the individual has a certificate of relief from disabilities or a certificate of good

conduct. N.Y. Correct. Law § 753.

63.     Section 754 of the Correction law allows an individual "previously convicted of

17

Case 6:18-cv-06591-MAV-CDH    Document 38-10    Filed 05/03/21    Page 19 of 30

one or more criminal offenses" to request a written explanation for the employer's denial of

employment, which the employer is required to provide within 30 days of the request—providing

applicants with crucial information as to the basis for the job denial. N.Y. Correct. Law § 754.

64.    NTT's failure to provide Plaintiff Mandala and other job applicants with a copy of

Article 23-A of the Correction law denied them information to advocate fully for a position with

NTT and explain their suitability for employment, and information about their legal right to be

free from discrimination and remedies for that discrimination once it had occurred.

65.    NTT's failure to provide this information also created the risk that Plaintiff

Mandala and other job applicants would fail to seek to vindicate their right to be free from

discrimination—either from NTT's denial of employment or the denial of employment by

another employer.

66.    NTT's violation of the NY FCRA frustrates New York's public policy to increase

the employment of persons with criminal convictions. *See* N.Y. Correct. Law § 753(1)(a).

67.    NTT has acted willfully in violating the requirements of the NY FCRA. NTT

knew or should have known about its obligations under the NY FCRA. These obligations are

well-established by the longstanding and plain language of the NY FCRA.

68.    Despite NTT's awareness of its legal obligations, it has acted recklessly and

willfully in breaching its known duties and depriving Plaintiff Mandala and other job applicants

of their rights under the NY FCRA.

## **CLASS ACTION ALLEGATIONS**

69.    Plaintiff brings this case as a proposed Class action pursuant to CPLR § 901(a) on

behalf of himself and three classes of persons (collectively, the "Classes").

70.    Plaintiff asserts the First Cause of Action against NTT on behalf of the "NYHRL

Disparate Impact Class," defined as follows:

18

Case 6:18-cv-06591-MAV-CDH   Document 38-10   Filed 05/03/21   Page 20 of 30

**NYHRL Disparate Impact Class:** All African American individuals who, from June 2, 2014, through the resolution of this action, were denied employment in New York State based in whole or in part on NTT's policy and practice of denying employment to individuals with criminal convictions.

71.     Plaintiff asserts the Second Cause of Action against NTT on behalf of the "NY Criminal History Discrimination Class" defined as follows:

**NY Criminal History Discrimination Class**:  All individuals who, from June 2, 2014, through the resolution of this action, were denied employment in New York State based in whole or in part on their criminal record without NTT having performed a complete New York Correction Law Article 23-A analysis, as required by N.Y. Exec Law § 296(15).

72.     Plaintiff asserts the Third Cause of Action against NTT on behalf of the "NY FCRA Class" defined as follows:

**NY FCRA Class**:  All individuals in New York State who, from August 15, 2016, through the resolution of this action, had consumer reports requested about them by NTT and were not provided with a copy of Article 23-A of the Correction Law.

73.     The members of the NYHRL Disparate Impact Class, the NY Criminal History Discrimination Class and the NY FCRA Class are collectively referred to as "Class Members."

74.     Plaintiff reserves the right to amend the definition of above-defined classes based on discovery or legal developments.

75.     The Class Members identified herein are so numerous that joinder of all members is impracticable.  NTT is a large employer both in the United States and in New York, with 18,000 employees in North America, and with four offices in New York State.  The number of job applicants harmed by NTT's violations of the law is far greater than feasibly could be addressed through joinder.  The precise number is uniquely within Defendants' possession, and Class Members may be notified of the pendency of this action by published, mailed and/or e-mailed notice.

19

Case 6:18-cv-06591-MAV-CDH    Document 38-10    Filed 05/03/21    Page 21 of 30

76.     There are questions of law and fact common to Class Members, and these questions predominate over any questions affecting only individual members.  Common legal and factual questions include, among others:

(a)     Whether it was Defendant's policy and practice to exclude job applicants with certain convictions who should have been eligible for employment based on valid factors assessing legitimate threat to public safety or risk of workplace misconduct;

(b)     Whether Defendant's policy and practice to exclude job applicants based on certain convictions had a discriminatory disparate impact on African Americans;

(c)     Whether Defendant's policy and practice to exclude job applicants based on their criminal history is job-related and consistent with business necessity;

(d)     Whether there was a less discriminatory policy and practice that would have met Defendant's legitimate needs;

(e)     Whether Defendant violated the NYHRL and the Correction Law when denying employment to Plaintiff and the NY Criminal History Discrimination Class;

(f)     Whether Defendant violated the NY FCRA by failing to provide Plaintiff and the NY FCRA Class with a copy of Article 23-A of the Correction Law, in violation of N.Y. Gen. Bus. Law § 380-g(d);

(g)     Whether Defendant was willful in its noncompliance with the requirements of the NY FCRA;

(h)     Whether compensatory damages and punitive damages for Class Members are warranted; and

(i)     Whether a declaratory judgement and/or injunctive relief is warranted regarding Defendant's policies and practices.

77.     Plaintiff is a member of the Classes he seeks to represent.  NTT took discriminatory adverse action against Plaintiff based on his criminal history and without providing him with a copy of Article 23-A of the Correction Law.

78.     Plaintiff's claims are typical of the claims of the Classes he seeks to represent: (1) Plaintiff applied for a job with NTT within the relevant time period; (2) Plaintiff was subjected to

Case 6:18-cv-06591-MAV-CDH    Document 38-10    Filed 05/03/21    Page 22 of 30

the hiring process screening applicants for criminal histories; (3) Plaintiff was denied the

position because of his criminal history; and (4) NTT did not provide Plaintiff with a copy of

Article 23-A of the Correction Law at the time. All of these claims are shared by each and every

Class Member. Upon information and belief, it is NTT's standard practice to take adverse

actions against applicants based on criminal convictions in a manner that is discriminatory and

inconsistent with business necessity and without properly considering the factors laid out in the

Correction Law.

79.     Plaintiff will fairly and adequately represent and protect the interests of Class

Members because his interests coincide with, and are not antagonistic to, the interests of the

Class Members he seeks to represent. Plaintiff has retained counsel who are competent and

experienced in complex class actions, including litigation pertaining to criminal background

checks, the Correction Law, NY FCRA, disparate impact litigation, other employment litigation,

and the intersection thereof. There is no conflict between Plaintiff and the Class Members.

80.     A class action is superior to other available methods for the fair and efficient

adjudication of this litigation. Class Members have been damaged and are entitled to recovery as

a result of Defendant's uniform policies and practices. NTT has acted and/or refused to act on

grounds generally applicable to the Class Members, making declaratory and injunctive relief

appropriate with respect to Plaintiff and the Class Members as a whole. Because NTT has

maintained a common policy of denying employment to individuals with certain criminal

convictions but may not have explained that policy to all Class Members, many Class Members

may be unaware that their rights have been violated. Judicial economy will be served by the

maintenance of this lawsuit as a class action, in that it is likely to avoid the burden which would

otherwise be placed on the judicial system by the filing of many similar suits by individual

Case 6:18-cv-06591-MAV-CDH   Document 38-10   Filed 05/03/21   Page 23 of 30

harmed persons.  There are no obstacles to the effective and efficient management of this lawsuit

as a class action.

## CAUSES OF ACTION

### FIRST CLAIM FOR RELIEF
**Disparate Impact Discrimination**
**New York Human Rights Law**
**(On Behalf of Plaintiff Mandala and the NYHRL Disparate Impact Class)**

81.     Plaintiff, on behalf of himself and the NYHRL Disparate Impact Class,

incorporates by reference the allegations in all preceding paragraphs.

82.     Plaintiff brings this claim on his own behalf and on behalf of the NYHRL

Disparate Impact Class.

83.     Defendant's policy and practice of denying employment opportunities to

individuals with criminal convictions has harmed, and continues to harm Plaintiff, and

constitutes unlawful discrimination on the basis of race, color, and/or national origin in violation

of the NYHRL.

84.     Defendant's policy and practice of denying employment opportunities to

individuals with criminal convictions has had a discriminatory disparate impact on African

Americans and is neither job related nor consistent with business necessity.  Even if Defendant's

policy and practice of denying employment opportunities to individuals with criminal

convictions could be justified by business necessity, a less discriminatory alternative exists that

would have equally served any legitimate purpose.

85.     Defendant's conduct has caused, and continues to cause, Plaintiff and the

members of the NYHRL Disparate Impact Class losses in earnings and other employment

benefits.

86.     Plaintiff and the NYHRL Disparate Impact Class also seek injunctive and declaratory relief to correct Defendant's discriminatory policies and practices.

## SECOND CLAIM FOR RELIEF
**Discriminatory Denial of Employment**
**New York Human Rights Law and Article 23-A of the Correction Law**
**(On Behalf of Plaintiff Mandala and the NY Criminal History Discrimination Class)**

87.     Plaintiff, on behalf of himself and the NY Criminal History Discrimination Class, incorporates the preceding paragraphs as alleged above.

88.     Defendant denied employment to Plaintiff and the NY Criminal History Discrimination Class based in whole or in part on their criminal history.

89.     Before denying employment to Plaintiff and job applicants in the NY Criminal History Discrimination Class, Defendant failed to conduct a proper inquiry into the factors outlined in Article 23-A of the Correction Law, in violation of N.Y. Exec. Law § 296(15).

90.     As a result of Defendant's actions, Plaintiff and the NY Criminal History Discrimination Class have been deprived of their rights and have lost employment opportunities, earnings and other employment benefits.

91.     Plaintiff and the NY Criminal History Discrimination Class also seek injunctive and declaratory relief to correct Defendant's discriminatory policies and practices.

## THIRD CLAIM FOR RELIEF
**NTT's Failure to Provide a Copy of Article 23-A**
**N.Y. Gen. Bus. Law § 380-g(d)**
**(On Behalf of Plaintiff Mandala and the NY FCRA Class)**

92.     Plaintiff, on behalf of himself and the NY FCRA Class, incorporates the preceding paragraphs as alleged above.

93.     NTT violated the NY FCRA by procuring consumer reports from Plaintiff and Class Members without providing them with a copy of Article 23-A of the Correction Law.

23

94.     NTT caused concrete injury (including the risk of harm) to Plaintiff and the NY

FCRA Class Members, including because they were denied the opportunity to contextualize and

explain their conviction histories in light of the Article 23-A factors, bring to the attention of

NTT their rehabilitative efforts and other employment, and they could not learn of their rights

and opportunities under the NY FCRA in ways that would increase their chances of employment

now and in the future.

95.     NTT acted willfully and in knowing or reckless disregard of its obligations and

the rights of Plaintiff and the NY FCRA Class.

96.     NTT's willful conduct is reflected by, among other things, the fact that it violated

a clear statutory mandate set forth in N.Y. Gen. Bus. Law § 380-g(d).

97.     As a result of NTT's actions, Plaintiff and the NY FCRA Class have been

deprived of their consumer rights, and prevented from timely and effectively contesting the

adverse action.

98.     NTT's willful and/or negligent conduct makes it liable for actual damages,

punitive damages, and attorneys' fees and costs, in an amount to be determined by the Court

pursuant to N.Y. Gen. Bus. Law § 380-l and N.Y. Gen. Bus. Law § 380-m.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff and Class Members pray for relief as follows:

(a)     A declaratory judgment that the practices complained of herein are
        unlawful and violate NYHRL and the NY FCRA;

(b)     A preliminary and permanent injunction against NTT and all officers,
        agents, successors, employees, representatives, and any and all persons
        acting in concert with them, from engaging in each of the unlawful
        policies, practices, customs, and usages set forth herein;

24

Case 6:18-cv-06591-MAV-CDH    Document 38-10    Filed 05/03/21    Page 26 of 30

(c)    An order that NTT institute and carry out policies, practices, and programs that provide equal employment opportunities for applicants with criminal records who would be eligible under application of Article 23-A and that Defendant eradicate the effects of past and present unlawful employment practices;

(d)    Certification of the case as a class action on behalf of the proposed Classes pursuant to Article 9 of the New York Civil Practice Law and Rules;

(e)    Designation of Plaintiff as representative of Class Members;

(f)    Designation of Plaintiff's counsel of record as Class Counsel;

(g)    Restoring of Plaintiff and Class Members to their rightful positions at NTT or those positions equivalent at NTT (i.e., reinstatement), or in lieu of reinstatements, an order for front pay benefits;

(h)    An award of backpay and/or compensatory damages for violations of the NYHRL;

(i)    An award of nominal damages;

(j)    An award of all actual damages awardable for violations of the NY FCRA;

(k)    An award of punitive damages under applicable statutes;

(l)    An award of costs incurred herein, including reasonable attorneys' fees to the extent allowable by law;

(m)    Such other injunctive and/or declaratory relief to correct Defendants' discriminatory policies and practices;

(n)    Pre-judgment and post-judgment interest, as provided by law;

(o)    Payment of a reasonable service award to Plaintiff, in recognition of the services he has rendered and will continue to render to Class Members, and the risks he has taken and will take; and

(p)    Such other and further legal and equitable relief as this Court deems necessary, just and proper.

25

## JURY DEMAND

Plaintiff demands a trial by jury in this action.

Dated:  New York, New York
       August 16, 2019

Respectfully submitted,

By: _/s/ Ossai Miazad_____

**OUTTEN & GOLDEN LLP**
Ossai Miazad
Christopher M. McNerney
Elizabeth V. Stork
685 Third Avenue, 25th Floor
New York, New York 10017
Telephone:  (212) 245-1000
Facsimile:  (646) 509-2060
E-mail: om@outtengolden.com
E-mail: cmcnerney@outtengolden.com
E-mail: estork@outtengolden.com

**NAACP LEGAL DEFENSE &
EDUCATIONAL FUND, INC.**
Rachel M. Kleinman
Catherine Meza
40 Rector Street, Fifth Floor
New York, NY 10006
E-mail: rkleinman@naacpldf.org
E-mail: cmeza@naacpldf.org

_Attorneys for Plaintiff and the Putative Classes_

26

Case 6:18-cv-06591-MAV-CDH     Document 38-10     Filed 05/03/21     Page 28 of 30

# Exhibit 1

## MONSTER

# Network/Systems Administrator

## NTT Data - New York City, NY 10008

**Posted:** 5/23/2015

---

Apply Now

Overview:

At NTT DATA, we know that with the right people on board, anything is possible. The quality, integrity, and commitment of our employees have been key factors in our company's growth and market presence. By hiring the best people and helping them grow both professionally and personally, we ensure a bright future for NTT DATA and for the people who work here.

A group company within NTT DATA currently seeks a Network/Systems Administrator to join our team in NYC, New York.

Position Functions or Responsibilities:

Daily Tasks will include but not limited to the following:

System administration, user on-boarding, and Active Directory management. Windows Server 2012 installation and maintenance. System backup of server OS and server applications including MS Exchange 2010, MS SQL 2012 using Veritas Backup Exec. Creation and maintenance of virtual servers using VMWare. Performance monitoring of systems. Maintain and support SAN, NAS, and tape storage devices/servers. Data Center equipment monitoring and support

Basic Qualifications:

5 years of experience in MS Windows servers,computer networks, messaging, cross-platform integration and large-scale, complex systems and applications design and implementation. 5 years of experience in disaster recovery/backup including production application such as Exchange and SQL Server Microsoft MCSE Certification 5 years of of experience VMWare virtualization 5 years of experience Active Directory and Group Policy Management design and configuration 3 years of experience Storage Attached Network (SAN) configuration No prior felony arrests. No drug related arrests. This is a full-time salaried position with a group company within NTT DATA. Please note, 1099 or corp-2-corp contractors will NOT be considered. This position is only available to those interested in direct staff employment opportunities. We offer a full comprehensive benefits package that starts from your first day of employment.

About NTT DATA

NTT DATA is your Innovation Partner anywhere around the world. With business operations in

more than 35 countries, we put emphasis on long-term commitment and combine global reach and local intimacy to provide premier professional services from consulting, system development, business process and IT outsourcing to cloud-based solutions.

Visit

Apply Now

data:text/html;charset=utf-8,%3Cdiv%20class%3D%22navbar%20navbar-default%20navbar-fixed-top%22%20style%3D%22box-sizing%3A%20border-box%3...          2/2

29 of 29