# Exhibit C

**OUTTEN & GOLDEN LLP**
Ossai Miazad
Christopher McNerney
685 Third Avenue, 25th Floor
New York, New York 10017

**NAACP LEGAL DEFENSE &
EDUCATIONAL FUND, INC.**
Rachel M. Kleinman
40 Rector Street, Fifth Floor
New York, NY 10006

## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NEW YORK

| | |
|---|---|
| GEORGE MANDALA and CHARLES BARNETT, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>NTT DATA, INC.,<br><br>Defendant. | Case No. 6:18-cv-06591-CJS<br><br>FIRST AMENDED CLASS ACTION COMPLAINT [EDITED]<br><br>Jury Trial Demanded |

Plaintiffs George Mandala and Charles Barnett, individually and on behalf of all others similarly situated, allege, upon personal knowledge as to themselves and upon information and belief as to other matters, as follows:

## NATURE OF THE ACTION

1.      As the U.S. Commission on Civil Rights has found, "[w]hen the collateral consequences [of criminal convictions] are unrelated [either to the underlying crime for which a person has been convicted or to a public safety purpose], their imposition generally negatively affects public safety and the public good."[1]  Therefore, "[e]mployers should not automatically

---

[1]      U.S. Commission on Civil Rights, *Collateral Consequences: The Crossroads of Punishment, Redemption, and the Effects on Communities* (June 2019), at 133, *available at* https://www.usccr.gov/pubs/2019/06-13-Collateral-Consequences.pdf.

disqualify a candidate with a criminal record, except in circumstances when the criminal record directly conflicts with the scope of employment."[2]

2.    NTT Data, Inc. ("Defendant" or "NTT"), one of the largest information technology ("IT") services providers in the world, and with offices across the United States, routinely rejects job applicants with criminal records like George Mandala ("Mr. Mandala") and Charles Barnett ("Mr. Barnett"), pursuant to an overbroad criminal history screening policy and practice.

3.    Plaintiffs applied for and received an offer for a job with NTT.  However, NTT subsequently and unjustifiably withdrew their job offers based on an overly restrictive criminal history screening policy triggering rejection without any individualized analysis.

4.    Because African Americans, like Plaintiffs, are subjected to arrest and conviction at disproportionally higher rates than whites regardless of education level and across demographic groups, NTT's policy and practice of denying individuals job opportunities based on their criminal history has an unjustified disparate impact on African Americans, that is not job related or consistent with any business necessity.  NTT's policy also does not adequately measure whether (i) an applicant's criminal history has a direct relationship to the employment sought or (ii) the applicant poses an unreasonable risk to persons or property.

5.    Because these practices perpetuate gross racial disparities in the criminal justice system, Plaintiffs allege they are unlawful under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq* ("Title VII").

6.    Plaintiff George Mandala, who is a resident of New York, further alleges that NTT violated his rights and the rights of those similarly situated under the New York Human

---

[2]    *Id.* at 137.

Rights Law, N.Y. Exec. Law § 290 *et seq.* ("NYHRL"), Article 23-A of the New York State

Correction Law, N.Y. Corr. Law § 750 *et seq.* ("Correction Law"), and the New York State Fair

Credit Reporting Act ("NY FCRA"), N.Y. Gen. Bus. Law § 380 *et seq*.

7.      Through this lawsuit, Plaintiffs will show that the conduct outlined in this

Complaint constitutes unlawful discrimination and clearly violates Title VII as well as New York

State law and the stated public policy of New York to remove barriers to employment for New

Yorkers who have paid the penalties for any crimes they may have committed.

8.      Accordingly, Plaintiffs seeks damages and injunctive and declaratory relief on

behalf of themselves and all other NTT applicants similarly impacted in New York and

nationwide, as outlined further below.

<u>**JURISDICTION AND VENUE**</u>

9.      This Court has jurisdiction over Plaintiffs' Title VII claims pursuant to 28 U.S.C.

§ 1331.  This Court also has jurisdiction over Plaintiffs' NYHRL and NY FCRA claims pursuant

to 28 U.S.C. § 1367 (supplemental jurisdiction).

10.      Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because a

substantial part of the events and omissions giving rise to the claims alleged herein occurred in

this District.

11.      This Court is empowered to issue a declaratory judgment pursuant to 28 U.S.C.

§§ 2201 and 2202.

12.      Plaintiffs have exhausted their administrative remedies and complied with all

statutory prerequisites to their Title VII claims.  Plaintiff Mandala filed a charge of

discrimination, individually and on behalf of individuals similarly situated with the Equal

Employment Opportunity Commission ("EEOC") on June 2, 2017.  By notice dated May 17,

2018, the EEOC issued a Notice of Right to Sue.  The original Complaint in this action was filed within ninety days of the Notice of Right to Sue.  Under the Second Circuit's application of the single-filing rule, Mr. Barnett may "piggy-back" on Mr. Mandala's previous filing, because Mr. Mandala's EEOC charge relates to the same claims that Mr. Barnett asserts.

## PARTIES

### Plaintiffs

13.     Plaintiffs and the proposed Class Members they seek to represent are each "persons," "individuals," "consumers," and "applicants for employment" within the meaning of the NYHRL, the NY FCRA, and Title VII.

14.     Plaintiffs have criminal convictions.

15.     Plaintiff Mandala is an African American resident of Rochester, New York, who received a job offer from NTT as a Salesforce Developer.  NTT subsequently withdrew Plaintiff Mandala's job offer due to his criminal conviction, which was a non-violent conviction for DWI from 2014.  NTT did not provide Plaintiff with a copy of Article 23-A of the Correction Law in the time and manner required by N.Y. Gen. Bus. Law § 380-g(d).

16.     Plaintiff Barnett is an African American resident of Frankfort, Kentucky who received a job offer from NTT as a web developer for the Commonwealth of Kentucky.  NTT subsequently withdrew Plaintiff's job offer due to his criminal conviction.

### Defendant

17.     NTT is a global IT services company that employs over 110,000 people worldwide, including approximately 18,000 employees in North America.

18.     At all relevant times, NTT has been an employer as defined by Title VII and the NYHRL, and a private employer as defined by the Correction Law.

19.     At all relevant times, NTT has been an employer as defined by the NYHRL, and a private employer as defined by the Correction Law.

20.     At all relevant times, NTT has or should have been aware of the requirements of the NY FCRA, and yet has disregarded those requirements.

21.     At all relevant times, NTT has been a "person, firm, corporation or other entity" requesting "consumer reports" of Plaintiff and proposed Class Members for "employment purposes" and has taken "adverse action" against Plaintiff and similarly situated applicants, as defined by the NY FCRA, for example by preventing them from explaining or challenging their rejections of employment.  These adverse actions have been based wholly or in part on those consumer reports.

## STATEMENT OF FACTS

**Plaintiff George Mandala**

22.     In or around January or February of 2017, Mr. Mandala applied for a job as a Salesforce Developer with NTT.

23.     Mr. Mandala had two telephone interviews with NTT employees, during which the NTT employees asked him technical questions related to the position and he answered competently, based on his years of applicable work experience.

24.     Mr. Mandala successfully completed his two telephone interviews and supplied NTT with professional references.

25.     NTT subsequently told Mr. Mandala that, while employed by NTT, he would be contracted to a company based in Wellesley, Massachusetts, and working remotely based out of his home in Rochester, New York.

26.     NTT sent Mr. Mandala a formal offer letter on March 22, 2017, signed by Patricia Price, a Senior Recruiter with NTT, offering Mr. Mandala a job as an Application Software Development Senior Principal Consultant.

27.     The offer letter stated that NTT's "management team was impressed with [Mr. Mandala's] credentials and experience," and that Mr. Mandala would "work out of NTT DATA's remote home office to begin on April 3, 2017."

28.     Mr. Mandala accepted NTT's offer of employment via correspondence dated March 23, 2017.

29.     Mr. Mandala authorized a background check pursuant to NTT's policy, and NTT obtained a criminal background check on Mr. Mandala from a consumer reporting agency.

30.     On March 30, 2017, Mr. Mandala attended a pre-orientation telephone call with other new employees.

31.     On the same day, Mr. Mandala received an e-mail from Patricia Price, asking "Could you give me a call to discuss your background check?"

32.     Mr. Mandala called Ms. Price and Ms. Price informed Mr. Mandala that NTT had a policy not to hire persons with felonies on their records.

33.     Mr. Mandala thereafter received a letter from NTT, signed by Ms. Price, dated April 6, 2017, which stated that NTT was withdrawing Mr. Mandala's job offer, and that "[t]his action was influenced by information contained in a consumer report, made at [NTT's] request and provided by . . . ASURINT[.]"

34.     During the interview process, and afterwards, NTT never sought or considered information from Mr. Mandala which would enable it to fully evaluate the factors laid out in Section 753 of the Correction Law.  For example, after reviewing Mr. Mandala's background

check, NTT never asked Mr. Mandala for information regarding the circumstances of his convictions or evidence of Mr. Mandala's rehabilitation or good conduct.  Furthermore, NTT's action was indicative of a policy and practice of denying job opportunities to individuals with criminal convictions, which does not adequately measure risk or the relationship of the conviction to the job, and does not permit NTT to fully evaluate the factors laid out in Section 753 of the Correction Law.

35.     Had NTT performed a legally compliant analysis, NTT would not have denied employment to Mr. Mandala because of his criminal conviction, which is a non-violent felony conviction for Driving While Intoxicated ("DWI") from 2014.  That conviction had no direct relationship to the employment Mr. Mandala sought and did not create an unreasonable risk to property or to the safety or welfare of specific individuals or the general public.

36.     NTT did not provide Mr. Mandala with a copy of Article 23-A of the Correction Law in the time and manner required by N.Y. Gen. Bus. Law § 380-g(d).

37.     This experience is not unique to Mr. Mandala. NTT stated, when posting for a Network/Systems Administrator in New York City, that part of its "Basic Qualifications" for employment is a requirement that an applicant have "No prior felony arrests. No drug related arrests."  Ex. 1.

38.     On June 2, 2017, Mr. Mandala filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC"), filed contemporaneously with the the the New York State Division of Human Rights, based on NTT's denial of employment.  On May 17, 2018, the EEOC issued Mr. Mandala a Notice of Right to Sue.

**Plaintiff Charles Barnett**

39.     In or around July 2017, NTT contacted Mr. Barnett regarding an opportunity to

work on a contract with the Commonwealth of Kentucky as a web developer.  Mr. Barnett said that he would be interested in the position and signed a "Right to Represent" form agreeing that NTT could present him to the Commonwealth of Kentucky for the position.

40.    Mr. Barnett understood that the job to which he applied would involve working on websites for the Kentucky Department of Education, though he would be an employee of NTT.

41.    After several phone calls with Katie Sargent, an NTT recruiter who collected Mr. Barnett's application information, Mr. Barnett had a phone interview with Mark McChesney, the NTT project director, and another NTT employee, Fonyam Atanga.

42.    The interview was successful and Mr. Barnett advanced to the next round.

43.    Mr. Barnett had an in-person interview with NTT employee Mr. Atanga, and this interview was also successful.

44.    After Mr. Barnett's in-person interview, Ms. Sargent told Mr. Barnett he had received an offer of employment, and she sent Mr. Barnett an offer of employment via email, which Mr. Barnett accepted.

45.    Mr. Barnett authorized a background check pursuant to NTT's policy.

46.    NTT obtained a criminal background check on Mr. Barnett from a consumer reporting agency.

47.    After the background check was completed, Ms. Sargent informed Mr. Barnett via phone that NTT was withdrawing its offer of employment to Mr. Barnett as a result of Mr. Barnett's convictions.

48.    NTT provided Mr. Barnett with a "Right-To-Represent" contracts for other open positions, which he signed.

49.     Mr. Barnett subsequently sought to apply for other positions with NTT, but several weeks after he sought to apply for these positions, Ms. Sargent informed Mr. Barnett that NTT would not submit Mr. Barnett's profile for other positions because of his felony convictions.

50.     Notably, after the convictions at issue but prior to applying to NTT, Mr. Barnett was an employee of the Commonwealth of Kentucky for approximately four years, performing IT work and project coordination as an Administrative Specialist.

51.     Also after the convictions at issue and prior to applying to NTT, Mr. Barnett achieved a Masters of Science in Computer Science Technology and an Associate degree in Applied Science/Computer Programming.  Previously, Mr. Barnett had also obtained a Bachelor of Science degree in Agricultural Economics.

52.     During the interview process, and afterwards, NTT never sought or considered information from Mr. Barnett regarding the circumstances of his convictions or evidence of Mr. Barnett's rehabilitation or good conduct.  Furthermore, NTT's action was indicative of a policy and practice of denying job opportunities to individuals with criminal convictions, a policy and practice that does not permit NTT to consider the factors outlined by the 2012 EEOC Enforcement Guidance on the Consideration of Arrest and Conviction Records in Employment Decisions under Title VII of the Civil Rights Act of 1964.

**Factual Allegations Common to All Class Members**

***Title VII and NYHRL Disparate Impact Claims***

53.     As the U.S. Commission on Civil Rights recently reported, "when employers use criminal background checks to indiscriminately disqualify all applicants with criminal records,

these employers severely curtail employment opportunities for formerly incarcerated people."[3]

Moreover, "[b]ecause black and Latino individuals are likelier to have criminal records than

white and Asian people, . . . black and Latino males are disproportionately affected by criminal

background checks."[4]

54.     NTT's policy and practice of denying job opportunities to individuals with non-

job-related convictions had and continues to have a significant and detrimental impact on

African Americans, based on their race, color and/or national origin, as compared to white

applicants.  African Americans are arrested, sentenced, and imprisoned for crimes at

substantially higher rates than whites, relative to their share of the national population.[5]

55.     According to a report to the United Nations Special Rapporteur on Contemporary

Forms of Racism, Racial Discrimination, Xenophobia, and Related Intolerance, "[i]n 2010, 8%

of all adults in the United States had a felony conviction on their record" but "[a]mong African-

American men, the rate was one in three."[6]  The same report showed that "African-American

---

[3]     U.S. Commission on Civil Rights, *Collateral Consequences: The Crossroads of Punishment, Redemption, and the Effects on Communities* (June 2019), at 42, *available at* https://www.usccr.gov/pubs/2019/06-13-Collateral-Consequences.pdf.

[4]     *Id.*

[5]     *See* U.S. Department of Justice, Federal Bureau of Investigation, *Crime in the United States 2016*, Table 21A (Arrests by Race and Ethnicity), *available at* https://ucr.fbi.gov/crime-in-the-u.s/2016/crime-in-the-u.s.-2016/topic-pages/tables/table-21 (showing 26.9% of arrests are of Black or African American individuals, while 69.6% of arrests are of white individuals); U.S. Census Bureau, *Quick Facts, United States* (2017), *available at* https://www.census.gov/quickfacts/fact/table/US/PST045217 (showing Black or African American individuals make up approximately 13.4% and whites make up 76.6% of the United States population).  *See also EEOC Enforcement Guidance on the Consideration of Arrest and Conviction Records in Employment Decisions Under Title VII of the Civil Rights Act of 1964*, at 9-10 (April 25, 2012) (national data showing Black individuals arrested and convicted at higher rates than whites "supports a finding that criminal record exclusions have a disparate impact based on race and national origin").

[6]     Report of The Sentencing Project to the United Nations Special Rapporteur on Contemporary Forms of Racism, Racial Discrimination, Xenophobia, and Related Intolerance: Regarding Racial Disparities in the United States Criminal Justice System, The Sentencing

adults are 5.9 times as likely to be incarcerated than whites," based on Bureau of Justice

Statistics from 2016, which derived estimates based on prisoners sentenced for more than one

year.[7]  Further, "[i]n 2016, black Americans comprised 27% of all individuals arrested in the

United States—double their share of the total population."[8]  Projections based on recent trends in

incarceration estimate that one out of every three African American males born today will go to

prison, compared to just one out of every seventeen white males.[9]

56.    These trends are equally salient in New York State.  According to data compiled

by the Sentencing Project, as of 2014, the Black imprisonment rate in New York State was 896

per 100,000, compared to a white imprisonment rate of 112 per 100,000.[10]  According to the

Bureau of Justice Statistics, in 2016 there were 24,370 Black prisoners under the jurisdiction of

state or federal correctional authorities in New York, nearly double the number of white

prisoners (12,391).[11] This is so even though Black people make up approximately 17.6% of the

---

Project (2018) at 9, *available at* https://www.sentencingproject.org/wp-content/uploads/2018/04/UN-Report-on-Racial-Disparities.pdf.  As is widely acknowledged, racial disparities in arrest and conviction rates in the United States are themselves the result of systemic discrimination in the criminal justice system.  *See generally, id.*

[7]    *Id.* at 2 (citing U.S. Bureau of Justice Statistics, Prisoners in 2016, 8 tbl.6 (Jan. 2018), *available at* https://www.bjs.gov/content/pub/pdf/p16.pdf).

[8]    *Id.  See also* Leah Sakala, *Breaking Down Mass Incarceration in the 2010 Census: State-by-State Incarceration Rates by Race/Ethnicity*, Prison Pol'y Initiative (May 28, 2014), http://www.prisonpolicy.org/reports/rates.html.

[9]    Marc Mauer, *Addressing Racial Disparities in Incarceration*, 91 Prison J. 87S, 88S (2011), *available at* https://www.sentencingproject.org/wp-content/uploads/2016/01/Addressing-Racial-Disparities-in-Incarceration.pdf.

[10]    The Sentencing Project, State-by-State Data, *available at* https://www.sentencingproject.org/the-facts/#detail?state1Option=New%20York&state2Option=0.  Another estimate using 2010 Census data shows 1,655 Blacks incarcerated per 100,000 people in that racial/ethnic group, compared to 219 whites per 100,000.  Prison Policy Initiative, New York profile, *available at* https://www.prisonpolicy.org/profiles/NY.html.

[11]    U.S. Bureau of Justice Statistics, Prisoners in 2016, 24 tbl.21 (Jan. 2018), *available at* https://www.bjs.gov/content/pub/pdf/p16.pdf.

statewide population.[12]  Finally, the New York State Department of Corrections and Community Supervision reported in 2016 that African Americans made up 48.6% of inmates under state custody, while whites made up 24.4% of inmates under state custody.[13]  As an additional example of the severe racial disparity in the New York justice system, New York has one of the largest disparities in marijuana possession arrest rates between Black and white people, with Black people over 4.5 times as likely to be arrested for marijuana possession as white people.[14]

57.     Unequal treatment persists throughout the criminal justice system. According to leading sociologists and criminologists, the differences in criminal conviction rates between white persons and Black persons in America are not only very large, but they are also historical and pervasive across geographic and demographic groups.  The racial disparities are so pervasive that there are no statistics available to suggest that Black and white people are treated equally at the hands of the criminal justice system in *any* segment of society, be it geographic location, educational level or socio-economic status.  *See* Ex. 2.

58.     Black men with some college education have imprisonment risks that are seven (7) times greater than white men with some college education (4.9% for Black men compared to 0.7% for white men). This is consistent with the racial disparities that exist among individuals with lesser educational attainment.[15]

---

[12]     United States Census, QuickFacts: New York, *available at* https://www.census.gov/quickfacts/fact/table/NY/RHI225219#RHI225219.

[13]     New York State Dep't of Corrections and Community Supervision, Under Custody Report: Profile of Under Custody Population as of January 1, 2016, at ii, 5, *available at* http://www.doccs.ny.gov/Research/Reports/2016/UnderCustody_Report_2016.pdf.

[14]     Ezekiel Edwards, Will Bunting, and Lynda Garcia, The War on Marijuana in Black and White, American Civil Liberties Union (2013) at 49, *available at* https://www.aclu.org/files/assets/1114413-mj-report-rfs-rel1.pdf.

[15]     BRUCE WESTERN, PUNISHMENT AND INEQUALITY IN AMERICA 27 (Russell Sage Foundation, 2006).

59.     One clear example of how racial discrimination in the criminal justice system persists regardless of educational level concerns discriminatory policing on college campuses. In a recent study, more than two-thirds of college students surveyed agreed with the following statement: "In general, most students on campus are treated differently by law enforcement officials based on their racial appearance."[16]

60.     Audit studies conducted by researchers at Harvard and Princeton Universities also found that even among people with criminal records, African Americans were particularly disadvantaged in the job market compared to white people with criminal records.[17]

61.     NTT's policies and practices as to screening applicants with criminal histories, including any blanket exclusions of individuals with felony or other types of convictions, are not consistent with business necessity.

62.     NTT's applicant screening policies and practices do not bear any direct relationship to the employment in question.

63.     For example, having a conviction is not an accurate proxy for determining

---

[16]     Jaylon Thomas & Kalen Russell, Black Students' Lived Experiences With and Perceptions of Law Enforcement, ASS'N AM. COLLEGES & U. (Winter 2019) https://www.aacu.org/diversitydemocracy/2019/winter/thomas. *See also,* Elizabeth Meizenzhal, Black Students*, Alumni Allege Pattern of Racial Profiling by Penn Police,* DAILY PENNSYLVANIAN, INC. (Aug. 7, 2020, 1:34 AM), https://www.thedp.com/article/2020/08/penn-police-racial-profiling-racism; Claire Hansen*, After Racial Profiling of a Student, Smith College Hires and Investigator to Review what Happened,* CHRON. HIGHER EDUC. (Aug. 3, 2018), https://www.chronicle.com/article/after-racial-profiling-of-a-student-smithcollege-hires-an-investigator-to-review-what-happened/; *Racial Profiling Problem on College Campuses,* WILLIAMS CEDAR LLC TRIAL LAW (June 27, 2019), https://www.williamscedar.com/racial-profiling-collegecampuses/.

[17]     Devah Pager et al., *Discrimination in a Low-Wage Labor Market: A Field Experiment*, 74 Am. Soc. Rev. 777, 785-86 (2009); Devah Pager et al., *Sequencing Disadvantage: Barriers to Employment Facing Young Black and White Men with Criminal Records*, 623 Annals Am. Acad. Pol. & Soc. Sci. 195, 199 (2009); Devah Pager, *The Mark of a Criminal Record*, 108 AM. J. SOC. 937, 955-61 (2003).

whether an applicant would be able to perform the duties of the job. Upon information and belief, no reliable studies or empirical data suggest that applicants with criminal records are more likely to engage in terminable offenses.[18]

64.     NTT's policy and practice of denying employment to individuals with criminal histories, including felony convictions, is far too over-inclusive to meet the standards of job-relatedness and consistency with business necessity.

65.     Upon information and belief, NTT does not have a process or policy to determine whether applicants convicted of crimes have made positive changes in their lives subsequent to their convictions. NTT's policy and practice of banning individuals with convictions from employment has effectively foreclosed applicants' abilities to provide proof of rehabilitation, such as documentation of successful participation in drug treatment programs, educational achievements or relevant employment, or to submit certificates of relief from disabilities, which in many states create a presumption of rehabilitation.

66.     Upon information and belief, the policy and practice of rejecting individuals with criminal records has created significant barriers to employment that excluded many properly qualified persons, including disproportionate numbers of African American applicants. There are less discriminatory alternatives that would have better achieved any legitimate business purpose.

67.     Less discriminatory alternatives include, but are not limited to: (1) considering all applicants with a record of conviction for a crime that by its nature does not pose a legitimate threat to the public safety or risk of workplace misconduct; and (2) giving each individual with a

---

[18]     *See, e.g.,* Ian B. Petersen, *Toward True Fair-Chance Hiring: Balancing Stakeholder Interests and Reality in Regulating Criminal Background Checks*, 94 Tex. L. Rev. 175, 187-88 (2015).

conviction a meaningful opportunity to demonstrate that he or she does not present a current threat, including providing evidence of rehabilitation, an explanation of events leading to the conviction, or information regarding other mitigating factors.

### The NYHRL Criminal History Discrimination Claim

68.     The NYHRL states "[i]t shall be an unlawful discriminatory practice" to "deny . . . employment to any individual" based on a criminal conviction "when such denial is in violation of the provisions of article twenty-three-A of the correction law."  N.Y. Exec. Law § 296(15).

69.     Article 23-A of the Correction Law prohibits an employer from denying employment to any person by virtue of their criminal record unless the employer can meet its burden of demonstrating one of two narrow exceptions:

> (1) there is a direct relationship between one or more of the previous criminal offenses and the specific license or employment sought or held by the individual; or
>
> (2) the issuance or continuation of the license or the granting or continuation of the employment would involve an unreasonable risk to property or to the safety or welfare of specific individuals or the general public.

N.Y. Correct. Law § 752.

70.     In evaluating whether an employer meets one of these two narrow exceptions, Article 23-A of the Correction Law further requires that the employer must consider *all* of the following factors:

> (a) The public policy of this state, as expressed in this act, to encourage the licensure and employment of persons previously convicted of one or more criminal offenses.
>
> (b) The specific duties and responsibilities necessarily related to the license or employment sought or held by the person.
>
> (c) The bearing, if any, the criminal offense or offenses for which the person was previously convicted will have on his fitness or ability to perform one or more such duties or responsibilities.

(d) The time which has elapsed since the occurrence of the criminal offense or offenses.

(e) The age of the person at the time of occurrence of the criminal offense or offenses.

(f) The seriousness of the offense or offenses.

(g) Any information produced by the person, or produced on his behalf, in regard to his rehabilitation and good conduct.

(h) The legitimate interest of the public agency or private employer in protecting property, and the safety and welfare of specific individuals or the general public.

N.Y. Correct. Law § 753.

71.    It is impossible for an employer to conduct the legally required evaluation of all Article 23-A factors without first engaging in a conversation with the prospective candidate before making an employment determination or affirmatively soliciting evidence of rehabilitation.  *See, e.g.*, N.Y. Correct. Law § 753.

72.    It is impossible for an employer to conduct the legally required evaluation of all Article 23-A factors if the employer operates with a policy or practice of denying employment to all individuals with criminal records, or with specific types of criminal convictions.  *See* N.Y. Correct. Law § 753.

73.    For this reason, among others, the NYHRL forbids companies from denying employment simply because a job applicant has a criminal record.  Instead, companies must engage in an evaluation of the factors outlined in the Correction Law before making an employment determination.

74.    Despite the requirements of the NYHRL, NTT has denied, and continues to deny, employment to job applicants with certain convictions, without undertaking the inquiry required by New York law.

75.     The ability to find employment is an essential aspect of reentering society for people with criminal histories.  Recidivism declines when those individuals have viable employment prospects and other stabilizing resources in their communities.  NTT's policy of discriminating against individuals with criminal records frustrates such public policy objectives.

76.     The New York City Commission on Human Rights' guidance about the recently enacted Fair Chance Act explains that "[e]mployers must carefully conduct the Article 23-A analysis."[19]  This means that "[o]nce an employer extends a conditional offer and learns of an applicant's conviction history, it must solicit the information necessary to properly consider each Article 23-A factor, including the applicant's evidence of rehabilitation."[20]

77.     NTT's criminal history policies and practices do not adequately assess whether an applicant's criminal history poses an unreasonable risk or whether there is a direct relationship between that conviction and the job.

78.     Upon information and belief, NTT has not validated its criminal history policies and practices.

79.     By denying employment to job applicants before soliciting such information, NTT violated Article 23-A and therefore violated the NYHRL.

80.     On information and belief, NTT has acted consciously and/or recklessly in breaching its duties and depriving Plaintiff Mandala and other job applicants of their rights under the NYHRL and the Correction Law, or in failing to make an appropriate inquiry to ascertain its obligations under the NYHRL and the Correction Law.

***The Notice of Rights Claim***

---

[19]     *See* Fair Chance Act: Legal Enforcement Guidance, NYC Commission on Human Rights Legal Enforcement Guidance on the Fair Chance Act, Local Law No. 63 (2015) *Revised 5/24/2019*, *available at* https://www1.nyc.gov/site/cchr/law/fair-chance-act.page.
[20]     *Id*.

81.    The NY FCRA requires that:

When a consumer reporting agency provides a consumer report that contains criminal conviction information, permitted by paragraph one of subdivision (a) of section three hundred eighty-j of this article, to a user, the person, firm, corporation or other entity requesting such report shall provide the subject of such report a printed or electronic copy of article twenty-three-A of the correction law governing the licensure and employment of persons previously convicted of one or more criminal offenses.

N.Y. Gen. Bus. Law § 380-g(d).

82.    "The public policy of [New York] state, as expressed in [its Correction Law], [is] to encourage the licensure and employment of persons previously convicted of one or more criminal offenses."  N.Y. Correct. Law § 753(1)(a).

83.    Consistent with the public policy of New York, in 2008 the New York Legislature added Section 380-g.

84.    The purpose of this requirement is to inform individuals with criminal records of their rights and remedies under the law and for employers to be informed of their obligations under the law in order to avoid illegal discrimination.

85.    For example, the New York State Assembly's Memorandum in Support of the Legislation stated, in part: "Once [criminal history information] is obtained, employers have repeatedly dismissed qualified applicants and terminated employees based solely on their criminal histories, even if there is no direct relationship between the criminal offense(s) and the job and no unreasonable risk to the safety to the public or property, the criteria upon which an employer can deny a job to an applicant or terminate an existing employee.  The enactment of this bill will help ensure that employers and prospective employees are informed about the mandates of Article 23-A of the correction law.  This will help to avoid illegal discrimination against persons with a criminal conviction."  N.Y.S. Assembly's Memorandum in Support of the Legislation, Bill No. 10288A, 2007-2008 Term.

86.     Upon information and belief, NTT has routinely and systematically failed to provide Plaintiff Mandala and other job applicants with a copy of Article 23-A of the Correction Law, in the timing and manner required under the law.

87.     This has caused Plaintiff Mandala and other job applicants concrete harm, including because it has prevented them from advocating fully for a job with NTT and from explaining why their conviction histories did not disqualify them from employment; it has denied them an opportunity to learn of their rights under Article 23-A of the Correction Law; and it has created the risk of future harm.

88.     For example, as discussed above, under the Correction Law, NTT cannot deny employment to an individual "when such finding is based upon the fact that the individual has previously been convicted of one or more criminal offenses, unless" NTT shows "a direct relationship" between the conviction(s) and the job or "an unreasonable risk to property or to the safety or welfare of specific individuals or the general public." N.Y. Correct. Law § 752.

89.     NTT must consider all eight factors laid out in Section 753 of the Correction Law and whether the individual has a certificate of relief from disabilities or a certificate of good conduct. N.Y. Correct. Law § 753.

90.     Section 754 of the Correction law allows an individual "previously convicted of one or more criminal offenses" to request a written explanation for the employer's denial of employment, which the employer is required to provide within 30 days of the request—providing applicants with crucial information as to the basis for the job denial. N.Y. Correct. Law § 754.

91.     NTT's failure to provide Plaintiff Mandala and other job applicants with a copy of Article 23-A of the Correction law denied them information to advocate fully for a position with NTT and explain their suitability for employment, and information about their legal right to be

free from discrimination and remedies for that discrimination once it had occurred.

92.    NTT's failure to provide this information also created the risk that Plaintiff Mandala and other job applicants would fail to seek to vindicate their right to be free from discrimination—either from NTT's denial of employment or the denial of employment by another employer.

93.    NTT's violation of the NY FCRA frustrates New York's public policy to increase the employment of persons with criminal convictions. *See* N.Y. Correct. Law § 753(1)(a).

94.    On information and belief, NTT has acted willfully in violating the requirements of the NY FCRA.  NTT knew or should have known about its obligations under the NY FCRA. These obligations are well-established by the longstanding and plain language of the NY FCRA.

95.    NTT has acted recklessly and willfully in breaching duties that it knew or should have known were required under the NY FCRA and depriving Plaintiff Mandala and other job applicants of their rights.

## CLASS ACTION ALLEGATIONS

96.    Plaintiffs bring this case as a proposed Class action pursuant to Fed. R. Civ. P. 23 on behalf of themselves and three classes of persons (collectively, the "Classes").

97.    Plaintiffs bring this class action pursuant to Federal Rules of Civil Procedure 23(a), (b)(2), and/or (c)(4) seeking liability-phase injunctive and declaratory relief.

98.    Plaintiffs also bring this class action pursuant to Federal Rules of Civil Procedure 23(a), (b)(3) and/or (c)(4) seeking backpay, monetary damages, and other make-whole relief.

99.    Plaintiffs asserts the First Cause of Action against NTT on behalf of the "Title VII Disparate Impact Class," defined as follows:

**Title VII Disparate Impact Class:** All African American individuals who, from August 6, 2016, through the resolution of this action, were denied employment

based in whole or in part because of NTT's policy and practice of denying employment to individuals with criminal convictions.

100.    Plaintiff Mandala asserts the Second Cause of Action against NTT on behalf of

the "NYHRL Disparate Impact Class," defined as follows:

**NYHRL Disparate Impact Class**: All African American individuals who, from June 2, 2014, through the resolution of this action, were denied employment in New York State based in whole or in part on NTT's policy and practice of denying employment to individuals with criminal convictions.

101.    Plaintiff Mandala asserts the Third Cause of Action against NTT on behalf of the

"NYHRL Criminal History Discrimination Class," defined as follows:

**NYHRL Criminal History Discrimination Class**: All individuals who, from June 2, 2014, through the resolution of this action, were denied employment in New York State based in whole or in part on NTT's policy and practice of denying employment to individuals with criminal convictions.

102.    Plaintiff Mandala asserts the Fourth Cause of Action against NTT on behalf of the

"Notice of Rights Class," defined as follows:

**Notice of Rights Class**: All individuals in New York State who, from August 15, 2016, through the resolution of this action, did not receive a copy of Article 23-A of the Correction Law from NTT when NTT received their consumer reports.

103.    The members of the Title VII Disparate Impact Class, the NYHRL Disparate

Impact Class, the NYHRL Criminal History Discrimination Class and the Notice of Rights Class

are collectively referred to as "Class Members."

104.    Plaintiffs reserve the right to amend the definition of above-defined Classes based

on discovery or legal developments.

105.    The Class Members identified herein are so numerous that joinder of all members

is impracticable.  NTT is a large employer both in the United States and in New York, with over

twenty offices in the United States including four offices in New York State.  The number of job

applicants harmed by NTT's violations of the law is far greater than feasibly could be addressed

through joinder.  The precise number is uniquely within Defendant's possession, and Class

Members may be notified of the pendency of this action by published, mailed and/or e-mailed

notice.

106.    There are questions of law and fact common to Class Members, and these

questions predominate over any questions affecting only individual members.  Common legal

and factual questions include, among others:

(a)    Whether it was Defendant's policy and practice to exclude job applicants with certain convictions who should have been eligible for employment based on valid factors assessing legitimate threat to public safety or risk of workplace misconduct;

(b)    Whether Defendant's policy and practice to exclude job applicants based on certain convictions had a discriminatory disparate impact on African Americans;

(c)    Whether Defendant's policy and practice to exclude job applicants based on their criminal history is job-related and/or consistent with business necessity;

(d)    Whether there was a less discriminatory policy and practice that would have met Defendant's legitimate needs;

(e)    Whether Defendant violated the NYHRL and the Correction Law when denying employment to Plaintiff and the NYHRL Criminal History Discrimination Class;

(f)    Whether Defendant violated the NY FCRA by failing to provide Plaintiff and the Notice of Rights Class with a timely copy of Article 23-A of the Correction Law, in violation of N.Y. Gen. Bus. Law § 380-g(d);

(g)    Whether Defendant was willful in its noncompliance with the requirements of the NY FCRA;

(h)    Whether compensatory damages and punitive damages for Class Members are warranted; and

(i)    Whether a declaratory judgement and/or injunctive relief is warranted regarding Defendant's policies and practices.

107.     Plaintiffs are members of the Classes they seek to represent.  NTT took discriminatory adverse action against Plaintiffs based on their criminal histories.  In addition, NTT did not provide Plaintiff Mandala with a timely copy of Article 23-A of the Correction Law.

108.     Plaintiffs' claims are typical of the claims of the Classes they seek to represent: (1) Plaintiffs both applied for a job with NTT within the relevant time period; (2) Plaintiffs both were subjected to the hiring process screening applicants for criminal histories; (3) Plaintiffs both were denied the position because of their criminal history; and (4) NTT did not provide Plaintiff Mandala with a timely copy of Article 23-A of the Correction Law.  All of these claims are shared by each and every Class Member.  Upon information and belief, it is NTT's standard practice to take adverse actions against applicants based on criminal convictions in a manner that is discriminatory and inconsistent with business necessity and without properly considering the factors laid out in the Correction Law for New York Class Members.

109.     Plaintiffs will fairly and adequately represent and protect the interests of Class Members because their interests coincide with, and are not antagonistic to, the interests of the Class Members they seek to represent.  Plaintiffs have retained counsel who are competent and experienced in complex class actions, including litigation pertaining to Title VII, criminal background checks, the Correction Law, NY FCRA, disparate impact litigation, other employment litigation, and the intersection thereof.  There is no conflict between Plaintiffs and the Class Members.

110.     A class action is superior to other available methods for the fair and efficient adjudication of this litigation.  Class Members have been damaged and are entitled to recovery as a result of Defendant's uniform policies and practices.  NTT has acted and/or refused to act on

grounds generally applicable to the Class Members, making declaratory and injunctive relief appropriate with respect to Plaintiff and the Class Members as a whole. Because NTT has maintained a common policy of denying employment to individuals with certain criminal convictions but may not have explained that policy to all Class Members, many Class Members may be unaware that their rights have been violated. Judicial economy will be served by the maintenance of this lawsuit as a class action, in that it is likely to avoid the burden which would otherwise be placed on the judicial system by the filing of many similar suits by individually harmed persons. There are no obstacles to the effective and efficient management of this lawsuit as a class action.

## CAUSES OF ACTION

### FIRST CLAIM FOR RELIEF
**Disparate Impact Discrimination**
**Title VII of the Civil Rights Act of 1964, 42 U.S.C §§ 2000e *et seq*.**
**(On Behalf of Plaintiffs and the Title VII Disparate Impact Class)**

111.    Plaintiffs incorporate by reference the allegations in all preceding paragraphs.

112.    Named Plaintiffs bring this claim on their own behalf and on behalf of the Title VII Disparate Impact Class.

113.    Plaintiff Mandala timely filed a charge with the EEOC, with class-wide allegations, and has thus exhausted the administrative remedies.

114.    Plaintiff Barnett may "piggy-back" off the previous filing of Mr. Mandala, because Mr. Mandala's EEOC charge relates to the same claims that Mr. Barnett asserts.

115.    Defendant's policy and practice of denying employment opportunities to individuals with criminal convictions has harmed, and continues to harm, Plaintiffs, and constitutes unlawful discrimination on the basis of race, color, and/or national origin in violation of 42 U.S.C. §§ 2000e *et seq*.

116.    Defendant's policy and practice of denying employment opportunities to individuals with criminal convictions had a disparate impact on African Americans and is neither job related nor consistent with business necessity.  Even if Defendant's policy and practice of denying employment opportunities to individuals with criminal convictions could be justified by business necessity, a less discriminatory alternative exists that would have equally served any legitimate purpose.

117.    Defendant's conduct has caused, and continues to cause, Plaintiffs and the members of the Title VII Disparate Impact Class losses in earnings and other employment benefits.

118.    Plaintiffs and the Title VII Disparate Impact Class also seek injunctive and declaratory relief to correct Defendant's discriminatory policies and practices.

## SECOND CLAIM FOR RELIEF
**Disparate Impact Discrimination**
**New York Human Rights Law**
**(On Behalf of Plaintiff Mandala and the NYHRL Disparate Impact Class)**

119.    Plaintiff Mandala, on behalf of himself and the NYHRL Disparate Impact Class, incorporates by reference the allegations in all preceding paragraphs.

120.    Plaintiff Mandala brings this claim on his own behalf and on behalf of the NYHRL Disparate Impact Class.

121.    Defendant's policy and practice of denying employment opportunities to individuals with criminal convictions has harmed, and continues to harm, Plaintiff Mandala, and constitutes unlawful discrimination on the basis of race, color, and/or national origin in violation of the NYHRL.

122.    Defendant's policy and practice of denying employment opportunities to individuals with criminal convictions has had a discriminatory disparate impact on African

Americans and is neither job related nor consistent with business necessity. Even if Defendant's policy and practice of denying employment opportunities to individuals with criminal convictions could be justified by business necessity, a less discriminatory alternative exists that would have equally served any legitimate purpose.

123. Defendant's conduct has caused, and continues to cause, Plaintiff Mandala and the members of the NYHRL Disparate Impact Class losses in earnings and other employment benefits.

124. Plaintiff Mandala and the NYHRL Disparate Impact Class also seek injunctive and declaratory relief to correct Defendant's discriminatory policies and practices.

### THIRD CLAIM FOR RELIEF
**Discriminatory Denial of Employment**
**New York Human Rights Law and Article 23-A of the Correction Law**
**(On Behalf of Plaintiff Mandala and the NYHRL Criminal History Discrimination Class)**

125. Plaintiff Mandala, on behalf of himself and the NYHRL Criminal History Discrimination Class, incorporates the preceding paragraphs as alleged above.

126. Defendant denied employment to Plaintiff Mandala and the NYHRL Criminal History Discrimination Class based in whole or in part on their criminal history.

127. Before denying employment to Plaintiff Mandala and job applicants in the NYHRL Criminal History Discrimination Class, Defendant failed to conduct a proper inquiry into the factors outlined in Article 23-A of the Correction Law (including an adequate assessment of risk or job-relatedness), in violation of N.Y. Exec. Law § 296(15).

128. As a result of Defendant's actions, Plaintiff Mandala and the NYHRL Criminal History Discrimination Class have been deprived of their rights and have lost employment opportunities, earnings and other employment benefits.

129.    Plaintiff Mandala and the NYHRL Criminal History Discrimination Class also seek injunctive and declaratory relief to correct Defendant's discriminatory policies and practices.

**FOURTH CLAIM FOR RELIEF**
**NTT's Failure to Provide a Copy of Article 23-A**
**N.Y. Gen. Bus. Law § 380-g(d)**
**(On Behalf of Plaintiff Mandala and the Notice of Rights Class)**

130.    Plaintiff Mandala, on behalf of himself and the Notice of Rights Class, incorporates the preceding paragraphs as alleged above.

131.    NTT violated the NY FCRA by procuring consumer reports from Plaintiff Mandala and Class Members without providing them with a copy of Article 23-A of the Correction Law at that time.

132.    NTT caused concrete injury (including the risk of harm) to Plaintiff Mandala and the Notice of Rights Class Members, including because they were denied the opportunity to contextualize and explain their conviction histories in light of the Article 23-A factors; they could not bring to the attention of NTT their rehabilitative efforts and other employment; and they could not learn of their rights and opportunities under the NY FCRA in ways that would increase their chances of employment now and in the future.

133.    NTT acted willfully and in knowing or reckless disregard of its obligations and the rights of Plaintiff Mandala and the Notice of Rights Class.

134.    NTT's willful conduct is reflected by, among other things, the fact that it acted recklessly in violating a clear statutory mandate set forth in N.Y. Gen. Bus. Law § 380-g(d).

135.    As a result of NTT's actions, Plaintiff Mandala and the Notice of Rights Class have been deprived of their consumer rights, and prevented from timely and effectively contesting the adverse action.

136.    NTT's willful and/or negligent conduct makes it liable for actual damages, punitive damages, and attorneys' fees and costs, in an amount to be determined by the Court pursuant to N.Y. Gen. Bus. Law § 380-l and N.Y. Gen. Bus. Law § 380-m.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs and Class Members pray for relief as follows:

(a)    A declaratory judgment that the practices complained of herein are unlawful and violate NYHRL and the NY FCRA;

(b)    A preliminary and permanent injunction against NTT and all officers, agents, successors, employees, representatives, and any and all persons acting in concert with them, from engaging in each of the unlawful policies, practices, customs, and usages set forth herein;

(c)    An order that NTT institute and carry out policies, practices, and programs that provide equal employment opportunities for applicants with criminal records who would be eligible under application of Title VII and Article 23-A and that Defendant eradicate the effects of past and present unlawful employment practices;

(d)    Certification of the case as a class action on behalf of the proposed Classes;

(e)    Designation of Plaintiffs as representatives of Class Members;

(f)    Designation of Plaintiffs' counsel of record as Class Counsel;

(g)    Restoring of Plaintiffs and Class Members to their rightful positions at NTT or those positions equivalent at NTT (i.e., reinstatement), or in lieu of reinstatements, an order for front pay benefits;

(h)    An award of backpay and/or compensatory damages for violations of Title VII and the NYHRL;

(i)    An award of nominal and/or exemplary damages;

(j)    An award of all actual damages awardable for violations of the NY FCRA;

(k)    An award of punitive damages under applicable statutes;

(l)    An award of costs incurred herein, including reasonable attorneys' fees to the extent allowable by law;

(m)    Such other injunctive and/or declaratory relief that is necessary to correct Defendant's discriminatory policies and practices;

(n)    Pre-judgment and post-judgment interest, as provided by law;

(o)    Payment of a reasonable service award to Plaintiffs, in recognition of the services they have rendered and will continue to render to Class Members, and the risks they have taken and will take; and

(p)    Such other and further legal and equitable relief as this Court deems necessary, just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury in this action.

Dated: New York, New York
March 11, 2021

Respectfully submitted,

By:   _/s/ Ossai Miazad_____
**OUTTEN & GOLDEN LLP**
Ossai Miazad
Christopher M. McNerney
685 Third Avenue, 25th Floor
New York, New York 10017
Telephone:  (212) 245-1000
E-mail: om@outtengolden.com
E-mail: cmcnerney@outtengolden.com

Rachel Williams Dempsey*
One California Street, Ste 1250
San Francisco, CA 94111
Telephone: (415) 638-8800
E-mail: rdempsey@outtengolden.com

**NAACP LEGAL DEFENSE &
EDUCATIONAL FUND, INC.**
Rachel M. Kleinman
40 Rector Street, Fifth Floor
New York, NY 10006
Telephone: (212) 965-2200
E-mail: rkleinman@naacpldf.org

Catherine Meza*
700 14th Street, NW, Suite 600
Washington, DC 20005
Telephone: (202) 682-1300
E-mail: cmeza@naacpldf.org

*Attorneys for Plaintiff and the Putative Classes*
*pro hac vice forthcoming*