UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

————————————————————————————

GEORGE MANDALA & CHARLES BARNETT,
*individually and on behalf of all others similarly
situated,*

|  |  |
|---|---|
| Plaintiffs, | DECISION AND ORDER |
| vs. |  |
|  | 18-CV-6591 (CJS) |
| NTT DATA, INC., |  |
| Defendant. |  |

————————————————————————————

In July 2019, the Court granted Defendant NTT Data, Inc.'s ("NTT") motion to dismiss Plaintiffs George Mandala's and Charles Barnett's ("Plaintiffs") putative class action Title VII disparate impact claims against NTT for its alleged policy not to hire individuals with criminal convictions. *Mandala v. NTT Data, Inc.*, No. 18-CV-6591 CJS, 2019 WL 3237361 (W.D.N.Y. July 18, 2019). The judgment was subsequently affirmed on appeal by the Second Circuit Court of Appeals, and Plaintiffs' petition for a rehearing *en banc* was denied. *Mandala v. NTT Data, Inc.*, 975 F.3d 202 (2d Cir. 2020); *Mandala v. NTT Data, Inc.*, 988 F.3d 664 (2d Cir. 2021).

The matter is presently before the Court on Plaintiffs' motion pursuant to Rule 60(b)(6) of the Federal Rules of Civil Procedure to vacate the Court's judgment so that Plaintiffs can file a first amended complaint. Mot. to Vacate, Mar. 31, 2021, ECF No. 35. For the reasons stated below, Plaintiffs' motion for relief [ECF No. 35] is denied.

BACKGROUND

The Second Circuit has succinctly summarized the background and procedural history of this case:

In early 2017, George Mandala applied for a position as a Salesforce Developer at NTT Data, Inc., a global information technology services provider. Impressed by his work experience and his answers to various "technical questions" during the interview process, . . . NTT offered Mandala a job as an "Application Software Development Senior Principal Consultant" . . . . But upon conducting a routine background check, the company discovered that Mandala had been convicted of a felony and quickly withdrew its offer of employment. When a member of NTT's recruitment team broke the news to Mandala, she indicated that "NTT had a policy not to hire persons with felonies on their records . . . ."

Charles Barnett had a similar experience. NTT reached out to him in July 2017 about a "web developer" position on a project for the Kentucky Department of Education . . . . On paper, Barnett appeared to be a strong candidate: he had relevant work experience, a "Masters of Science in Computer Science Technology[,] and an Associate degree in Applied Science/Computer Programming . . . ." And after a few rounds of interviews, NTT offered him the job. But the company pulled that offer once it learned that Barnett had been convicted of several felonies. Though Barnett asked NTT to consider hiring him for other positions, he was informed that he was ineligible "because of his felony convictions . . . ."

So, in August 2018, Mandala and Barnett filed a putative class action complaint against NTT, alleging that the company's hiring practices violate Title VII of the Civil Rights Act of 1964, as well as several New York State anti-discrimination laws. Specifically, they assert that NTT has a policy not to hire "individuals with certain criminal convictions including felonies (or similar criminal classifications)," . . . which Plaintiffs say is unlawful because it invariably disqualifies a disproportionate number of African-American applicants.

To support this assertion, Plaintiffs point to numerous studies showing that "African Americans are arrested and incarcerated for crimes at higher rates than [w]hites, relative to their share of the national population . . . ." This disparity is compounded, they say, by evidence suggesting that employers place additional weight on criminal history when an applicant is African American as opposed to white. Notably, however, the complaint contains no allegations about racial disparities in NTT's existing workforce or the demographics of qualified applicants that NTT has rejected as a result of its hiring policy . . . .

A little less than a year after it was filed, the district court dismissed the complaint for failure to state a claim . . . . The court concluded that the national statistics on which Plaintiffs rely are "inadequate to show a

> relationship between the pool of [NTT] applicants who are Caucasian versus African Americans and their respective rates of felony convictions . . . ." And without any remaining federal claims, the district court refused to exercise supplemental jurisdiction over Plaintiffs' state law claims and dismissed their complaint in its entirety . . . .

*Mandala*, 975 F.3d at 205–06 (internal citations omitted).

A divided panel of the Second Circuit affirmed this Court's dismissal of Plaintiffs' complaint. The majority opinion noted that "Plaintiffs have offered no allegations to suggest that the general population statistics on which they rely 'might accurately reflect [NTT's] pool of qualified job applicants.'" *Mandala*, 975 F.3d at 211 (quoting *Malave v. Potter*, 320 F.3d 321, 326 (2d Cir. 2003)). The majority further stated that "if a Title VII plaintiff intends to rely on national statistics to plead a disparate impact claim, she must explain why those statistics can plausibly be expected to hold true for the qualified applicant pool in question." *Mandala*, 975 F.3d at 212. The dissent, on the other hand, argued that in rejecting Plaintiffs' use of national statistics, the Court was holding Plaintiffs to an improperly high pleading standard. *Mandala*, 975 F.3d at 214 (Chin, J., dissenting).

The Second Circuit's denial of Plaintiffs' petition for a rehearing *en banc* also involved dissenting opinions. The majority concurrence to the denial elaborated on the majority's reasoning in the circuit court's decision affirming this Court's judgment:

> [Our decision] does not mean that national statistics can never be used in disparate impact cases involving skilled positions. Plaintiffs simply need to "provide additional allegations to explain why their chosen national statistics are in fact likely to be representative of [the] qualified applicant pool" in question. *Mandala*, 975 F.3d at 212. Here, that could have taken the form of additional national statistics indicating that, even as education levels increase, racial disparities between conviction rates remain. But Plaintiffs failed to provide such allegations. It is for that limited reason that the panel majority opinion affirmed the district court's dismissal of Plaintiffs' complaint for failure to state a claim.

3

*Mandala*, 988 F.3d at 668. The majority then referenced additional statistics introduced in an amicus brief, which indicated that black males with some college education are seven times more likely to be imprisoned than white males with some college education, and suggested these statistics "might" have rendered Plaintiffs' claims plausible had they been included in the original pleadings. *Mandala*, 988 F.3d at 668. The dissent seized on the majority's statement, and "encourage[d] both future litigants to bring such cases and the Plaintiffs here to move under Rule 60 for relief from the district court's judgment in order to file an amended complaint that includes statistics incorporating the continued racial gaps in conviction rates as education levels rise." *Mandala*, 988 F.3d at 671 (Pooler, J., dissenting).

Accordingly, Plaintiffs now move this Court, pursuant to Rule 60 of the Federal Rules of Civil Procedure, to vacate its judgment dismissing their complaint, and to "allow them to file their First Amended Class Action Complaint ('FAC') setting forth claims alleging that [NTT's] policy of denying employment to applicants with criminal histories violates Title VII of the Civil Rights Act of 1964 ('Title VII') and related state laws." Mem. in Support, Mar. 31, 2021, ECF No. 35-1. NTT presents "several reasons" for denying Plaintiffs' motion, including that Plaintiffs' motion is untimely, and that Plaintiffs have not demonstrated "exceptional circumstances" justifying relief from judgment. Mem. in Opp., May 3, 2021, ECF No. 38.

LEGAL STANDARD

Plaintiffs maintain that their Rule 60 motion to vacate should be considered in the context of their proposed amended complaint, and that the Court should therefore analyze

4

their motion using the liberal amendment standard set forth in Rule 15(a) of the Federal Rules of Civil Procedure. The Supreme Court has established that, under Rule 15, "leave to amend should be routinely granted '[i]n the absence of any . . . reason – such as undue delay, bad faith, dilatory motive . . ., repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party . . ., futility of amendment, etc.'" Mem. in Support at 10 (quoting *Foman v. Davis*, 371 U.S. 178, 182 (1962)). Plaintiffs state that "[t]he 'liberal spirit of Rule 15' is at its strongest where, as here, the plaintiffs have not previously sought to amend the complaint." Mem. in Support at 12. The Court disagrees with Plaintiff's recitation of the standard.

In a recent case, the Second Circuit declined to adopt Rule 15 as the governing standard for parties seeking leave to amend the complaint in the post-judgment context. Instead, the circuit court ruled that:

> It is well-established that "[a] party seeking to file an amended complaint post[-]judgment must first have the judgment vacated or set aside pursuant to Fed. R. Civ. P. 59(e) or 60(b)." *Ruotolo v. City of New York*, 514 F.3d 184, 191 (2d Cir. 2008). "[I]t would be contradictory to entertain a motion to amend the complaint" without "a valid basis to vacate the previously entered judgment." *Nat'l Petrochemical Co. of Iran v. M/T Stolt Sheaf*, 930 F.2d 240, 245 (2d Cir. 1991). "To hold otherwise would enable the liberal amendment policy of Rule 15(a) to be employed in a way that is contrary to the philosophy favoring finality of judgments and the expeditious termination of litigation." [*Williams v. Citigroup Inc*., 659 F.3d 208, 213 (2d Cir. 2011)] (brackets and internal quotation marks omitted) (quoting *Nat'l Petrochemical*, 930 F.2d at 245).

*Metzler Inv. Gmbh v. Chipotle Mexican Grill, Inc*., 970 F.3d 133, 142–43 (2d Cir. 2020).

In other words, there is a clear distinction between the *pre-trial* application of Rule 15, and the *post-judgment* application of Rule 15 in light of Rules 59(e) and 60. *See, e.g., State Trading Corp. of India v. Assuranceforeningen Skuld*, 921 F.2d 409, 418 (2d Cir.

5

1990) (stating that "[w]hen the moving party has had an opportunity to assert the amendment earlier, but has waited until after judgment before requesting leave, a court may exercise its discretion more exactly."). In the post-judgment context, Plaintiffs must present adequate grounds for relief under Rule 59(e) or Rule 60, and courts must give "due regard" – but not "sole regard" – to Rule 15, lest the liberal amendment policy of Rule 15(a) "swallow the philosophy favoring finality of judgments whole."[1] *Metzler Inv. Gmbh,* 970 F.3d at 146 (quoting *Nat'l Petrochem.*, 930 F.2d at 245) (internal quotation marks omitted).

DISCUSSION

The Court has made a thorough review of the papers in this action, the Court's earlier decision to grant NTT's motion to dismiss, the majority opinion and dissent in the Second Circuit's affirmance of this Court's decision, and the concurrence and dissents in the Second Circuit's denial of Plaintiffs' petition for a rehearing *en banc*. Having done so, the Court finds that Plaintiffs have failed to demonstrate adequate grounds for relief from the Court's judgment under Rule 60. Specifically, the motion is not timely, and Plaintiffs have presented no "extraordinary circumstances" that would warrant the provision of the extraordinary remedy of relief from judgment.

---

[1] In the context of *Metzler Inv. Gmbh v. Chipotle Mexican Grill, Inc.*, the Second Circuit stated that it had given "due regard" to Rule 15 "by ensuring plaintiffs at least one opportunity to replead." 970 F.3d at 146 (citing *Williams*, 659 F.3d at 213-14."). The Court does not read this statement to establish a rule in the Second Circuit that all plaintiffs are guaranteed the right to amend their pleadings at least once in the post-judgment context. Rather, the Court reads this statement as illustrating how the circuit court had given due consideration to Rule 15 *in the specific circumstances of the case before it*. The district court in the case had dismissed the first amended complaint, but "issued a thorough opinion that identified defects that a second amended complaint should cure," and the plaintiffs thereafter filed a second amended complaint prior to appeal. *Metzler Inv. Gmbh*, 970 F.3d at 145.

Rule 60(b)

Rule 60(b) provides that, "[o]n motion and just terms," a court may relieve a party from a final judgment for several reasons, including:

(1) mistake, inadvertence, surprise, or excusable neglect;

* * *

(6) any other reason that justifies relief.

Fed. R. Civ. P. 60(b). "A motion under Rule 60(b) must be made within a reasonable time – and for reasons (1), (2), and (3) no more than a year after entry of the judgment . . . ." Fed. R. Civ. P. 60(c)(1).

"Properly applied Rule 60(b) strikes a balance between serving the ends of justice and preserving the finality of judgments." *Nemaizer v. Baker*, 793 F.2d 58, 61 (2d Cir. 1986). Because "[a] motion for relief from judgment is generally not favored and is properly granted only upon a showing of exceptional circumstances, a party moving under Rule 60(b) must meet an "onerous standard." *United States v. Int'l Bhd. of Teamsters*, 247 F.3d 370, 391–92 (2d Cir. 2001). Further, the Second Circuit has "found that Rule 60(b)(1) and Rule 60(b)(6) are mutually exclusive, such that any conduct which generally falls under the former cannot stand as a ground for relief under the latter . . . . Where a party's Rule 60(b) motion is premised on grounds fairly classified as mistake, inadvertence, or neglect, relief under Rule 60(b)(6) is foreclosed." *Stevens v. Miller*, 676 F.3d 62, 67–68 (2d Cir. 2012) (internal quotation marks and citation omitted).

<u>Timeliness of Plaintiff's Rule 60(b) Motion</u>

In the present case, Plaintiffs state that:

> In a divided opinion on appeal, the Second Circuit explained what evidence Plaintiffs were required to plead to state a plausible claim for relief under Title VII . . . and then further clarified that standard in a concurrence to the denial of Plaintiffs' *en banc* petition. That standard, as applied to the particular facts of this case, was previously unclear . . . .

Mem. in Supp. at 12–13. In other words, Plaintiffs paint themselves as unwitting victims of an ambiguous standard that was unpredictably applied to their detriment, the clarification of which provides an ostensible ground for relief from judgment under Rule 60(b)(6). The Court finds this to be a misinterpretation of the Second Circuit's rulings in this case.

To be sure, Judge Pooler's dissent from the denial of Plaintiffs' petition for a rehearing encouraged "Plaintiffs here to move under Rule 60 for relief from the district court's judgment in order to file an amended complaint that includes statistics incorporating the continual racial gaps in conviction rates as education levels rise." *Mandala*, 988 F.3d at 671 (Pooler, J., dissenting). However, Judge Pooler's dissent is not controlling, and does not compel the conclusion that this Court in the first instance, and the majority of the Second Circuit panel on direct appeal, apply a standard that was heretofore ambiguous. *See, e.g., Philadelphia Indem. Ins. Co. v. Cent. Terminal Restoration Corp.*, 722 F. App'x 79, 83 (2d Cir. 2018) ("To the extent [the plaintiff] relies on the dissent . . . the reliance is misplaced."). In fact, as the majority concurrence points out, the Second Circuit's decision to affirm this Court's dismissal of Plaintiff's complaint "reflect[ed] a heartland application of the plausibility pleading standard that has been the

8

law of this Circuit for more than a decade." *Mandala*, 988 F.3d at 665 (Sullivan, J. and Nardini, J., concurring).

In the light of the Second Circuit's stated opinion that the ruling in this case was a "heartland application of the plausibility pleading standard," Plaintiffs' motion to vacate appears instead to be premised on their own mistake, inadvertence, and neglect rather than the "extraordinary circumstances" required by Rule 60(b)(6). A review of the Second Circuit's affirmance of this Court's judgment confirms that the circuit court was merely summarizing rather than clarifying the law on a plaintiff's use of statistics to show disparate impact in a Title VII claim. Indeed, arguably its most significant statement relative to Plaintiffs' claims – that "[g]eneral population statistics are a reliable surrogate only when there is reason to think that they 'accurately reflect the pool of qualified job applicants' for the position in question" – is drawn from a Second Circuit case decided in 2003, approximately 15 years before Plaintiffs filed their claim. *Mandala*, 975 F.3d at 210–11 (quoting *Malave v. Potter*, 320 F.3d 321, 326 (2d Cir. 2003)).

Thus, whereas Plaintiffs maintain that vacating the Court's judgment is justified by the Second Circuit's clarification of an ambiguous standard, a more reasonable interpretation of the Second Circuit's majority opinion – which is consistent with the Court's judgment that Plaintiffs now seek to vacate – is that Plaintiffs simply did not meet a well-settled standard. *See Nemaizer*, 793 F.2d at 62 ("we have consistently declined to relieve a client . . . of the burdens of a final judgment entered against him due to the mistake or omission of his attorney by reason of the latter's ignorance of the law . . . ."). In short, Plaintiffs' motion to vacate is nothing more than a late Rule 60(b)(1) motion,

which Plaintiffs were required to make no more than a year after the entry of the judgment. *See Stevens*, 676 F.3d at 67–68 (denying the State's motion to vacate on the grounds that it was nothing more than "an untimely Rule 60(b)(1) motion masquerading as a Rule 60(b)(6) motion."). Plaintiffs' motion to vacate is therefore untimely,[2] and should be denied. *Warren v. Garvin*, 219 F.3d 111, 114 (2d Cir. 2000) ("The one-year limitation period for Rule 60(b) motions is 'absolute.'").

Rule 60(b)(6) and Extraordinary Circumstances

Moreover, even assuming Plaintiffs' motion was a timely Rule 60(b)(6) motion, Plaintiffs fail to demonstrate relief would be warranted. As the "extraordinary circumstances" justifying relief from the Court's judgment, Plaintiffs point to the Second Circuit's denial of Plaintiffs' petition for a rehearing, noting that the majority concurrence "clarified that Plaintiffs needed only to allege claims that would make it plausible that national statistics might accurately reflect the relevant labor pool . . . . [and] then identified such statistics in an amicus brief." Reply, 6, May 17, 2021, ECF No. 39. Plaintiffs liken this case to the Second Circuit's decision in *Marrerro Pichardo v. Ashcroft*, 374 F.3d 46 (2d Cir. 2004), in which the circuit court overturned the district court's denial of appellant's motion under Rule 60(b)(6) because the "claims were 'virtually certain to succeed' if the judgment was reopened." Reply at 3 (quoting *Marrerro Pichardo*, 374 F.3d at 54). Plaintiffs suggest that, given the majority concurrence's statement, their amended

---

[2] By contrast, Rule 60(c)(1) requires that a motion made under Rule 60(b)(6) be "made within a reasonable time." "The Second Circuit has interpreted a 'reasonable time' as eighteen months, unless the movant shows good cause for the delay or mitigating circumstances." *E. End Eruv Ass'n, Inc. v. The Vill. of Westhampton Beach*, No. CV 11-213 AKT, 2015 WL 5774981, at *2 (E.D.N.Y. Sept. 30, 2015) (citing, *inter alia*, *Maisonet v. Conway*, No. 04–CV–2860, 2011 WL 317833, at *3 n. 3 (E.D.N.Y. Jan. 31, 2011) (noting that "[c]ourts in the Second Circuit have found delays exceeding eighteen months to be unreasonable absent mitigating circumstances" and collecting cases)).

complaint – if they are given leave to file it – is virtually certain to make it past any NTT motions to dismiss.

The Supreme Court has stated that "Rule [60(b)(6)] does not particularize the factors that justify relief, but we have previously noted that it provides courts with authority adequate to enable them to vacate judgments whenever such action is appropriate to accomplish justice . . . while also cautioning that it should only be applied in extraordinary circumstances . . . ." *Liljeberg v. Health Servs. Acquisition Corp*., 486 U.S. 847, 863–64 (1988) (internal citations omitted). One such case of "extraordinary circumstances" justifying relief under Rule 60(b)(6) was *Klapprott v. United States*, 335 U.S. 601 (1949). As described by the Supreme Court, in *Klapprott*:

> [B]efore, at the time, and after the default judgment was entered, petitioner was held in jail in New York, Michigan, and the District of Columbia by the United States, his adversary in the denaturalization proceedings. Without funds to hire a lawyer, petitioner was defended by appointed counsel in the criminal cases. Thus petitioner's prayer to set aside the default judgment did not rest on mere allegations of 'excusable neglect.' The foregoing allegations and others in the petition tend to support petitioner's argument that he was deprived of any reasonable opportunity to make a defense to the criminal charges instigated by officers of the very United States agency which supplied the secondhand information upon which his citizenship was taken away from him in his absence. The basis of his petition was not that he had neglected to act in his own defense, but that in jail as he was, weakened from illness, without a lawyer in the denaturalization proceedings or funds to hire one, disturbed and fully occupied in efforts to protect himself against the gravest criminal charges, he was no more able to defend himself in the New Jersey court than he would have been had he never received notice of the charges."

*Ackermann v. United States*, 340 U.S. 193, 199-200 (1950). "By no stretch of imagination can the voluntary, deliberate, free, untrammeled choice[s] of" Rule 60(b) movants compare with such circumstances. *Ackermann*, 340 U.S. at 200. Thus, a party is not

entitled to relief under . . . Rule 60 if it is seeking to be relieved from the consequences of its own "free, calculated, deliberate choices." *Palacios v. Coca-Cola Co.*, 499 F. App'x 54, 56 (2d Cir. 2012) (citing *Ackermann*, 340 U.S. at 198; *United States v. Bank of N.Y.*, 14 F.3d 756, 759 (2d Cir. 1994) (holding that a party who "made a conscious and informed choice of litigation strategy . . . cannot in hindsight seek extraordinary relief" under Rule 60(b)).

In this case, Plaintiffs filed their initial complaint in August 2018. Compl., Aug. 15, 2018, ECF No. 1. In November 2018, NTT responded with a motion to dismiss Plaintiffs' complaint, which argued in pertinent part that "the purported statistics cited by Plaintiffs have absolutely nothing to do with the alleged facially neutral policy they challenge – i.e., the alleged failure to hire applicants with criminal felony convictions." Mem. in Supp. of Mot. to Dismiss, 9, Nov. 13, 2018, ECF No. 11-3. In a cross motion to stay discovery in May of 2019, NTT further stated that "Plaintiffs proffer no facts that plausibly support that NTT [policies] caused any disparate impact on any protected group." Mem. in Supp. of Cross Mot. to Stay, 5, May 10, 2019, ECF No. 22-2. In the face of NTT's specific and repeated allegations regarding the deficiencies of their pleadings, Plaintiffs had the opportunity to seek leave to amend their complaint, but chose instead to stand by their original complaint using only general population statistics in support of their claim.

In June 2019, the Court directly addressed the generality of Plaintiffs' statistics and NTT's allegations of their insufficiency during the motion hearing on NTT's motion to dismiss. Attempting to put a finer point on the parties' respective positions, the Court led the following exchange:

THE COURT: . . . What would [Plaintiffs] have to plead to go forward? . . . . Would you have to plead that – if they said that a disproportionate number of African-Americans with felony convictions were denied – were offered jobs and the offer was retracted than Caucasians, would that be enough?

MS. PIZZUTELLI: No. That would be a similar conclusory allegation under *Iqbal*. . . . You need to look at what the Second Circuit has said you need to plead. That's [*Brown v. Coach Stores, Inc.*, 163 F.3d 706, 712 (2d Cir. 1998)] which addresses and affirms a district court dismissal on a 12(b)(6) motion of a disparate impact claim. And what *Brown* said was you need to plead facts that show a facially neutral employment policy or practice has a significant disparate impact.

* * *

THE COURT: . . . . If we came here with that complaint, if the complaint said . . . that over the last five years, NTT has offered jobs to 100 individuals, whatever the job was, and then withdrawn those offers after a record check had revealed that each had felony convictions. Of those 100 individuals, 75 were African-American. If that was the allegation for disparate treatment, would you be moving to dismiss the complaint?

[DEFENSE COUNSEL]: Your Honor, I think I would be in a more difficult position to move to dismiss but I would also need to review, again, the *Wards Cove* decision and be guided by what the Supreme Court said in *Wards Cove*. And what *Wards Cove* said is you also need to look at who's in that applicant pool, who's making those applications.

* * *

[PLAINTIFFS' COUNSEL]: . . . . The question here, this is a disparate impact case so we're looking at the amount of people who got the job, the amount of people who didn't get the job because of their criminal records and the races of those individuals to determine whether NTT's policy, which screens out applicants because of their criminal records, screens out more African-Americans. And so that's why we're looking at race and that's also why, going back to the pleading stage, why the statistics that we pled raise a plausible inference . . . .

* * *

THE COURT: . . . I think you're indicating that you have to show the group that was qualified for the position and out of the group that was qualified, how many were denied the position because of whatever, felony criminal

13

records, and did that group, was that group disproportionately unfair to African-Americans? . . . . And you're saying you don't have to do that [at the pleading stage]?

[PLAINTIFFS' COUNSEL]: Your Honor, I believe what this comes down to is a question of causation and, as some of the case law we cited analyzing disparate impact at the motion to dismiss stage has said, you don't have to establish causation at this stage. What defendants are asking us to do is to prove our claims at this stage, to prove that there actually was impact but that is improper at a motion to dismiss stage. At the motion to dismiss stage we just need to raise a plausible inference.

Tr. of Mot. Hr'g on Mot. to Dismiss, 13:8–20:17. Here too, following an extended discussion of NTT's allegations regarding the deficiencies of their pleadings, including references to relevant Supreme Court and Second Circuit caselaw and the Court's specific inquiry into what constitutes an adequate pleading, Plaintiffs had the opportunity to seek leave to amend their complaint, but chose instead to stand by their original complaint using only general population statistics in support of their claim.

The following month, July of 2019, the Court issued its decision and order granting NTT's motion to dismiss because "Plaintiffs have not alleged facts showing that [NTT]'s facially-neutral policy of not hiring convicted felons is related to the statistical disparity in the numbers of African-Americans arrested and convicted of crimes in proportion to their representative numbers in the pool of qualified applicants for Defendant's positions." *Mandala*, 2019 WL 3237361, at *4. Again, following a dismissal on grounds that had been raised both in NTT's motion papers and during oral argument, Plaintiffs had the opportunity to seek leave to amend their complaint, but chose instead to appeal the Court's judgment and test the theory of law that they believed to be proper. The Court's reasoning and judgment was affirmed by the Second Circuit in September 2020, and only

14

after the Second Circuit denied Plaintiffs' petition for a rehearing *en banc* in February 2021 did Plaintiffs return to this Court seeking leave to amend their complaint.

What's more, the relevant statistics[3] that Plaintiffs now seek to add into their first amended complaint – that "Black men with some college education have imprisonment risks that are seven (7) times greater than white men with some college education" – are drawn from a study that was published in 2006. Proposed First Am. Compl., ¶ 57, May 17, 2021, ECF No. 39-3. A second study, from 2009, purportedly found that "even among people with criminal records, African Americans were particularly disadvantaged in the job market compared with white people with criminal records." Proposed First Am. Compl. at ¶ 59. In sum, both sets of statistics that Plaintiffs seek to add to their complaint to correct the deficiencies in their pleadings were publicly available for nearly a decade prior to the filing of the complaint. *See Mandala*, 988 F.3d at 668 (noting that ". . . the very figures that might have rendered Plaintiffs' claims plausible not only exist but also are publicly available; Plaintiffs simply failed to include them in their pleadings.")

Giving due regard to Rule 15, the Court notes that Plaintiffs could easily have protected themselves at several points in both the pre-trial and post-judgment context by seeking leave to amend their complaint to offer more relevant statistics, but made a strategic decision not to. *Simone v. Prudential Ins. Co. of Am*., 164 F. App'x 39, 41 (2d Cir. 2006). The Court declines to use Rule 60(b) to relieve Plaintiffs from the consequences of that conscious and informed litigation strategy. *Palacios*, 499 F. App'x

---

[3] Plaintiffs also introduce a study from 2019 regarding a perception of discriminatory policing on college campuses, but the Court sees little relevance of the statistics presented in that study to the pool of qualified applicants for positions with NTT. Proposed First Am. Compl. at ¶ 59.

at 56 (citing *U.S. v. Bank of N.Y.*, 14 F.3d at 759). "There must be an end to litigation someday, and free, calculated, deliberate choices are not to be relieved from." *Ackermann*, 340 U.S. at 199.

CONCLUSION

For the foregoing reasons, it is hereby,

ORDERED that Plaintiffs' motion to vacate judgment [ECF No. 35] is denied, and the Clerk of Court is respectfully directed to close this case.

Dated:      December 6, 2021
            Rochester, New York

                                    ENTER:

                                    CHARLES J. SIRAGUSA
                                    United States District Judge