# EXHIBIT 2

# EXHIBIT 2

**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF NEW YORK**
---------------------------------------------------------------

GEORGE MANDALA, individually and on behalf
of all others similarly situated,

                                             Plaintiffs,

                     - against -

NTT DATA, INC.,

                                       Defendant.
---------------------------------------------------------------

**Index No.: 654705/2019**

**FIRST AMENDED CLASS ACTION**
**COMPLAINT**

Jury Trial Demanded

Plaintiff George Mandala, individually and on behalf of all others similarly situated,

alleges, upon personal knowledge as to himself and upon information and belief as to other

matters, as follows:

## <u>NATURE OF THE ACTION</u>

1.       As the U.S. Commission on Civil Rights has found, "[w]hen the collateral

consequences [of criminal convictions] are unrelated [either to the underlying crime for which a

person has been convicted or to a public safety purpose], their imposition generally negatively

affects public safety and the public good."[1]  Therefore, "[e]mployers should not automatically

disqualify a candidate with a criminal record, except in circumstances when the criminal record

directly conflicts with the scope of employment."[2]  Because of the harms that attach to such

denials of employment, and other related reasons, New York State has some of the strongest

protections in the country against employment discrimination on the basis of criminal history.

---

[1]      U.S. Commission on Civil Rights, *Collateral Consequences: The Crossroads of Punishment, Redemption, and the Effects on Communities* (June 2019), at 133, *available at* https://www.usccr.gov/pubs/2019/06-13-Collateral-Consequences.pdf.

[2]      *Id.* at 137.

Case 6:18-cv-06591-MAV-CDH    Document 57-4    Filed 04/17/24    Page 3 of 28

2.      Despite these protections, NTT Data, Inc. ("Defendant" or "NTT"), one of the largest information technology ("IT") services providers in the world, and with a significant presence in New York State, routinely rejects job applicants with criminal records like George Mandala ("Mr. Mandala" or "Plaintiff"), pursuant to an overbroad criminal history screening policy and practice—in blatant violation of New York law.

3.      Mr. Mandala applied for and received an offer for a job with NTT.  However, NTT subsequently and unjustifiably withdrew his job offer based on an overly restrictive criminal history screening policy triggering rejection without any individualized analysis.

4.      Further, NTT failed to provide Mr. Mandala with a copy of Article 23-A of the Correction Law in the time and manner required by N.Y. Gen. Bus. Law § 380-g(d).

5.      Accordingly, Plaintiff brings three claims against NTT.

6.      **First**, because African Americans, like Plaintiff, are subjected to arrest and conviction at disproportionally higher rates than whites, NTT's policy and practice of denying individuals job opportunities based on their criminal history has an unjustified disparate impact on African Americans, that is not job related or consistent with any business necessity, in violation of the New York Human Rights Law ("NYHRL"), N.Y. Exec. Law § 290 *et seq*.

7.      **Second**, because NTT's policy does not adequately measure whether (i) an applicant's criminal history has a direct relationship to the employment sought or (ii) the applicant poses an unreasonable risk to persons or property, NTT's policy unlawfully discriminates on the basis of criminal history, in further violation of the NYHRL, N.Y. Exec. Law § 290 *et seq*.

8.      **Third** (Plaintiff's Notice of Rights claim), because NTT fails to provide applicants with a copy of their criminal history rights under Article 23-A of the New York

Case 6:18-cv-06591-MAV-CDH Document 57-4 Filed 04/17/24 Page 4 of 28

Correction Law when it procures consumer reports on them, it also violates the New York State

Fair Credit Reporting Act ("NY FCRA"), N.Y. Gen. Bus. Law § 380 *et seq*., because it fails to

give applicants adequate notice of their rights under law.

9.     Through this lawsuit, Plaintiff will show that the conduct outlined in this

Complaint constitutes unlawful discrimination and clearly violates the stated public policy of

New York to remove barriers to employment for New Yorkers who have paid the penalties for

any crimes they may have committed.

10.     Accordingly, Plaintiff seeks damages and injunctive and declaratory relief on

behalf of himself and all other New Yorkers similarly impacted, as outlined further below.

### JURISDICTION AND VENUE

11.     This Court has jurisdiction over the claims alleged in this Complaint pursuant to

New York Civil Practice Law and Rules §§ 301 and 302.

12.     NTT is subject to personal jurisdiction in New York because NTT is licensed to

do business in New York and because NTT regularly transacts business in New York and has

committed acts within New York that have caused injury to persons within New York including

denying employment to New York residents.

13.     Venue is proper in this County pursuant to New York Civil Practice Law and

Rule § 503 because, upon information and belief, Defendant's principal place of business in New

York State is in New York County and therefore Defendant resides in New York County for the

purposes of C.P.L.R. § 503.  Defendant's Certificate of Change of Application for Authority to

do business in New York State lists 28 Liberty Street, New York, NY as the post office address

to which the Secretary of State shall mail a copy of any process against Defendant.  In addition,

NTT's challenged policy operates to exclude otherwise qualified applicants in New York City, as

3

Case 6:18-cv-06591-MAV-CDH   Document 57-4   Filed 04/17/24   Page 5 of 28

is evidenced by the fact that NTT has stated, when posting for a Network/Systems Administrator in New York City, that part of its "Basic Qualifications" is a requirement that applicant have "No prior felony arrests. No drug related arrests." Ex. 1.

**PARTIES**

**Plaintiff**

14.     Plaintiff and the proposed Class Members he seeks to represent are each "persons," "individuals," "consumers," and "applicants for employment" within the meaning of the NYHRL and the NY FCRA.

15.     Plaintiff, an African American resident of Rochester, New York, received a job offer from NTT as a Salesforce Developer.  NTT subsequently withdrew Plaintiff's job offer due to his criminal conviction, which was a non-violent conviction for DWI from 2014. NTT did not provide Plaintiff with a copy of Article 23-A of the Correction Law in the time and manner required by N.Y. Gen. Bus. Law § 380-g(d).

**Defendant**

16.     NTT is a global IT services company that employs over 110,000 people worldwide, including approximately 18,000 employees in North America.

17.     NTT has at least four office locations in New York State, including one in New York County, one in Syracuse, one in Albany, and one in Hauppauge.

18.     NTT is licensed to do business in New York and its Certificate of Change of Application for Authority to do business in New York State lists 28 Liberty Street, New York, NY as the post office address to which the Secretary of State shall mail a copy of any process against Defendant.

4

Case 6:18-cv-06591-MAV-CDH    Document 57-4    Filed 04/17/24    Page 6 of 28

19.     At all relevant times, NTT has been an employer as defined by the NYHRL, and a private employer as defined by the Correction Law.

20.     At all relevant times, NTT has or should have been aware of the requirements of the NY FCRA, and yet has disregarded those requirements.

21.     At all relevant times, NTT has been a "person, firm, corporation or other entity" requesting "consumer reports" of Plaintiff and proposed Class Members for "employment purposes" and has taken "adverse action" against Plaintiff and similarly situated applicants, as defined by the NY FCRA, for example by preventing them from explaining or challenging their rejections of employment.  These adverse actions have been based wholly or in part on those consumer reports.

## STATEMENT OF FACTS

### Plaintiff George Mandala

22.     In or around January or February of 2017, Mr. Mandala applied for a job as a Salesforce Developer with NTT.

23.     Mr. Mandala had two telephone interviews with NTT employees, during which the NTT employees asked him questions related to the position and he answered competently, based on his years of applicable work experience.

24.     Mr. Mandala successfully completed his two telephone interviews and supplied NTT with professional references.

25.     NTT subsequently told Mr. Mandala that, while employed by NTT, he would be contracted to a company based in Wellesley, Massachusetts, and working remotely based out of his home in Rochester, New York.

Case 6.18-cv-06591-MAV-CDH   Document 57-4   Filed 04/17/24   Page 7 of 28

26.     NTT sent Mr. Mandala a formal offer letter on March 22, 2017, signed by Patricia Price, a Senior Recruiter with NTT, offering Mr. Mandala a job as an Application Software Development Senior Principal Consultant.

27.     The offer letter stated that NTT's "management team was impressed with [Mr. Mandala's] credentials and experience," and that Mr. Mandala would "work out of NTT DATA's remote home office to begin on April 3, 2017."

28.     Mr. Mandala accepted NTT's offer of employment via correspondence dated March 23, 2017.

29.     Mr. Mandala authorized a background check pursuant to NTT's policy, and NTT obtained a criminal background check on Mr. Mandala from a consumer reporting agency.

30.     On March 30, 2017, Mr. Mandala attended a pre-orientation telephone call with other new employees.

31.     On the same day, Mr. Mandala received an e-mail from Patricia Price, asking "Could you give me a call to discuss your background check?"

32.     Mr. Mandala called Ms. Price and Ms. Price informed Mr. Mandala that NTT had a policy not to hire persons with felonies on their records.

33.     Mr. Mandala thereafter received a letter from NTT, signed by Ms. Price, dated April 6, 2017, which stated that NTT was withdrawing Mr. Mandala's job offer, and that "[t]his action was influenced by information contained in a consumer report, made at [NTT's] request and provided by . . . ASURINT[.]"

34.     During the interview process, and afterwards, NTT never sought or considered information from Mr. Mandala which would enable it to fully evaluate the factors laid out in Section 753 of the Correction Law.  For example, after reviewing Mr. Mandala's background

6

Case 6:18-cv-06591-MAV-CDH    Document 57-4    Filed 04/17/24    Page 8 of 28

check, NTT never asked Mr. Mandala for information regarding the circumstances of his

convictions or evidence of Mr. Mandala's rehabilitation or good conduct.  Furthermore, NTT's

action was indicative of a policy and practice of denying job opportunities to individuals with

criminal convictions, which does not adequately measure risk or the relationship of the

conviction to the job, and does not permit NTT to fully evaluate the factors laid out in Section

753 of the Correction Law.

35.    Had NTT performed a legally compliant analysis, NTT would not have denied

employment to Mr. Mandala because of his criminal conviction, which is a non-violent felony

conviction for Driving While Intoxicated ("DWI") from 2014.  That conviction had no direct

relationship to the employment Mr. Mandala sought and did not create an unreasonable risk to

property or to the safety or welfare of specific individuals or the general public.

36.    NTT did not provide Mr. Mandala with a copy of Article 23-A of the Correction

Law in the time and manner required by N.Y. Gen. Bus. Law § 380-g(d).

37.    This experience is not unique to Mr. Mandala. NTT stated, when posting for a

Network/Systems Administrator in New York City, that part of its "Basic Qualifications" for

employment is a requirement that an applicant have "No prior felony arrests. No drug related

arrests."  Ex. 1.

38.    On June 2, 2017, Mr. Mandala filed a Charge of Discrimination with the Equal

Employment Opportunity Commission ("EEOC"), filed contemporaneously with the the New

York State Division of Human Rights, based on NTT's denial of employment.  On May 17,

2018, the EEOC issued Mr. Mandala a Notice of Right to Sue.

39.    On August 15, 2018, Mr. Mandala, along with another applicant denied

employment by NTT because of criminal history unrelated to the job in question, on behalf of

themselves and on behalf of all others similarly situated, filed a Class Action Complaint in the United States District Court for the Western District of New York, alleging claims of disparate impact discrimination in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq* ("Title VII"), and violations of the NYHRL, the Correction Law, and the NY FCRA.  On July 18, 2019, the District Court dismissed their Title VII claim, and declined to exercise supplemental jurisdiction over their NYHRL, Correction Law, and NY FCRA claims. Pursuant to 28 U.S.C. § 1367(d), Mr. Mandala's claims and the claims of the putative Classes, have been tolled since the District Court's dismissal.  On September 21, 2020, the U.S. Court of Appeals for the Second Circuit issued a decision affirming the district court's dismissal of the complaint, with one judge in dissent, and on February 23, 2021 the Second Circuit denied Plaintiffs' petition for rehearing en banc, with five judges joining in dissenting opinions. The concurring opinion in the denial for rehearing, which was authored by Judge Sullivan and Judge Nardini, the original panel members who had dismissed Plaintiffs' claims, clarified that the pleading standard had not been heightened and that there is no blanket rule against using general statistics to plead a disparate impact claim. The court was concerned, however, that Plaintiffs' allegations did not include information about the racial disparities in criminal convictions among individuals with a certain degree of educational attainment. They noted that had Plaintiffs' federal complaint included allegations that were cited to in an amicus brief from social scientists in support of Plaintiffs then it could have survived a motion to dismiss.  *Mandala v. NTT Data, Inc.*, No. 19 Civ. 2308, 2021 WL 684330, at *4 (2d Cir. Feb. 23, 2021) (Sullivan, J., concurring) (noting that Plaintiffs could have met their burden at the pleading stage by citing "national statistics indicating that, even as education levels increase, racial disparities between conviction rates remain," and noting that such statistics were presented by amici in support of Plaintiffs' en

Case 6:18-cv-06591-MAV-CDH    Document 57-4    Filed 04/17/24    Page 10 of 28

banc petition).  Those allegations are included here. *See infra*, ¶ 45.

**Factual Allegations Common to All Class Members**

*The NYHRL Disparate Impact Claim*

40.     As the U.S. Commission on Civil Rights recently reported, "when employers use criminal background checks to indiscriminately disqualify all applicants with criminal records, these employers severely curtail employment opportunities for formerly incarcerated people."[3] Moreover, "[b]ecause black and Latino individuals are likelier to have criminal records than white and Asian people, . . . black and Latino males are disproportionately affected by criminal background checks."[4]

41.     NTT's policy and practice of denying job opportunities to individuals with non-job-related convictions had and continues to have a significant and detrimental impact on African Americans, based on their race, color and/or national origin, as compared to white applicants.  African Americans are arrested, sentenced, and imprisoned for crimes at substantially higher rates than whites, relative to their share of the national population.[5]

---

[3]     U.S. Commission on Civil Rights, *Collateral Consequences: The Crossroads of Punishment, Redemption, and the Effects on Communities* (June 2019), at 42, *available at* https://www.usccr.gov/pubs/2019/06-13-Collateral-Consequences.pdf.

[4]     *Id.*

[5]     *See* U.S. Department of Justice, Federal Bureau of Investigation, *Crime in the United States 2016*, Table 21A (Arrests by Race and Ethnicity), *available at* https://ucr.fbi.gov/crime-in-the-u.s/2016/crime-in-the-u.s.-2016/topic-pages/tables/table-21 (showing 26.9% of arrests are of Black or African American individuals, while 69.6% of arrests are of white individuals); U.S. Census Bureau, *Quick Facts, United States* (2017), *available at* https://www.census.gov/quickfacts/fact/table/US/PST045217 (showing Black or African American individuals make up approximately 13.4% and whites make up 76.6% of the United States population).  *See also EEOC Enforcement Guidance on the Consideration of Arrest and Conviction Records in Employment Decisions Under Title VII of the Civil Rights Act of 1964*, at 9-10 (April 25, 2012) (national data showing Black individuals arrested and convicted at higher rates than whites "supports a finding that criminal record exclusions have a disparate impact based on race and national origin").

9

42.　　According to a report to the United Nations Special Rapporteur on Contemporary Forms of Racism, Racial Discrimination, Xenophobia, and Related Intolerance, "[i]n 2010, 8% of all adults in the United States had a felony conviction on their record" but "[a]mong African-American men, the rate was one in three."[6] The same report showed that "African-American adults are 5.9 times as likely to be incarcerated than whites," based on Bureau of Justice Statistics from 2016, which derived estimates based on prisoners sentenced for more than one year.[7] Further, "[i]n 2016, black Americans comprised 27% of all individuals arrested in the United States—double their share of the total population."[8] Projections based on recent trends in incarceration estimate that one out of every three African American males born today will go to prison, compared to just one out of every seventeen white males.[9]

43.　　These trends are equally salient in New York State. According to data compiled by the Sentencing Project, as of 2014, the Black imprisonment rate in New York State was 896 per 100,000, compared to a white imprisonment rate of 112 per 100,000.[10] According to the

---

[6]　　Report of The Sentencing Project to the United Nations Special Rapporteur on Contemporary Forms of Racism, Racial Discrimination, Xenophobia, and Related Intolerance: Regarding Racial Disparities in the United States Criminal Justice System, The Sentencing Project (2018) at 9, *available at* https://www.sentencingproject.org/wp-content/uploads/2018/04/UN-Report-on-Racial-Disparities.pdf. As is widely acknowledged, racial disparities in arrest and conviction rates in the United States are themselves the result of systemic discrimination in the criminal justice system. *See generally, id.*

[7]　　*Id.* at 2 (citing U.S. Bureau of Justice Statistics, Prisoners in 2016, 8 tbl.6 (Jan. 2018), *available at* https://www.bjs.gov/content/pub/pdf/p16.pdf).

[8]　　*Id. See also* Leah Sakala, *Breaking Down Mass Incarceration in the 2010 Census: State-by-State Incarceration Rates by Race/Ethnicity*, Prison Pol'y Initiative (May 28, 2014), http://www.prisonpolicy.org/reports/rates.html.

[9]　　Marc Mauer, *Addressing Racial Disparities in Incarceration*, 91 Prison J. 87S, 88S (2011), *available at* https://www.sentencingproject.org/wp-content/uploads/2016/01/Addressing-Racial-Disparities-in-Incarceration.pdf.

[10]　　The Sentencing Project, State-by-State Data, *available at* https://www.sentencingproject.org/the-facts/#detail?state1Option=New%20York&state2Option=0. Another estimate using 2010 Census data shows 1,655 Blacks incarcerated per 100,000 people in that racial/ethnic group,

10

Case 6:18-cv-06591-MAV-CDH    Document 57-4    Filed 04/17/24    Page 12 of 28

Bureau of Justice Statistics, in 2016 there were 24,370 Black prisoners under the jurisdiction of state or federal correctional authorities in New York, nearly double the number of white prisoners (12,391).[11] This is so even though Black people make up approximately 17.6% of the statewide population.[12]  Finally, the New York State Department of Corrections and Community Supervision reported in 2016 that African Americans made up 48.6% of inmates under state custody, while whites made up 24.4% of inmates under state custody.[13]  As an additional example of the severe racial disparity in the New York justice system, New York has one of the largest disparities in marijuana possession arrest rates between Black and white people, with Black people over 4.5 times as likely to be arrested for marijuana possession as white people.[14]

44.    Unequal treatment persists throughout the criminal justice system. According to leading sociologists and criminologists, the differences in criminal conviction rates between white persons and Black persons in America are not only very large, but they are also historical and pervasive across geographic and demographic groups.  The racial disparities are so pervasive that there are no statistics available to suggest that Black and white people are treated equally at the hands of the criminal justice system in *any* segment of society, be it geographic location, educational level or socio-economic status.  *See* Ex. 2.

---

compared to 219 whites per 100,000.  Prison Policy Initiative, New York profile, *available at* https://www.prisonpolicy.org/profiles/NY.html.

[11]    U.S. Bureau of Justice Statistics, Prisoners in 2016, 24 tbl.21 (Jan. 2018), *available at* https://www.bjs.gov/content/pub/pdf/p16.pdf.

[12]    United States Census, QuickFacts: New York, *available at* https://www.census.gov/quickfacts/fact/table/NY/RHI225219#RHI225219.

[13]    New York State Dep't of Corrections and Community Supervision, Under Custody Report: Profile of Under Custody Population as of January 1, 2016, at ii, 5, *available at* http://www.doccs.ny.gov/Research/Reports/2016/UnderCustody_Report_2016.pdf.

[14]    Ezekiel Edwards, Will Bunting, and Lynda Garcia, The War on Marijuana in Black and White, American Civil Liberties Union (2013) at 49, *available at* https://www.aclu.org/files/assets/1114413-mj-report-rfs-rel1.pdf.

Case 6.18-cv-06591-MAV-CDH    Document 57-4    Filed 04/17/24    Page 13 of 28

45.     Black men with some college education have imprisonment risks that are seven

(7) times greater than white men with some college education (4.9% for Black men compared to

0.7% for white men). This is consistent with the racial disparities that exist among individuals

with lesser educational attainment.[15]

46.     One clear example of how racial discrimination in the criminal justice system

persists regardless of educational level concerns discriminatory policing on college campuses. In

a recent study, more than two-thirds of college students surveyed agreed with the following

statement: "In general, most students on campus are treated differently by law enforcement

officials based on their racial appearance."[16]

47.     Audit studies conducted by researchers at Harvard and Princeton Universities,

including a study in New York City, also found that even among people with criminal records,

African Americans were particularly disadvantaged in the job market compared to white people

with criminal records.[17]

---

[15]     BRUCE WESTERN, PUNISHMENT AND INEQUALITY IN AMERICA 27 (Russell
Sage Foundation, 2006).

[16]     Jaylon Thomas & Kalen Russell, Black Students' Lived Experiences With and
Perceptions of Law Enforcement, ASS'N AM. COLLEGES & U. (Winter 2019)
https://www.aacu.org/diversitydemocracy/2019/winter/thomas. See also, Elizabeth Meizenzhal,
Black Students, Alumni Allege Pattern of Racial Profiling by Penn Police, DAILY
PENNSYLVANIAN, INC. (Aug. 7, 2020, 1:34 AM),
https://www.thedp.com/article/2020/08/penn-police-racial-profiling-racism;
Claire Hansen, After Racial Profiling of a Student, Smith College Hires an
Investigator to Review what Happened, CHRON. HIGHER EDUC. (Aug. 3, 2018),
https://www.chronicle.com/article/after-racial-profiling-of-a-student-smithcollege-
hires-an-investigator-to-review-what-happened/; Racial Profiling Problem on College
Campuses, WILLIAMS CEDAR LLC TRIAL LAW (June 27, 2019),
https://www.williamscedar.com/racial-profiling-collegecampuses/.

[17]     Devah Pager et al., Discrimination in a Low-Wage Labor Market: A Field Experiment, 74
Am. Soc. Rev. 777, 785-86 (2009); Devah Pager et al., Sequencing Disadvantage: Barriers to
Employment Facing Young Black and White Men with Criminal Records, 623 Annals Am. Acad.
Pol. & Soc. Sci. 195, 199 (2009); Devah Pager, The Mark of a Criminal Record, 108 AM. J.
SOC. 937, 955-61 (2003).

12

48. NTT's policies and practices as to screening applicants with criminal histories, including any blanket exclusions of individuals with felony or other types of convictions, are not consistent with business necessity.

49. NTT's applicant screening policies and practices do not bear any direct relationship to the employment in question.

50. For example, having a conviction is not an accurate proxy for determining whether an applicant would be able to perform the duties of the job. Upon information and belief, no reliable studies or empirical data suggest that applicants with criminal records are more likely to engage in terminable offenses.[18]

51. NTT's policy and practice of denying employment to individuals with criminal histories, including felony convictions, is far too over-inclusive to meet the standards of job-relatedness and consistency with business necessity.

52. Upon information and belief, NTT does not have a process or policy to determine whether applicants convicted of crimes have made positive changes in their lives subsequent to their convictions. NTT's policy and practice of banning individuals with convictions from employment has effectively foreclosed applicants' abilities to provide proof of rehabilitation, such as documentation of successful participation in drug treatment programs, educational achievements or relevant employment, or to submit certificates of relief from disabilities, which in many states create a presumption of rehabilitation.

53. Upon information and belief, the policy and practice of rejecting individuals with criminal records has created significant barriers to employment that excluded many properly

---

[18] *See, e.g.,* Ian B. Petersen, *Toward True Fair-Chance Hiring: Balancing Stakeholder Interests and Reality in Regulating Criminal Background Checks*, 94 Tex. L. Rev. 175, 187-88 (2015).

13

Case 6:18-cv-06591-MAV-CDH    Document 57-4    Filed 04/17/24    Page 15 of 28

qualified persons, including disproportionate numbers of African American applicants. There are less discriminatory alternatives that would have better achieved any legitimate business purpose.

54.     Less discriminatory alternatives include, but are not limited to: (1) considering all applicants with a record of conviction for a crime that by its nature does not pose a legitimate threat to the public safety or risk of workplace misconduct; and (2) giving each individual with a conviction a meaningful opportunity to demonstrate that he or she does not present a current threat, including providing evidence of rehabilitation, an explanation of events leading to the conviction, or information regarding other mitigating factors.

### The NYHRL Criminal History Discrimination Claim

55.     The NYHRL states "[i]t shall be an unlawful discriminatory practice" to "deny . . . employment to any individual" based on a criminal conviction "when such denial is in violation of the provisions of article twenty-three-A of the correction law." N.Y. Exec. Law § 296(15).

56.     Article 23-A of the Correction Law prohibits an employer from denying employment to any person by virtue of their criminal record unless the employer can meet its burden of demonstrating one of two narrow exceptions:

(1) there is a direct relationship between one or more of the previous criminal offenses and the specific license or employment sought or held by the individual; or

(2) the issuance or continuation of the license or the granting or continuation of the employment would involve an unreasonable risk to property or to the safety or welfare of specific individuals or the general public.

N.Y. Correct. Law § 752.

57.     In evaluating whether an employer meets one of these two narrow exceptions, Article 23-A of the Correction Law further requires that the employer must consider *all* of the

14

Case 6:18-cv-06591-MAV-CDH    Document 57-4    Filed 04/17/24    Page 16 of 28

following factors:

(a) The public policy of this state, as expressed in this act, to encourage the licensure and employment of persons previously convicted of one or more criminal offenses.

(b) The specific duties and responsibilities necessarily related to the license or employment sought or held by the person.

(c) The bearing, if any, the criminal offense or offenses for which the person was previously convicted will have on his fitness or ability to perform one or more such duties or responsibilities.

(d) The time which has elapsed since the occurrence of the criminal offense or offenses.

(e) The age of the person at the time of occurrence of the criminal offense or offenses.

(f) The seriousness of the offense or offenses.

(g) Any information produced by the person, or produced on his behalf, in regard to his rehabilitation and good conduct.

(h) The legitimate interest of the public agency or private employer in protecting property, and the safety and welfare of specific individuals or the general public.

N.Y. Correct. Law § 753.

58.     It is impossible for an employer to conduct the legally required evaluation of all Article 23-A factors without first engaging in a conversation with the prospective candidate before making an employment determination or affirmatively soliciting evidence of rehabilitation. *See, e.g.*, N.Y. Correct. Law § 753.

59.     It is impossible for an employer to conduct the legally required evaluation of all Article 23-A factors if the employer operates with a policy or practice of denying employment to all individuals with criminal records, or with specific types of criminal convictions. *See* N.Y. Correct. Law § 753.

15

Case 6:18-cv-06591-MAV-CDH    Document 57-4    Filed 04/17/24    Page 17 of 28

60.    For this reason, among others, the NYHRL forbids companies from denying

employment simply because a job applicant has a criminal record.  Instead, companies must

engage in an evaluation of the factors outlined in the Correction Law before making an

employment determination.

61.    Despite the requirements of the NYHRL, NTT has denied, and continues to deny,

employment to job applicants with certain convictions, without undertaking the inquiry required

by New York law.

62.    The ability to find employment is an essential aspect of reentering society for

people with criminal histories.  Recidivism declines when those individuals have viable

employment prospects and other stabilizing resources in their communities.  NTT's policy of

discriminating against individuals with criminal records frustrates such public policy objectives.

63.    The New York City Commission on Human Rights' guidance about the recently

enacted Fair Chance Act explains that "[e]mployers must carefully conduct the Article 23-A

analysis."[19]  This means that "[o]nce an employer extends a conditional offer and learns of an

applicant's conviction history, it must solicit the information necessary to properly consider each

Article 23-A factor, including the applicant's evidence of rehabilitation."[20]

64.    NTT's criminal history policies and practices do not adequately assess whether an

applicant's criminal history poses an unreasonable risk or whether there is a direct relationship

between that conviction and the job.

---

[19]    *See* Fair Chance Act: Legal Enforcement Guidance, NYC Commission on Human Rights
Legal Enforcement Guidance on the Fair Chance Act, Local Law No. 63 (2015) *Revised
5/24/2019*, *available at* https://www1.nyc.gov/site/cchr/law/fair-chance-act.page.
[20]    *Id.*

16

Case 6:18-cv-06591-MAV-CDH    Document 57-4    Filed 04/17/24    Page 18 of 28

65.     Upon information and belief, NTT has not validated its criminal history policies and practices.

66.     By denying employment to job applicants before soliciting such information, NTT violated Article 23-A and therefore violated the NYHRL.

67.     On information and belief, NTT has acted consciously and/or recklessly in breaching its duties and depriving Plaintiff Mandala and other job applicants of their rights under the NYHRL and the Correction Law, or in failing to make an appropriate inquiry to ascertain its obligations under the NYHRL and the Correction Law.

***The Notice of Rights Claim***

68.     The NY FCRA requires that:

> When a consumer reporting agency provides a consumer report that contains criminal conviction information, permitted by paragraph one of subdivision (a) of section three hundred eighty-j of this article, to a user, the person, firm, corporation or other entity requesting such report shall provide the subject of such report a printed or electronic copy of article twenty-three-A of the correction law governing the licensure and employment of persons previously convicted of one or more criminal offenses.

N.Y. Gen. Bus. Law § 380-g(d).

69.     "The public policy of [New York] state, as expressed in [its Correction Law], [is] to encourage the licensure and employment of persons previously convicted of one or more criminal offenses."  N.Y. Correct. Law § 753(1)(a).

70.     Consistent with the public policy of New York, in 2008 the New York Legislature added Section 380-g.

71.     The purpose of this requirement is to inform individuals with criminal records of their rights and remedies under the law and for employers to be informed of their obligations under the law in order to avoid illegal discrimination.

Case 6:18-cv-06591-MAV-CDH   Document 57-4   Filed 04/17/24   Page 19 of 28

72.     For example, the New York State Assembly's Memorandum in Support of the Legislation stated, in part: "Once [criminal history information] is obtained, employers have repeatedly dismissed qualified applicants and terminated employees based solely on their criminal histories, even if there is no direct relationship between the criminal offense(s) and the job and no unreasonable risk to the safety to the public or property, the criteria upon which an employer can deny a job to an applicant or terminate an existing employee.  The enactment of this bill will help ensure that employers and prospective employees are informed about the mandates of Article 23-A of the correction law.  This will help to avoid illegal discrimination against persons with a criminal conviction."  N.Y.S. Assembly's Memorandum in Support of the Legislation, Bill No. 10288A, 2007-2008 Term.

73.     Upon information and belief, NTT has routinely and systematically failed to provide Plaintiff Mandala and other job applicants with a copy of Article 23-A of the Correction Law, in the timing and manner required under the law.

74.     This has caused Plaintiff Mandala and other job applicants concrete harm, including because it has prevented them from advocating fully for a job with NTT and from explaining why their conviction histories did not disqualify them from employment; it has denied them an opportunity to learn of their rights under Article 23-A of the Correction Law; and it has created the risk of future harm.

75.     For example, as discussed above, under the Correction Law, NTT cannot deny employment to an individual "when such finding is based upon the fact that the individual has previously been convicted of one or more criminal offenses, unless" NTT shows "a direct relationship" between the conviction(s) and the job or "an unreasonable risk to property or to the safety or welfare of specific individuals or the general public."  N.Y. Correct. Law § 752.

Case 6:18-cv-06591-MAV-CDH    Document 57-4    Filed 04/17/24    Page 20 of 28

76. NTT must consider all eight factors laid out in Section 753 of the Correction Law and whether the individual has a certificate of relief from disabilities or a certificate of good conduct. N.Y. Correct. Law § 753.

77. Section 754 of the Correction law allows an individual "previously convicted of one or more criminal offenses" to request a written explanation for the employer's denial of employment, which the employer is required to provide within 30 days of the request—providing applicants with crucial information as to the basis for the job denial. N.Y. Correct. Law § 754.

78. NTT's failure to provide Plaintiff Mandala and other job applicants with a copy of Article 23-A of the Correction law denied them information to advocate fully for a position with NTT and explain their suitability for employment, and information about their legal right to be free from discrimination and remedies for that discrimination once it had occurred.

79. NTT's failure to provide this information also created the risk that Plaintiff Mandala and other job applicants would fail to seek to vindicate their right to be free from discrimination—either from NTT's denial of employment or the denial of employment by another employer.

80. NTT's violation of the NY FCRA frustrates New York's public policy to increase the employment of persons with criminal convictions. *See* N.Y. Correct. Law § 753(1)(a).

81. On information and belief, NTT has acted willfully in violating the requirements of the NY FCRA. NTT knew or should have known about its obligations under the NY FCRA. These obligations are well-established by the longstanding and plain language of the NY FCRA.

82. NTT has acted recklessly and willfully in breaching duties that it knew or should have known were required under the NY FCRA and depriving Plaintiff Mandala and other job applicants of their rights.

Case 6:18-cv-06591-MAV-CDH    Document 57-4    Filed 04/17/24    Page 21 of 28

## CLASS ACTION ALLEGATIONS

83.     Plaintiff brings this case as a proposed Class action pursuant to CPLR § 901(a) on behalf of himself and three classes of persons (collectively, the "Classes").

84.     Plaintiff asserts the First Cause of Action against NTT on behalf of the "NYHRL Disparate Impact Class," defined as follows:

**NYHRL Disparate Impact Class**: All African American individuals who, from June 2, 2014, through the resolution of this action, were denied employment in New York State based in whole or in part on NTT's policy and practice of denying employment to individuals with criminal convictions.

85.     Plaintiff asserts the Second Cause of Action against NTT on behalf of the "NYHRL Criminal History Discrimination Class," defined as follows:

**NYHRL Criminal History Discrimination Class**: All individuals who, from June 2, 2014, through the resolution of this action, were denied employment in New York State based in whole or in part on NTT's policy and practice of denying employment to individuals with criminal convictions.

86.     Plaintiff asserts the Third Cause of Action against NTT on behalf of the "Notice of Rights Class," defined as follows:

**Notice of Rights Class**: All individuals in New York State who, from August 15, 2016, through the resolution of this action, did not receive a copy of Article 23-A of the Correction Law from NTT when NTT received their consumer reports.

87.     The members of the NYHRL Disparate Impact Class, the NYHRL Criminal History Discrimination Class and the Notice of Rights Class are collectively referred to as "Class Members."

88.     Plaintiff reserves the right to amend the definition of above-defined Classes based on discovery or legal developments.

89.     The Class Members identified herein are so numerous that joinder of all members is impracticable.  NTT is a large employer in New York, with four offices in New York State. The number of job applicants harmed by NTT's violations of the law is far greater than feasibly

20

could be addressed through joinder.  The precise number is uniquely within Defendant's

possession, and Class Members may be notified of the pendency of this action by published,

mailed and/or e-mailed notice.

90.    There are questions of law and fact common to Class Members, and these

questions predominate over any questions affecting only individual members.  Common legal

and factual questions include, among others:

(a)    Whether it was Defendant's policy and practice to exclude job applicants with certain convictions who should have been eligible for employment based on valid factors assessing legitimate threat to public safety or risk of workplace misconduct;

(b)    Whether Defendant's policy and practice to exclude job applicants based on certain convictions had a discriminatory disparate impact on African Americans;

(c)    Whether Defendant's policy and practice to exclude job applicants based on their criminal history is job-related and/or consistent with business necessity;

(d)    Whether there was a less discriminatory policy and practice that would have met Defendant's legitimate needs;

(e)    Whether Defendant violated the NYHRL and the Correction Law when denying employment to Plaintiff and the NYHRL Criminal History Discrimination Class;

(f)    Whether Defendant violated the NY FCRA by failing to provide Plaintiff and the Notice of Rights Class with a timely copy of Article 23-A of the Correction Law, in violation of N.Y. Gen. Bus. Law § 380-g(d);

(g)    Whether Defendant was willful in its noncompliance with the requirements of the NY FCRA;

(h)    Whether compensatory damages and punitive damages for Class Members are warranted; and

(i)    Whether a declaratory judgement and/or injunctive relief is warranted regarding Defendant's policies and practices.

21

Case 6:18-cv-06591-MAV-CDH    Document 57-4    Filed 04/17/24    Page 23 of 28

91.    Plaintiff is a member of the Classes he seeks to represent. NTT took discriminatory adverse action against Plaintiff based on his criminal history and without providing him with a timely copy of Article 23-A of the Correction Law.

92.    Plaintiff's claims are typical of the claims of the Classes he seeks to represent: (1) Plaintiff applied for a job with NTT within the relevant time period; (2) Plaintiff was subjected to the hiring process screening applicants for criminal histories; (3) Plaintiff was denied the position because of his criminal history; and (4) NTT did not provide Plaintiff with a timely copy of Article 23-A of the Correction Law. All of these claims are shared by each and every Class Member. Upon information and belief, it is NTT's standard practice to take adverse actions against applicants based on criminal convictions in a manner that is discriminatory and inconsistent with business necessity and without properly considering the factors laid out in the Correction Law.

93.    Plaintiff will fairly and adequately represent and protect the interests of Class Members because his interests coincide with, and are not antagonistic to, the interests of the Class Members he seeks to represent. Plaintiff has retained counsel who are competent and experienced in complex class actions, including litigation pertaining to criminal background checks, the Correction Law, NY FCRA, disparate impact litigation, other employment litigation, and the intersection thereof. There is no conflict between Plaintiff and the Class Members.

94.    A class action is superior to other available methods for the fair and efficient adjudication of this litigation. Class Members have been damaged and are entitled to recovery as a result of Defendant's uniform policies and practices. NTT has acted and/or refused to act on grounds generally applicable to the Class Members, making declaratory and injunctive relief appropriate with respect to Plaintiff and the Class Members as a whole. Because NTT has

maintained a common policy of denying employment to individuals with certain criminal convictions but may not have explained that policy to all Class Members, many Class Members may be unaware that their rights have been violated. Judicial economy will be served by the maintenance of this lawsuit as a class action, in that it is likely to avoid the burden which would otherwise be placed on the judicial system by the filing of many similar suits by individually harmed persons. There are no obstacles to the effective and efficient management of this lawsuit as a class action.

## **CAUSES OF ACTION**

### **FIRST CLAIM FOR RELIEF**
**Disparate Impact Discrimination**
**New York Human Rights Law**
**(On Behalf of Plaintiff Mandala and the NYHRL Disparate Impact Class)**

95.     Plaintiff, on behalf of himself and the NYHRL Disparate Impact Class, incorporates by reference the allegations in all preceding paragraphs.

96.     Plaintiff brings this claim on his own behalf and on behalf of the NYHRL Disparate Impact Class.

97.     Defendant's policy and practice of denying employment opportunities to individuals with criminal convictions has harmed, and continues to harm, Plaintiff, and constitutes unlawful discrimination on the basis of race, color, and/or national origin in violation of the NYHRL.

98.     Defendant's policy and practice of denying employment opportunities to individuals with criminal convictions has had a discriminatory disparate impact on African Americans and is neither job related nor consistent with business necessity. Even if Defendant's policy and practice of denying employment opportunities to individuals with criminal

Case 6:18-cv-06591-MAV-CDH   Document 57-4   Filed 04/17/24   Page 25 of 28

convictions could be justified by business necessity, a less discriminatory alternative exists that would have equally served any legitimate purpose.

99.     Defendant's conduct has caused, and continues to cause, Plaintiff and the members of the NYHRL Disparate Impact Class losses in earnings and other employment benefits.

100.    Plaintiff and the NYHRL Disparate Impact Class also seek injunctive and declaratory relief to correct Defendant's discriminatory policies and practices.

**SECOND CLAIM FOR RELIEF**
**Discriminatory Denial of Employment**
**New York Human Rights Law and Article 23-A of the Correction Law**
**(On Behalf of Plaintiff Mandala and the NYHRL Criminal History Discrimination Class)**

101.    Plaintiff, on behalf of himself and the NYHRL Criminal History Discrimination Class, incorporates the preceding paragraphs as alleged above.

102.    Defendant denied employment to Plaintiff and the NYHRL Criminal History Discrimination Class based in whole or in part on their criminal history.

103.    Before denying employment to Plaintiff and job applicants in the NYHRL Criminal History Discrimination Class, Defendant failed to conduct a proper inquiry into the factors outlined in Article 23-A of the Correction Law (including an adequate assessment of risk or job-relatedness), in violation of N.Y. Exec. Law § 296(15).

104.    As a result of Defendant's actions, Plaintiff and the NYHRL Criminal History Discrimination Class have been deprived of their rights and have lost employment opportunities, earnings and other employment benefits.

105.    Plaintiff and the NYHRL Criminal History Discrimination Class also seek injunctive and declaratory relief to correct Defendant's discriminatory policies and practices.

Case 6:18-cv-06591-MAV-CDH    Document 57-4    Filed 04/17/24    Page 26 of 28

### THIRD CLAIM FOR RELIEF
**NTT's Failure to Provide a Copy of Article 23-A**
**N.Y. Gen. Bus. Law § 380-g(d)**
**(On Behalf of Plaintiff Mandala and the Notice of Rights Class)**

106.    Plaintiff, on behalf of himself and the Notice of Rights Class, incorporates the preceding paragraphs as alleged above.

107.    NTT violated the NY FCRA by procuring consumer reports from Plaintiff and Class Members without providing them with a copy of Article 23-A of the Correction Law at that time.

108.    NTT caused concrete injury (including the risk of harm) to Plaintiff and the Notice of Rights Class Members, including because they were denied the opportunity to contextualize and explain their conviction histories in light of the Article 23-A factors; they could not bring to the attention of NTT their rehabilitative efforts and other employment; and they could not learn of their rights and opportunities under the NY FCRA in ways that would increase their chances of employment now and in the future.

109.    NTT acted willfully and in knowing or reckless disregard of its obligations and the rights of Plaintiff and the Notice of Rights Class.

110.    NTT's willful conduct is reflected by, among other things, the fact that it acted recklessly in violating a clear statutory mandate set forth in N.Y. Gen. Bus. Law § 380-g(d).

111.    As a result of NTT's actions, Plaintiff and the Notice of Rights Class have been deprived of their consumer rights, and prevented from timely and effectively contesting the adverse action.

112.    NTT's willful and/or negligent conduct makes it liable for actual damages, punitive damages, and attorneys' fees and costs, in an amount to be determined by the Court pursuant to N.Y. Gen. Bus. Law § 380-l and N.Y. Gen. Bus. Law § 380-m.

25

INDEX NO. 654705/2019

RECEIVED NYSCEF: 03/11/2021

Case 6:18-cv-06591-MAV-CDH   Document 57-4   Filed 04/17/24   Page 27 of 28

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff and Class Members pray for relief as follows:

(a)    A declaratory judgment that the practices complained of herein are unlawful and violate NYHRL and the NY FCRA;

(b)    A preliminary and permanent injunction against NTT and all officers, agents, successors, employees, representatives, and any and all persons acting in concert with them, from engaging in each of the unlawful policies, practices, customs, and usages set forth herein;

(c)    An order that NTT institute and carry out policies, practices, and programs that provide equal employment opportunities for applicants with criminal records who would be eligible under application of Article 23-A and that Defendant eradicate the effects of past and present unlawful employment practices;

(d)    Certification of the case as a class action on behalf of the proposed Classes pursuant to Article 9 of the New York Civil Practice Law and Rules;

(e)    Designation of Plaintiff as representative of Class Members;

(f)    Designation of Plaintiff's counsel of record as Class Counsel;

(g)    Restoring of Plaintiff and Class Members to their rightful positions at NTT or those positions equivalent at NTT (i.e., reinstatement), or in lieu of reinstatements, an order for front pay benefits;

(h)    An award of backpay and/or compensatory damages for violations of the NYHRL;

(i)    An award of nominal and/or exemplary damages;

(j)    An award of all actual damages awardable for violations of the NY FCRA;

(k)    An award of punitive damages under applicable statutes;

(l)    An award of costs incurred herein, including reasonable attorneys' fees to the extent allowable by law;

(m)    Such other injunctive and/or declaratory relief that is necessary to correct Defendant's discriminatory policies and practices;

(n)    Pre-judgment and post-judgment interest, as provided by law;

26

    (o)    Payment of a reasonable service award to Plaintiff, in recognition of the services he has rendered and will continue to render to Class Members, and the risks he has taken and will take; and

    (p)    Such other and further legal and equitable relief as this Court deems necessary, just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury in this action.

Dated: New York, New York
March 11, 2021

Respectfully submitted,

By:   /s/ Ossai Miazad
**OUTTEN & GOLDEN LLP**
Ossai Miazad
Christopher M. McNerney
685 Third Avenue, 25th Floor
New York, New York 10017
Telephone: (212) 245-1000
E-mail: om@outtengolden.com
E-mail: cmcnerney@outtengolden.com

Rachel Williams Dempsey*
One California Street, Ste 1250
San Francisco, CA 94111
Telephone: (415) 638-8800
E-mail: rdempsey@outtengolden.com

**NAACP LEGAL DEFENSE &**
**EDUCATIONAL FUND, INC.**
Rachel M. Kleinman
40 Rector Street, Fifth Floor
New York, NY 10006
Telephone: (212) 965-2200
E-mail: rkleinman@naacpldf.org

Catherine Meza*
700 14th Street, NW, Suite 600
Washington, DC 20005
Telephone: (202) 682-1300
E-mail: cmeza@naacpldf.org

*Attorneys for Plaintiff and the Putative Classes*

*\*pro hac vice forthcoming*

27