UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

---

GEORGE MANDALA & CHARLES BARNETT, *individually and on behalf of all others similarly situated,*

Plaintiffs,

vs.

NTT DATA, INC.,

Defendant.

---

DECISION AND ORDER

18-CV-6591 (MAV)

## INTRODUCTION

In July 2019, the Hon. Judge Charles J. Siragusa of this district granted Defendant NTT Data, Inc.'s ("NTT") motion to dismiss Plaintiffs George Mandala's and Charles Barnett's putative class action suit against NTT for its alleged policy not to hire individuals with criminal convictions. *Mandala v. NTT Data, Inc.*, No. 18-CV-6591 CJS, 2019 WL 3237361 (W.D.N.Y. July 18, 2019). The judgment was subsequently affirmed on appeal by the Second Circuit Court of Appeals, and Plaintiffs' petition for a rehearing *en banc* was denied. *Mandala v. NTT Data, Inc.*, 975 F.3d 202 (2d Cir. 2020); *Mandala v. NTT Data, Inc.*, 988 F.3d 664 (2d Cir. 2021).

Following the denial of their petition for a rehearing, Plaintiffs filed a motion to vacate judgment with the district court and sought to amend their complaint. ECF No. 35. After Judge Siragusa's denial of Plaintiffs' motion to vacate was reversed by the Second Circuit, Plaintiffs filed their First Amended Complaint ("FAC") in March 2024, which is a putative class action complaint. ECF No. 49; *see also Mandala v.*

*NTT Data, Inc.*, No. 18-CV-6591 (CJS), 2021 WL 5771154 (W.D.N.Y. Dec. 6, 2021), *rev'd and remanded*, 88 F.4th 353 (2d Cir. 2023). The FAC alleges disparate impact claims under Title VII and the New York State Human Rights Law, and claims under New York law alleging improper use of a criminal background check. ECF No. 49.

The matter is presently before the Court on NTT's motion to dismiss the FAC, or alternatively to strike Plaintiffs' class action allegations. ECF No. 57. For the reasons stated below, NTT's motion is granted in part and denied in part.

## BACKGROUND

### I. Procedural History

To put Plaintiffs' factual allegations into context, it is helpful to first review the relevant aspects of this matter's procedural history. The Second Circuit succinctly summarized the original complaint and its dismissal:

> [I]n August 2018, Mandala and Barnett filed a putative class action complaint against NTT, alleging that the company's hiring practices violate Title VII of the Civil Rights Act of 1964, as well as several New York State anti-discrimination laws. Specifically, they assert that NTT has a policy not to hire "individuals with certain criminal convictions including felonies (or similar criminal classifications)," . . . which Plaintiffs say is unlawful because it invariably disqualifies a disproportionate number of African-American applicants.
>
> To support this assertion, Plaintiffs point to numerous studies showing that "African Americans are arrested and incarcerated for crimes at higher rates than [w]hites, relative to their share of the national population . . . ." This disparity is compounded, they say, by evidence suggesting that employers place additional weight on criminal history when an applicant is African American as opposed to white. Notably, however, the complaint contains no allegations about racial disparities in NTT's existing workforce or the demographics of qualified applicants that NTT has rejected as a result of its hiring policy . . . .
>
> A little less than a year after it was filed, the district court dismissed

> the complaint for failure to state a claim . . . . The [district] court concluded that the national statistics on which Plaintiffs rely are "inadequate to show a relationship between the pool of [NTT] applicants who are Caucasian versus African Americans and their respective rates of felony convictions . . . ." And without any remaining federal claims, the district court refused to exercise supplemental jurisdiction over Plaintiffs' state law claims and dismissed their complaint in its entirety . . . .

*Mandala*, 975 F.3d at 205–06.

As Judge Siragusa explained in a 2021 decision, Plaintiffs then challenged the dismissal of their complaint before the Second Circuit, first by direct appeal, and then by a petition for a rehearing *en banc*:

> A divided panel of the Second Circuit affirmed th[e district court]'s dismissal of Plaintiffs' complaint. The majority opinion noted that "Plaintiffs have offered no allegations to suggest that the general population statistics on which they rely 'might accurately reflect [NTT's] pool of qualified job applicants.'" *Mandala*, 975 F.3d at 211 (quoting *Malave v. Potter*, 320 F.3d 321, 326 (2d Cir. 2003)). The majority further stated that "if a Title VII plaintiff intends to rely on national statistics to plead a disparate impact claim, she must explain why those statistics can plausibly be expected to hold true for the qualified applicant pool in question." *Mandala*, 975 F.3d at 212. The dissent, on the other hand, argued that in rejecting Plaintiffs' use of national statistics, the Court was holding Plaintiffs to an improperly high pleading standard. *Mandala*, 975 F.3d at 214 (Chin, J., dissenting).
>
> The Second Circuit's denial of Plaintiffs' petition for a rehearing *en banc* also involved dissenting opinions. The majority concurrence to the denial elaborated on the majority's reasoning in the . . . decision affirming th[e district court]'s judgment:
>
> > [Our decision] does not mean that national statistics can never be used in disparate impact cases involving skilled positions. Plaintiffs simply need to "provide additional allegations to explain why their chosen national statistics are in fact likely to be representative of [the] qualified applicant pool" in question. *Mandala*, 975 F.3d at 212. ***Here, that could have taken the form of additional national statistics indicating that, even as education levels increase, racial disparities between***

> ***conviction rates remain***. But Plaintiffs failed to provide such allegations. It is for that limited reason that the panel majority opinion affirmed the district court's dismissal of Plaintiffs' complaint for failure to state a claim.
>
> *Mandala*, 988 F.3d at 668. The majority then referenced additional statistics introduced in an amicus brief, which indicated that black males with some college education are seven times more likely to be imprisoned than white males with some college education, and suggested these statistics "might" have rendered Plaintiffs' claims plausible had they been included in the original pleadings. *Mandala*, 988 F.3d at 668. The dissent seized on the majority's statement, and "***encourage[d] both future litigants to bring such cases and the Plaintiffs here to move under Rule 60 for relief from the district court's judgment in order to file an amended complaint that includes statistics incorporating the continued racial gaps in conviction rates as education levels rise***." *Mandala*, 988 F.3d at 671 (Pooler, J., dissenting).

*Mandala v. NTT Data, Inc.*, No. 18-CV-6591 (CJS), 2021 WL 5771154, at *2 (W.D.N.Y. Dec. 6, 2021), *rev'd and remanded*, 88 F.4th 353 (2d Cir. 2023) (emphasis added to the original).

The FAC presently being tested by NTT's motion to dismiss is presumably Plaintiffs' answer to the Second Circuit's call for "statistics incorporating the continued racial gaps in conviction rates as education levels rise." *Mandala*, 988 F.3d at 671 (Pooler, J., dissenting).

## II. Factual Allegations Regarding Plaintiffs

For the purposes of ruling on NTT's motion to dismiss, the Court accepts all factual allegations in Plaintiffs' pleadings as true, and draws all reasonable inferences in Plaintiffs' favor. *See Trs. of Upstate New York Eng'rs Pension Fund v. Ivy Asset Mgmt.*, 843 F.3d 561, 566 (2d Cir. 2016).

Defendant NTT Data, Inc. is a global IT services company employing over

110,000 people worldwide, including approximately 18,000 people in North America. FAC ¶ 17. The company has at least four offices in New York. *Id.* ¶ 105.

Plaintiff George Mandala, an African American, was convicted of Driving While Intoxicated in 2014. *Id.* ¶ 35. In early 2017, Mandala applied for a position as a "Salesforce Developer" with NTT, successfully completed two phone interviews, and received a letter formally offering him the job on March 22, 2017. *Id.* ¶¶ 15, 22–26. On March 23, 2017, Mandala accepted the offer and "authorized a background check pursuant to NTT's policy, and NTT obtained a criminal background check on Mr. Mandala from a consumer reporting agency." *Id.* ¶¶ 28–29.

Then, on March 30, 2017, Mandala was informed by phone that "NTT had a policy not to hire persons with felonies on their records." *Id.* ¶ 32. On April 6, 2017, Mandala received a letter from NTT withdrawing its job offer, and stating that "[t]his action was influenced by information contained in a consumer report . . . ." *Id.* ¶ 33. On June 2, 2017, Mandala filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC"), which issued him a Right to Sue letter on May 17, 2018. *Id.* ¶ 38.

Plaintiff Charles Barnett is also an African American with at least one prior felony conviction, though the FAC does not specify what he was convicted of or when. *See, e.g., Id.* ¶ 49 (referencing Barnett's "felony convictions"). In July 2017, Barnett was contacted by an NTT recruiter about an opportunity to work on a contract with the Commonwealth of Kentucky as a web developer. *Id.* ¶ 39. After several phone interviews and an in-person interview, Barnett received an offer of employment from

NTT, which he accepted. *Id.* ¶¶ 41–44. Barnett authorized a background check pursuant to NTT's policy, and NTT obtained a criminal background check on him from a consumer reporting agency. *Id.* ¶ 44–45.

After the background check was completed, NTT informed Barnett that it was withdrawing its offer of employment. *Id.* ¶ 47. Although Barnett subsequently sought to apply for other positions with NTT, he was informed that his employment profile would not be submitted for consideration due to his felony convictions. *Id.* ¶ 49.

**III. Factual Allegations Common to All Class Members**

Statistics show that African Americans are arrested, sentenced, and imprisoned for crimes at substantially higher rates than whites, relative to their share of the national population. FAC ¶¶ 54–55 (citing reports from the Federal Bureau of Investigation (2016) and the Census Bureau (2017), and enforcement guidance from the EEOC (2012)). According to data from "The Sentencing Project," as of 2014 this trend holds in New York State, as well. *Id.* ¶ 56. One study found that New York has one of the largest disparities in marijuana possession arrest rates between Black and white people,[1] with Black people over 4.5 times as likely to be arrested for marijuana possession as white people. *Id.* ¶ 56 (citing a 2013 article from the American Civil Liberties Union). By contrast, "there are no statistics available to suggest that Black and white people are treated equally at the hands of the criminal justice system in *any* segment of society, be it geographic location, education level or

[1] Plaintiff uses this capitalization convention throughout the FAC. "Black" is capitalized, "white" is not.

socio-economic status." *Id.* ¶ 57 (emphasis in original).

A study published by the Russell Sage Foundation in 2006 found that "Black men with some college education have imprisonment risks that are seven (7) times greater than white men with some college education." *Id.* ¶ 58 (citing Bruce Western, *Punishment and Inequality in America*, Russell Sage Foundation: 2006). "This [pattern] is consistent with the racial disparities that exist among individuals with lesser educational attainment." *Id.* (again citing the Russell Sage Foundation study). Further, a series of 2019 articles reported that more than two-thirds of college students surveyed agreed with the following statement: "In general, most students on campus are treated differently by law enforcement officials based on their racial experience." *Id.* ¶ 59 (citing several articles).

With respect to employment opportunities, researchers at Harvard University and Princeton University have "found that even among people with criminal records, African Americans were particularly disadvantaged in the job market compared to white people with criminal records." *Id.* ¶ 60 (citing three articles published between 2003 and 2009). Yet Plaintiffs have discovered "no reliable studies or empirical data [which] suggest that applicants with criminal records are more likely to engage in terminable offenses" on the job. *Id.* ¶ 63 (citing a 2015 article in the Texas Law Review).

Plaintiffs allege that notwithstanding these disparities, NTT has a policy and practice of denying employment to individuals with criminal histories, including felony convictions, and no process or policy to determine whether applicants convicted

of crimes have made positive changes in their lives subsequent to their conviction. *Id.* ¶ 64–65. For instance, when posting for a Network/Systems Administrator in New York City, NTT listed as a "basic qualification" that the applicant have "[n]o prior felony arrests." *Id.* ¶ 37.

Thus, Plaintiffs infer that NTT's policy and practice of denying job opportunities to individuals with non-job-related convictions had and continues to have a significant and detrimental impact on African Americans based on their race, color and/or national origin, as compared to white applicants. *Id.* at ¶ 54.

## LEGAL STANDARD

The purpose of a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) "is to test . . . the formal sufficiency of the plaintiff's statement of a claim for relief without resolving a contest regarding its substantive merits." *Global Network Commc'ns, Inc. v. City of New York*, 458 F.3d 150, 155 (2d Cir. 2006) (emphasis omitted). An action must be dismissed under Rule 12(b)(6) "when the allegations in a complaint, however true, could not raise a claim of entitlement to relief . . . ." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 558 (2007). To survive a motion to dismiss under Rule 12(b)(6), on the other hand, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570).

"A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 678. Where a plaintiff's factual allegations are "merely

consistent with" a defendant's liability, those allegations "'stop[] short of the line between possibility and plausibility of entitlement to relief.'" *Id.* (quoting *Twombly*, 550 U.S. at 557). Moreover, "[c]onclusory allegations or legal conclusions masquerading as factual conclusions will not suffice to defeat a motion to dismiss." *Kirch v. Liberty Media Corp.*, 449 F.3d 388, 398 (2d Cir. 2006) (citation and internal quotation marks omitted). "Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679.

"The standard for reviewing a 12(b)(1) motion to dismiss is essentially identical to the 12(b)(6) standard, except that '[a] plaintiff asserting subject matter jurisdiction has the burden of proving by a preponderance of the evidence that it exists.'" *Allstate Ins. Co. v. Elzanaty*, 916 F. Supp. 2d 273, 286 (E.D.N.Y. 2013) (quoting *Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000)). "'A case is properly dismissed for lack of subject matter jurisdiction under Rule 12(b)(1) when the district court lacks the statutory or constitutional power to adjudicate it.'" *Andrews v. Town of W. Seneca*, No. 21-CV-746-LJV, 2025 WL 959658, at *6 (W.D.N.Y. Mar. 31, 2025) (quoting *Makarova*, 201 F.3d at 113).

**DISCUSSION**

Plaintiffs' FAC from March 2024 is a putative class action asserting four causes of action: (I.) a disparate impact claim under Title VII of the Civil Rights Act of 1964; (II.) a disparate impact claim under the New York State Human Rights Law ("NYSHRL"); (III.) a claim of discriminatory denial of employment under the

NYSHRL and Article 23-A of the New York Correction Law; and (IV.) a claim under the New York General Business Law for failure to provide Mandala with a copy of the Article 23-A notice. ECF No. 49.

NTT filed a motion to dismiss in April 2024 testing the FAC on several grounds, arguing: (I.) that the statistics Plaintiffs added in their FAC failed to cure the deficiencies in their disparate impact claims that led to the dismissal of their original complaint; (II.) that Plaintiff Mandala's disparate impact claims under the NYSHRL are time-barred; (III.) that Plaintiff Mandala's claims under the NYSHRL and Article 23-A of the Correction law is partially time-barred; and (IV.) that Mandala does not have standing to bring his claim under the New York General Business Law. ECF No. 57-1. Further, NTT argues that Plaintiffs' class action allegations should be stricken because Plaintiffs fail to plead they have standing to represent the class defined in the FAC, and have failed to adequately plead the Fed. R. Civ. P. 23 requirements. *Id.*

Plaintiffs responded to NTT's motion to dismiss in May 2024. ECF No. 64. Although Plaintiffs opposed NTT's arguments regarding the two disparate impact claims and Plaintiffs' class allegations, Plaintiffs nevertheless agreed to dismiss their cause of action under the General Business Law and limit the start of the statute of limitations period for the claim under NYSHRL and Article 23-A of the Correction law to August 15, 2015. ECF No. 64 at 23. Accordingly, the discussion below will address only the parties' arguments regarding whether the NYSHRL disparate impact claim is time-barred, whether Plaintiffs' have sufficiently pleaded their

disparate impact claims, and whether Plaintiffs' class allegations should be stricken.

**I. Plaintiff Mandala's NYSHRL Disparate Impact Claim**

The FAC includes disparate impact claims under both Title VII and NYSHRL. However, as NTT points out, Plaintiff Mandala did not assert the NYSHRL disparate impact claim in the original complaint in August of 2018 (ECF No. 1), only beginning with the proposed amended complaint filed on March 31, 2021 (ECF No. 35). As a consequence, NTT maintains that the NYSHRL's three year statute of limitations operates to bar Mandala's NYSHRL claim. ECF No. 57-1 at 14–15. Plaintiff Mandala does not dispute that more than three years elapsed between the alleged discriminatory action and the assertion of his NYSHRL disparate impact claim in federal court. *See* ECF No. 64 at 22–23. Rather, Plaintiff Mandala maintains that the NYSHRL claim is saved by Plaintiffs' filing, in 2019, of a putative class action in state court. *Id.* (discussing *American Pipe & Constr. Co. v. Utah*, 414 U.S. 538 (1974)).

The Court has doubts about the merits of Plaintiff Mandala's claim regarding the applicability of *American Pipe* to the present matter. *See China Agritech v. Michael H. Resh*, 584 U.S. 732, 736 (2018) (". . . *American Pipe* does not permit the maintenance of a follow-on class action past expiration of the statute of limitations."). Nevertheless, according to the Court's cursory calculations, and assuming – without finding – that the filing of a charge with the EEOC tolls the statute of limitations for any related claims under the NYSHRL, the time by which Plaintiffs exceeded the limitations period was as little as one day. *See Franchitti v. Cognizant Tech. Sols. Corp.*, No. 21-CV-2174 (JMF), 2022 WL 2657171, at *8 (S.D.N.Y. July 8, 2022)

(collecting cases regarding tolling the limitations period while the EEOC investigates a claim). Given the narrowness of the margin, and because resolution of NTT's statute of limitations argument requires a fact-specific evaluation, it would be premature at this stage to dismiss Plaintiff Mandala's disparate impact claim under the NYSHRL as time-barred. *See, e.g., Cmty. Ass'n Underwriters of Am., Inc. v. Main Line Fire Prot. Corp.*, No. 18CIV4273PMHJCM, 2020 WL 5089444, at *7 (S.D.N.Y. Aug. 28, 2020); *Ortiz v. City of New York*, 755 F. Supp. 2d 399, 401 (E.D.N.Y. 2010) ("[a] motion to dismiss is often not the appropriate stage to raise affirmative defenses like the statute of limitations.").

**II. The Legal Sufficiency of Plaintiffs' Disparate Impact Claims**

As indicated above, Plaintiffs' original complaint was dismissed after Judge Siragusa found that they had failed to plead a plausible Title VII disparate impact claim because "general statistics are inadequate to show a relationship between the pool of applicants who are Caucasian versus African Americans and their respective rates of felony convictions." *Mandala*, 2019 WL 3237361 at *4.

The Second Circuit affirmed Judge Siragusa's decision, but explained that general population statistics *could* be sufficient to support a disparate impact claim provided that Plaintiffs made "additional allegations to explain why their chosen national statistics are in fact likely to be representative of NTT's qualified applicant pool" at NTT. *Mandala*, 975 F.3d at 212. The panel majority went on to clarify that in the present case, those missing allegations "could have taken the form of additional national statistics indicating that, even as education levels increase, racial disparities

between conviction rates remain." *Id.* In the concurrence discussing why at least five of the Judges on the circuit court voted to deny Plaintiffs a rehearing *en banc*, Judge Sullivan even went so far as to say that a study identified in an *amicus* brief regarding the relative disparity in imprisonment risks between black and white men of some college education "might have rendered Plaintiffs' claim plausible." *Mandala*, 988 F.3d at 668.

Despite Plaintiffs' allegations in the FAC regarding the very statistics referenced by Judge Sullivan (*see* FAC at ¶ 58), NTT argues that Plaintiffs' FAC *still* does not plead plausible disparate impact claims because it fails to plausibly allege that a disparity exists in NTT's hiring, and that a focus on irrelevant comparator groups fails to suggest a causal relationship between NTT's policy of not hiring individuals convicted of crimes and a racial disparity in its workforce.

**A. Legal Principles**

"Disparate impact claims involve employment practices which are facially neutral, but fall more harshly on one group than another and cannot be justified by some business necessity." *Hayden v. Cnty. of Nassau*, 180 F.3d 42, 52 (2d Cir. 1999); *see also Ricci v. DeStefano*, 557 U.S. 557, 577–78 (2009). Thus, the Second Circuit has held that under both Title VII and the NYSHRL, a plaintiff establishes a prima facie case of disparate impact by (1) identifying a specific employment practice or policy; (2) demonstrating that a disparity exists between a protected class and a similarly situated group; and (3) establishing a causal relationship between the two. *Chin v. Port Auth. of N.Y. & N.J.*, 685 F.3d 135, 151 (2d Cir. 2012) (citations omitted); *see*

*also* 42 U.S.C. § 2000e-2(k)(1)(A)(i) (identifying "race, color, religion, sex, or national origin" as the protected classes).

At the motion to dismiss stage, however, "Plaintiffs must merely allege sufficient facts to support a plausible claim that an employer's facially neutral practice or policy disproportionately and adversely affects a particular protected group." *Loc. 2507, Uniformed EMTs, Paramedics & Fire Inspectors v. City of New York on behalf of Fire Dep't of City of New York*, No. 22 CIV. 10336, 2024 WL 916520, at *8 (S.D.N.Y. Mar. 4, 2024) ("*Loc. 2507*") (citation omitted). "To nudge a disparate impact claim across the line from conceivable to plausible . . . plaintiffs typically rely on statistical evidence to show a disparity in outcome between groups." *Mandala*, 975 F.3d at 209 (citations omitted). Although on a motion to dismiss the standard is somewhat relaxed with respect to the methodological soundness of the statistics and the complaint's corroborating allegations, the statistics nevertheless "must plausibly suggest that the challenged practice *actually* has a disparate impact . . . and, at minimum, 'focus on the disparity between appropriate comparator groups' or 'reveal disparities between populations that are relevant to the claim . . . plaintiff[s] seek[ ] to prove.'" *Loc. 2507*, 2024 WL 916520, at *8 (quoting *Mandala*, 975 F.3d at 209–10)).

**B. Application**

NTT argues that Plaintiffs have failed to plausibly allege the second element in their disparate impact claim – that a disparity in racial classes exists – and also that they have failed to focus on the appropriate comparator groups. The Court disagrees.

Plaintiffs have plausibly alleged that a racial disparity exists. Contrary to NTT's argument, Plaintiffs' allegation that NTT's "policy and practice of denying employment opportunities to individuals with criminal convictions had a disparate impact on African Americans . . ." was not a legal conclusion, but rather a permissible inference derived from multiple statistical studies acceptable at face value at this stage of the case. FAC ¶ 116. In support of the inference of a racial disparity, Plaintiffs point to statistics from several studies, including studies indicating that African Americans are convicted of crimes at substantially higher rates than whites (*Id.* ¶ 54–55); that "Black men with some college education have imprisonment risks that are seven (7) times greater than white men with some college education," which pattern "is consistent with the racial disparities that exist among individuals with lesser educational attainment" (*Id.* ¶ 58); that "even among people with criminal records, African Americans were particularly disadvantaged in the job market compared to white people with criminal records" (*Id.* ¶ 60); and that "no reliable studies or empirical data suggest that applicants with criminal records are more likely to engage in terminable offenses" on the job (*Id.* ¶ 63).

In short, Plaintiffs' inference that NTT's alleged policy of denying employment opportunities to individuals convicted of crimes has a disparate impact on African Americans is rendered plausible by statistical evidence sufficient at the pleading stage to show that a disparity exists.

With respect to comparator groups, NTT maintains that the studies that Plaintiffs reference are not focused on the appropriate comparator groups or focused

to reveal disparities between populations relevant to the claims that they seek to prove. The Court again disagrees.

To be sure, a disparate impact claim requires the plaintiff to demonstrate that members of a protected group are disproportionately impacted by a particular policy or practice when compared with other similarly situated individuals. *See Watson v. New York Pressman's Union No. 2*, 444 F. App'x 500, 501 (2d Cir. 2011); *Brown v. S. Shore Univ. Hosp.*, 762 F. Supp. 3d 191, 214 (E.D.N.Y. 2025). However, at the motion to dismiss stage, "Plaintiffs must merely allege sufficient facts to support a plausible claim that an employer's facially neutral practice or policy disproportionately and adversely affects a particular protected group." *Loc. 2507*, 2024 WL 916520, at *8. Further, the Second Circuit has repeatedly pointed out that the similarity of comparators "'presents a question of fact,' rather than a legal question to be resolved on a motion to dismiss." *Brown v. Daikin Am. Inc.*, 756 F.3d 219, 230 (2d Cir. 2014) (quoting *Graham v. Long Island R.R.*, 230 F.3d 34, 39 (2d Cir. 2000)); *Woods v. Newburgh Enlarged City Sch. Dist.*, 288 F. App'x 757, 760 (2d Cir. 2008).

Here, Plaintiffs have pleaded that NTT's alleged policy of denying employment to individuals convicted of crimes has a disproportionately greater impact on African American job applicants than on white job applicants. FAC at ¶ 116. In explaining why the dismissal of Plaintiffs' original complaint was affirmed, the Second Circuit indicated that to use national statistics as a reliable surrogate for statistics specific to NTT, Plaintiffs were required to include allegations that gave reason to think the national figures accurately reflected the pool of qualified job candidates. *Mandala*,

975 F.3d at 211 (citing, *inter alia, Wards Cove Packing Co. v. Atonio,* 490 U.S. 642, 651 (1989); *Malave v. Potter*, 320 F.3d at 326). The Circuit Court later indicated that these allegations "could have taken the form of additional national statistics indicating that, even as education levels increase, racial disparities between conviction rates remain." *Mandala*, 988 F.3d at 668. Thus, Plaintiffs here have "nudge[d]" their disparate impact allegations across the line from conceivable to plausible by citing to statistics not only from the general population, but also from a population with "some college education" (*Id.* at ¶ 58), and "in the job market" (*Id.* at ¶ 60). *See Mandala*, 988 F.3d at 668 (identifying the statistics Plaintiffs have cited in the FAC as "the very figures that might have rendered Plaintiffs' claims plausible").

Accordingly, the Court finds that Plaintiffs have plausibly pleaded a disparate impact claim under Title VII and the NYSHRL.

**III. Class Allegations**

NTT argues that the Court should strike the class allegations in the complaint because Plaintiffs lack standing to represent the class, and because they fail to satisfy the Fed. R. Civ. P. 23 requirements of numerosity, commonality, typicality, and adequacy of representation. ECF No. 57-1 at 22–24.

However, district courts in the Second Circuit generally disfavor motions to strike class allegations before a class certification motion is filed. *Ironforge.com v. Paychex, Inc.*, 747 F. Supp. 2d 384, 404 (W.D.N.Y. 2010); *see also Carrasquillo v. Westech Sec. & Investigation Inc.*, No. 1:23-CV-04931 (MKV), 2024 WL 4227795, at *10 (S.D.N.Y. Sept. 17, 2024) (collecting cases). For the most part, the question of

whether to strike the class allegations requires a more developed record on the facts and law. *Mason v. Reed's Inc.*, 515 F. Supp. 3d 135, 148 (S.D.N.Y. 2021). An exception to this rule exists when the motion to strike "addresses issues separate and apart from the issues that will be decided on a class certification motion." *Chen-Oster v. Goldman, Sachs & Co.*, 877 F. Supp. 2d 113, 117 (S.D.N.Y. 2012) (citation omitted). Nevertheless, absent this circumstance, a motion to strike class allegations is generally "procedurally premature." *Id.*

In the present case, NTT challenges Plaintiffs' standing to represent the class, as well as the four common requirements of Fed. R. Civ. P. 23. In other words, NTT's motion to strike largely "mirror[s]" the inquiry that will occur at the class certification stage but has been filed before the benefit of discovery. *Andres v. Town of Wheatfield*, 621 F. Supp. 3d 415, 418–19 (W.D.N.Y. 2022) (quoting *Gill v. Nat'l Football League*, No. 21 CIV. 1032 (PAE), 2021 WL 5087900, at *4 (S.D.N.Y. Nov. 2, 2021)). Regardless of the relevance of NTT's arguments, the Court notes that it "is not bound by the class definition proposed in the complaint and should not dismiss the action simply because the complaint seeks to define the class too broadly." *Robidoux v. Celani*, 987 F.2d 931, 937 (2d Cir. 1993). Indeed, to the extent Plaintiffs' classes are defined too broadly in the FAC, "they may be amended either by Plaintiffs or the court at the class certification stage rather than being stricken by the court pre-discovery." *Andres*, 621 F. Supp. 3d at 419.

Accordingly, the motion to strike the class action allegations is denied without prejudice to renewal in connection with a motion for class action certification.

**CONCLUSION**

For the foregoing reasons, NTT's motion to dismiss [ECF No. 57] is GRANTED in part, and DENIED in part. Accordingly, it is hereby

ORDERED that Plaintiffs' fourth cause of action for a violation of New York General Business Law § 380-g(d) is dismissed; and it is further

ORDERED that Plaintiffs' third cause of action under the NYSHRL and Article 23-A of New York Corrections law shall be limited to claims arising after August 15, 2015; and it is further

ORDERED that NTT shall file and serve its answer on Plaintiffs' remaining claims on or before thirty (30) days from the date of this order.

Dated: July 28, 2025
Rochester, New York

ENTER:

HON. MEREDITH A. VACCA
United States District Judge